No. 20-2129

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

DUSTIN JOHN HIGGS,
*PETITIONER-APPELLANT,*

V.

T. J. WATSON, WARDEN,
*RESPONDENT-APPELLEE.*

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:16-cv-321, Hon. Jane Magnus-Stinson, Chief J.

## APPENDIX TO BRIEF FOR APPELLANT

Volume II

Leigh Skipper, Esq.
Chief Federal Defender
Matthew Lawry
Aren Adjoian
Cristi Charpentier
Elizabeth Hadayia
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Stephen H. Sachs
Wilmer Cutler Pickering Hale
& Dorr, LLP
5 Roland Mews
Baltimore, MD 21210
410-532-8405

Dated: September 25, 2020

# Index to Appendix

## Volume 1

District Court Order Denying Petition For Writ of Habeas Corpus, April 30, 2020 ................................................................................................ APP-001

## Volume II

*United States v. Higgs*, 353 F. 3.d 281 (4th Cir 2003) .................................. APP-008

*United States v. Higgs*, 95 F. App'x 37 (4th Cir. 2004) ................................. APP-080

*United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010) .......................... APP-091

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) .................................. APP-163

*United States v. Higgs*, Crim. No. PJM-98-0520, Civ. No. PJM-05-3180, 2016 WL 3541387 (D. Md.June 29, 2016) ................................................................................................ APP-187

*In re Higgs*, No. 16-8, Order (4th Cir. June 27, 2016).................................. APP-204

*In re Haynes*, No. 16-9516, Order (4th Cir. July 25, 2016) ........................... APP-206

## Volume III

*In re Higgs*, No. 20-2, Order (4th Cir. Feb. 6, 2020) .................................... APP-209

*United States v. Higgs*, Crim. No. PJM-98-520 (D. Md.), Second Superseding Indictment.................................................................................................. APP-210

*United States v. Higgs*, Crim. No. PJM-98-0520 (D. Md.), Tr. 10/10/2000, Excerpts..................................................................................................... APP-225

*United States v. Higgs*, Crim. No. PJM-98-0520, Verdict Form.................... APP-230

*United States v. Higgs*, Crim. No. PJM-98-0520 (D. Md.), Judgment and Order (Jan. 9, 2001) ............................................................................................. APP-233

*In re Higgs*, No. 16-8, Government's Opposition to Defendant's Application to File Successive § 2255 Mot. (4th Cir. June 3, 2016) .................................... APP-245

*In re Higgs*, No. 20-2, Resp. in Opposition of Respondent's United States of America (4th Cir. Jan. 28, 2020) ................................................................. APP-317



353 F.3d 281
(Cite as: 353 F.3d 281)

▷

United States Court of Appeals,
Fourth Circuit.
UNITED STATES of America,
Plaintiff-Appellee,
v.
Dustin John HIGGS, Defendant-Appellant.
**No. 01-3.**

Argued: June 4, 2003.
Decided: Dec. 22, 2003.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, J., of three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, three counts of kidnapping resulting in death, and three counts of using a firearm during and in relation to a crime of violence, and sentenced to death, and he appealed.

**Holdings:** The Court of Appeals, Traxler, Circuit Judge, held that:
(1) "multiple killings" aggravator could not act as the sole statutory aggravator which rendered murders death-eligible under Federal Death Penalty Act (FDPA) since "multiple killings" was not added to the FDPA as a statutory aggravating factor until three months after the murders were committed;
(2) prior conviction aggravators, which supported a death sentence for all murder and

kidnapping charges, were not required to be alleged in the indictment;
(3) denial of defendant's motion for a change of venue was not an abuse of discretion;
(4) evidence of defendant's participation in nightclub shooting which took place approximately two months before the murders was admissible in murder trial to link defendant to the same caliber weapon that witness testified defendant owned;
(5) evidence was sufficient to convict defendant of first-degree premeditated murder of three victims;
(6) prior drug conviction aggravator of FDPA encompassed all predicate convictions occurring prior to sentencing, even those occurring after the conduct giving rise to the capital charges;
(7) FDPA did not violate the Eighth Amendment; and
(8) evidence of defendant's prison infractions was properly admitted as rebuttal to his mitigation case.

Affirmed.

West Headnotes

**[1] Indictment and Information 210 ☞ 2(.5)**

210 Indictment and Information
   210I Necessity of Indictment or Presentment
       210k2 Constitutional and Statutory Provisions
       210k2(.5) k. In general. Most Cited Cases
Purpose of Indictment Clause of the Fifth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Amendment is to ensure that a defendant's jeopardy is limited to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. U.S.C.A. Const.Amend. 5.

**[2] Indictment and Information 210 71.2(2)**

210 Indictment and Information
    210V Requisites and Sufficiency of Accusation
       210k71 Certainty and Particularity
       210k71.2 Purpose of Requirement and Test of Compliance
        210k71.2(2) k. Informing accused of nature of charge. Most Cited Cases

**Indictment and Information 210 71.2(4)**

210 Indictment and Information
    210V Requisites and Sufficiency of Accusation
       210k71 Certainty and Particularity
       210k71.2 Purpose of Requirement and Test of Compliance
        210k71.2(4) k. Protection against subsequent prosecution. Most Cited Cases

**Indictment and Information 210 71.3**

210 Indictment and Information
    210V Requisites and Sufficiency of Accusation

210k71 Certainty and Particularity
    210k71.3 k. Acts constituting and elements and incidents of offense, allegations as to. Most Cited Cases
Indictment Clause provides the right of a defendant to be notified of the charges against him through a recitation of the elements, and the right to a description of the charges that is sufficiently detailed to allow the defendant to argue that future proceedings are precluded by a previous acquittal or conviction. U.S.C.A. Const.Amend. 5.

**[3] Jury 230 34(6)**

230 Jury
    230II Right to Trial by Jury
       230k30 Denial or Infringement of Right
       230k34 Restriction or Invasion of Functions of Jury
       230k34(5) Sentencing Matters
       230k34(6) k. In general. Most Cited Cases
(Formerly 350Hk322, 230k34(1))
With the exception of the fact of a prior conviction, a defendant may not be exposed to a penalty exceeding the statutory maximum he would receive if punished according to the facts reflected in the jury's verdict alone.

**[4] Jury 230 34(6)**

230 Jury
    230II Right to Trial by Jury
       230k30 Denial or Infringement of Right
       230k34 Restriction or Invasion of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Functions of Jury

230k34(5) Sentencing Matters

230k34(6) k. In general. Most Cited Cases

(Formerly 350Hk322, 230k34(1))

In determining whether a particular fact is to be treated as an element of the offense for *Apprendi* purposes, as opposed to a sentencing factor, the relevant inquiry is one not of form, but of effect-whether the required finding exposes the defendant to a greater punishment than that authorized by the jury's guilty verdict.

**[5] Indictment and Information 210 ⚷ 113**

210 Indictment and Information

210V Requisites and Sufficiency of Accusation

210k113 k. Matter of aggravation in general. Most Cited Cases

**Jury 230 ⚷ 34(9)**

230 Jury

230II Right to Trial by Jury

230k30 Denial or Infringement of Right

230k34 Restriction or Invasion of Functions of Jury

230k34(5) Sentencing Matters

230k34(9) k. Death penalty. Most Cited Cases

(Formerly 230k34(1))

**Sentencing and Punishment 350H ⚷ 1771**

350H Sentencing and Punishment

350HVIII The Death Penalty

350HVIII(G) Proceedings

350HVIII(G)2 Evidence

350Hk1771 k. Degree of proof. Most Cited Cases

Intent and aggravating factors which the government intends to rely upon to render a defendant death-eligible under Federal Death Penalty Act (FDPA) are the functional equivalent of elements of the capital offenses and must be charged in the indictment, submitted to the petit jury, and proved beyond a reasonable doubt. 18 U.S.C.A. §§ 3591(a)(2), 3592(c).

**[6] Indictment and Information 210 ⚷ 113**

210 Indictment and Information

210V Requisites and Sufficiency of Accusation

210k113 k. Matter of aggravation in general. Most Cited Cases

Indictment Clause does not require that nonstatutory aggravators relied upon by the government at trial of the capital offenses be included in the indictment since nonstatutory aggravating factors do not increase the available punishment to which a defendant might be subjected; rather, the purpose of nonstatutory aggravators is to aid the factfinder in selecting the appropriate sentence from the available options, i.e., death or life imprisonment. 18 U.S.C.A. §§ 3591(a)(2), 3592(c).

**[7] Indictment and Information 210 ⚷ 113**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

**210** Indictment and Information

**210V** Requisites and Sufficiency of Accusation

**210k113** k. Matter of aggravation in general. Most Cited Cases

For purposes of rendering defendant death-eligible under Federal Death Penalty Act (FDPA), indictment for capital crimes of first-degree murder and kidnapping sufficiently alleged that defendant engaged in intentional acts to take the lives of the three victims and intentional acts of violence that created a grave risk of death to the three victims. 18 U.S.C.A. § 3591(a)(2).

**[8] Indictment and Information 210 ⚷ 113**

**210** Indictment and Information

**210V** Requisites and Sufficiency of Accusation

**210k113** k. Matter of aggravation in general. Most Cited Cases

Because only one statutory aggravating factor is required under Federal Death Penalty Act (FDPA) to render a defendant death-eligible, indictment need only allege one such aggravating factor; there is no requirement that the indictment allege all of the factors that might be weighed by the jury when deciding whether to impose a death sentence. 18 U.S.C.A. § 3593(d, e).

**[9] Constitutional Law 92 ⚷ 2789**

**92** Constitutional Law

**92XXIII** Ex Post Facto Prohibitions

**92XXIII(A)** Constitutional Prohibitions in General

**92k2789** k. Penal laws in general. Most Cited Cases

(Formerly 92k197)

**Constitutional Law 92 ⚷ 2790**

**92** Constitutional Law

**92XXIII** Ex Post Facto Prohibitions

**92XXIII(A)** Constitutional Prohibitions in General

**92k2790** k. Punishment in general. Most Cited Cases

(Formerly 92k197)

**Constitutional Law 92 ⚷ 2810**

**92** Constitutional Law

**92XXIII** Ex Post Facto Prohibitions

**92XXIII(B)** Particular Issues and Applications

**92k2809** Criminal Proceedings

**92k2810** k. In general. Most Cited Cases

(Formerly 92k197)

Any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto; Ex Post Facto Clause prohibits laws that retroactively alter the definition of crimes or increase the punishment for criminal acts.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

U.S.C.A. Const. Art. 1, § 9.

**[10] Constitutional Law 92 🗝 2784**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2784 k. Purpose. Most Cited Cases
    (Formerly 92k203, 92k197)

**Constitutional Law 92 🗝 2790**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2790 k. Punishment in general. Most Cited Cases
    (Formerly 92k203, 92k197)
Although the prohibition against the use of ex post facto laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed, it does assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed; Clause operates to forbid the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. U.S.C.A. Const. Art. 1, § 9.

**[11] Constitutional Law 92 🗝 2784**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2784 k. Purpose. Most Cited Cases
    (Formerly 92k203)

**Constitutional Law 92 🗝 2790**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(A) Constitutional Prohibitions in General
            92k2790 k. Punishment in general. Most Cited Cases
    (Formerly 92k203)
Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. U.S.C.A. Const. Art. 1, § 9.

**[12] Constitutional Law 92 🗝 2815**

92 Constitutional Law
    92XXIII Ex Post Facto Prohibitions
        92XXIII(B) Particular Issues and Applications
            92k2814 Sentencing and Imprisonment
            92k2815 k. In general. Most Cited Cases
    (Formerly 92k203)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

**Sentencing and Punishment 350H** ☜ **1634**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(A) In General
            350Hk1631 Retroactive Operation
                350Hk1634 k. Validity of particular retroactive applications. Most Cited Cases
Under Ex Post Facto Clause, "multiple killings" aggravator could not act as the sole statutory aggravator which rendered murders death-eligible under Federal Death Penalty Act (FDPA) since "multiple killings" was not added to the FDPA as a statutory aggravating factor until three months after the murders were committed. U.S.C.A. Const. Art. 1, § 9; 18 U.S.C.A. § 3592(c)(16).

**[13] Indictment and Information 210** ☜ **113**

210 Indictment and Information
      210V Requisites and Sufficiency of Accusation
        210k113 k. Matter of aggravation in general. Most Cited Cases
Indictment was not defective as to capital murder charges because it sufficiently alleged the "death during commission of another crime" aggravator; however, aggravator could not suffice to render the indictment sufficient for purposes of the capital counts for kidnapping resulting in death charged since it was only submitted to the jury in connection with the first-degree murder counts.

**[14] Indictment and Information 210** ☜ **113**

210 Indictment and Information
      210V Requisites and Sufficiency of Accusation
        210k113 k. Matter of aggravation in general. Most Cited Cases
Prior conviction aggravators, which supported a death sentence for all murder and kidnapping charges, were not required to be alleged in the indictment. U.S.C.A. Const.Amend. 5.

**[15] Criminal Law 110** ☜ **1167(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
           110k1167 Rulings as to Indictment or Pleas
                110k1167(1) k. Indictment or information in general. Most Cited Cases
Even if indictment was defective because it failed to allege the requisite statutory aggravating factor or factors ultimately relied upon by the jury to impose a sentence of death, such error was not a structural error that mandated summary reversal of defendant's capital convictions; rather, such error was harmless because it appeared beyond a reasonable doubt that the error did not contribute to the verdict obtained. U.S.C.A. Const.Amend. 5.

**[16] Criminal Law 110** ☜ **1162**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

**110** Criminal Law
    **110XXIV** Review
        **110XXIV(Q)** Harmless and Reversible Error
           **110k1162** k. Prejudice to rights of party as ground of review. Most Cited Cases
Unlike the vast majority of trial errors which are reviewed for harmlessness, structural errors are conclusively presumed to affect the substantial rights of the defendant because they deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair.

**[17] Criminal Law 110**   **1150**

**110** Criminal Law
    **110XXIV** Review
        **110XXIV(N)** Discretion of Lower Court
           **110k1150** k. Change of venue. Most Cited Cases
District court's denial of a motion for a change of venue is reviewed for abuse of discretion. Fed.Rules Cr.Proc.Rule 21(a), 18 U.S.C.A.

**[18] Criminal Law 110**   **134(1)**

**110** Criminal Law
    **110IX** Venue
        **110IX(B)** Change of Venue
           **110k129** Application
               **110k134** Affidavits and Other Proofs
                   **110k134(1)** k. In general. Most

Cited Cases
Only in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself.

**[19] Criminal Law 110**   **126(2)**

**110** Criminal Law
    **110IX** Venue
        **110IX(B)** Change of Venue
           **110k123** Grounds for Change
               **110k126** Local Prejudice
                   **110k126(2)** k. Particular offenses. Most Cited Cases
District court's denial of defendant's motion for a change of venue was not an abuse of discretion; although there was a large amount of media coverage when the murders occurred four years before trial, that coverage, which was not highly inflammatory, did not rise to the level necessary to require a change of venue, and voir dire of the jury members failed to demonstrate that an impartial jury could not be seated. Fed.Rules Cr.Proc.Rule 21(a), 18 U.S.C.A.

**[20] Criminal Law 110**   **126(1)**

**110** Criminal Law
    **110IX** Venue
        **110IX(B)** Change of Venue
           **110k123** Grounds for Change
               **110k126** Local Prejudice
                   **110k126(1)** k. In general. Most Cited Cases
District court may order a change of venue if voir dire reveals that an impartial jury cannot be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

impaneled due to actual prejudice of the venire members; to demonstrate actual prejudice, defendant must show that a prospective juror has formed an pre-trial opinion that the defendant is guilty and cannot lay aside his impression or opinion and render a verdict based on the evidence presented in court. Fed.Rules Cr.Proc.Rule 21(a), 18 U.S.C.A.

**[21] Criminal Law 110** 🗝 **407(1)**

110 Criminal Law
 110XVII Evidence
  110XVII(L) Admissions
   110k405 Admissions by Accused
    110k407 Acquiescence or Silence
     110k407(1) k. In general. Most Cited Cases
A party may manifest adoption of another's statement in any number of ways, including through words, conduct, or silence. Fed.Rules Evid.Rule 801(d)(2)(B), 28 U.S.C.A.

**[22] Criminal Law 110** 🗝 **407(1)**

110 Criminal Law
 110XVII Evidence
  110XVII(L) Admissions
   110k405 Admissions by Accused
    110k407 Acquiescence or Silence
     110k407(1) k. In general. Most Cited Cases
Defendant's silence, during telephone conversation, to jailhouse friend's reading of newspaper article reporting that shooter claimed that he only shot victims because he was afraid

of defendant could be admitted as an adoptive admission; defendant and friend were freely discussing the trial of shooter and the accusations made against defendant in the course of those proceedings, defendant not only heard and understood the statements made by friend, but commented upon them to some extent, and thus, district court appropriately allowed the jury the opportunity to conclude, as instructed, either that defendant would have made his disagreement known if such existed or that he chose to remain silent because of the knowledge that he was being recorded. Fed.Rules Evid.Rule 801(d)(2)(B), 28 U.S.C.A.

**[23] Criminal Law 110** 🗝 **369.2(1)**

110 Criminal Law
 110XVII Evidence
  110XVII(F) Other Offenses
   110k369 Other Offenses as Evidence of Offense Charged in General
    110k369.2 Evidence Relevant to Offense, Also Relating to Other Offenses in General
     110k369.2(1) k. In general. Most Cited Cases
"Other crimes" evidence is admissible if (1) it is relevant to an issue, such as an element of an offense, and is not offered to establish the general character of the defendant; (2) it is necessary in the sense that it is probative of an essential claim or an element of the offense; (3) it is reliable; and (4) its probative value is not substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process. Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

**[24] Criminal Law 110** 🔑 **369.2(4)**

110 Criminal Law
    110XVII Evidence
        110XVII(F) Other Offenses
            110k369 Other Offenses as Evidence of Offense Charged in General
                110k369.2 Evidence Relevant to Offense, Also Relating to Other Offenses in General
                    110k369.2(3) Particular Offenses, Prosecutions for
                    110k369.2(4) k. Assault, homicide, abortion and kidnapping. Most Cited Cases

**Criminal Law 110** 🔑 **369.15**

110 Criminal Law
    110XVII Evidence
        110XVII(F) Other Offenses
            110k369 Other Offenses as Evidence of Offense Charged in General
                110k369.15 k. Evidence of other offenses to prove identity. Most Cited Cases
Evidence of defendant's participation in nightclub shooting which took place approximately two months before the murders was admissible in murder trial to link defendant to the same caliber weapon that witness testified defendant owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon; additionally, the evidence was admissible under "other crimes" evidence rule 404(b) as it and other evidence placed the murder weapon, which was disposed of in the river and never found, in defendant's hand a short time before the murders and, therefore, served the necessary function of proving his identity as one of the murderers and his use of the firearm in connection with the murders. Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

**[25] Criminal Law 110** 🔑 **371(4)**

110 Criminal Law
    110XVII Evidence
        110XVII(F) Other Offenses
            110k371 Acts Showing Intent or Malice or Motive
                110k371(4) k. In prosecutions for homicide. Most Cited Cases

**Criminal Law 110** 🔑 **371(12)**

110 Criminal Law
    110XVII Evidence
        110XVII(F) Other Offenses
            110k371 Acts Showing Intent or Malice or Motive
                110k371(12) k. Motive. Most Cited Cases
Evidence of defendant's participation in unrelated bank fraud scheme and death threats that defendant issued when he became concerned that his partners in the fraud scheme might "snitch" on him were admissible in murder trial to show defendant's motive and intent to murder victim to likewise keep her from taking steps that might implement him in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

criminal activities or otherwise harm him in some way. Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

**[26] Homicide 203 ⚷ 1165**

203 Homicide
   203IX Evidence
      203IX(G) Weight and Sufficiency
         203k1162 Homicide in Commission of or with Intent to Commit Other Unlawful Act
         203k1165 k. Predicate offenses or conduct. Most Cited Cases

**Kidnapping 231E ⚷ 36**

231E Kidnapping
   231Ek33 Evidence
      231Ek36 k. Weight and sufficiency. Most Cited Cases
   (Formerly 232k5)
Evidence was sufficient to convict defendant of kidnapping the victims and first-degree murder occurring during the perpetration of a kidnapping; evidence supported the conclusion that defendant confined victims in van under the pretense of taking them home and then stopped on the side of the road against their wishes, held and ultimately killed the women to avenge defendant's fight with one victim, or perhaps to retaliate against victim for an earlier action or threat she had made, and to prevent victim and her friends from retaliating against defendant. 18 U.S.C.A. §§ 1111(a), 1201.

**[27] Homicide 203 ⚷ 1180**

203 Homicide
   203IX Evidence
      203IX(G) Weight and Sufficiency
         203k1176 Commission of or Participation in Act by Accused; Identity
         203k1180 k. Participation in crime committed by another. Most Cited Cases

**Homicide 203 ⚷ 1185**

203 Homicide
   203IX Evidence
      203IX(G) Weight and Sufficiency
         203k1176 Commission of or Participation in Act by Accused; Identity
         203k1185 k. Motive. Most Cited Cases
Evidence was sufficient to convict defendant of first-degree premeditated murder of three victims based on defendant's handing of the murder weapon to shooter mere moments before victims were shot and killed and evidence indicating that the murders were motivated by defendant's fight with one victim and her copying down defendant's license plate number. 18 U.S.C.A. § 1111(a).

**[28] Weapons 406 ⚷ 294(5)**

406 Weapons
   406V Prosecution
      406V(E) Weight and Sufficiency of Evidence

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

**406k289** Possession, Use, Carrying
**406k294** Use or Possession in Commission of Crime
**406k294(5)** k. Use and manner of use. Most Cited Cases
(Formerly 406k17(4))
Evidence that defendant retrieved gun from a drawer in his apartment before leaving the apartment to pursue the three murder victims and kept the gun in his possession until after he had pulled off the road and instructed the victims to get out of the van, after which they were shot and killed, was sufficient to support defendant's conviction for firearm violations. 18 U.S.C.A. § 924(c).

**[29]** **Sentencing and Punishment 350H 1618**

**350H** Sentencing and Punishment
**350HVIII** The Death Penalty
**350HVIII(A)** In General
**350Hk1613** Requirements for Imposition
**350Hk1618** k. Narrowing class of eligible offenders. Most Cited Cases
"Narrowing function" of aggravating factor mandated by the Eighth Amendment in death penalty cases may be performed by jury findings at either the sentencing phase of the trial or the guilt phase. U.S.C.A. Const.Amend. 8.

**[30]** **Sentencing and Punishment 350H 1660**

**350H** Sentencing and Punishment

**350HVIII** The Death Penalty
**350HVIII(C)** Factors Affecting Imposition in General
**350Hk1660** k. Dual use of evidence or aggravating factor. Most Cited Cases
Eighth Amendment does not prohibit the use of an aggravating factor during the sentencing phase that duplicates one or more elements of the offense of the crime found at the guilt phase. U.S.C.A. Const.Amend. 8.

**[31]** **Sentencing and Punishment 350H 1705**

**350H** Sentencing and Punishment
**350HVIII** The Death Penalty
**350HVIII(E)** Factors Related to Offender
**350Hk1703** Other Offenses, Charges, Misconduct
**350Hk1705** k. Nature, degree, or seriousness of other offense. Most Cited Cases
Although use of a firearm was not a specific element of the Maryland offenses of assault and reckless endangerment to which defendant pled guilty, and defendant did not specifically admit the use of a firearm during the incident, district court did not err in submitting as a statutory aggravating factor in federal death penalty case fact that defendant had been previously convicted of a violent felony involving a firearm. 18 U.S.C.A. § 3592(c)(2).

**[32]** **Sentencing and Punishment 350H 1704**

**350H** Sentencing and Punishment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

350HVIII The Death Penalty

350HVIII(E) Factors Related to Offender

350Hk1703 Other Offenses, Charges, Misconduct

350Hk1704 k. In general. Most Cited Cases

Prior drug conviction aggravator of Federal Death Penalty Act (FDPA) encompassed all predicate convictions occurring prior to sentencing, even those occurring after the conduct giving rise to the capital charges. 18 U.S.C.A. § 3592(c)(12).

**[33]** **Sentencing and Punishment 350H 1789(9)**

350H Sentencing and Punishment

350HVIII The Death Penalty

350HVIII(G) Proceedings

350HVIII(G)4 Determination and Disposition

350Hk1789 Review of Proceedings to Impose Death Sentence

350Hk1789(9) k. Harmless and reversible error. Most Cited Cases

Even if prior drug conviction aggravator of Federal Death Penalty Act (FDPA) was improperly submitted for consideration, the error was harmless; prior drug offense aggravator was only one of six aggravating factors submitted to and found by the jury in support of death sentence, and jury found only three mitigating factors. 18 U.S.C.A. § 3592(c)(12).

**[34]** **Sentencing and Punishment 350H 1625**

350H Sentencing and Punishment

350HVIII The Death Penalty

350HVIII(A) In General

350Hk1622 Validity of Statute or Regulatory Provision

350Hk1625 k. Aggravating or mitigating circumstances. Most Cited Cases

Federal Death Penalty Act (FDPA) did not violate Eighth and Fourteenth Amendments merely because it allowed the sentencing jury to weigh nonstatutory aggravating factors when deciding whether to impose the sentence of death upon a defendant convicted of a death-eligible offense. U.S.C.A. Const.Amends. 8, 14; 18 U.S.C.A. § 3592.

**[35]** **Sentencing and Punishment 350H 1627**

350H Sentencing and Punishment

350HVIII The Death Penalty

350HVIII(A) In General

350Hk1622 Validity of Statute or Regulatory Provision

350Hk1627 k. Review. Most Cited Cases

Federal Death Penalty Act (FDPA) did not violate the Eighth Amendment because it does not require proportionality review. U.S.C.A. Const.Amend. 8; 18 U.S.C.A. § 3592.

**[36] Constitutional Law 92 2415(2)**

92 Constitutional Law

92XX Separation of Powers

92XX(B) Legislative Powers and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Functions
92XX(B)4 Delegation of Powers
92k2410 To Executive, Particular Issues and Applications
92k2415 Criminal Law
92k2415(2) k. Prosecutors. Most Cited Cases
(Formerly 92k62(5.1))

**Sentencing and Punishment 350H** 🔑 **1623**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(A) In General
350Hk1622 Validity of Statute or Regulatory Provision
350Hk1623 k. In general. Most Cited Cases
Federal Death Penalty Act (FDPA) did not impermissibly delegate legislative power to government prosecutors in violation of the separation-of-powers doctrine. 18 U.S.C.A. § 3592.

**[37] Constitutional Law 92** 🔑 **2815**

92 Constitutional Law
92XXIII Ex Post Facto Prohibitions
92XXIII(B) Particular Issues and Applications
92k2814 Sentencing and Imprisonment
92k2815 k. In general. Most Cited Cases
(Formerly 92k203)

**Sentencing and Punishment 350H** 🔑 **1625**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(A) In General
350Hk1622 Validity of Statute or Regulatory Provision
350Hk1625 k. Aggravating or mitigating circumstances. Most Cited Cases
Federal Death Penalty Act (FDPA) did not violate the Ex Post Facto Clause because it allowed the prosecution to define aggravating factors after the crime was committed; although aggravating factors made more burdensome the punishment for the crime, nonstatutory aggravating factors and mitigating factors were weighed by the jury to make the individualized determination to impose the death sentence upon a defendant who has already been found eligible, and did not increase the possible punishment or alter the elements of the offense. U.S.C.A. Const. Art. 1, § 9; 18 U.S.C.A. § 3592.

**[38] Sentencing and Punishment 350H** 🔑 **1707**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(E) Factors Related to Offender
350Hk1703 Other Offenses, Charges, Misconduct
350Hk1707 k. Unadjudicated conduct. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1744**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

**350H** Sentencing and Punishment
    **350HVIII** The Death Penalty
        **350HVIII(G)** Proceedings
            **350HVIII(G)1** In General
                **350Hk1744** k. Notice of sentencing factors. Most Cited Cases

District court did not err in admitting evidence of an uncharged and unadjudicated offense of obstruction of justice for jury's consideration as a nonstatutory aggravating factor in federal death penalty case where government gave defendant appropriate notice that it would pursue obstruction of justice as an additional, nonstatutory aggravator; defendant's destruction of evidence and tampering with witnesses in order to cover his tracks, impede the investigation into the murders, and increase his chances of being acquitted were highly relevant aggravating circumstances which were properly submitted to the jury. 18 U.S.C.A. § 3592(c) .

**[39]** **Sentencing and Punishment 350H 1789(3)**

**350H** Sentencing and Punishment
    **350HVIII** The Death Penalty
        **350HVIII(G)** Proceedings
            **350HVIII(G)4** Determination and Disposition
                **350Hk1789** Review of Proceedings to Impose Death Sentence
                **350Hk1789(3)** k. Presentation and reservation in lower court of grounds of review. Most Cited Cases

Even if the introduction during capital sentencing proceeding of out-of-court statements of triggerman was error, the error was not plain since it was unclear whether the Confrontation Clause applied, and the statements were merely corroborative of eyewitness testimony regarding defendant's and triggerman's acts of disposing of physical evidence. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3593(c).

**[40]** **Sentencing and Punishment 350H 1762**

**350H** Sentencing and Punishment
    **350HVIII** The Death Penalty
        **350HVIII(G)** Proceedings
            **350HVIII(G)2** Evidence
                **350Hk1755** Admissibility
                    **350Hk1762** k. Other offenses, charges, or misconduct. Most Cited Cases

Evidence pertaining to prior shooting incident was relevant to the obstruction aggravator in sentencing phase of capital murder trial because it reflected defendant's attempts to dissociate himself from the bullet in the prior shooting that was tied to victims' deaths; while forensic evidence could not establish an exact match between the bullets examined from the murders and the prior shooting, the bullets all had the same land and groove impressions, consistent with being fired from the same .38 caliber weapon.

**[41] Constitutional Law 92 ☞ 4557**

**92** Constitutional Law
    **92XXVII** Due Process
        **92XXVII(H)** Criminal Law
            **92XXVII(H)4** Proceedings and Trial
                **92k4557** k. Course and conduct of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

proceedings in general. Most Cited Cases
(Formerly 92k257)

In some situations, the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants. U.S.C.A. Const.Amend. 5.

**[42] Constitutional Law 92 ⚷ 4629**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4627 Conduct and Comments of Counsel; Argument
                    92k4629 k. Prosecutor. Most Cited Cases
(Formerly 92k268(8))

**Criminal Law 110 ⚷ 1985**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)1 In General
                110k1985 k. Miscellaneous particular issues. Most Cited Cases
(Formerly 110k700(1))

District court did not violate defendant's rights to due process and a fair murder trial by denying his motion to preclude the government from offering the contrary argument that defendant was more culpable than triggerman, and denying his motion to introduce arguments made by the government during triggerman's trial about the relative culpability of the two men; the argument that triggerman was a "partner in crime" with defendant because he could have chosen not to murder the victims was not inconsistent with the argument that defendant was more culpable because he brought the murder weapon to the scene and told triggerman to do it. U.S.C.A. Const.Amend. 5.

**[43] Sentencing and Punishment 350H ⚷ 1757**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)2 Evidence
                350Hk1755 Admissibility
                    350Hk1757 k. Evidence in mitigation in general. Most Cited Cases

**Sentencing and Punishment 350H ⚷ 1784(1)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)4 Determination and Disposition
                350Hk1784 Verdict or Recommendation of Jury
                350Hk1784(1) k. In general. Most Cited Cases

Constitution only requires that the jury be allowed to consider evidence that is proffered as mitigating; there is no constitutional requirement that the jury find a mitigating factor even when

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

it is supported by uncontradicted evidence.

**[44] Sentencing and Punishment 350H** 🔑 **1655**

350H Sentencing and Punishment
 350HVIII The Death Penalty
  350HVIII(C) Factors Affecting Imposition in General
   350Hk1655 k. Sentence or disposition of co-participant or codefendant. Most Cited Cases
Jury's failure to find that triggerman's life sentence was a mitigating factor for defendant was supported by the evidence in capital murder trial; a rational juror could well have found that defendant had the dominant role in the murders and, therefore, that defendant and triggerman were not "equally culpable in the crime." 18 U.S.C.A. § 3592(a)(4).

**[45] Sentencing and Punishment 350H** 🔑 **1721**

350H Sentencing and Punishment
 350HVIII The Death Penalty
  350HVIII(E) Factors Related to Offender
   350Hk1721 k. Other matters related to offender. Most Cited Cases
Defendant's unknowing presence within federal jurisdiction, as opposed to the jurisdiction of the State of Maryland where he would have been ineligible for a death sentence, was not a circumstance that mitigated against imposition of the death sentence. 18 U.S.C.A. § 3592(a).

**[46] Criminal Law 110** 🔑 **683(1)**

110 Criminal Law
 110XX Trial
  110XX(C) Reception of Evidence
   110k683 Scope of Evidence in Rebuttal
    110k683(1) k. In general. Most Cited Cases
When otherwise inadmissible, rebuttal evidence must be reasonably tailored to the evidence it seeks to refute.

**[47] Sentencing and Punishment 350H** 🔑 **1762**

350H Sentencing and Punishment
 350HVIII The Death Penalty
  350HVIII(G) Proceedings
   350HVIII(G)2 Evidence
    350Hk1755 Admissibility
     350Hk1762 k. Other offenses, charges, or misconduct. Most Cited Cases
Evidence of defendant's prison infractions was properly admitted as rebuttal to his mitigation case; by presenting mitigation evidence directed in part to establish that defendant was attempting to stay out of trouble while incarcerated and that he was and intended to continue to be a good influence on his son and his nephew from prison, defendant opened the door to the subject of his "staying out of trouble" in prison and the evidence of defendant's numerous infractions of prison rules at various facilities was reasonably tailored to refute the image defendant attempted to create in mitigation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

110k1171.1(2.1) k. In general. Most Cited Cases
Improper remarks during closing argument do not always mandate retrial; relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

**[48] Sentencing and Punishment 350H 1780(2)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)3 Hearing
          350Hk1780 Conduct of Hearing
          350Hk1780(2) k. Arguments and conduct of counsel. Most Cited Cases
Defendant failed to establish that government engaged in improper argument during its penalty phase summation and rebuttal that deprived him of a fair sentencing hearing; complained-of comments regarding jurors' duty to impose death were isolated, did not rise to the level of argument that might mislead or inflame the jury, and even if prosecutor's remarks regarding mercy and defendant's life in prison were improper, the statements did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. U.S.C.A. Const.Amend. 5.

**[49] Criminal Law 110 1171.1(2.1)**

110 Criminal Law
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1171 Arguments and Conduct of Counsel
          110k1171.1 In General
          110k1171.1(2) Statements as to Facts, Comments, and Arguments

**[50] Criminal Law 110 1171.1(2.1)**

110 Criminal Law
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1171 Arguments and Conduct of Counsel
          110k1171.1 In General
          110k1171.1(2) Statements as to Facts, Comments, and Arguments
          110k1171.1(2.1) k. In general. Most Cited Cases
In order to obtain a new trial on the basis of prosecutorial misconduct, a defendant must demonstrate (1) that the government's remarks were in fact improper and (2) that the remarks prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. U.S.C.A. Const.Amend. 5.

**[51] Criminal Law 110 1171.1(2.1)**

110 Criminal Law
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1171 Arguments and Conduct of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Counsel

110k1171.1 In General

110k1171.1(2) Statements as to Facts, Comments, and Arguments

110k1171.1(2.1) k. In general. Most Cited Cases

Factors considered in evaluating prejudice resulting from improper argument are: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. U.S.C.A. Const.Amend. 5.

**[52] Criminal Law 110 ⚷ 2091**

110 Criminal Law
110XXXI Counsel
110XXXI(F) Arguments and Statements by Counsel
110k2088 Matters Not Sustained by Evidence
110k2091 k. Personal knowledge, opinion, or belief of counsel. Most Cited Cases
(Formerly 110k719(3))

As a general premise, a prosecutor's repeated references to his or her personal opinion about a defendant may be found improper; however, a prosecutor's use of the phrase "I think" in an innocuous, conversational sense does not violate due process because such use does not suggest an attempt to replace the evidence with the prosecutor's personal judgments. U.S.C.A. Const.Amend. 5.

**[53] Sentencing and Punishment 350H ⚷ 604**

350H Sentencing and Punishment
350HIII Sentence on Conviction of Different Charges
350HIII(B) Consecutive or Cumulative Sentences
350HIII(B)3 Factors and Purposes
350Hk603 Offenses Committed in One Transaction, Episode, or Course of Conduct
350Hk604 k. In general. Most Cited Cases

Imposition of separate consecutive sentences for multiple firearms violations occurring during the same criminal episode were lawful. 18 U.S.C.A. § 924(c).

West Codenotes
Unconstitutional as Applied 18 U.S.C.A. § 3592(c)(16) **\*288** ARGUED: Timothy Joseph Sullivan, Sullivan & Sullivan, College Park, MD, for Appellant. Deborah A. Johnston, Assistant United States Attorney, Greenbelt, MD, for Appellee. ON BRIEF: Barbara L. Hartung, Richmond, Virginia, for Appellant.**\*289** Thomas M. DiBiagio, United States Attorney, Sandra Wilkinson, Assistant United States Attorney, Greenbelt, MD, for Appellee.

Before WILKINS, Chief Judge, and LUTTIG and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

TRAXLER wrote the opinion, in which Chief Judge WILKINS and Judge LUTTIG joined.

**OPINION**

TRAXLER, Circuit Judge:

During the early morning hours of January 27, 1996, Tanji Jackson, Tamika Black, and Mishann Chinn were found murdered in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Dustin John Higgs was subsequently convicted by a federal jury of three counts of first-degree premeditated murder, *see* 18 U.S.C.A. § 1111(a) (West 2000), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.,* and three counts of kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a)(2) (West 2000), all of which are punishable by life imprisonment or death. Higgs was also convicted of three counts of using a firearm "during and in relation to [a] crime of violence." 18 U.S.C.A. § 924(c) (West 2000). Ultimately, Higgs received nine death sentences under the Federal Death Penalty Act of 1994, *see* 18 U.S.C.A. § 3591-3598 (West 2000 & Supp.2003) (the "FDPA" or "Act"), one for each murder and kidnapping count, and a consecutive 45-year sentence for the firearm convictions. *See* 18 U.S.C.A. § 924(c)(1). On appeal, Higgs challenges his convictions and sentences on multiple grounds. Having considered all issues raised by Higgs on appeal, as well as the question of "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592," we find no reversible error. Accordingly, we affirm Higgs's convictions and the sentences of death imposed by the district court.

I. Background

A. The Murders

On Friday evening, January 26, 1996, Higgs, Willie Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up Tanji Jackson, Tamika Black, and Mishann Chinn. Higgs knew Jackson and they had arranged dates for Haynes and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.[FN1]

> FN1. After he was arrested in the fall of 1998 on federal charges of illegal distribution of crack cocaine, Victor Gloria agreed to cooperate with the government in the murder case against Higgs and Haynes. Most of the facts surrounding the murders of the three women were obtained from his eyewitness testimony. However, Gloria's testimony was partially corroborated by a friend of the Jackson family and Chinn's mother, both of whom observed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

the girls being picked up by a man or men in a blue Mazda MPV van. Gloria ultimately pled guilty to being an accessory after the fact to the murders and was sentenced to eighty-four months incarceration with three years supervised release.

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had **\*290** been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "[s]he stopped at the door and said something like I am going to get you all f---ed up or robbed" or made "some kind of threat." J.A. 473. In response, Higgs commented to the other two men that Jackson "do know a lot of n-----s." J.A. 474. As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh-." J.A. 474. Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f---- that, and grabbed his coat and said come on." J.A. 474. He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three men got into Higgs's van, with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore-Washington Parkway exit, which would have taken them directly into Washington, D.C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from [t]here," and Higgs responded, "something like that." J.A. 482. After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and heard a woman screaming.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," J.A. 485, and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. J.A. 487. The men then left the apartment and dropped the trash by a dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut." J.A. 489.

At about 4:30 a.m., a motorist found the bodies of the three women strewn about **\*291** the roadway and contacted the Park Police. Jackson's day planner was found at the scene with Higgs's nickname-"Bones"-and telephone number recorded in it. On another page was written "13801 'MAZDA' 769GRY"-Higgs's address number on Briarwood Drive and the tag number for his Mazda van. A .38 caliber wadcutter bullet was also found there. According to the medical examiner, Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of the head.

### B. The Investigation

Although Higgs was almost immediately a suspect, the investigation into the murders continued for nearly three years before an arrest was made. On March 21, 1996, Park Police officers first interviewed Higgs at his apartment. At that time, Higgs acknowledged that he knew Jackson and that he may have talked to her the night before she died, but he denied that she had ever been in his apartment. Higgs told the officers that he first heard about the murders while watching the ten o'clock news on Saturday, January 27, while attending a party at the home of Phyllis Smith, who was his girlfriend at the time. Higgs also told the officers that he had immediately commented to a party guest that he thought he knew "that Tanji girl." J.A. 672. According to the chief investigator, however, the names and photographs of the three victims were not released to the media until January 28.

After the interview of Higgs was concluded, the officers executed an arrest and search warrant arising from Higgs's suspected involvement in unrelated bank fraud violations. In addition to a variety of documents and cash bundles, the officers seized crack cocaine, a .380 semiautomatic firearm, and boxes of ammunition for .380, .45 and .38 caliber weapons. Higgs was arrested on federal drug charges and, on May 12, 1997, pled guilty to possession with intent to distribute cocaine base. He was ultimately sentenced to seventeen years imprisonment for the charge. Higgs has remained in the custody of either state or federal law enforcement officials since that arrest.

After Higgs was interviewed and arrested, the Park Police turned their attention to Phyllis

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Smith. Smith initially provided a false alibi for Higgs on the night of the murders. She claimed that Higgs had been with her and her family members the entire night of January 26, helping her clean her home in preparation for the party that was to be held the following night. She also instructed her family members to confirm the alibi. In April 1996, however, Smith testified before the grand jury that Higgs was only with her at 5 a.m. on January 27.

Ultimately, Smith recanted both accounts. She testified that Higgs called her when he was arrested in March 1996 and asked her to tell officials that he had been with her the entire night of January 26. She did as she was instructed, but believed at the time that she was being interviewed in connection with the drug charges that had been filed against Higgs. When Smith later learned that the questions pertained to the triple murder investigation, Higgs told her that he did not know the murdered women, but that Haynes had known them. When Smith was called before the grand jury in late 1998, she admitted her earlier lies about Higgs's whereabouts that night. Although she and several of her family members had been cleaning her home on the evening of January 26, Higgs was not with them. Nor was Higgs at her house in the early morning hours of January 27. At trial, Smith again testified that Higgs had not helped her prepare for the party that **\*292** night and was not with her when she went to bed at 1:30 a.m. on January 27. Nor was he in her home when she awoke, as she routinely did, at 5 a.m. to care for her disabled son. Smith returned to bed shortly thereafter and awoke at 10:00 a.m., when she first found Higgs and Haynes present in her home. Thus, Higgs must have

arrived at Smith's home sometime between 5 a.m. and 10 a.m. on the morning of January 27. Smith did confirm that Higgs and Haynes were at her house that night for the party and that the television was on during the party.

Officers also interviewed Enidsia Darby, a former girlfriend of Higgs and the mother of his son, Daquon. Darby testified that Higgs contacted her by telephone after his March 1996 arrest and told her that he had been arrested for drugs. Darby, however, had seen news reports of Higgs's arrest that contained photographs of the three murdered women and she asked Higgs about them. In response, Higgs asked Darby if she remembered that he had been with her at the hospital on the night of the murders, which was not true. When Darby visited Higgs in jail, Higgs admitted that he had been present when Haynes shot the women. He told Darby that Jackson had been invited over to his house to smoke and drink because she had been "snitching on one of them." J.A. 759. He told her that he did not know the other two girls; "[t]hey were just for his friends." J.A. 761.

In addition to her testimony regarding Higgs's drug activities, Darby offered testimony regarding a bank fraud scheme and credit card scheme that she and Higgs had conducted in the fall of 1995. Higgs deposited checks into accounts that had been opened by Darby and Andrea Waters, one of Darby's friends. The women, in turn, would withdraw the cash and give it to Higgs. Waters was paid a portion of the money withdrawn from her account, but when the checks deposited in her account bounced and Higgs refused to return the money,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

she threatened to go to the police. Higgs responded with a threat to kill her. Darby also testified that, while employed in the electronics department of a retail department store, she charged merchandise for Higgs to a credit card number Higgs had given her. Months later, when Darby was contacted by the police about the matter, Higgs threatened to kill her if she identified him from the surveillance photographs.

The investigation into Higgs's possible involvement in the murders also uncovered his participation in two prior shooting incidents involving a .38 caliber weapon. The incidents were significant because the same caliber weapon had been used to murder the three women.

The first incident occurred on November 20, 1995, approximately two months before the murders. Higgs got into an argument outside the Chaconia Nightclub in Washington, D.C., and shot out the windows of a vehicle in a drive-by shooting. After Higgs's arrest on the federal drug charges and while the murder investigation was still underway, the vehicle was searched and the police recovered a .38 caliber bullet. Wondwossen Kabtamu, who was with Higgs at the time of the Chaconia shooting, testified that he drove Higgs's Mazda MPV van while Higgs did the shooting. Kabtamu threw the gun out the window after the shooting, but they returned to get it at Higgs's insistence.

Higgs was ultimately charged with the Chaconia shooting in the D.C. Superior Court. In late

1998, while housed at a D.C. jail, Higgs had a number of discussions about the Chaconia charges with Domenick Williams, a fellow inmate and "jailhouse lawyer." Higgs never admitted involvement in the Chaconia shooting to *293 Williams, but he did tell Williams "[t]hat he didn't want to plead guilty because they would try to use the gun in another case." J.A. 975. After Williams learned through a press report that Higgs was being indicted for the murders of the three women, Higgs commented to Williams, "you see why I can't plead guilty to that charge?" J.A. 979. Higgs also advised Williams that he had rebuffed the authorities' attempts to strike a deal with him to cooperate against his co-defendant Haynes. When Williams advised Higgs that the authorities would likely offer Haynes a deal to cooperate if Higgs refused, Higgs told Williams "that his youngan would hold up," J.A. 984, and "that the government wouldn't offer a deal to the trigger man," J.A. 985.

Williams also testified that Higgs asked him what the chances would be "if the witness after the fact wasn't there," J.A. 982, referring to Gloria. Williams told him that "his chances would be good." J.A. 983. Higgs later "explained to [Williams] that he wasn't worrying about the [murder] case because Mel and T would be out there." J.A. 987. Melvin Grayson and "T" were former inmates at the jail where Williams and Higgs were incarcerated. Higgs told Williams "[t]hat Mel would be out there to handle anything that he needed and that he could rely on him." J.A. 992.

Williams later notified the authorities of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

conversations with Higgs and produced letters that Higgs had written to him in which Higgs reported that the Chaconia case had been dismissed, that Higgs had not heard from "T", but that "Mel has been in my corner." J.A. 1011. Through visitation records, authorities learned that Melvin Grayson had visited Higgs in the D.C. jail in February 1999 and again in March 1999. The Chaconia charges against Higgs were dismissed in D.C. Superior Court in May 1999.

The second shooting incident occurred on December 10, 1995, approximately a month after the Chaconia nightclub shooting. Haynes went to the home of Rodney Simms on Cherry Lane in Laurel, Maryland, and argued with Simms about a woman. During the argument, Haynes took out a 9mm handgun and began shooting. Higgs came out from a nearby shed and also began firing shots. Haynes and Higgs were charged in Maryland state court for the shooting. Police recovered 9mm and .38 caliber bullets and bullet casings from the Cherry Lane crime scene. Forensic evidence revealed that the .38 caliber bullets fired from the weapons at the Cherry Lane and Chaconia sites had five "lands and grooves," with a right twist.[FN2] Although forensics could not definitively conclude that the bullets had been fired from the same weapon, the .38 caliber bullets recovered from the Patuxent murder scene and the murder victims were also .38 caliber bullets shot from a gun with five lands and grooves with a right twist.

> FN2. According to the testimony, "lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." J.A.

1137. Because "[d]ifferent manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," J.A. 1123-24, the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

In April 1997, Higgs pled guilty to the Cherry Lane shooting and was sentenced to 18 months imprisonment. During the plea hearing, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to the facts underlying the Cherry Lane shooting, with **\*294** the single exception of gratuitously asserting that he "didn't have a .38. It was the other way around." J.A. 1104.

## C. The Indictment

On December 21, 1998, Higgs and Haynes were indicted for three counts each of first-degree premeditated murder, *see* 18 U.S.C.A. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id,* kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a), and using a firearm in the commission of a crime of violence, *see* 18 U.S.C. § 924(c). On October 22, 1999, the government filed the statutorily-required notice of its intent to seek a death sentence for the murder and kidnapping charges. *See* 18 U.S.C.A. § 3593(a). On

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

December 20, 1999, the grand jury returned a second superseding indictment, and the government filed an amended death notice on February 8, 2000.[FN3]

> FN3. All references made to the indictment or death notice hereafter refer to the amended documents.

The cases were severed for trial. Haynes was tried first and convicted of first-degree murder, kidnapping, and use of a firearm during a crime of violence. During the penalty phase of Haynes's trial for the murder and kidnapping counts, however, the jury was unable to reach a unanimous verdict on the death sentence. Accordingly, on August 24, 2000, the district court sentenced Haynes to concurrent life terms for the first-degree murder and kidnapping counts and to a forty-five year consecutive sentence for the firearm offenses. His convictions and sentences were affirmed on appeal. *See United States v. Haynes,* 26 Fed. Appx. 123, 2001 WL 1459702 (4th Cir.2001), *cert. denied,* 535 U.S. 979, 122 S.Ct. 1455, 152 L.Ed.2d 396 (2002).

### D. The Trial

Jury selection in Higgs's trial began on September 5, 2000, and the jury returned guilty verdicts on all charges on October 11, 2000. The case then proceeded to the penalty phase. On October 26, 2000, after hearing evidence on aggravating and mitigating factors, the jury returned a sentence of death for each of the murder and kidnapping counts.

In order to impose a sentence of death under the FDPA, a jury is required to find at least one "intent" factor enumerated by Congress, *see* 18 U.S.C.A. § 3591(a)(2), and at least one statutory "aggravating" factor, *see* 18 U.S.C.A. § 3592(c). Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible. The jury must then determine the existence of any nonstatutory aggravating factors submitted to it for consideration, provided the government has given the appropriate notice of its intent to submit such additional factors, *see* 18 U.S.C.A. § 3592(c), as well as any mitigating factors, *see* 18 U.S.C.A. § 3592(a), and "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death," 18 U.S.C.A. § 3593(e).

As to all victims and offenses, the jury in Higgs's case determined that the government had proven two intent factors beyond a reasonable doubt: (1) that Higgs had "intentionally participated in ... act[s], contemplating that the [lives] of [the victims] would be taken or intending that lethal force would be used in connection with [the victims]"; and (2) that Higgs had "intentionally and specifically engaged in ... act[s] of violence, knowing that the **\*295** act[s] created a grave risk of death to the [victims]." *See* 18 U.S.C.A. § 3591(a)(2)(C) & (D).

The jury also found that the government had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

proven beyond a reasonable doubt four statutory aggravating factors: (1) that the deaths occurred during the commission of another crime (kidnapping), for the first-degree murder counts only, *see* 18 U.S.C.A. § 3592(c)(1); (2) that Higgs had a previous conviction of a violent felony involving a firearm, based on Higgs's guilty plea to assault and reckless endangerment for his participation in the Cherry Lane shooting, *see* 18 U.S.C.A. § 2592(c)(2); (3) that Higgs had a previous conviction for a serious federal drug offense, based on Higgs's March 1996 arrest and subsequent conviction for possession with intent to distribute cocaine base, *see* 18 U.S.C.A. § 3592(c)(12); and (4) that the crime for which he was on trial involved multiple killings in a single criminal episode, *see* 18 U.S.C.A. § 3592(c)(16). The jury found that the government had also proven two nonstatutory aggravating factors beyond a reasonable doubt: (1) that Higgs had caused harm and loss to each victim and their families, based on the effect of the offense on the victims, their personal characteristics as individual human beings, and the impact of the death upon the victims and their families ("victim impact"); and (2) that Higgs obstructed the investigation into the kidnappings and murders by tampering or attempting to tamper with evidence and witnesses ("obstruction of justice").

Members of the jury also found three mitigating factors by a preponderance of the evidence: (1) that Higgs was not the sole proximate cause of the victims' deaths (12 jurors); (2) that Higgs was impaired by alcohol and marijuana at the time of the murders (2 jurors); and (3) that a sentence of death would have an adverse impact on Higgs's son (4 jurors). *See* 18 U.S.C.A. § 3592(a). However, the jury unanimously rejected three additional mitigating factors: (1) that Haynes was an equally culpable defendant who had not been sentenced to death for the murders; (2) that Higgs's family history, including the abandonment by his father and the death of his mother at a young age, influenced the direction his life had taken; and (3) that other factors in Higgs's background, record, or character or other circumstances of the offense mitigated against imposition of the death sentence.

Ultimately, the jury recommended that Higgs be sentenced to death for each death-eligible conviction and, on January 3, 2001, the district court imposed nine death sentences. The district court also imposed sentences of five years, twenty years, and twenty years for the three § 924(c) convictions, respectively, directing that the sentences be served consecutively. Additionally, the court imposed a three-year term of supervised release and directed Higgs to pay restitution of $13,687. On appeal, Higgs presents twenty separate assignments of error to his convictions and sentences, which we address in turn.

## II. The Sufficiency of the Indictment

We first consider Higgs's claim that his capital convictions and death sentences must be vacated because the indictment failed to charge Higgs specifically with the intent factors required under 18 U.S.C.A. § 3591(a)(2) and the aggravating factors required under 18 U.S.C.A. § 3592(c) to impose a sentence of death under the FDPA. We review the legal sufficiency of an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

indictment de novo. *See United States v. Bolden, 325 F.3d 471, 486 (4th Cir.2003).*

A. The Indictment Clause

[1][2] The Indictment Clause of the Fifth Amendment provides, in pertinent **\*296** part, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. Its purpose is to ensure that a defendant's jeopardy is limited "to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States,* 361 U.S. 212, 218, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). In conjunction with the notice requirement of the Sixth Amendment, [FN4] the Indictment Clause provides two additional protections: the right of a defendant to be notified of the charges against him through a recitation of the elements, and the right to a description of the charges that is sufficiently detailed to allow the defendant to argue that future proceedings are precluded by a previous acquittal or conviction. *See Russell v. United States,* 369 U.S. 749, 763-64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *see also Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense"); *United States v. Carrington,* 301 F.3d 204, 209-10 (4th Cir.2002) (same). In this case, we are presented with the question of whether Higgs's federal indictment sufficiently alleged the nine murder and kidnapping counts as death-eligible, capital offenses-an inquiry that places us squarely within the arena of *Apprendi* and its progeny. *See Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

> FN4. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation." U.S. Const. amend. VI.

In *Apprendi,* the defendant was convicted of second-degree possession of a firearm, punishable by a term of imprisonment of between five and ten years. However, he was sentenced to twelve years imprisonment under New Jersey's "hate crime" law, which authorized an enhanced sentence of between ten and twenty years if the sentencing judge found, by a preponderance of the evidence, that the crime was motivated by racial animus. The Supreme Court reversed and remanded, concluding that the Sixth Amendment mandated that, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.

A similar mandate flows from the Fifth Amendment's Indictment Clause: "In federal prosecutions, such facts must also be charged in the indictment." *United States v. Cotton,* 535 U.S. 625, 627, 122 S.Ct. 1781, 152 L.Ed.2d 860

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

(2002); *see also United States v. Promise,* 255 F.3d 150, 156-57 (4th Cir.2001) (en banc) (holding that, when applying *Apprendi* to a federal prosecution, a fact that increases the maximum penalty "must be treated as an element of an aggravated ... offense, *i.e.,* charged in the indictment and proved to the jury beyond a reasonable doubt" (footnote omitted)); *id.* at 157 n. 6 (rejecting argument that "a fact that increases the maximum penalty must be treated as an element for purposes of some rights guaranteed by the Fifth Amendment (*e.g.* the right to a determination of guilt beyond a reasonable doubt) but not others (*e.g.,* the right to indictment by a grand jury)").

**\*297** [3][4] These cases stand for the settled proposition that, with the exception of the fact of a prior conviction, a defendant may not be exposed "to a penalty *exceeding* the [statutory] maximum he would receive if punished according to the facts reflected in the jury's verdict alone." *Apprendi,* 530 U.S. at 483, 120 S.Ct. 2348. In determining whether a particular fact is to be treated as an element of the offense, as opposed to a sentencing factor, "the relevant inquiry is one not of form, but of effect-does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. 2348.

In *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Supreme Court had occasion to consider the effect of *Apprendi* 's holding upon Arizona's capital sentencing scheme, which allowed the trial judge alone to determine the presence of aggravating factors required for imposition of the sentence of death. Overruling its prior decision in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990),[FN5] the Court struck down the scheme, holding that the Sixth Amendment mandates that "[c]apital defendants, no less than non-capital defendants, ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring,* 536 U.S. at 589, 122 S.Ct. 2428. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact ... must be found by a jury beyond a reasonable doubt. A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 602, 122 S.Ct. 2428 (internal citation, quotation marks and alterations omitted). "Because Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense," the Court held that "the Sixth Amendment requires that they be found by a jury." *Id.* at 609, 122 S.Ct. 2428 (internal quotation marks omitted).

FN5. In *Walton v. Arizona,* the Court had held that Arizona's sentencing scheme did not run afoul of the Sixth Amendment because the aggravating factors were not "element[s] of the offense of capital murder." 497 U.S. 639, 649, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). The *Ring* Court concluded that this holding was "irreconcilable" with *Apprendi* 's reasoning. *See Ring v. Arizona,* 536 U.S. 584, 589, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

The Arizona sentencing scheme at issue in *Ring* did not directly implicate the Fifth Amendment Indictment Clause. *See Ring,* 536 U.S. at 597 n. 4, 122 S.Ct. 2428 (noting that Ring "does not contend that his indictment was constitutionally defective" and that "the Fourteenth Amendment has not been construed to include the Fifth Amendment right to presentment or indictment of a Grand Jury" (internal quotation marks and ellipsis omitted)). Thus, the Supreme Court has not yet addressed the precise issue of whether, and to what extent, the Indictment Clause requires that the intent and aggravating factors be charged in the indictment. Higgs asserts that the principles of *Apprendi* and *Ring* dictate that any factor required to be submitted to the jury must be included in the indictment. We agree.

Higgs's indictment charged him with three counts each of premeditated murder, murder committed in the perpetration of a kidnapping, and kidnapping resulting in death. Like the Arizona criminal statutes at issue in *Ring,* the federal statutes setting forth these offenses provide that the offender shall be punished by *either* death *or* life imprisonment.[FN6]

> FN6. Section 1111 of Title 18 provides as follows:
>
> (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or

attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed is murder in the first degree.

....

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree *shall be punished by death or by imprisonment for life.*

18 U.S.C.A. § 1111 (emphasis added). Section 1201 of Title 18 provides that:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when-

...

(2) any such act against the person is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

done within the special maritime and territorial jurisdiction of the United States;

...

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, *shall be punished by death or life imprisonment.*

18 U.S.C.A. § 1201(a)(2) (emphasis added).

**\*298** [5] A defendant does not become *eligible* for the death penalty, however, unless the jury finds at least one statutory intent factor, *see* 18 U.S.C.A. § 3591(a)(2), and at least one statutory aggravating factor, *see* 18 U.S.C.A. § 3592(c). *See Jones v. United States,* 527 U.S. 373, 376-377, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999); *see also* 18 U.S.C.A. § 3593. Because a defendant may be sentenced only to life imprisonment unless the jury finds the existence of at least one intent factor and one statutory aggravating factor, we have little trouble concluding that such factors increase the penalty for the crimes of first-degree murder and kidnapping resulting in death beyond the otherwise maximum sentence of life imprisonment. Accordingly, with the exception of the fact of prior convictions, those intent and aggravating factors which the government intends to rely upon to render a defendant death-eligible under the FDPA are the functional equivalent of elements of the capital offenses and must be charged in the indictment, submitted to the petit jury, and proved beyond a reasonable doubt.

[6] We reject, however, Higgs's claim that the Indictment Clause requires that nonstatutory aggravators relied upon by the government at trial be included in the indictment. The finding of a nonstatutory aggravator alone will not support imposition of the death penalty. Rather, the purpose of nonstatutory aggravators is to aid the factfinder in selecting the appropriate sentence from the available options, *i.e.,* death or life imprisonment. Thus, "the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (internal quotation marks omitted); *see also Jones,* 527 U.S. at 376-379, 119 S.Ct. 2090 (discussing the FDPA decisionmaking process and the distinction between the "eligibility" decision and the "selection" decision); *Zant v. Stephens,* 462 U.S. 862, 878-79, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (discussing difference between "eligibility" and "selection" factors); *cf. United States v. Tipton,* 90 F.3d 861, 893-94 (4th Cir.1996) (discussing the decisionmaking process under the analogous death sentencing proceedings of **\*299** 21 U.S.C. § 848). Because nonstatutory aggravating factors do not increase the available punishment to which a defendant might be subjected, they are not required to be alleged in the indictment.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

B. The Indictment for Capital Murder

We now turn to the issue of whether Higgs's indictment for the capital crimes was in fact constitutionally defective under the Indictment Clause because it failed to allege the statutory intent and aggravating factors relied upon by the government.

1. The Intent Factors

[7] We begin with the intent factors of 18 U.S.C.A. § 3591(a)(2). In returning the verdict of death for each of the murder and kidnapping charges, the jury found that the government had proven two such factors beyond a reasonable doubt-intentional acts to take a life and intentional acts of violence creating a grave risk of death. *See* 18 U.S.C.A. § 3591(a)(2). In the indictment, Higgs is charged with killing each of the three women, "by shooting [them] with a firearm, willfully, deliberately, maliciously, and with premeditation," and "in the perpetration of ... kidnapping." J.A. 135-36, 140-41, 145-46. Hence, the indictment sufficiently alleged that Higgs engaged in intentional acts to take the lives of the three women and intentional acts of violence that created a grave risk of death to the three women.

2. The Statutory Aggravating Factors

The question of whether the indictment sufficiently alleged the statutory aggravating factor required under 18 U.S.C.A. § 3592(c) to impose a death sentence is more difficult to answer.

[8] We reject at the outset Higgs's contention that the indictment failed to sufficiently charge each of the capital murder and kidnapping counts because it failed to allege *all* of the statutory aggravating factors which were ultimately found by the petit jury. The FDPA sets forth sixteen potentially aggravating factors for a homicide conviction. *See* 18 U.S.C.A. § 3592(c). However, only one such aggravating factor need be found for the jury to recommend a sentence of death. *See* 18 U.S.C.A. § 3593(d) & (e). Because only one statutory aggravating factor is required under the Act to render a defendant death-eligible, we hold that the indictment need only allege one such aggravating factor. *See United States v. Jackson, 327 F.3d 273, 287 (4th Cir.2003)* (Niemeyer, J., concurring) ("[W]hen the death penalty is dependent on a finding of an aggravated offense, then the core statutory elements of that offense, as well as at least one aggravating factor, must be charged in the indictment and found by the jury."). There is no requirement that the indictment allege *all* of the factors that might be weighed by the jury when deciding whether to impose a death sentence. So long as one statutory aggravating factor is alleged in the indictment and the petit jury finds that statutory aggravating factor to exist, the indictment is not defective as to the capital offense charged. *See id.* The elements of the offense of conviction have been charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. Any additional statutory or nonstatutory

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

aggravating factors may be fairly viewed as sentencing considerations.[FN7]

> FN7. This is not to say, of course, that such a limited indictment would be the better course. In order to render the offense death-eligible, the petit jury must find the statutory aggravating factor relied upon by the government in the indictment. Thus, the better practice would obviously be to allege *all* potential statutory aggravating circumstances in the indictment.

**\*300** With regard to the six counts of murder and the three counts of kidnapping resulting in death with which Higgs was charged, the petit jury found the existence of three statutory aggravating factors: (1) multiple killings in a single criminal episode under 18 U.S.C.A. § 3592(c)(16); (2) previous conviction of a violent felony involving a firearm under § 3592(c)(2), based on Higgs's guilty plea to assault and reckless endangerment arising from the Cherry Lane shooting; and (3) previous conviction for a serious federal drug offense under § 3592(c)(12), based on Higgs's federal conviction for possession with intent to distribute cocaine base. With regard to the six first-degree murder counts, the jury also found that the government had proven, as an additional statutory aggravating factor, that the deaths occurred during the commission of another crime, specifically, a kidnapping. *See* 18 U.S.C.A. § 3592(c)(1).

The government argues that the indictment is not defective because it alleges facts which, if found by the jury, support two of these § 3592(c) aggravating factors-multiple killings in a single criminal episode and death during the commission of a kidnapping. In the alternative, the government argues that the indictment is not defective because the Fifth Amendment does not require that the prior conviction aggravators be alleged in the indictment.

For the reasons that follow, we agree that the indictment was not constitutionally deficient. However, the multiple killings aggravator, while adequately alleged in the indictment, cannot serve as the requisite statutory aggravator for any of the charges because it was not a statutory aggravator at the time the murders were committed. Rather, the indictment is not defective because the "other crime" aggravator was adequately alleged in the indictment to support a death sentence for the six first-degree murder charges and because the prior conviction aggravators, which support a death sentence for all charges, were not required to be alleged in the indictment at all.

a. The "Multiple Killings" Aggravator

We begin by rejecting the government's contention that the indictment is not defective as to either the § 1111(a) murder or § 1201(a) kidnapping charges because it alleges facts supporting the statutory aggravator of multiple killings in a single criminal episode. *See* 18 U.S.C.A. § 3592(c)(16). Although the indictment sufficiently alleged the aggravating factor, "multiple killings" was not added to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

FDPA as a *statutory* aggravating factor until April 1996, three months after the murders were committed.

[9] Article 1, § 9 of the United States Constitution provides that "[n]o Bill of Attainder or ex post facto Law shall be passed." Pursuant to the Clause, " 'any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.' " *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (quoting *Beazell v. Ohio,* 269 U.S. 167, 169-170, 46 S.Ct. 68, 70 L.Ed. 216 (1925)). In short, the Ex Post Facto Clause prohibits "laws that retroactively alter the definition of crimes or increase the punishment for criminal acts." *California Dep't of Corr. v. Morales,* 514 U.S. 499, 504, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995) (internal quotation **\*301** marks omitted). A new law may not alter the elements of the offense or the quantum of punishment, nor may it deprive the defendant of a defense to which he would otherwise be entitled. *See id.; Carmell v. Texas,* 529 U.S. 513, 521-525, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000).

[10][11] Although the prohibition against the use of ex post facto laws "does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed," *Dobbert,* 432 U.S. at 293, 97 S.Ct. 2290 (internal quotation marks omitted), it does "assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham,* 450 U.S. 24, 28-29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). The Clause operates to "forbid[ ] the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was *prescribed* when the crime was consummated." *Id.* at 30, 101 S.Ct. 960 (emphasis added).

[12] In view of the Supreme Court's jurisprudence in *Apprendi* and *Ring,* we agree that the government cannot solely rely upon "multiple killings" as a statutory aggravating factor for a crime committed before its adoption without violating the Ex Post Facto Clause. With the exception of the prior conviction aggravators, statutory aggravating factors which render an offense of conviction death-eligible clearly "increase the punishment for criminal acts." *Morales,* 514 U.S. at 504, 115 S.Ct. 1597. Accordingly, we hold that the "multiple killings" aggravator cannot act as the sole statutory aggravator which rendered these murders death-eligible.

b. The "Other Crime" Aggravator

[13] The indictment is not defective as to the first-degree murder charges because it sufficiently alleged the "death during

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

commission of another crime" aggravator. The indictment specifically alleges that Higgs killed the three women "in the perpetration of, and attempted perpetration of a felony, to wit, kidnapping," J.A. 136, 141, 146, and charges further that Higgs "did knowingly, willfully and unlawfully seize, confine, inveigle, decoy, kidnap, abduct, carry away and hold [the women] for a reason which was of benefit to [him]." J.A. 138, 143, 148. Because the indictment charges facts supporting at least one aggravating factor, it is not defective as to the six capital murder counts charged under § 1111(a). This aggravator cannot, however, suffice to render the indictment sufficient for purposes of the three capital counts for kidnapping resulting in death charged under § 1201(a). Even if we assume that the statutory aggravator could have been submitted in support of the kidnapping counts, it was only submitted to the jury in connection with the § 1111(a) first-degree murder counts.

c. The Prior Conviction Aggravators

[14] This leaves us with the government's argument that the indictment is not defective as to either the first-degree murder counts or the kidnapping-resulting-in-death counts because both categories of crimes carry the sentence of death as the statutory maximum and because two of the statutory aggravators found by the jury-Higgs's prior conviction for a violent felony involving a firearm and Higgs's prior conviction for a serious federal drug offense-fall within the *Apprendi* and *Almendarez-Torres* exception for prior convictions. *See Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348; *302 Almendarez-Torres v.*

*United States,* 523 U.S. 224, 226-27, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). In a nutshell, the government contends that the indictment is not defective because these "prior conviction" aggravators, both of which were found by the jury and either of which rendered the offenses death eligible, are not required to be alleged in the indictment to authorize imposition of the maximum penalty of death. We agree.

In *Almendarez-Torres,* the Supreme Court was squarely presented with the question of whether a federal indictment must allege the fact of a prior conviction to expose a defendant to an enhanced sentence. Under 8 U.S.C.A. § 1326(a), a deported alien who returned to the United States without special permission was subject to imprisonment for up to two years. Under subsection (b) of the same statute, however, such a deported alien could be imprisoned for up to twenty years "if the initial deportation was subsequent to a conviction for commission of an aggravated felony." *Almendarez-Torres,* 523 U.S. at 226, 118 S.Ct. 1219 (internal quotation marks omitted). As framed by the Court, the issue was

whether th[e] latter provision defines a separate crime or simply authorizes an enhanced penalty. If the former, *i.e.,* if it constitutes a separate crime, then the Government must write an indictment that mentions the additional element, namely, a prior aggravated felony conviction. If the latter, *i.e.,* if the provision simply authorizes an enhanced sentence when an offender also has an earlier conviction, then the indictment need not mention that fact, for the fact of an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

earlier conviction is not an element of the present crime.

*Id.* at 226, 118 S.Ct. 1219. The court held that subsection (b) was "a penalty provision, which simply authorizes a court to increase the sentence for a recidivist. It does not define a separate crime. Consequently, neither the statute nor the Constitution required the Government to charge the factor that it mentions, an earlier conviction, in the indictment." *Id.* at 226-27, 118 S.Ct. 1219.

The distinction between prior convictions and other facts that might expand a penalty range, first made in *Almendarez-Torres,* was addressed by the Court again in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). In the wake of its recognition of the constitutional concerns raised by the "diminishment of the jury's significance by removing control over facts determining a statutory sentencing range," the Court reiterated that *Almendarez-Torres* "stands for the proposition that not *every* fact expanding a penalty range must be stated in a felony indictment." *Jones,* 526 U.S. at 248, 119 S.Ct. 1215 (emphasis added). The Court explained:

[T]he precise holding [in *Almendarez-Torres* ] that recidivism increasing the maximum penalty need not be so charged ... rested in substantial part on the tradition of regarding recidivism as a sentencing factor, not as an element to be set out in the indictment. The Court's repeated emphasis on the distinctive significance of recidivism leaves no question

that the Court regarded that fact as potentially distinguishable for constitutional purposes from other facts that might extend the range of possible sentencing. *See* [ 523 U.S.] at 230, 118 S.Ct. 1219 ("At the outset, we note that the relevant statutory subject matter is recidivism"); *ibid.* ("With recidivism as the subject matter in mind, we turn to the statute's language"); *id.* at 243, 118 S.Ct. 1219 ("First, the sentencing factor at issue here-recidivism-is a traditional, if not the most traditional, basis for a sentencing court's *303 increasing an offender's sentence"); *id.* at 245, 118 S.Ct. 1219 (distinguishing *McMillan [v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) ] "in light of the particular sentencing factor at issue in this case-recidivism"). One basis for that possible constitutional distinctiveness is not hard to see: unlike virtually any other consideration used to enlarge the possible penalty for an offense, ... a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees.

*Id.* at 248-249, 118 S.Ct. 1219. And, in *Apprendi,* the Court again distinguished the recidivism at issue in *Almendarez-Torres* from the "hate crime" enhancer before it:

Whereas recidivism does not relate to the commission of the offense itself, New Jersey's biased purpose inquiry goes precisely to what happened in the commission of the offense. Moreover, there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.

530 U.S. at 496, 120 S.Ct. 2348 (citation and internal quotation marks omitted); *see also id.* at 488, 120 S.Ct. 2348 (noting that "*Almendarez-Torres* turned heavily upon the fact that the additional sentence to which the defendant was subject was the prior commission of a serious crime" and explaining that "[b]oth the certainty that procedural safeguards attached to any 'fact' of prior conviction, and the reality that Almendarez-Torres did not challenge the accuracy of that fact in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a fact increasing punishment beyond the maximum of the statutory range." (internal quotation marks omitted)).

Higgs acknowledges the Supreme Court's recidivism exception to the *Apprendi* mandate, but asserts that the Court's holding in *Ring* has placed on shaky ground the *Almendarez-Torres* proposition that prior convictions that increase the maximum penalty need not be alleged in the indictment, much like the defendant in *Ring* alleged that *Walton* 's holding was irreconcilable with *Apprendi* 's reasoning. That may or may not be so, but we are not at liberty to conclude that *Almendarez-Torres* is irreconcilable with *Ring* and grant him relief. Nor would we do so in view of the fact that the *Ring* Court specifically reserved the question of whether a judge may find the fact of prior convictions to be an aggravating circumstance in the death penalty context:

Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez-Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence.

*Ring,* 536 U.S. at 597 n. 4, 122 S.Ct. 2428. Until the Supreme Court overrules *Almendarez-Torres,* we are bound to follow its holding. The indictment against Higgs alleged crimes for first-degree murder and kidnapping resulting in death, all of which authorized a sentence of life imprisonment or death. By virtue of the FDPA, life imprisonment is the maximum sentence **\*304** that may be imposed *unless* the facts support a finding of at least one enumerated statutory aggravating factor. However, while statutory aggravators must be alleged in the indictment, submitted to the jury, and proven beyond a reasonable doubt, current Supreme Court jurisprudence excepts from this mandate the fact of a prior conviction. The Fifth Amendment Indictment Clause does not require an indictment to allege prior convictions that expose a defendant to an enhanced penalty.

## C. Harmless Error

[15] Even assuming that the indictment was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

defective because it failed to allege the requisite statutory aggravating factor or factors, Higgs would not be entitled to have his convictions or sentences overturned.

It has long been "recognized that most constitutional errors can be harmless." *See Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (internal quotation marks omitted); *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (noting the settled "principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt"); Fed.R.Crim.P. 52(a) (providing that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded"). To determine whether a constitutional error is harmless, we ask "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder,* 527 U.S. at 15, 119 S.Ct. 1827 (internal quotation marks omitted). Higgs contends that such a "harmless error" inquiry is inappropriate because the indictment's failure to charge the aggravating factors ultimately relied upon by the jury to impose a sentence of death is a structural error that mandates summary reversal of his capital convictions. We disagree.

[16] Unlike the vast majority of trial errors which are reviewed for harmlessness, structural errors are conclusively presumed to affect the substantial rights of the defendant because they "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair.' " *Neder,* 527 U.S. at 8-9, 119 S.Ct. 1827 (quoting *Rose v. Clark,* 478 U.S. 570, 577-78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)). The Supreme Court has repeatedly stated that most constitutional errors are not structural and may, instead, be reviewed for harmlessness. *See, e.g., id.* at 8, 119 S.Ct. 1827. "If the defendant had counsel and was tried by an impartial adjudicator, there is a *strong* presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis." *Id.* (alterations and internal quotation marks omitted) (emphasis added). The "very limited class of cases" in which the Court has found structural error are those in which there was "a defect affecting the framework within which the trial proceed[ed], rather than simply an error in the trial process itself." *Id.* (internal quotation marks omitted). Such defects include such things as the failure to honor the core principle of proof beyond a reasonable doubt, the complete deprivation of counsel, the denial of the right to self-representation at trial, a biased trial judge, and the failure to preserve open and public trials. *See Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *Arizona v. Fulminante,* 499 U.S. 279, 309-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); **\*305** *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

As correctly pointed out by Higgs, the Supreme Court has thus far found two grand jury errors to be structural-racial discrimination in the selection of grand jurors, *see Vasquez v. Hillery,* 474 U.S. 254, 260-64, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), and sex discrimination in the selection of grand jurors, *see Ballard v. United States,* 329 U.S. 187, 195-96, 67 S.Ct. 261, 91 L.Ed. 181 (1946). However, only a month after *Vasquez* was decided, the Supreme Court found that a procedural error in a grand jury proceeding-allowing two witnesses to be in the grand jury room at the same time-was subject to harmless error review. *See United States v. Mechanik,* 475 U.S. 66, 70-71, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). The Court found the error harmless in view of the subsequent jury verdict. Although the error

> had the theoretical potential to affect the grand jury's determination whether to indict [the defendants] ... the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70, 106 S.Ct. 938. The Court rejected the argument that an indictment error could not be held harmless on the basis of evidence presented at trial, reasoning that "even if this argument were accepted, there is no simple way after the verdict to restore the defendant to the position in which he would have been had the indictment

been dismissed before trial." *Id.* at 71, 106 S.Ct. 938. In light of this fact, the Court saw "no reason not to apply" the general rule "that errors not affecting substantial rights shall be disregarded." *Id.*

The *Mechanik* Court also distinguished *Vasquez,* noting that the rationale of the *Vasquez* decision had "little force outside the context of racial discrimination in the composition of the grand jury," where automatic reversal was called for by the perniciousness of the problem and the impracticability of other remedies. *Id.* at 70 n. 1, 106 S.Ct. 938. "[T]he societal interest in deterring" the error before it, the Court held, "d[id] not rise to the level of [society's] interest in deterring racial discrimination." *Id.*

Most recently, in *United States v. Cotton,* the Supreme Court was presented with a conceded indictment error; *i.e.,* the indictment did not allege the drug quantity that increased the statutory maximum sentence as required by *Apprendi* and *Jones.* Although the court declined to explicitly resolve the question of whether an indictment error was structural or subject to harmless error review, the Court did apply the plain error test and, having assumed that the defendant could establish that the error affected his substantial rights, held that "the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings." 535 U.S. at 632-33, 122 S.Ct. 1781.

The statements of the Supreme Court in *Mechanik* and *Cotton* indicate that it is far from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

settled under Supreme Court precedent that indictment errors are structural. Indeed, we think it more likely that this is not the case, given the Court's reluctance to identify new structural errors. *Cf. Mitchell v. Esparza,* 540 U.S. 12, 124 S.Ct. 7, 11-12, 157 L.Ed.2d 263, (2003) (per **\*306** curiam) (holding that state court's determination that failure to charge aggravating factor for capital murder in indictment and to submit it to the jury was subject to harmless error review was not "contrary to," or "an unreasonable application of" its precedents governing harmless error review); *id.* at 11 ("We cannot say that because the violation occurred in the context of a capital sentencing proceeding that our precedent [on harmless error review] requires [an] opposite result.").

In the end, we are persuaded by the reasoning of our sister circuits, which have held that indictment error, and in particular the failure of an indictment to allege an element of a charged offense, may be reviewed for harmlessness:

> [T]he Court in *Neder* held that the failure to instruct the jury on every element of an offense "does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder,* 527 U.S. at 9, 119 S.Ct. 1827 (emphasis in original). To us, a defendant's right to have a petit jury find each element of the charged offense beyond a reasonable doubt is no less important than a defendant's right to have each element of the same offense presented to the grand jury. If denial of the former right is subject to harmless error analysis, we believe denial of the latter right

must be as well.

*United States v. Prentiss,* 256 F.3d 971, 984 (10th Cir.2001) (en banc) (per curiam); *see also United States v. Mojica-Baez,* 229 F.3d 292, 311 (1st Cir.2000) (holding that the distinction between the trial judge's failure in *Neder* "to submit an element of the offense to the petit jury at trial" and "the failure to present an element to the grand jury to secure an indictment" on the offense is not "significant where the indictment provided the defendant with fair notice of the charges against him").

In this case, Higgs was charged with nine first-degree murder and felony murder charges, all of which carried a penalty of life imprisonment or death. Even if we assume that all of the aggravators relied upon by the jury to impose the sentence of death (including prior convictions) are to be treated as elements of the offenses that should have been alleged in the indictment, the indictment would only be defective because it failed to allege those essential elements of the offenses, not because it charged an offense different from the one for which he was ultimately convicted and sentenced. Such error is harmless because "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder,* 527 U.S. at 15, 119 S.Ct. 1827 (internal quotation marks omitted).

First, the primary function of an indictment is to notify the defendant of the charges against him and provide a sufficient basis upon which the defendant can plead the defense of former

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

jeopardy. *See Russell,* 369 U.S. at 763-64, 82 S.Ct. 1038; *Carrington,* 301 F.3d at 209-10; *see also Mojica-Baez,* 229 F.3d at 310 (noting that the most serious harm that can result from a defective indictment "may be when a defendant is without fair notice of the charges against him"). These purposes were served by the indictment's reference to statutes for which death is the maximum possible penalty and the government's notice of its intent to seek the death penalty, which notified Higgs of *all* of the aggravating factors the government would seek to prove at trial to obtain that maximum sentence. Thus, while the indictment failed to specify every aggravating circumstance that the prosecutor intended to pursue in support of the statutorily-authorized penalty of **\*307** death, Higgs was provided with fair notice of the charges against him, the prosecutor's intent to pursue the sentence of death, and each and every statutory and nonstatutory aggravating circumstance that the prosecutor intended to prove at trial.

Second, the petit jury's finding of all the aggravating factors beyond a reasonable doubt demonstrates that Higgs was not prejudiced by the lack of an independent judgment of the grand jury. *See Mechanik,* 475 U.S. at 70, 106 S.Ct. 938 (holding grand jury error harmless in light of subsequent finding of guilt beyond a reasonable doubt by petit jury); *cf. United States v. Patterson,* 241 F.3d 912, 914 (7th Cir.) (per curiam) ("Once the petit jury finds beyond a reasonable doubt ... that a particular [fact] was involved, we can be confident in retrospect that the grand jury (which acts under a lower burden of persuasion) would have reached the same conclusion."), *cert. denied,* 534 U.S. 853, 122 S.Ct. 124, 151 L.Ed.2d 79 (2001).

Finally, the record evidence of Higgs's previous convictions for a violent felony involving a firearm and for a serious federal drug offense, either of which would have been sufficient to meet the "aggravating factor" requirement, was not contested. *Cf. Neder,* 527 U.S. at 16, 119 S.Ct. 1827 (holding that harmlessness test was met when the record evidence supporting the element was "so overwhelming" that the defendant had not even contested it); *id.* at 19, 119 S.Ct. 1827 ("[W]here a defendant did not, and apparently could not, bring forth facts contesting the omitted element, answering the question whether the jury verdict would have been the same absent the error does not fundamentally undermine the purposes of the jury trial guarantee.").

In sum, we hold that any alleged indictment error was harmless beyond a reasonable doubt. The indictment's failure to specify every aggravating factor "did not necessarily render the indictment unfair or make it an unreliable vehicle with which to commence the proceedings in this case." *Mojica-Baez,* 229 F.3d at 312. Nor can we say the indictment error contributed to the verdict ultimately obtained from the petit jury.

### III. Change of Venue

[17] Prior to his trial, Higgs filed a motion for a change of venue from Greenbelt, Maryland, to Baltimore, Maryland, based on the extensive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

media coverage of the case. The district court denied the motion. On appeal, Higgs argues that he was denied his constitutional right to a fair and impartial jury in violation of the Fifth and Sixth Amendments because the media coverage rendered a fair trial in the Greenbelt Division impossible. We review the district court's denial of Higgs's motion for a change of venue for abuse of discretion. *See United States v. Bailey,* 112 F.3d 758, 770 (4th Cir.1997).

[18] As a general premise, a change of venue is warranted when the court is satisfied that there exists in the district where the prosecution is pending "so great a prejudice against the defendant" that "the defendant cannot obtain a fair and impartial trial." Fed.R.Crim.P. 21(a). The determination of whether a change of venue is required as a result of pretrial publicity involves a two-step process. *See United States v. Bakker,* 925 F.2d 728, 732 (4th Cir.1991). First, the district court must determine "whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted," and, if so, grant a change of venue prior to jury selection. *Id.* However, "[o]nly in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself."**\*308** *Wells v. Murray,* 831 F.2d 468, 472 (4th Cir.1987); *see also United States v. Jones,* 542 F.2d 186, 193 (4th Cir.1976) (noting that cases in which prejudice will be presumed will be rare). Ordinarily, the trial court must "conduct[ ] a *voir dire* of prospective jurors to determine if actual prejudice exists." *Bakker,* 925 F.2d at 732. If "*voir dire* reveals that an impartial jury cannot be impanelled," the trial court should then grant the motion. *Id.*

[19] Higgs first asserts that he satisfied the presumed prejudice test based upon the volume of news media coverage that occurred during the four-plus years that elapsed between the time of the murders and the time that jury selection began in his case. In particular, he points to the fact that Higgs and Haynes were the first federal defendants in the Greenbelt Division to face the death penalty, that Haynes had just been tried and convicted on the same murder charges, and that news stories released just prior to his trial reported that Haynes claimed that Higgs ordered the murders and that both men were local drug dealers serving federal sentences. As evidence of the volume of coverage, he points to the fact that 130 prospective jurors and seven of those ultimately seated had read or heard about the case prior to the trial.

Although Higgs is correct that there was a large amount of media coverage when the murders occurred in late January 1996, the district court did not abuse its discretion in ruling that the coverage did not rise to the level necessary to require a change of venue. Here, although the coverage was not entirely dispassionate and factual, neither was it highly inflammatory. *See United States v. De La Vega,* 913 F.2d 861, 864 (11th Cir.1990) (finding "several hundred news reports" over two years which were "largely dispassionate" but "occasionally punctuated by editorial remarks" insufficient to establish presumed prejudice). In addition, the bulk of the coverage occurred contemporaneously with the murders, four years before Higgs's trial. There was additional coverage on the one-year anniversary of the murders and when the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

indictment was issued. However, there was no evidence of any media coverage between the time of the indictment and the November 15, 1999, initial hearing on the motion for a change of venue.

Higgs also cannot establish presumed prejudice based on the additional coverage that occurred around the time of Haynes's trial. The additional coverage was not extensive and, as found by the district court, was more factual than inflammatory. *See* *Bakker,* 925 F.2d at 732 (holding that extensive initial coverage of alleged crime a few years earlier coupled with more recent coverage of criminal proceedings which was factual was insufficient to establish presumed prejudice).

[20] We are also unpersuaded by Higgs's assertion that he demonstrated actual prejudice because *voir dire* revealed that the majority of the prospective jurors knew about the case and because several prospective jurors stated that they had formed an opinion about the case based on the media reports. Under the second prong of *Bailey,* the district court may order a change of venue if *voir dire* reveals that an impartial jury cannot be impaneled due to actual prejudice of the venire members. To demonstrate actual prejudice, the defendant must show that a prospective juror has formed an pre-trial opinion that the defendant is guilty and cannot "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

*309 The *voir dire* of the jury members failed to demonstrate that an impartial jury could not be seated. Of the seated members of the jury, seven acknowledged that they had heard of the case. However, it is a long-settled proposition that mere knowledge of a case is insufficient to support a finding of actual prejudice. *See* *Irvin,* 366 U.S. at 722-23, 81 S.Ct. 1639; *Murphy v. Florida,* 421 U.S. 794, 799-800, 95 S.Ct. 2031 (1975) ("Qualified jurors need not ... be totally ignorant of the facts and issues involved."). During *voir dire,* the district court excused those prospective jurors who had expressed an inability to be fair and impartial. Each of the seven seated jurors who had some knowledge of the case stated that they could decide the case based solely on the evidence presented at trial. Accordingly, we affirm the district court's denial of Higgs's motion for a change of venue.

### IV. Guilt Phase Challenges

We next address Higgs's challenges to various district court rulings during the guilt phase of his trial.

### A. The Telephone Conversation between Higgs and Grayson

Higgs contends that his rights under the Fifth and Sixth Amendments were violated by the district court's admission of a taped telephone conversation that took place between Higgs and his former D.C. jailhouse friend, Melvin Grayson, as well as the district court's instruction to the jury that Higgs's silence during

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

the conversation could constitute an admission. Because Higgs did not object to the admission of the tape recording at trial, we review the admission of the evidence for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 732-35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We review the district court's decision to give a particular instruction and its content for abuse of discretion. *See United States v. Stotts,* 113 F.3d 493, 496 (4th Cir.1997). We review jury instructions to determine "whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990). An error in the jury instruction will warrant reversal of the conviction only if "the error is prejudicial based on a review of the record as a whole." *United States v. Ellis,* 121 F.3d 908, 923 (4th Cir.1997).

On May 20, 2000, after Higgs was transferred to a federal penitentiary, he placed a telephone call to Grayson. During the conversation, which was recorded pursuant to prison policy, Higgs and Grayson discussed Haynes's conviction for the murders, which had been handed down the previous day. Higgs commented that Haynes's attorney had blamed the murders on Higgs and complained that the lawyer "got the whole joint twisted." J.A. 1337. Grayson subsequently read Higgs a newspaper article reporting Haynes's conviction, including the report that Haynes had claimed that he only shot the women because he was afraid of Higgs. Higgs did not respond to Grayson's reading of the article.

Higgs did not object to the admission of the tape recording at trial. At the conclusion of the trial,

the district court instructed the jury that Higgs's silence during Grayson's reading of the newspaper article could be considered an admission of guilt by Higgs under Federal Rule of Evidence 801(d)(2)(B):

Now there has been testimony that while incarcerated, the defendant was silent when statements were made in his presence implicating him in the commission of the acts charged in the indictment.

**\*310** If you find that the defendant was actually present and heard the statements and understood them, then you may consider the defendant's silence as an admission of their truth if you find, in accordance with your common sense and experience, that the defendant would have denied the statements had they been untrue.

However, you should bear in mind that some people will remain silent even if they are innocent. For example, an inmate who knows that his telephone calls will be monitored or recorded may choose to remain silent.

J.A. 1282-83. Higgs unsuccessfully objected to the 801(d)(2)(B) charge.

[21] Under Rule 801(d)(2)(B), "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement of which the party has manifested an adoption or belief in its truth." "A party may manifest adoption of a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

statement in any number of ways, including [through] words, conduct, or silence." *United States v. Robinson,* 275 F.3d 371, 383 (4th Cir.2001).

When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.

*Id.* at 383 (quoting *United States v. Jinadu,* 98 F.3d 239, 244 (6th Cir.1996)).

[22] We find no error in the district court's decision to admit the recorded telephone conversation between Higgs and Grayson. Higgs and Grayson were freely discussing the trial of Haynes and the accusations made against Higgs in the course of those proceedings. Higgs gave no indication that he was being silent in the face of those accusations because he knew he was being recorded. On the contrary, the recording demonstrates that Higgs not only heard and understood the statements made by Grayson, but commented upon them to some extent. Thus, we are satisfied that the district court appropriately allowed the jury the opportunity to conclude, as instructed, either that Higgs would have made his disagreement known if such existed or that he chose to remain silent because of the knowledge that he was being recorded. In view of the district court's instruction, which correctly stated the law, the district court did not abuse its discretion in admitting the evidence and charging the jury that Higgs's silence could be considered an admission under Rule 801(d)(2)(B).

### B. Admission of Evidence of the Chaconia Shooting and the Bank Fraud Scheme

Higgs also contends that the district court's admission of evidence of the Chaconia nightclub shooting and the bank fraud scheme that Higgs carried out with Darby and Waters violated his rights to due process and a fair trial. At the conclusion of the government's case, the defense presented no witnesses and Higgs did not testify. With regard to the government's evidence of unrelated offenses, the court charged the jury as follows:

Now there has been evidence received during the trial that the defendant engaged in a shooting outside the Chaconia's Nightclub in November 1995, also a shooting at Cherry Lane in December 1995, bank fraud, firearm possession and also drug activity. The defendant is not on trial for these matters. They may not be used to show the bad character of the defendant on prior occasions.

**\*311** Accordingly, you may not consider the evidence of these acts as substitute for proof that he committed the crimes charged in this case, nor may you consider this evidence as proof that the defendant has a criminal personality, bad character or propensity to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

commit crimes.

The evidence ... may, however, be considered to establish the defendant's identity, his motive, intent, and knowledge on January 27, 1996. The evidence may also be considered by you to show, one, the defendant's relationship with Willis Mark Haynes and with Victor Gloria and with Wondwossen Kabtamu, and with Enidsia Darby in criminal activity, and it may also be evidence of defendant's ownership of a firearm.

J.A. 1296-97. Higgs asserts that the district court abused its discretion in admitting this evidence during the guilt phase because it was neither intrinsic to the crimes charged nor admissible under Rule 404(b).

[23] Reviewing the district court's admission of this evidence for an abuse of discretion, *see United States v. Chin,* 83 F.3d 83, 87 (4th Cir. 1996), we find none. "[W]here testimony is admitted as to acts intrinsic to the crime charged, and is not admitted solely to demonstrate bad character, it is admissible." *Id. at 88.* "Evidence of uncharged conduct is not considered evidence of other crimes where it is necessary to complete the story of the crime on trial." *United States v. Stitt,* 250 F.3d 878, 888 (4th Cir.2001) (internal quotation marks omitted). "Evidence of other crimes, wrongs, or acts" that is not intrinsic to the crime may still be admissible if it demonstrates "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Crim.P. 404(b). Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Young,* 248 F.3d 260, 271-72 (4th Cir.2001) (internal quotation marks omitted) (emphasis added). Specifically, the evidence is admissible if (1) it is "relevant to an issue, such as an element of an offense, and [is not] offered to establish the general character of the defendant"; (2) it is "necessary in the sense that it is probative of an essential claim or an element of the offense"; (3) it is reliable; and (4) its "probative value [is not] substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process." *United States v. Queen,* 132 F.3d 991, 997 (4th Cir.1997).

1. The Chaconia Shooting

[24] The shooting at the Chaconia nightclub in Washington, D.C., took place approximately two months before the murders. According to the testimony of Wondwossen Kabtamu, Higgs got into an argument with another man and, as Kabtamu was driving away in Higgs's van, Higgs fired several shots at another vehicle with a .38 caliber handgun. According to the testimony of Domenick Williams, with whom Higgs was housed at the D.C. jail while awaiting trial on the Chaconia charges, Higgs expressed great reluctance to plead guilty to the Chaconia charges "because they would try to use the gun in another case." J.A. 975. After Williams learned that Higgs was being indicted for the murders of the three women in this case, Higgs

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

commented to Williams, "you see why I can't plead guilty to that charge?" J.A. 979.

The victims in the case before us were indeed murdered with a .38 caliber weapon. The bullet recovered from the Chaconia shooting was forensically similar to those recovered from the Patuxent murder **\*312** scene and the victims, in that they shared the same rifling characteristics-five lands and grooves with a right twist. Thus, the evidence of Higgs's participation in the Chaconia Nightclub shooting was properly introduced by the government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon. *See United States v. Grimmond,* 137 F.3d 823, 831-32 (4th Cir.1998) (upholding admission of prior shooting incidents to establish the defendant's possession of a firearm). In addition, the evidence was admissible under Rule 404(b) as it and the Cherry Lane evidence placed the murder weapon, which was disposed of in the Anacostia River and never found, in Higgs's hand a short time before the murders and, therefore, served the necessary function of proving his identity as one of the murderers and his use of the firearm in connection with the murders. Consequently, we hold the district court did not abuse its discretion in ruling that the evidence was admissible, nor in ruling that its probative value outweighed its prejudicial effect under Rule 403.

2. The Bank Fraud Scheme

[25] Higgs also challenges the district court's admission of Darby's testimony about the unrelated bank fraud scheme that she and Waters had engaged in with Higgs. In particular, Higgs points to the death threats that ensued when authorities began to look into the matter and Higgs became concerned that the women might implicate him in the scheme. The district court admitted the evidence after concluding that it demonstrated a possible motive for the murders, and Higgs's *modus operadi* of issuing death threats to those that might be inclined to "snitch" on him.

We find no abuse of discretion. Gloria testified that just prior to the murders, Higgs and Jackson violently argued at Higgs's apartment, prompting Jackson to retrieve a knife from the kitchen. When the women left, Higgs made the comment to Gloria and Haynes that Jackson "do know a lot of n-----s," and expressed anger that she appeared to be "writing down [his] sh-." J.A. 474. Darby testified that Higgs told her shortly after his arrest that Jackson had been invited to his apartment because she had been "snitching on one of them," J.A. 759, suggesting that retaliation may have been a motive for the murders. Thus, the challenged bank fraud and related death threats that Higgs issued when he became concerned that his partners in the fraud scheme might "snitch" on him were admissible to show Higgs's motive and intent to murder Jackson to likewise keep her from taking steps that might implement him in criminal activities or otherwise harm him in some way. *Cf. United States v. Van Metre,* 150 F.3d 339, 350-51 (4th Cir.1998) (holding that evidence of a prior kidnapping and sexual assault committed by the defendant was admissible to establish his motive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

and intent to sexually assault the deceased victim in a kidnapping-resulting-in-death case); *Queen,* 132 F.3d at 993-94 (upholding admission of evidence, in a witness tampering case, that the defendant had intimidated two witnesses in an unrelated, earlier prosecution); *United States v. Clark,* 988 F.2d 1459, 1465 (6th Cir.1993) (per curiam) (upholding admission of evidence of threats and plans to harm other witnesses to establish motive and intent to murder where the defendant was charged with the murder of a person he wanted to silence).

### C. Sufficiency of the Evidence

Finally, Higgs contends that the evidence was insufficient to support each of **\*313** his convictions. In determining the sufficiency of the evidence supporting a conviction, this court must determine whether "there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); see *also United States v. Perry,* 335 F.3d 316, 320 (4th Cir.2003). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos,* 94 F.3d 849, 862 (4th Cir.1996) (en banc).

### 1. Evidence of Kidnapping and Felony Murder

[26] Higgs claims that the evidence was legally insufficient to convict him of kidnapping the

victims under 18 U.S.C.A. § 1201 or of first-degree murder occurring during the perpetration of a kidnapping under 18 U.S.C.A. § 1111(a). In order to establish that Higgs kidnapped the victims, the government was required to prove that each victim was "(1) unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted or carried away by any means whatsoever; and (2) was held for ransom or reward or otherwise." *Chatwin v. United States,* 326 U.S. 455, 459, 66 S.Ct. 233, 90 L.Ed. 198 (1946) (internal quotation marks omitted); *United States v. Lewis,* 662 F.2d 1087, 1088 (4th Cir.1981).

According to the testimony of Gloria, after the argument between Higgs and Jackson was broken up by Haynes, the women left the apartment on foot. After expressing anger about one of the women writing down his license plate number, Higgs retrieved the .38 caliber weapon before leaving the apartment, moments before instructing Haynes to get the women into the van. Shortly after Higgs drove past the most direct route back to the homes of the three young women, he stopped the van on the side of the road in a desolate stretch of the Patuxent National Wildlife Refuge. Aware at that point that something was amiss, one of the women asked if they were going to have to "walk from here" and Higgs responded "something like that." J.A. 482. Higgs then handed the gun to Haynes and Haynes got out of the van and shot the three women.

Higgs claims that this evidence is insufficient to show that he "unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

carried away" the three women because they voluntarily got into Higgs's van based upon what Haynes told them and that it was also insufficient to establish that the women were "held for ransom or reward or otherwise." *Chatwin,* 326 U.S. at 459, 66 S.Ct. 233. We disagree. The evidence presented was more than sufficient to support the conclusion that the three women, who had left the apartment on foot during the early morning hours after the argument, were tricked or lured by Haynes, at Higgs's direction, into getting into the van with the promise of a ride home and, therefore, that Higgs and Haynes "inveigled" or "decoyed" them within the meaning of § 1201, and that Higgs at least was prepared to confine them at gunpoint if necessary. *See United States v. Boone,* 959 F.2d 1550, 1555 (11th Cir.1992) (To determine whether there has been inveigling for purposes of a kidnapping conviction, the "fact finder must ascertain whether the alleged kidnapper had the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed."). The evidence was also sufficient to support the conclusion that Higgs and Haynes, after confining the women in the van under the pretense of taking them home and then stopping on the side of the road against their wishes, **\*314** held and ultimately killed the women to avenge Higgs's fight with Jackson, or perhaps to retaliate against Jackson for an earlier action or threat she had made, and to prevent Jackson and her friends from retaliating against Higgs. *See United States v. Healy,* 376 U.S. 75, 81, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964) (holding a victim "for ransom, reward *or otherwise*" under § 1201 encompasses holding a victim for any reason which was of benefit to the defendant); *United States v. Childress,* 26 F.3d 498, 503 (4th Cir.1994) (stating that kidnapping need not be performed for pecuniary gain; "ransom or otherwise" element is satisfied if "the defendant acted for *any* reason which would in *any* way be of benefit"). Accordingly, we conclude that the evidence was sufficient to convict Higgs of the kidnapping and felony murder counts.

## 2. Evidence of First-Degree Premeditated Murder

[27] Higgs also claims that the evidence was legally insufficient to convict him of first-degree premeditated murder under 18 U.S.C.A. § 1111(a), because there was no evidence that he knew Haynes was going to shoot the women, even though he provided Haynes with the murder weapon moments before the killings. We disagree.

In order to convict Higgs of first-degree premeditated murder, the government was required to prove that Higgs "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *United States v. Horton,* 921 F.2d 540, 543 (1990) (internal quotation marks omitted). The government clearly satisfied this standard. Contrary to Higgs's contention, his handing the murder weapon to Haynes was not the only evidence of his participation in the premeditated murder of the three women. The jury could easily have concluded that the murders were motivated by Higgs's fight with Jackson and her copying down Higgs's license plate number. Higgs

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

retrieved the gun used to commit the murders from a drawer in his apartment in the first instance, and instructed Haynes to lure the women into the van. After engaging in a whispered conversation with Haynes, Higgs also drove the van to the location of the murders, passing the most direct route back to the victims' homes. After Higgs pulled the van over to the side of the road on an isolated stretch of highway, Jackson asked him if they were being put out, and Higgs replied "something like that." J.A. 482. At that point, he supplied the gun used to commit the murders to Haynes, mere moments before Haynes shot and killed the women. Clearly, there was sufficient evidence for the jury to convict Higgs of the charged offenses.

### 3. Evidence of Section 924(c) Violations

[28] For the same reasons, we likewise reject Higgs's challenge to the sufficiency of the evidence proffered to convict him of the firearm violations. In order to establish a violation of 18 U.S.C.A. § 924(c), the government was required to prove that Higgs (1) "used or carried a firearm," and (2) that he "did so during and in relation to" the murders. *See United States v. Mitchell,* 104 F.3d 649, 652 (4th Cir.1997). Higgs retrieved the gun from a drawer in his apartment before leaving the apartment to pursue the three women and kept the gun in his possession until after he had pulled off the road and instructed the women to get out of the van. Thus, it is clear that substantial evidence supports the jury's verdict on these counts as well.

### V. Sentencing Phase Challenges

We now turn to Higgs's challenges to various rulings pertaining to the capital penalty phase of his trial.

### *315 A. Challenges to the Statutory Aggravating Factors

We begin with Higgs's independent challenges to the four statutory aggravating factors that were submitted to the jury for consideration during the capital penalty phase. Prior to the hearing, Higgs moved to strike each of the proposed statutory aggravating factors, and each motion was denied by the district court. We review the district court's legal conclusions *de novo. See United States v. Helem,* 186 F.3d 449, 454 (4th Cir.1999).

### 1. Death During the Commission of a Kidnapping

For the charges of first-degree premeditated murder and first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see* 18 U.S.C.A. § 1111(a), the court submitted as a statutory aggravating factor the fact that "the death[s] ... occurred during the commission or attempted commission of ... an offense under ... section 1201 (kidnapping)," 18 U.S.C.A. § 3592(c)(1).

Higgs argues that this aggravating factor merely

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

repeated the substantive elements of the section 1201 kidnapping counts for which he was also found guilty during the guilt phase of the trial and, therefore, failed to narrow or channel the jury's discretion to impose the sentence of death. *See Zant,* 462 U.S. at 877, 103 S.Ct. 2733 (holding that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder"). In other words, Higgs asserts that the aggravating factor served no narrowing function because the government improperly used the fact that death occurred during the commission of a kidnapping as both an element of the substantive crimes for which he was charged and as an aggravating factor for his crimes.

[29][30] This claim is without merit. "Death during commission of another crime" was not submitted as an aggravating factor for the substantive kidnapping counts charged under 18 U.S.C.A. § 1201. It was only submitted as an aggravating factor for the first-degree premeditated murder and first-degree murder committed in the perpetration of a kidnapping charged under 18 U.S.C.A. § 1111(a). As to the § 1111(a) murder counts for which it was submitted, the kidnapping factor clearly did serve the requisite narrowing function for the jury. In order to convict Higgs of the § 1111(a) first-degree murder committed in the perpetration of a kidnapping charge, the jury had to find that a kidnapping had occurred. However, the "narrowing function" mandated by the Eighth Amendment in death penalty cases "may ... be performed by jury findings at either the sentencing phase of the trial or the guilt

phase." *Lowenfield v. Phelps,* 484 U.S. 231, 244-45, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). And, the Eighth Amendment does not prohibit the use of an aggravating factor during the sentencing phase that duplicates one or more elements of the offense of the crime found at the guilt phase. *See id.* at 246, 108 S.Ct. 546; *see also United States v. Hall,* 152 F.3d 381, 416-17 (5th Cir.1998) (upholding submission of the § 3592(c)(1) statutory aggravating factor in prosecution for kidnapping resulting in death); *United States v. Jones,* 132 F.3d 232, 249 (5th Cir.1998) (rejecting defendant's contention that a statutory aggravating factor providing that the defendant caused the death of the victim during the commission of a kidnapping failed to genuinely narrow the class of persons eligible for the death penalty); *Deputy v. Taylor,* 19 F.3d 1485, 1502 (3rd Cir.1994) (noting that "federal courts of **316** appeals have consistently held that a sentencing jury can consider an element of the capital offense as an aggravating circumstance even if it is duplicitous"). Accordingly, we find no error in the district court's submission of the statutory aggravating factor to the jury.

### 2. Previous Conviction of a Violent Felony Involving a Firearm

[31] Higgs next challenges the district court's submission as a statutory aggravating factor the fact that Higgs had been previously convicted of a violent felony involving a firearm. *See* 18 U.S.C.A. § 3592(c)(2). The aggravating factor was based upon Higgs's participation in the December 1995 Cherry Lane shooting. Higgs pleaded guilty in Maryland state court to assault

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

and reckless endangerment for the offense in April 1997. During the plea colloquy, which was admitted into evidence in Higgs's sentencing proceeding, the prosecutor stated that Higgs had fired a .38 caliber handgun and Haynes had fired a 9 mm handgun during the incident. In response, Higgs claimed that he "didn't have a .38. It was the other way around." J.A. 1104.

On appeal, Higgs argues that the court must take a "categorical" approach to determining whether a prior felony conviction involved the use of a firearm, *i.e.,* the court may only look to the fact of conviction and the statutory definition of the crime of conviction to determine whether a firearm was involved, not to the particular facts of the case. *Cf. Taylor v. United States,* 495 U.S. 575, 588-89, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (holding that courts must employ a categorical approach when determining whether burglary was a predicate crime of violence for armed career offender status under 18 U.S.C.A. § 924(e)); *United States v. Pierce,* 278 F.3d 282, 286 (4th Cir.2002) (holding that, in determining whether a state felony offense of taking indecent liberties with a child falls within the federal definition of a "crime of violence" for purposes of U.S.S.G. § 4B1.1, the court must employ a similar "categorical approach, which takes into account only the definition of the offense and the fact of conviction"). According to Higgs, because use of a firearm is not a specific element of the Maryland offenses of assault and reckless endangerment, the crimes to which he pled guilty, and he did not specifically admit the use of a firearm during the Cherry Lane incident, the prior conviction did not "involv[e] the use or attempted or threatened use of a firearm ... against another person" as required by §

3592(c)(2).

We reject this claim as well. Higgs correctly points out that the Supreme Court has called for such a categorical approach when Congress has specified that a predicate offense have certain elements. *See, e.g., Taylor,* 495 U.S. at 588, 110 S.Ct. 2143; *Pierce,* 278 F.3d at 286; *United States v. Ward,* 171 F.3d 188, 192 (4th Cir.1999). However, this same approach is not required under § 3592(c)(2) of the federal death penalty scheme. Section 3592(c)(2) provides, as a statutory aggravator, the fact that

the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, *involving the use or attempted or threatened use of a firearm* (as defined in section 921) against another person.

18 U.S.C.A. § 3592(c)(2) (emphasis added). Because the language quite plainly requires only that the previous conviction "involv[e] the use or attempted or threatened use of a firearm," it authorizes and likely requires the court to look past the elements of the offense to the offense conduct. *See* **\*317***United States v. Chong,* 98 F.Supp.2d 1110, 1120 (D.Haw.1999). Additionally, whereas the court in *Taylor* noted that the categorical approach was proper to avoid "the practical difficulties and potential unfairness of a factual approach," *Taylor,* 495 U.S. at 601, 110 S.Ct. 2143, the Court has made it clear that an individualized determination *is* required in the death penalty context, *Zant,* 462 U.S. at 877-79, 103 S.Ct. 2733. Accordingly, we

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

hold that the district court did not err in submitting the challenged statutory aggravating factor to the jury for its consideration.

### 3. Previous Conviction of a Serious Federal Drug Offense

[32] Higgs next claims that the district court erred in refusing to strike as an aggravating factor the fact that he "had previously been convicted" of a serious drug offense carrying a potential sentence of five years or more. *See* 18 U.S.C.A. § 3592(c)(12).

The federal drug offense at issue involved Higgs's conviction for possession with intent to distribute cocaine base, which arose from the drugs seized during the search of his apartment on March 21, 1996. Higgs pled guilty in May 1997 to the drug offense, and judgment was entered in December 1997. Higgs argues that, for purposes of the death penalty statute, a defendant has been "previously convicted" of a federal drug offense only if the predicate drug conviction occurred prior to the conduct giving rise to capital murder. Had Congress intended to include *any* conviction prior to the sentencing hearing, the argument goes, it would have framed the issue as whether the defendant "has been convicted" of a predicate offense, rather than "had previously been convicted" of a predicate offense. Because his drug arrest and conviction for a serious drug offense occurred after the murders, Higgs asserts that the statutory aggravator was improperly submitted for consideration by the jury. The district court disagreed, ruling that the aggravator refers to

any conviction for a serious drug offense that occurred prior to sentencing and, therefore, denied the motion to strike the factor.

As support for their respective interpretations of the language of the statute, the parties direct us to analogous language and practice under the United States Sentencing Guidelines. The government, for example, points us to U.S.S.G. § 4A1.2 (2002), which provides that, for purposes of calculating a defendant's criminal history category under the United States Sentencing Guidelines, a "prior sentence" includes "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere,* for conduct not part of the instant offense." As correctly pointed out by the government, the commentary makes clear that "[a] sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense, is a prior sentence if it was for conduct other than conduct that was part of the instant offense." U.S.S.G. § 4A1.2, cmt. n.1. For purposes of establishing whether a defendant is a career offender, however, the guidelines are equally clear that "prior convictions" only count if they occurred before commission of the federal crime. *See* U.S.S.G. § 4B1.2(c).

Higgs, for his part, points us to the case of *United States v. Barton,* 100 F.3d 43 (6th Cir.1996), which interprets a more ambiguous provision of a now-defunct guideline, U.S.S.G. § 2K2.1, which provided for an increase in the base offense level for a firearms offense if the defendant "had one prior felony conviction of either a crime of violence or a controlled

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

substance offense." U.S.S.G. § 2K2.1(a)(2000). The *Barton* court held that the use of the words "had" and "prior" reflected an intent**\*318** to only encompass predicate convictions occurring prior to the conduct which formed the basis for the federal offense. *See Barton,* 100 F.3d at 46. Those circuits that have addressed the issue of whether use of the past-tense verb "had" when referring to prior convictions under § 2K2.1 encompassed post-offense convictions, however, ultimately reached differing results. *Compare United States v. Oetken,* 241 F.3d 1057, 1058-60 (8th Cir.2001) (reaching same conclusion as *Barton* court), *with United States v. Laihben,* 167 F.3d 1364, 1366 (11th Cir.1999) (holding that post-offense convictions do count as prior felony convictions for purposes of § 2K2.1); *United States v. Pugh,* 158 F.3d 1308, 1309-1312 (D.C.Cir.1998) (same); *United States v. Gooden,* 116 F.3d 721, 724-725 (5th Cir.1997)(same); *United States v. McCary,* 14 F.3d 1502, 1505-06 (10th Cir.1994)(same).

In 2001, the Sentencing Commission put an end to the difference of opinion, amending § 2K2.1 to provide that a defendant's base offense level would be increased where "the defendant committed any part of the instant offense *subsequent to* sustaining one felony conviction of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(4)(2001) (emphasis added). Thus, the Sentencing Commission adopted the minority view, but it did not make that view retroactive. *See Cofske v. United States,* 290 F.3d 437, 442 (1st Cir.2002) (adopting the "minority view" for purposes of sentencings which occurred prior to the amendment, but noting that "[o]ne could as easily call [the change] a revision as a

clarification").

In the end, we find the parties' reliance upon the sentencing guidelines to be of limited utility. We hold that the § 3592(c)(12) statutory aggravating factor encompasses *all* predicate convictions occurring prior to sentencing, even those occurring after the conduct giving rise to the capital charges. In short, we can discern no basis upon which to conclude that Congress intended that the prior serious drug offense aggravator encompass only drug offenses or convictions that occurred prior to the conduct giving rise to the murder or kidnapping charges. Unlike others contained within § 3592(c), the aggravator does not concern matters directly related to the death penalty offense. Rather, it is concerned with the characteristics of the offender as of the time that he is sentenced. Although it easily could have done so, Congress did not specify that either the prior offense or conviction had to occur before the death penalty offense. On the contrary, the entire section speaks in terms of those things that must be considered when the death sentencing hearing is conducted and the petit jury begins its weighing process. And, we note that where Congress has intended a different practice in other circumstances, it has made that intent clear. *See, e.g.,* 21 U.S.C.A. § 841(b)(1)(C) (West Supp.2003) (providing for an enhanced penalty "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final"); 18 U.S.C.A. § 922(g)(1) (West 2000) (stating "[i]t shall be unlawful for any person ... who has been convicted ... to [commit specified violations]").

At bottom, Higgs's argument is that the prior

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

drug conviction aggravator of § 3592(c)(12) is to be treated differently than every other prior conviction aggravator because it directs us to inquire as to whether the defendant "had previously been convicted," (*i.e.,* uses the past-perfect tense), rather than "has previously been convicted" (as does every other statutory, prior conviction aggravator contained within**\*319** § 3592(c), as well as § 3592(b) and (d)).[FN8] This grammatical difference is far too tenuous a basis upon which to conclude that Congress intended that the prior serious drug offense aggravating factor for homicide was to be treated differently than every other prior conviction aggravating factor and every other prior serious drug offense aggravating factor for other crimes under the FDPA.[FN9]

> FN8. 18 U.S.C.A. § 3592(b) and (d) address aggravating factors for espionage and treason and the aggravating factors for drug offense death penalties. They contain identical aggravators for a previous conviction of a serious drug offense, but use the term "has" instead of "had" when referring to them.

> FN9. Higgs contends that this reading of § 3592(c)(12) would be inconsistent with *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), because statutory aggravators must be found by the grand jury and included within the indictment. Because we have concluded that prior convictions need not be alleged in the indictment, submitted to the jury, or proven beyond

a reasonable doubt, *see Almendarez-Torres,* 523 U.S. at 226-27, 118 S.Ct. 1219, we need not interpret § 3592(c)(12) as requiring prior convictions to be prior to the grand jury's indictment in order to pass constitutional muster.

[33] Finally, even if the aggravator was improperly submitted for consideration, the error was harmless. The prior drug offense aggravator was only one of six aggravating factors submitted to and found by the jury, and the jury found only three mitigating factors (and only one of these unanimously-that Higgs was not the sole proximate cause of the deaths). Accordingly, Higgs would not be entitled to relief on this basis.

### 4. Multiple Killings

Finally, Higgs contests the district court's denial of his motion to strike multiple killings in a single criminal episode as a statutory aggravating factor, *see* 18 U.S.C.A. § 3592(c)(16), because reliance upon the aggravating factor violated his rights under the Ex Post Facto Clause. The district court denied the motion, ruling that the aggravating factor was not a substantive change because it did not increase the punishment that was available when the murder was committed.

As discussed earlier, we agree that the "multiple killings" aggravator was improperly submitted to the jury as a statutory aggravating factor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Reliance upon a statutory aggravating factor that was added to the death-penalty statute after a murder is committed would run afoul of the Ex Post Facto Clause *if* the aggravating factor served as the sole aggravating factor that rendered the crime death-eligible because it would clearly "increase the punishment for [the] criminal acts." *Morales,* 514 U.S. at 504, 115 S.Ct. 1597; *see Carmell,* 529 U.S. at 521-525, 120 S.Ct. 1620. It does not follow, however, that Higgs's death sentences are infirm.

In Higgs's case, the jury found the existence of four statutory aggravators for the first-degree murder convictions and three statutory aggravators for the kidnapping conviction. Accordingly, although the district court's submission of the "multiple killings" aggravating factor as a *statutory* aggravating factor was error, its submission as such was harmless error. *See Zant,* 462 U.S. at 884, 103 S.Ct. 2733 ("[A] death sentence supported by at least one valid aggravating circumstance need not be set aside ... simply because another aggravating circumstance is 'invalid' in the sense that it is insufficient by itself to support the death penalty."); *United States v. Paul,* 217 F.3d 989, 1001 (8th Cir.2000) (consideration of inapplicable statutory aggravator was harmless error where jury found two other statutory aggravators existed). Because the jury **\*320** found the existence of at least one intent factor and at least one other properly-submitted statutory aggravating factor, the murder was death-eligible. Any additional statutory and nonstatutory aggravating factors did not increase the *available* punishment and were, instead, appropriately considered by the jury in determining whether to impose the death sentence.

### B. Constitutional Challenges to the Nonstatutory Aggravators

The government submitted two nonstatutory aggravating factors for the jury's consideration-victim impact and obstruction of justice-after having given appropriate notice to the defendant.[FN10] On appeal, Higgs asserts that the statute's authorization of the jury's consideration of nonstatutory aggravating factors is unconstitutional for four separate reasons. We also review these challenges de novo. *See Helem,* 186 F.3d at 454.

> FN10. Prior to the start of the penalty phase, the government withdrew future dangerousness, for which notice had also been given, as an additional nonstatutory aggravating factor.

### 1. The Consideration of Nonstatutory Aggravators by the Jury

[34] First, Higgs argues that the FDPA violates the Eighth and Fourteenth Amendments to the Constitution because the submission of nonstatutory aggravating factors at the penalty phase allows for the random and unguided imposition of the death penalty by jurors. *See McCleskey v. Kemp,* 481 U.S. 279, 304, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (providing that the jury's decision to impose death must be guided by "carefully defined standards that must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

narrow a sentencer's discretion"). We disagree. Once a defendant has been rendered eligible for the death penalty by the jury's finding of a statutory aggravating factor, the use of nonstatutory aggravating factors serves only to individualize the sentencing determination.[FN11] *See* Zant, 462 U.S. at 878-79, 103 S.Ct. 2733 (holding that the use of nonstatutory aggravating factors is appropriate after the jury finds the existence of at least one statutory aggravating factor that narrows the class of defendants eligible for the death penalty); United States v. McCullah, 76 F.3d 1087, 1106-07 (10th Cir.1996) ("The Supreme Court has dealt with the issue of nonstatutory aggravating factors in state capital punishment statutes and has held the use of non-statutory aggravating factors permissible."). Thus, we reject the contention that the FDPA is unconstitutional merely because it allows the sentencing jury to weigh nonstatutory aggravating factors when deciding whether to impose the sentence of death upon a defendant convicted of a death-eligible offense.

> FN11. A nonstatutory aggravating factor is improper if it is not "relevant to the character of the defendant or the circumstances of the crime." Barclay v. Florida, 463 U.S. 939, 967, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring). Higgs does not claim that either of the nonstatutory aggravating circumstances submitted to the jury was invalid on this basis.

2. Proportionality Review by the Court

[35] Higgs next claims that the FDPA is facially unconstitutional because it does not require proportionality review of a death sentence. Although acknowledging that the Supreme Court has held that the Eighth Amendment does *not* require state courts to conduct such a review, *see* Pulley v. Harris, 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), Higgs asserts such review *is* required when a death penalty scheme allows a jury to weigh nonstatutory aggravating factors in deciding whether to impose a death sentence.

**\*321** Higgs bases this argument on two cases in which the Supreme Court observed that proportionality review is a useful safeguard against arbitrary imposition of the death penalty. *See* Zant, 462 U.S. at 890, 103 S.Ct. 2733; Gregg v. Georgia, 428 U.S. 153, 198, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Neither case, however, holds that proportionality review is mandated, and both predate the Court's decision in *Pulley.* As noted by the Court in *Pulley,* "that some schemes providing proportionality review are constitutional does not mean that such review is indispensable.... Examination of our [prior] cases makes clear that they do not establish proportionality review as a constitutional requirement." Pulley, 465 U.S. at 44-45, 104 S.Ct. 871. Nor are we persuaded by Higgs's attempt to distinguish *Pulley* because it did not deal with a death penalty scheme involving nonstatutory aggravating factors. *See* Jones, 132 F.3d at 240-41 (rejecting attempt to distinguish *Pulley* from application to the FDPA on this basis, and holding that "the Constitution does not mandate proportionality review when the capital sentencing scheme permits the jury to consider nonstatutory aggravating factors as long

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

as the statute provides for other safeguards against an arbitrary imposition of the death penalty"); *see also United States v. Allen,* 247 F.3d 741, 760 (8th Cir.2001) (holding "that the FDPA has sufficient safeguards-notably the requirements that a jury find beyond a reasonable doubt the existence of one statutory aggravating factor and at least one of four requisite levels of specific intent on the part of a defendant, not to mention various other procedural protections-such that proportionality review is not required in order for the FDPA to pass constitutional muster"), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). Accordingly, we reject Higgs's claim that the FDPA violates the Eighth Amendment because it does not require proportionality review.

### 3. Improper Delegation by Congress

[36] Higgs next contends that, by affording prosecutors virtually unlimited discretion in identifying and defining nonstatutory aggravating factors, the FDPA impermissibly delegates legislative power to government prosecutors in violation of the separation-of-powers doctrine.

We likewise reject this argument. First, the statute does not delegate a legislative function to the prosecutor. The prosecutor's discretion with regard to defining what is a death-eligible offense is wholly circumscribed by the statute's requirement that the jury unanimously find at least one intent factor and one statutory aggravating factor before the defendant becomes death eligible. *Cf. Jones,* 527 U.S. at 376-77, 119 S.Ct. 2090 (noting that, "[e]ven on a finding of intent, ... a defendant is not death eligible unless the sentencing jury also finds that the Government has proved beyond a reasonable doubt at least one of the statutory aggravating factors set forth at § 3592"). Only after the selection of those critical, legislatively-defined factors is made is the prosecutor afforded discretion to argue that additional nonstatutory aggravators combine with the statutory aggravators to outweigh any mitigating factors that have been submitted for consideration, thus assisting the jury in its task of determining whether a death-eligible defendant should indeed receive that maximum sentence. *See, e.g., id.* at 377-78, 119 S.Ct. 2090; *Jones,* 132 F.3d at 240.

Moreover, to the extent that this discretion could be viewed as a delegation of legislative power, such delegation is constitutionally permissible. *See Tipton,* 90 F.3d at 895 (rejecting facial challenge to the death sentencing provisions of **\*322** 21 U.S.C.A. § 848, which also permits the consideration of nonstatutory aggravating factors, because "any delegation involved was sufficiently circumscribed by 'intelligible principles' to avoid violating separation of powers principles"); *Paul,* 217 F.3d at 1003 ("[T]he prosecutor's authority to define non-statutory aggravating factors is a constitutional delegation of Congress' legislative power."); *Jones,* 132 F.3d at 239-40 (same); *McCullah,* 76 F.3d at 1106 (holding that "[t]he prosecutorial discretion to promulgate non-statutory aggravating factors falls squarely within the permissible delegation of power to the Executive Branch").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

### 4. Violation of the Ex Post Facto Clause

[37] Higgs's final constitutional challenge to the FDPA's authorization of the use of nonstatutory aggravating factors centers on his claim that the statute violates the Ex Post Facto Clause because it allows the prosecution to define aggravating factors after the crime was committed. The district court rejected this argument based on *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

Although Higgs correctly points out that *Walton* was overruled by *Ring,* he is not entitled to relief. Although aggravating factors do "make[ ] more burdensome the punishment for [the] crime," *Dobbert,* 432 U.S. at 292, 97 S.Ct. 2290, nonstatutory aggravating factors and mitigating factors are weighed by the jury to make the individualized determination to impose the death sentence upon a defendant who has already been found eligible. They do not increase the possible punishment or alter the elements of the offense.

### C. Evidentiary Challenges to the Obstruction Aggravator

Higgs also raises challenges to the evidence admitted by the district court in support of the nonstatutory aggravating factor of obstruction of justice. The government argued that Higgs obstructed the investigation into and prosecution of the murders based upon evidence that Higgs, along with Haynes and Gloria, got rid of the .38 caliber murder weapon and disposed of any physical evidence that the three women had been in Higgs's apartment that evening; that Higgs solicited false statements and testimony from Phyllis Smith, Smith's family members, and Darby concerning his whereabouts on the night of the murder in order to establish an alibi; that Higgs, while incarcerated, made plans with at least one accomplice to eliminate Gloria as a witness; and that Higgs attempted to intimidate an eyewitness to the Chaconia shooting to help defeat the D.C. charges against him. We review the district court's rulings for an abuse of discretion. *See United States v. Lancaster,* 96 F.3d 734, 744 (4th Cir.1996) (en banc).

### 1. Admission of Evidence of Unadjudicated Crimes

[38] We begin with Higgs's contention that it was improper to allow the government to introduce evidence that Higgs engaged in obstruction of justice by getting rid of the murder weapon, destroying the physical evidence of the victims' presence in his apartment, directing Smith and her family to lie to the police and the grand jury regarding his whereabouts on the night of the murder, and planning the elimination of Gloria as an eyewitness against him. Because prior convictions are specifically included as statutory aggravating factors, *see* 18 U.S.C.A. § 3592(c), Higgs asserts that only conduct that results in a conviction for listed crimes may constitute an aggravating factor. Accordingly, the argument goes, the **\*323** district court erred in admitting evidence of an uncharged and unadjudicated offense of obstruction of justice.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

This argument is plainly without merit. Although the FDPA does specify certain types of convicted criminal conduct that may be used as a statutory aggravating factor authorizing imposition of the death penalty, it also provides that "[t]he jury ... may consider whether any other aggravating factor for which notice has been given exists" when making the individualized decision of whether the authorized sentence of death should indeed be imposed. 18 U.S.C.A. § 3592(c). There is no question that the government gave Higgs appropriate notice that it would pursue obstruction of justice as an additional, nonstatutory aggravator, and we have no doubt that Higgs's destruction of evidence and tampering with witnesses in order to cover his tracks, impede the investigation into the murders, and increase his chances of being acquitted were highly relevant aggravating circumstances which were properly submitted to the jury for its consideration in making the requisite individualized determination. For the same reasons, we also reject Higgs's contention that its probative value was outweighed by the dangers of unfair prejudice and confusion.

We may summarily reject Higgs's assertion that introduction of the evidence was prohibited by the Fifth, Sixth, and Eighth Amendments to the Constitution because the evidence lacked the requisite indicia of reliability necessary to impose a sentence of death and because the jury would be unable to fairly evaluate that evidence. The jury was carefully instructed that the government was required to "prove beyond a reasonable doubt that the defendant tampered

and attempted to tamper with evidence and witnesses for the purpose of obstructing the investigation of the kidnappings and murders" of the three women. J.A.1932. Accordingly, we find no error or abuse of discretion in the district court's submission of this evidence to the jury for its consideration as a nonstatutory aggravating factor.

### 2. Admission of Evidence Referring to Haynes's Confession

[39] Higgs next challenges the district court's decision to allow Captain Robert Rule of the United States Park Police to introduce statements made by Haynes in his confession, which corroborated the testimony of Gloria and others, regarding the actions they took to eliminate physical evidence immediately after the murders. During the guilt phase, Gloria testified that either Higgs or Haynes disposed of the murder weapon in the Anacostia River immediately after the murders and that the three men then returned to the apartment to clean it and dispose of any items the women might have touched. Corroborating testimony was also introduced that the rented videotapes were never returned to the video store and that no victim fingerprints were found in the apartment. According to Captain Rule, Haynes's statements corroborated Gloria's testimony that Higgs drove from the murder scene to the Anacostia River, where Haynes threw the gun into the water, and that the three men then returned to Higgs's apartment where they cleaned it of potentially incriminating evidence.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Higgs objected to Captain Rule's testimony regarding Haynes's statements, asserting that the testimony was more prejudicial than probative. The district court rejected this assertion and admitted the testimony because, even if the rules of evidence applied, the statement was a declaration against interest. *See* 18 U.S.C.A. § 3593(c) ("Information is admissible regardless of its admissibility under the **\*324** rules of evidence governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.").

On appeal, Higgs now argues that the admission of Haynes's statements through Captain Rule violated the Confrontation Clause of the Sixth Amendment, which he contends does remain applicable during the penalty phase of the proceedings. Because this constitutional claim was not raised below, we review it only for plain error. *See Olano,* 507 U.S. at 732, 113 S.Ct. 1770. In order to prevail under this standard, Higgs must establish that an error occurred, that it was plain, and that it affected his substantial rights. *Id.* Further, even if Higgs can make such a showing, we would exercise our discretion to correct such error only if it seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. Assuming arguendo that the admission of Haynes's statements would be a violation of Higgs's rights under the Confrontation Clause during the guilt phase, *see Lilly v. Virginia,* 527 U.S. 116, 139, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality) (holding that a defendant's Sixth Amendment right to confront the witnesses against him was violated when an out-of-court statement made by his non-testifying co-defendant, which incriminated the defendant, was admitted into evidence at their joint trial), such presumed error was not plain in the context of Higgs's sentencing phase. It is far from clear that the Confrontation Clause applies to a capital sentencing proceeding. *Cf. United States v. Terry,* 916 F.2d 157, 160-61 (4th Cir.1990) ("United States courts have a long history of using reliable hearsay for sentencing" and a "trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain") (internal quotation marks omitted). In *Bassette v. Thompson*, we rejected an argument that the admission of a psychiatrist's report during a capital sentencing proceeding violated the defendant's confrontation rights, relying in part on the Supreme Court's prior holding that the rules of evidence do not apply in such proceedings. *See* 915 F.2d 932, 939 (4th Cir.1990) (citing *Williams v. New York,* 337 U.S. 241, 251, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)); *but see Proffitt v. Wainwright,* 685 F.2d 1227, 1254 (11th Cir.1982) (reaching contrary conclusion). And, in *Maynard v. Dixon,* 943 F.2d 407, 414 n. 5 (4th Cir.1991), we noted that the question of whether the Confrontation Clause applies in sentencing proceedings remains undecided.

Thus, even if the introduction of Haynes's statements through Captain Rule during the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

sentencing proceeding was error, we cannot say that the error was plain since it even now remains unclear whether the Confrontation Clause applies in this circumstance. *See Promise,* 255 F.3d at 160 (An error is plain "when the settled law of the Supreme Court or this circuit establishes that an error has occurred."). In addition, even if we were to assume error that was plain, we would not grant relief. Haynes's statements were merely corroborative of Gloria's eyewitness testimony regarding Haynes's and Higgs's acts of disposing of the gun and any physical evidence in the apartment, as well as the corroborative testimony that no fingerprints were found and that the videotapes were indeed never returned. Given the cumulative nature of the precise evidence challenged, and the overwhelming evidence otherwise proffered in support of the obstruction**\*325** aggravator, we cannot say that Rule's limited testimony regarding Haynes's statements affected Higgs's substantial rights, nor would we exercise our discretion to correct the error as it did not seriously affect the fairness, integrity or public reputation of the judicial proceedings.

### 3. Admission of Evidence Pertaining To The Chaconia Shooting

Higgs also challenges the admission of evidence that he attempted to obstruct the prosecution of charges filed against him related to the Chaconia Nightclub shooting, in order to minimize the damaging effect of that looming conviction in his murder case.

Higgs was charged with the Chaconia shooting in the D.C. Superior Court and housed at the D.C. jail. Higgs's counsel for the Chaconia charges believed that Richard Diolamou, who was at the Chaconia Nightclub on the night of the shooting and incarcerated elsewhere on unrelated charges, could offer testimony that would be helpful to Higgs's case. Thus, Diolamou was transferred to the D.C. jail in April 1999, pursuant to a writ issued on Higgs's behalf, and was questioned by Higgs's counsel on three occasions. On the first two occasions, Diolamou failed to offer any helpful information. On the third occasion, Higgs personally attended the meeting with his attorney, but Diolamou again failed to offer any helpful information. Later, Higgs and another inmate, known by the name "Doc" to Diolamou, entered the room where Diolamou was watching television. After Higgs and Doc conversed privately for a short time, Doc left the room and returned with a screwdriver or shank. According to Diolamou, Higgs had "a smirk on his face." J.A. 1555. Diolamou became concerned about his safety and asked to be moved away from Higgs. He was not moved from Higgs's unit, but after the Chaconia case was dismissed in May 1999, Higgs wrote Diolamou a note stating that there were "no hard feelings" between them and wishing him luck on the street. J.A. 1537. The government argued that Higgs's intimidation of Diolamou was designed to obtain either a dismissal or acquittal on the Chaconia charges so that it would not harm his case on the murder charges.

Higgs first complains that the district court abused its discretion in admitting Diolamou's testimony because he did not receive pretrial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

notice that the government intended to introduce evidence concerning Diolamou or the Chaconia shooting in support of the obstruction of justice nonstatutory aggravator. This argument is plainly without merit. The FDPA and the Constitution require that the defendant receive adequate notice of the aggravating factor, which Higgs admittedly received in this case, not notice of the specific evidence that will be used to support it. *See* 18 U.S.C.A. § 3593(a) (requiring only that the government's notice "set[ ] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death"); *United States v. Battle,* 173 F.3d 1343, 1347 (11th Cir.1999) (observing that notice given to a defendant of the applicable aggravating factors in a death penalty case is not the same as notice of the specific evidence that the government intends to present at a sentencing hearing), *cert. denied,* 529 U.S. 1022, 120 S.Ct. 1428, 146 L.Ed.2d 318 (2000); *cf. Gray v. Netherland,* 518 U.S. 152, 167-68, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (noting that there is no constitutional right to advance notice of the government's evidence in aggravation at a capital sentencing hearing).

[40] Higgs also challenges the district court's conclusion that the evidence was **\*326** relevant to the obstruction aggravator because it reflected Higgs's attempts "to dissociate himself from the bullet in the Chaconia shooting that is tied to the deaths." J.A. 1394. Higgs asserts that no such relevance exists because the bullet recovered from the Chaconia shooting was not the same *type* of bullets used to murder the three women, *i.e.,* it was not a wadcutter bullet. While true, this distinction does not render the evidence

irrelevant. The bullet used in the .38 caliber revolver during the Chaconia shooting was only of a different *type* than those used in the murders. Indeed, while forensic evidence could not establish an exact match, the bullets examined from the murders, the Chaconia shooting, *and* the Cherry Lane shooting all had the same land and groove impressions, consistent with being fired from the same .38 caliber weapon. Accordingly, we hold that the district court did not abuse its discretion in admitting the evidence.

### D. Challenges to the Mitigation Case

#### 1. Challenges to Rulings Regarding Higgs's Culpability

As a mitigating factor in his case, Higgs argued that Haynes was equally culpable in the crimes, but had not been sentenced to death. *See* 18 U.S.C.A. § 3592(a)(4). On appeal, Higgs contends that the district court violated his rights to due process and a fair trial by (1) denying his motion to preclude the government from offering the contrary argument that Higgs was more culpable than Haynes, the admitted triggerman, and (2) denying his motion to introduce arguments made by the government during Haynes's trial about the relative culpability of the two men, which Higgs believed to be irreconcilable with the government's current position. We review the district court's rulings for an abuse of discretion. *See United States v. Barnette,* 211 F.3d 803, 816 (4th Cir.2000).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

[41] In some situations, the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants. For example, due process may be violated if "an inconsistency ... exist[s] at the *core* of the prosecutor's cases against the defendants for the same crime," *see Smith v. Groose,* 205 F.3d 1045, 1052 (8th Cir.2000) (finding due process violation where prosecution obtained two convictions for the same murder based on conflicting statements from the same cooperating codefendant) (emphasis added), or where the evidence used at the two trials is "factually inconsistent and irreconcilable," *Paul,* 217 F.3d at 998 (holding that government's argument that both defendants were the triggerman and killed the victim was not inconsistent). *See also United States v. GAF Corp.,* 928 F.2d 1253, 1260 (2d Cir.1991) (holding that the defendant could inform the jury that the government had pursued a different theory during a previous trial).

[42] No such inconsistency exists in this case. The "inconsistent" arguments relied upon by Higgs stem from arguments the government made in response to Haynes's tactic of conceding that he was the triggerman, but arguing that he committed the murders under duress from Higgs. Specifically, the government argued that, even though Higgs may have told Haynes to shoot the women, Haynes acted of his own free will and made the voluntary choice to commit three brutal acts of violence. Higgs asserts that the government's argument that Higgs was the mastermind and driving force behind the murders, and, therefore more culpable than Haynes because he ordered Haynes to kill the women, was inconsistent with **\*327** the

argument it advanced in Haynes's trial.

We disagree. The government argued precisely the same factual predicate for Haynes's and Higgs's convictions, *i.e.,* that Higgs retrieved the gun from his apartment, drove the van to the murder scene, and handed the gun to Haynes after the women got out of the vehicle. And, the government has consistently represented that Haynes was the sole triggerman in the murders. The government did not argue at Haynes's trial that Haynes was more culpable than Higgs, but rather that Haynes deserved the death penalty because he was no less than an equal partner in crime with Higgs. Nor did the government take any other position in the prior trial that would preclude it from arguing that Higgs was actually more culpable than Haynes. In short, the argument that Haynes was a "partner in crime" with Higgs because he could have chosen not to murder the women is not inconsistent with the argument that Higgs was more culpable because he brought the murder weapon to the scene and told Haynes to do it. It was certainly not so inconsistent as to amount to a due process violation.

2. The Jury's Failure to Find Equal Culpability

In a similar vein, Higgs argues that his death sentence must be vacated and the case remanded because the jurors failed to find as a mitigating factor that Haynes was equally culpable in the crime, but did not receive a death sentence. Higgs contends that the mitigating factor was established by uncontradicted evidence and, therefore, that the jury's failure to find the factor

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

reflects an arbitrary and unreliable decision requiring us to vacate the sentence. *See* 18 U.S.C.A. § 3595(c)(2)(A) ("Whenever the court of appeals finds that ... the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor[,] ... the court shall remand the case for consideration under section 3593 or imposition of a sentence other than death.").

Under 18 U.S.C.A. § 3592(a)(4), the jury is to consider, as a mitigating factor, whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C.A. § 3592(a)(4). At Higgs's request, the district court submitted the factor to the jury. However, although the jury unanimously found that Higgs was not the sole proximate cause of the victims' deaths, it unanimously refused to find that Haynes was equally culpable in the commission of the three capital murders.

[43][44] Higgs argues that his death sentence must be reversed because the mitigating factor was supported by uncontradicted evidence that Haynes had been convicted on identical charges and sentenced to life. This argument fails, however, because the Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating. *See generally Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality). There is no constitutional requirement that the jury find a mitigating factor even when it is supported by uncontradicted evidence. *See Paul,* 217 F.3d at 999-1000. In addition, the jury's failure to find that Haynes's life sentence was a

mitigating factor for Higgs was supported by the evidence. Although it was undisputed that Haynes was the triggerman, a rational juror could well have found that Higgs had the dominant role in the murders and, therefore, that Higgs and Haynes were not "equally culpable in the crime." 18 U.S.C.A. § 3592(a)(4). Equal culpability was simply not established by uncontradicted evidence.

**\*328** 3. Evidence of Higgs's Death-Eligibility under Maryland Law

[45] We review de novo Higgs's claim that the district court violated the Eighth Amendment by refusing to submit to the jury, as a mitigating circumstance, that Higgs would not have been eligible for the death penalty if the murders had occurred within the jurisdiction of the State of Maryland. Higgs sought to introduce expert testimony that, under Maryland law, the death penalty may only be imposed on the "triggerman" in cases such as this and to argue that, because the murders took place in an area where Maryland had an easement over federal property, he could not have known that he was on federal land when he committed the murders.

We find no error in the district court's refusal to submit the proposed mitigating factor to the jury. Section 3592(a) provides that "[i]n determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor." 18 U.S.C.A. § 3592(a). In addition to seven enumerated factors, the statute requires consideration of "[o]ther factors in the defendant's background,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

record, or character or any other circumstances of the offense that mitigate against imposition of the death sentence." *Id.* Higgs asserts that his unknowing presence within federal jurisdiction, as opposed to the jurisdiction of the State of Maryland where he would have been ineligible for a death sentence, is a "circumstance[ ] of the offense that mitigate[s] against imposition of the death sentence." *Id.* We disagree.

The Constitution requires that the jury "not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett,* 438 U.S. at 604, 98 S.Ct. 2954. However, evidence not falling within these categories may be excluded as irrelevant. *See Lockett,* 438 U.S. at 604 n. 12, 98 S.Ct. 2954.

We are satisfied that the district court properly rejected Higgs's request. An assertion that the death penalty is improper in one jurisdiction because it is not allowed in another is, at bottom, a reflection of the debate surrounding the propriety of the death penalty, which is a matter of policy for the legislative branch. *Cf. United States v. Johnson,* 223 F.3d 665, 675 (7th Cir.2000) (affirming the district court's refusal to allow the defendant to argue that life imprisonment was sufficient punishment because such an argument was better addressed to the legislature). As such, it was not error to refuse to submit it as a mitigating factor in this case.

E. Challenge to the Government's Rebuttal Evidence

Higgs also contends that the district court erred in allowing the government to introduce as rebuttal evidence numerous prison infractions committed by Higgs while he was incarcerated.

In support of his mitigation case, Higgs presented testimony of a mitigation expert and family members regarding his family history and educational background. This evidence revealed that Higgs was born to a single mother and that his father was uninvolved in his childhood. When Higgs was ten years old, his mother died of breast cancer. Higgs went to live with his aunt and uncle, Constance and Hugh McKinnon, and was cared for by his extended family. When Higgs was eleven years old, another uncle was killed in a mugging and his grandmother died. His grandfather died a few years later. With regard to his educational background, Higgs repeated the second grade because of reading difficulties. However, he was an average student in high school, played high school **\*329** sports, and graduated at the age of nineteen.

Mrs. McKinnon, Higgs's aunt, testified that Higgs assisted his mother during the last days of her battle with cancer, but that money he received from a medical malpractice suit after his mother's death, in her opinion, had a negative effect upon Higgs's work ethic. However, Mrs. McKinnon offered positive testimony concerning Higgs's relationship with his four-year-old son Daquon and testified that she believed the contacts between Daquon and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Higgs were important for Daquon. Higgs's cousins, Gerard McKinnon and Alexa Cave, both testified that they viewed Higgs as their brother and were supportive of him. Cave testified that Higgs also had a positive relationship with her son, whom she refers to as Higgs's nephew, which had continued during his incarceration. In support of her testimony, three letters that Higgs had written to Cave while he was incarcerated were introduced into evidence. In the letters, Higgs wrote that he was "try[ing] to stay out of trouble" and that he was trying to be the best "father, uncle and brother" that he could be. J.A. 1802. In short, Higgs sought to establish, as potentially mitigating factors, the fact that a sentence of death would have an adverse impact on Higgs's son and Cave's son, that he was trying to be a good prisoner, and that other factors in Higgs's background, record, character, or other circumstances of the offense mitigated against imposition of the death sentence.

In rebuttal, the government elicited testimony about a sealed juvenile adjudication for an armed robbery committed by Higgs when he was a senior in high school, as well as information that Higgs had been arrested in 1996 for possession of a gun on college grounds. The government also presented evidence of multiple prison infractions that Higgs had committed while incarcerated. Among other incidents, the government introduced evidence that Higgs had failed to cooperate with an institutional count; had demonstrated disorderly, disruptive, and disrespectful behavior on a number of occasions; had been caught in possession of a weapon; had engaged in a theft and fighting incidents; had thrown a cup of urine on another inmate; and

had refused to provide information or cooperate in the investigation of a stabbing of Higgs by another inmate. Higgs objected to the introduction of his prison infractions, contending that the evidence lacked any nexus with Higgs's mitigation case and amounted instead to the improper admission of evidence of his future dangerousness, a non-statutory aggravator that the government had withdrawn prior to starting the penalty phase. The district court admitted the evidence, over Higgs's objection, ruling that it was proper and fair "evidence to rebut the picture that the defendant has drawn with regard to who he is now and his future relationship with his son." J.A. 1803.

[46] "[W]hen otherwise inadmissible, rebuttal evidence must be reasonably tailored to the evidence it seeks to refute." *Stitt*, 250 F.3d at 897 (footnote omitted). Rebuttal evidence is "[e]vidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party" or "which tends to explain or contradict or disprove evidence offered by the adverse party." *Id.* (alterations in original). "Rulings related to admission and exclusion of evidence are addressed to the sound discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Id.* at 896.

[47] Here, we find no error in the district court's decision to allow evidence of Higgs's prison infractions as rebuttal to his mitigation case. Higgs's mitigation evidence was directed in part to establish that **\*330** he was attempting to stay out of trouble while incarcerated and that he was and intended to continue to be a good influence on his son and his nephew from prison. By

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

presenting such evidence, Higgs opened the door to the subject of his "staying out of trouble" in prison and the evidence of Higgs's numerous infractions of prison rules at various facilities was reasonably tailored to refute the image Higgs attempted to create in mitigation. In addition, the district court gave the jury a limiting instruction prior to admission of the evidence, informing them that the rebuttal evidence could "only be considered by [them] insofar as it may rebut the mitigating factors that ha[d] been specified by the defendant" and was "not to be considered by [the jury] for any other purpose." J.A. 1835. Accordingly, we hold that the district court did not abuse its discretion in admitting the rebuttal evidence.

#### F. The Penalty Phase Summation

[48] Higgs next contends that the government engaged in improper argument during its penalty phase summation and rebuttal that deprived Higgs of a fair sentencing hearing. Specifically, Higgs claims that the prosecutor (1) improperly argued that the jurors were required by the law and their oath to impose a sentence of death, (2) improperly argued that Higgs was more culpable than Haynes for what occurred that night and that the jury should disregard the "equally culpable" mitigating factor argued by the defense, (3) improperly argued that the jury could not consider mercy in rendering its decision, (4) improperly interjected her personal opinion of Higgs and the verdict in her argument, and (5) improperly argued that Higgs would lead a soft life in prison if not executed.

[49][50][51] "Improper remarks during closing argument do not always mandate retrial. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Mitchell,* 1 F.3d 235, 240 (4th Cir.1993) (internal quotation marks omitted). In order to obtain a new trial on the basis of prosecutorial misconduct, Higgs must demonstrate (1) that the government's remarks were in fact improper and (2) that the remarks "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *Id.* (internal quotation marks omitted). In evaluating prejudice, a number of factors should be considered:

(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*Id.* at 241 (internal quotation marks omitted). Ultimately, "[t]he issue of whether improper argument by government counsel has so prejudiced the trial process as to require reversal must be gauged from the facts of each trial." *Id.* (internal quotation marks and alterations omitted).

#### 1. The Jurors' Duty to Impose Death

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

Higgs's first claim of prosecutorial misconduct, that the government improperly argued that the jurors were required by their oath and law to impose the death penalty, is without merit. In support of this claim, Higgs points to a number of statements in which the government reminds the jury of its oath to impose the death sentence if justified by the facts and the court's instructions and to the **\*331** government's argument that the death penalty is the only just resolution of the case. The government's arguments strongly urged imposition of the death penalty given the egregious nature of the murders. However, they did not contradict the instructions given by the trial court regarding aggravating and mitigating circumstances or exceed the bounds of proper argument concerning the propriety of imposing the sentence under those instructions. Nor, in any event, would we conclude that the comments "so prejudiced the trial process as to require reversal." *Id.* (internal quotation marks omitted). The complained-of comments were isolated, did not rise to the level of argument that might mislead or inflame the jury concerning its duty or divert it from its task, and were made in the context of a case involving compelling evidence of numerous aggravating factors.

### 2. The "Equal Culpability" Factor

We also reject Higgs's contention that the prosecution improperly argued that Higgs was more culpable than Haynes for what occurred that night and that the jury should disregard the "equally culpable" mitigating factor argued by the defense. The first claim essentially repeats Higgs's argument that the government

impermissibly presented contradictory theories of the case in the trials of Haynes and Higgs and, for the reasons previously set forth in the discussion of that issue, is also without merit. The related second claim likewise fails. The government did not tell the jury that it should disregard the proffered mitigating factor, *i.e.,* that Haynes was an "equally culpable" defendant who received a life sentence. Rather, the government argued that the jury was not required to reach the conclusion that Haynes was equally culpable or otherwise reach the same sentencing result in Higgs's case as the jury did in Haynes's case. There was nothing improper about this argument.

### 3. The Consideration of Mercy

Higgs next contends that the government impermissibly made the following argument during summation:

> [M]ercy is not what this case is about. Mercy is not in the instructions. It is not something you do in this case. Put aside all of those things.

J.A.2037. Higgs contends that this statement was improper because it misrepresented and misstated the law concerning capital sentencing. The district court instructed the jury that, regardless of the findings on aggravating and mitigating circumstances, the death penalty was not required to be imposed. In a nutshell, Higgs argues that mercy is always an implicit sentencing consideration, and that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

government improperly argued that the jury should set aside such a consideration. *See* [18 U.S.C.A. § 3592(a)(8)](); [*Nelson v. Nagle,* 995 F.2d 1549, 1555-57 (11th Cir.1993)]().

Higgs correctly argues that the jury is empowered to show mercy to reject a death sentence. Here, the prosecutor appropriately argued that "mercy is not what this case is about" and that the jury should "[p]ut aside all of those things." J.A.2037. However, the prosecutor's statements that "mercy is not in the instructions," and "not something you do in this case" (as opposed to not something it *should* do) arguably crossed into an argument in contradiction of the district court's instructions. However, we need not definitively determine whether the prosecutor's remarks were improper. Even if Higgs could demonstrate that the comments amounted to error, they did not prejudicially affect Higgs's substantial rights so as to deprive him of a fair trial. The challenged remarks amounted to isolated statements in **\*332** a lengthy closing argument. There is no indication that the comments were made to confuse or mislead the jury, and the district court explicitly instructed the jury that it need not impose the death sentence regardless of the findings on mitigation and aggravation. *See* J.A.1996 ("Even if you find that all of the aggravating factors are established beyond a reasonable doubt and that none of you ha[ve] [found] that any mitigation has been established at all, you still have the right to decide against the death penalty in the case....").

### 4. The Expression of Personal Opinion

Higgs next argues that the prosecutor improperly injected her personal opinion about Higgs by repeatedly using the personal pronoun "I." In particular, Higgs objects to the following statement from the conclusion of the prosecutor's argument:

> I keep coming back to these beautiful young women and I look at them and I can't believe ... Mr. Higgs has caused this hell for so many people, that he has ruined so many lives with his actions and the way he has chosen to live his life. I have to think, ladies and gentlemen, this world would have been a better place without Dustin Higgs. The hard truth is, ladies and gentlemen, it would be a better world in the future without Dustin Higgs.

J.A.1982.

[52] As a general premise, a prosecutor's repeated references to his or her personal opinion about a defendant may indeed be found improper. *See* [*Boyd v. French,* 147 F.3d 319, 328-329 (4th Cir.1998)](). However, a prosecutor's "use [of] the phrase 'I think' in an innocuous, conversational sense" does not violate due process because such use "do[es] not suggest an attempt to replace the evidence with the prosecutor's personal judgments." [*United States v. Adam,* 70 F.3d 776, 780 (4th Cir.1995)](). Prosecutors must remain mindful to avoid the expression of personal opinions. However, in this case, the prosecutor's statements did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." [*Mitchell,* 1 F.3d at 240]().

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

### 5. Higgs's Life in Prison

We summarily reject Higgs's final claim that the government improperly argued that life imprisonment would be soft because Higgs could go to school, have a job, establish friendships, talk on the phone to his friends and family, eat food, watch television, read the newspaper, and generally establish a life within the prison community. We find no impropriety in the government's argument, much of which followed similar, but opposing, notions argued by Higgs that life in prison meant life in a high security place of confinement where Higgs would be continuously monitored. In any event, we would not grant him relief. The remarks did not so prejudicially affect Higgs's substantial rights so as to deprive him of a fair sentencing hearing.

### G. Passion and Prejudice

The FDPA requires us to "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," 18 U.S.C.A. § 3595(c)(1), in violation of the Fifth, Sixth, and Eighth Amendments. In undertaking this duty, "we look to the record to see if these factors motivated the jury's recommendation of the death penalty, including an analysis of the aggravating factors to see if the jury had an abundance of evidence to support imposition of the death penalty." *Barnette,* 211 F.3d at 821. Higgs argues that the emotional content of this case was so extreme as

to render his death sentences invalid under this provision.**\*333** We disagree. We find no basis upon which to conclude that the jury imposed the death penalty under improper influence. "[W]hile [death penalty] proceedings must be free from passion, prejudice, and other arbitrary factors, a death penalty case will not be emotionless." *Id.* Here, we find no indication that the jury was swayed by emotion rather than reason in deciding to impose the sentences of death upon Higgs.

### H. Cruel and Unusual Punishment

Higgs preserves for appellate review his argument that the death penalty is cruel and unusual punishment under all circumstances and, therefore, violates the Eight Amendment. As acknowledged by Higgs, this argument is foreclosed by Supreme Court precedent. *See McCleskey,* 481 U.S. at 300-03, 107 S.Ct. 1756; *Gregg,* 428 U.S. at 187, 96 S.Ct. 2909; *Jones,* 132 F.3d at 242.

### VI. Firearm Sentences

[53] Finally, we review de novo Higgs's challenge to the term of imprisonment imposed for the three § 924(c) firearm convictions. The district court imposed consecutive sentences of five years imprisonment, twenty years imprisonment, and twenty years imprisonment on Count Five (use of a firearm during and in relation to the murder and kidnapping of Black), Count Ten (use of a firearm during and in relation to the murder and kidnapping of Chinn),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)

and Count Fifteen (use of a firearm during and in relation to the murder and kidnapping of Jackson), respectively. The twenty-year sentences were imposed pursuant to § 924(c)'s requirement of such enhanced penalties for all "second or subsequent" convictions. *See* 18 U.S.C.A. § 924(c)(1). On appeal, Higgs challenges the enhanced twenty-year sentences, arguing that they were not "second or subsequent" within the meaning of the statute because all three counts arose from one criminal episode in which a single gunman fired multiple shots.

In *Deal v. United States,* 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), the defendant committed six armed bank robberies over the course of four months. He was charged in a single indictment with six § 924(c)(1) violations, each of which corresponded to one of the bank robberies also charged. After Deal was convicted on all counts, the district court sentenced him to consecutive sentences for each § 924(c)(1) violation. On appeal, Deal argued that the second through sixth § 924(c) convictions were not "second or subsequent" to the first because they had been charged in the same indictment and sentenced at the same time. The Supreme Court rejected this argument, concluding the language of § 924(c)(1) only requires "a conviction after the first conviction." *Id.* at 135, 113 S.Ct. 1993 (emphasis omitted). It does not speak in terms of criminal episodes.

In the wake of *Deal,* at least two courts have rejected the argument Higgs makes here: that multiple consecutive sentences cannot be imposed for § 924(c)(1) convictions arising out of the same criminal episode. *See United States v. Casiano,* 113 F.3d 420, 424-26 (3d Cir.1997); *United States v. Andrews,* 75 F.3d 552, 557-58 (9th Cir.1996); *cf. United States v. Burnette,* 170 F.3d 567, 572 (6th Cir.1999) ("It is now firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode are lawful."); *United States v. Camps,* 32 F.3d 102, 109 (4th Cir.1994) (holding that enhanced sentences for consecutive § 924(c) convictions arising out of a single predicate offense were not error). Accordingly, we reject Higgs's challenge to the enhanced twenty-**\*334** year sentences imposed for his second and third § 924(c) convictions.

## VII. Conclusion

For the foregoing reasons, we find no reversible error with respect to the issues that Jackson has raised on appeal. As set forth above, the evidence clearly supports the jury's special findings of the existence of at least one of the aggravating factors listed in § 3592 for each murder and kidnapping conviction. Having reviewed the entire record in accordance with § 3592(b), we are also satisfied that the sentences of death handed down were not imposed under the influence of passion, prejudice, or any other arbitrary factor. Accordingly, we affirm the convictions and sentences imposed upon Higgs in their entirety.

*AFFIRMED*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

353 F.3d 281
(Cite as: 353 F.3d 281)


C.A.4 (Md.),2003.
U.S. v. Higgs
353 F.3d 281


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

**H**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Fourth Circuit Rule 32.1 (Find CTA4 Rule 32.1)

United States Court of Appeals,
Fourth Circuit.
UNITED STATES of America,
Plaintiff-Appellee,
v.
Dustin John HIGGS, Defendant-Appellant.
**No. 03-19.**

Argued Jan. 20, 2004.
Decided April 20, 2004.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, J., of three counts of first-degree premeditated murder, three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, and three counts of kidnapping resulting in death. Defendant received nine death sentences. Defendant appealed. The Court of Appeals, 353 F.3d 281, affirmed. Defendant

sought post-conviction relief in form of a new trial and new sentencing hearing. The District Court denied relief. Defendant appealed.

**Holdings:** The Court of Appeals, Traxler, Circuit Judge, held that:
(1) failure of government to identify potential witness to defendant and to provide him with copy of notes taken in interview with witness did not constitute *Brady* violation such as would entitle defendant to new trial, and
(2) failure of government to identify potential witness to defendant and to provide him with copy of notes taken in interview with witness did not constitute *Brady* violation such as would entitle defendant to new trial.

Affirmed.

West Headnotes

**[1] Criminal Law 110 🔑 1999**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1993 Particular Types of Information Subject to Disclosure
                    110k1999 k. Impeaching Evidence. Most Cited Cases
    (Formerly 110k700(4))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

Failure of government to identify potential witness to capital murder defendant and to provide him with copy of notes taken in interview with witness did not constitute *Brady* violation such as would entitle defendant to new trial; co-defendant's statement to witness that he "would kill whoever the f---" he wanted to kill, made in heat of confrontation with another inmate, provided no information as to any specific motive on part of co-defendant in murders and no information regarding defendant's involvement in murders, statements to witness did not indicate that co-defendant acted alone or that defendant was not involved, statement had no impeachment value, and evidence of defendant's guilt was overwhelming.

**[2] Criminal Law 110 ⚷ 1999**

110 Criminal Law
　　110XXXI Counsel
　　　　110XXXI(D) Duties and Obligations of Prosecuting Attorneys
　　　　　　110XXXI(D)2 Disclosure of Information
　　　　　　110k1993 Particular Types of Information Subject to Disclosure
　　　　　　110k1999 k. Impeaching Evidence. Most Cited Cases
　　(Formerly 110k700(4))
Failure of government to identify potential witness to capital murder defendant and to provide him with copy of notes taken in interview with witness did not constitute *Brady* violation such as would entitle defendant to new trial; even if co-defendant's statements to witness that "one of the girls may have set him

up" and that he "had to kill her" were favorable to defendant for purposes of his mitigation case to show that defendant and co-defendant were "equally culpable," defendant failed to establish materiality, as evidence of defendant's involvement in murders was overwhelming, as was evidence of his predominant role in events that took place at time in question. 18 U.S.C.A. § 3592(a)(4).

**\*38** Appeal from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, District Judge. (CR-98-520-PJM).**ARGUED:** Timothy Joseph Sullivan, Sullivan & Sullivan, College Park, Maryland, for Appellant. Deborah A. Johnston, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.**ON BRIEF:** Barbara L. Hartung, Richmond, Virginia, for Appellant. Thomas M. DiBiagio, United States Attorney, Greenbelt, Maryland, for Appellee.

Before WILKINS, Chief Judge, and LUTTIG and TRAXLER, Circuit Judges.

Affirmed by unpublished opinion. Judge TRAXLER wrote the opinion, in which Chief Judge WILKINS and Judge LUTTIG joined.

**OPINION**

TRAXLER, Circuit Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

**\*\*1** Appellant Dustin John Higgs ("Higgs") was convicted of three counts of first-degree premeditated murder, *see* 18 U.S.C.A. § 1111(a) (West 2000), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.,* and three counts of kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a)(2) (West 2000), arising out of the January 27, 1996, murders of three young women in the Patuxent National Wildlife Refuge. He ultimately received nine death sentences. We affirmed. *See United States v. Higgs,* 353 F.3d 281 (4th Cir.2003). In this appeal, Higgs challenges the district court's denial of his motion for a new trial and new sentencing hearing based upon the government's failure to disclose favorable evidence in contravention of the rule announced in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). For the following reasons, we affirm.

I.

The facts and evidence pertaining to the triple murders in this case are fully set forth in our prior opinion. Thus, we summarize only those facts most pertinent to Higgs's *Brady* claim.

On the evening of January 26, 1996, Dustin John Higgs, Willis Mark Haynes, and Victor Gloria traveled to Washington, D.C., and picked up Tanji Jackson, Tamika Black, and Mishann Chinn. Higgs knew Jackson, and they had arranged dates for Haynes and Gloria with Black and Chinn. The six returned to Higgs's apartment in Laurel, Maryland, to drink alcohol and listen to music. In the early morning hours of January 27, Higgs and Jackson began to argue violently, culminating in Jackson retrieving a knife from Higgs's kitchen. Gloria and Chinn were in the living room with Higgs and Jackson at the time. Haynes and Black were in the bedroom. Upon hearing the commotion, Haynes came out from the bedroom and broke up the fight.

Despite the early morning hour, the three women abruptly left Higgs's apartment on foot. As they were leaving, Jackson "stopped at the door and said something like I am going to get you all f-ked up or robbed" or made "some kind of threat." J.A. 473. Higgs commented to Haynes and Gloria that Jackson "do know a lot of n-----s." J.A. 474. Higgs, who was watching from inside the apartment, saw Jackson stop and appear to write down the license plate number of his Mazda **\*39** van, and Higgs commented to Haynes and Gloria that Jackson was "writing down [his] sh-." J.A. 474. Higgs then "said f-k that, and grabbed his coat and said come on." J.A. 474. As he was leaving, Higgs retrieved his .38 caliber firearm from the end table drawer and put it in his pocket.

The three men got into Higgs's vehicle and Higgs drove to where the women were walking. At Higgs's direction, Haynes talked the women into getting in the van. Higgs then began driving away from the apartment complex. While en route, Gloria observed Higgs and Haynes, who were sitting in the front seat, leaning towards one another and whispering, but he could not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

hear what the two were saying. Instead of taking the most direct route to Washington, D.C., Higgs drove into the Patuxent National Wildlife Refuge and pulled over at a secluded location. When one of the women asked if they were trying to "make [them] walk from [t]here," Higgs responded, "something like that." J.A. 482. The women then got out of the van. Higgs handed his .38 caliber pistol to Haynes, who put it behind his back and also exited the vehicle. Within moments, Haynes shot and killed all three women.

**\*\*2** Shortly after the killings, the bodies of the three women were discovered strewn about the roadway by a passing motorist. Law enforcement officers found Jackson's day planner at the scene. In it, Jackson had recorded Higgs's nickname ("Bones") and telephone numbers. The notation "13801 'MAZDA' 769GRY"-Higgs's address number and the tag number for his Mazda vehicle-had also been recorded.

After the men left the crime scene, they stopped at a nearby river where they disposed of the gun. They then returned to Higgs's apartment, which they cleaned of any trace of the women's presence that evening, and dropped the trash by a dumpster. Higgs and Haynes then dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut." J.A. 489. Ultimately, Gloria did not abide by Higgs's order. In the fall of 1998, after he was arrested on federal drug charges, Gloria cooperated with the government in its drug distribution and murder investigations of Haynes and Higgs,

ultimately providing eyewitness testimony regarding the murders and the events surrounding the crimes.

On October 5, 1998, Haynes was arrested on a federal complaint for distribution of cocaine base. While in custody, Haynes gave several oral and written statements which largely corroborated Gloria's version of the events that evening. Haynes also admitted that he was the triggerman, but claimed that he shot the women because he was afraid of Higgs.[FN1]

FN1. The following summary of Haynes's confession is set forth in our opinion affirming the kidnapping, murder, and related convictions of Haynes:

In [his] first written statement, Haynes maintained that he was partying with the three women at Higgs' apartment; that Higgs had a fight with one of the women; that Higgs offered to take them home; that Higgs pulled over on a dark road, got out of the vehicle and shot all three women; and that after the shooting Higgs drove to a place where the firearm was thrown into the Anacostia River. Originally, when describing the murders, Haynes wrote, "I ran back to the van." During the question and answer period, Lieutenant Rule asked Haynes why he had written "I ran back to the van," to which Haynes responded that it was a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

mistake and changed the "I" to "he."

*United States v. Haynes,* 26 Fed. Appx. 123, *130, 2001 WL 1459702, at *5 (4th Cir.2001) (internal citations omitted), *cert. denied,* 535 U.S. 979, 122 S.Ct. 1455, 152 L.Ed.2d 396 (2002). Later, Haynes "orally admitted that he had shot the women because he was afraid that Higgs would kill him if he did not kill the women." *Id.* at 131. In a subsequent written statement, he "wrote that he originally lied about who had been the shooter and that he killed the women because he was afraid that Higgs would kill him if he did not." *Id.* There appears to have been no dispute in either trial that Haynes was, indeed, the triggerman.

**\*40** In December 1998, Higgs and Haynes were jointly indicted for first degree murder, kidnapping, and use of a firearm in the commission of a crime of violence, in connection with the abduction and murders of the three young women. The cases were severed for trial. Haynes's trial began in August 2000. He was convicted of the charges, but the jury was unable to reach a unanimous verdict as to the imposition of the sentence of death. Consequently, the court imposed a sentence of life imprisonment. We affirmed his convictions and sentences on appeal. *See United States v. Haynes,* 26 Fed. Appx. 123, 2001 WL 1459702 (4th Cir.2001), *cert. denied,* 535 U.S. 979, 122 S.Ct. 1455, 152 L.Ed.2d 396 (2002). Higgs's trial began in September 2000. He was also convicted of the charges. However, at the conclusion of the sentencing phase of his trial, the jury imposed nine death sentences. His convictions and sentences were also affirmed on appeal. *See Higgs,* 353 F.3d at 334.

In the course of preparing his appeal to this court, Higgs's counsel reviewed the district court record from Haynes's trial and discovered that the government had identified two witnesses who had been incarcerated with Haynes at the Charles County Detention Center. Both witnesses professed to have had conversations with Haynes about the triple murders.

The first inmate, Gerald Vaughn, was called to testify at Haynes's trial. Vaughn testified that, shortly after Haynes's arrest in the fall of 1998, Haynes told Vaughn that he and his "cousin" were partners in drug dealing and that the women were murdered because one of them was holding "a quarter of a million dollars" of their drug money.[FN2] S.J.A 144. Haynes also told Vaughn that he tricked the women into getting into Higgs's van that evening and that Haynes used a .38 caliber weapon to kill them. *See Haynes,* 26 Fed. Appx. at 128.

> FN2. Although Haynes never named the specific identity of his "cousin," Haynes told Vaughn that his cousin was with him when the women were murdered, that his cousin told Haynes they he "should have killed Vic because Vic was weak," but that Haynes "didn't want to do it because Vic was his friend."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

Supp.J.A.II. 175. After Haynes "learned that Vic was cooperating in his coke charge, as well as the murder charges, he was ... saying that he should have killed him." Supp.J.A.II. 175.

**\*\*3** The second inmate was Kevin Anderson. Although the government attorneys submitted under seal a copy of notes taken by them during an interview with Anderson in May 2000, as well as an outline prepared by the prosecutors in anticipation of questioning Anderson at Haynes's trial, Anderson was never called to testify during Haynes's trial and it appears that no further effort was made by Haynes's counsel to obtain copies of those notes or a *Brady* ruling regarding them. According to the notes, Anderson told the prosecutors that, while he and Haynes were incarcerated together, he witnessed a confrontation between Haynes and another inmate over the use of a telephone. In response to the inmate's comment that "you think [you're] big stuff because you killed [three] women," Haynes replied that "I'll kill whoever the f--- I want to kill." Supp.J.A.I. 124. Anderson also said that Haynes later told him that "one of the girls may have set him up" and he "had to kill her." Supp.J.A.I. 125.

**\*41** Upon learning of these statements, Higgs moved for a new trial and new sentencing hearing pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Rule 33 of the Federal Rules of Criminal Procedure. Higgs asserted that the government's failure to identify Anderson as a potential witness and to provide Higgs with a copy of the Anderson interview notes violated his due process rights because Anderson's testimony would have been persuasive evidence that Haynes had his own motive for killing the women and was "equally culpable" with Higgs for the murders.

The district court denied the motion, finding that Anderson's statements would have been neither exculpatory nor of impeachment value in the guilt phase of Higgs's trial. With regard to the sentencing phase of Higgs's trial, the district court found no reasonable probability that a juror would have found that Haynes was "equally culpable" with Higgs and that this mitigating factor, combined with the others, outweighed the aggravating factors so as to result in the imposition of a sentence of life imprisonment instead of death. We review the district court's denial of a motion for a new trial for an abuse of discretion. *See United States v. Stokes,* 261 F.3d 496, 502 (4th Cir.2001), *cert. denied,* 535 U.S. 990, 122 S.Ct. 1546, 152 L.Ed.2d 471 (2002).

II.

In *Brady v. Maryland,* the Supreme Court held that the prosecution's failure to disclose favorable evidence to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. In order to establish that the government's failure to turn over evidence constitutes a *Brady* violation, the defendant must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

demonstrate (1) that the undisclosed evidence was favorable, either because it was exculpatory or impeaching; (2) that the prosecution had the materials and failed to disclose them, either willfully or inadvertently; and (3) that the evidence was material to the defense. *See Strickler v. Greene,* 527 U.S. 263, 280-81, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Moore v. Illinois,* 408 U.S. 786, 794-95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Evidence is "material" for purposes of the *Brady* inquiry "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A " 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* Thus, although "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence-that is, to any suppression of so-called '*Brady* material'-... strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936.

A.

**4** [1] We begin with Higgs's claim that he is entitled to a new trial as to his guilt on the kidnapping, murder, and related charges. Like the district court, we have little difficulty rejecting this claim.

First, Haynes's statement that "I'll kill whoever the f--- I want to kill," made in the heat of a confrontation with another inmate, provides no information as to any specific motive on the part of Haynes in the murders and no information at all regarding Higgs's involvement in the murders.**42** Haynes's later statement that "one of the girls may have set him up" and he "had to kill her" also does not serve to exculpate Higgs from involvement in the crime. The statements to Anderson do not indicate that Haynes acted alone or that Higgs was not involved. At most, it might be viewed as evidence that Haynes and Higgs had a joint motive to kill the women, but even that premise is not inconsistent with the theory that Higgs was involved in deciding to kill the women and carrying out that decision, perhaps to retaliate against Jackson for an earlier action or the threat she made "to get you *all* f-ked up or robbed." J.A. 473 (emphasis added).

Despite Higgs's claims to the contrary, Haynes's statement also had no impeachment value during the testimony of Victor Gloria or Ednisia Darby. With regard to Gloria, Haynes's statement to Anderson cannot be characterized as impeachment evidence because it does not contradict Gloria's account of the events that evening. Indeed, Higgs does not contend that it has direct impeachment value, asserting instead that it would only have allowed him to cast a "different light" upon Gloria's testimony by arguing that the whispered conversation between Haynes and Higgs in the front seat of the van was Haynes telling Higgs that Haynes intended to kill the women instead of Higgs directing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

Haynes to kill them. With regard to Darby, the statement also carried no impeachment value. Darby testified that Higgs admitted to her that he was involved in the murders and that Jackson was "snitching" on someone. Supp.J.A.I. 293. Again, Higgs's statement to Darby is not contradicted by Haynes's statement to Anderson.

Finally, even if we were to assume that Higgs could have introduced Haynes's statements to Anderson and used them in some favorable way during the guilt phase of his trial, Higgs has not established a due process violation because he cannot establish the materiality component of the *Brady* inquiry.

According to the uncontroverted evidence, Higgs and Jackson got into a heated argument that evening, which Haynes broke up. As he watched the women leave, Higgs believed Jackson was writing down his vehicle information. He retrieved the murder weapon, and told the other two men to come with him. After the men enticed the women to enter Higgs's van (most likely under the pretense of taking them home), Higgs drove the group into the deserted Patuxent National Wildlife Refuge where he gave the murder weapon to Haynes. Although primarily related by Gloria's eyewitness testimony, the events that evening and Higgs's involvement in them are corroborated in a number of ways. Jackson's day planner, which was found at the murder scene, contained Higgs's name and telephone numbers, as well as a notation of his address and vehicle license tag number. The next evening, before the names of the victims were released, Higgs

commented in response to a television account of the murders that he knew "that Tanji girl." J.A. 672. Darby testified that Higgs confessed his involvement in the murders to her, told her that the women were killed because Jackson was "snitching" on one of them, and told her that the other two were "just for his friends." Supp.J.A.I. 293.[FN3]

> FN3. We also note that, had Haynes's confessions concerning the murders that night been admitted in addition to his statements to Anderson, the jury would have learned that Haynes's version of the events also corroborated Gloria's version of the events and Higgs's involvement in them.

**\*\*5** In sum, the evidence of Higgs's guilt in the kidnappings and murders was overwhelming, and the evidence is not contradicted by Haynes's statement to Anderson. **\*43** We are satisfied that there is no reasonable probability that the jury would not have convicted Higgs of the kidnappings and murders had they been aware of the undisclosed statements made by Haynes to Anderson. Therefore, we conclude that the district court properly denied Higgs's motion for a new trial on the issue of his guilt.

### B.

[2] Higgs next asserts that he is entitled to a new sentencing hearing because Haynes's statement to Anderson would have given him an additional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

basis upon which to argue that Haynes was "equally culpable" with Higgs in the kidnappings and murders, but only received a sentence of life imprisonment. *See* 18 U.S.C.A. § 3592(a)(4) (West 2000) (providing, as a statutory mitigating factor, that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death").

During the sentencing phase of Higgs's trial, the jury found that the government had proven a total of six aggravating factors: (1) that the deaths occurred during the commission of another crime (kidnapping); (2) that Higgs had a previous conviction of a violent felony involving a firearm; (3) that Higgs had a previous conviction for a serious federal drug offense; (4) that the crimes for which he was on trial involved multiple killings in a single criminal episode; (5) victim impact; and (6) obstruction of justice. Some members of the jury also found the existence of three mitigating factors: (1) that Higgs was not the sole proximate cause of the victims' deaths (12 jurors); (2) that Higgs was impaired by alcohol and marijuana at the time of the murders (2 jurors); and (3) that a sentence of death would have an adverse impact on Higgs's minor son (4 jurors). Although submitted as an additional mitigating factor for consideration, no juror found the existence of the "equally culpable" mitigator. After weighing the aggravating factors against any mitigating factors individually found to exist, the jury unanimously found that the aggravating factors outweighed the mitigating factors and imposed a sentence of death.

Higgs contends that Haynes's statements to Anderson that "one of the girls may have set him up" and that he "had to kill her" were of exculpatory value for purposes of the mitigation case and that, had the jurors known about them, it is reasonably probable that at least one juror would have voted against imposition of the penalty of death. We disagree. Even if we assume that the statements were favorable to Higgs for purposes of the mitigation case, Higgs has not demonstrated the requisite materiality to establish a *Brady* violation.

In order to establish the materiality of Haynes's statements to Anderson, Higgs was required to demonstrate a reasonable probability that the disclosure of the statements would have produced a different outcome in Higgs's sentencing hearing. In this case, the six aggravating factors found by the jury were largely undisputed as a factual matter and wholly unaffected by Haynes's alleged statements to Anderson. The statements also have no bearing upon any mitigating factor submitted to the jury, with the single exception of the "equally culpable" factor. Thus, to establish materiality, Higgs was required to demonstrate a reasonable probability that the evidence would have persuaded a juror to reach the conclusion that Haynes was "equally culpable" to Higgs in the murders, *and* that this mitigating factor, combined with the others, would have tipped the balance and led the juror to also conclude that the mitigating factors outweighed the aggravating factors so as to foreclose the sentence of death. "The mere possibility that an item of undisclosed**\*44** information might have helped the defense, or might have affected the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler,* 523 U.S. at 290, 118 S.Ct. 1244 (internal quotation marks omitted).

**\*\*6** As discussed above, the evidence of Higgs's involvement in the pursuit, kidnapping, and murders of the three women is overwhelming, as is the evidence of his predominant role in the events that took place that evening and early morning. Gloria's testimony, corroborated by Darby's testimony, evidence found at the scene, and other physical evidence, confirms that it was Higgs who set up the "dates" with the girls, Higgs who got into the violent argument with Jackson, Higgs who observed Jackson writing down his license plate number, Higgs who retrieved the .38 caliber murder weapon (which he owned) and told the other two men to come along, Higgs who told Haynes to "trick" the women into getting into the van, Higgs who drove the van past the route back to their homes and into the Patuxent National Wildlife Refuge, Higgs who handed the murder weapon to Haynes moments before Haynes shot and killed the women, and Higgs who orchestrated the destruction of the physical evidence at his apartment after the murders.

Haynes's confession, given in the hours immediately after his arrest, corroborates the evidence presented at Higgs's trial, although his

"reasons" for actually shooting the women varied when he later talked to his co-inmates. In his confession, Haynes said that the women were killed because he thought Higgs would kill him if he did not do as he was told. He told co-inmate Vaughn that he killed the women because one of them owed him and his cousin "a quarter of a million dollars." And, he told Anderson that he had to kill the girls because one of them "may have set him up." In this light, we can discern no reasonable probability that any juror would have viewed the single statement Haynes made to Anderson as sufficient to overcome the overwhelming evidence of Higgs's predominant role in the crimes and concluded that Haynes was "equally culpable" with Higgs in the kidnappings and murders.

In any event, we think Haynes's statement to Anderson might have been viewed (at most) as evidence that Haynes may have thought (or been told by Higgs) that Jackson intended to retaliate against "all" of the men and, therefore, that he shared a motive to kill the women with Higgs. However, there is nothing in Haynes's statements to Anderson that contradicts the overwhelming evidence of Higgs's predominant role in the kidnappings and murders or the government's argument that Higgs was more culpable than Haynes.

Because we are satisfied that the evidence set forth at Higgs's trial provides "strong support for the conclusion that [Higgs] would have been convicted of capital murder and sentenced to death, even if" Haynes's statement to Anderson

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.)))

had been introduced into evidence, *Strickler, 527 U.S. at 294, 119 S.Ct. 1936,* we affirm the district court's denial of Higgs's motion for a new sentencing hearing.

### III.

For the foregoing reasons, we affirm the district court's denial of Higgs's motion for a new trial and new sentencing hearing.

**\*\*7** *AFFIRMED.*

C.A.4 (Md.),2004.
U.S. v. Higgs
95 Fed.Appx. 37, 2004 WL 835795 (C.A.4 (Md.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

H

United States District Court,
D. Maryland.
Dustin John HIGGS, Petitioner,
v.
UNITED STATES of America, Respondent.
**Civil No. PJM 05-3180.**
**Criminal No. PJM 98-0520.**

April 6, 2010.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, J., of first-degree premeditated murder and kidnapping resulting in death, among other crimes, and he appealed. The Court of Appeals, Traxler, Circuit Judge, 353 F.3d 281, affirmed, and defendant moved to vacate, set aside, or correct his sentence.

**Holdings:** The District Court held that:
(1) government did not violate *Brady* in failing to disclose internal studies concerning reliability of comparative bullet lead analysis;
(2) defendant's *Batson* claim was procedurally defaulted;
(3) defendant failed to demonstrate that government engaged in purposeful discrimination in allegedly using its peremptory challenges against prospective female jurors; and
(4) trial counsel did not render ineffective assistance in failing to present defendant's school records as mitigation evidence at sentencing.

Motion denied.

West Headnotes

**[1] Criminal Law 110 ⚷ 1995**

110 Criminal Law

110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k1995 k. Diligence on part of accused; availability of information. Most Cited Cases
Government did not violate *Brady* in failing to disclose internal studies conducted by FBI and state university concerning reliability of comparative bullet lead analysis in prosecution for first-degree premeditated murder; studies' strongest critiques of comparative bullet lead analysis were available in at least one publicly accessible study, and thus defendant could have obtained identical or nearly identical information through exercise of reasonable diligence. U.S.C.A. Const.Amend. 5.

**[2] Constitutional Law 92 ⚷ 4594(1)**

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(1) k. In general. Most Cited Cases
Under *Brady*, the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor. U.S.C.A. Const.Amends. 5, 14.

**[3] Criminal Law 110 ⚷ 2004**

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k2002 Information Within Knowledge of Prosecution

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

110k2004 k. Duty to locate information. Most Cited Cases

**Criminal Law 110 ⚷ 2005**

110 Criminal Law
    110XXXI Counsel
      110XXXI(D) Duties and Obligations of Prosecuting Attorneys
      110XXXI(D)2 Disclosure of Information
      110k2002 Information Within Knowledge of Prosecution
      110k2005 k. Responsibility of and for police and other agencies. Most Cited Cases
The duty of disclosure under *Brady* applies not only to evidence actually known to the trial prosecutor, but also evidence known to those acting on the government's behalf. U.S.C.A. Const.Amends. 5, 14.

**[4] Criminal Law 110 ⚷ 1992**

110 Criminal Law
    110XXXI Counsel
      110XXXI(D) Duties and Obligations of Prosecuting Attorneys
      110XXXI(D)2 Disclosure of Information
      110k1992 k. Materiality and probable effect of information in general. Most Cited Cases
The mere possibility that an item of undisclosed information might have helped the defense does not establish materiality in the constitutional sense for purposes of a *Brady* claim. U.S.C.A. Const.Amends. 5, 14.

**[5] Constitutional Law 92 ⚷ 4594(1)**

92 Constitutional Law
    92XXVII Due Process
      92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
      92k4592 Disclosure and Discovery
      92k4594 Evidence
      92k4594(1) k. In general. Most Cited Cases
Under *Brady*, the prosecution's failure to disclose evidence gives rise to a due process violation only where the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. U.S.C.A. Const.Amends. 5, 14.

**[6] Constitutional Law 92 ⚷ 4594(1)**

92 Constitutional Law
    92XXVII Due Process
      92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
      92k4592 Disclosure and Discovery
      92k4594 Evidence
      92k4594(1) k. In general. Most Cited Cases
Where a defendant could have obtained the same information through the exercise of reasonable diligence, the prosecution's failure to disclose does not violate due process under *Brady*. U.S.C.A. Const.Amends. 5, 14.

**[7] Criminal Law 110 ⚷ 1457**

110 Criminal Law
    110XXX Post-Conviction Relief
      110XXX(B) Grounds for Relief
      110k1457 k. Criminal liability; innocence. Most Cited Cases
Even assuming actual innocence was valid basis for post-conviction relief, defendant failed to demonstrate that he was actually innocent of first-degree premeditated murder based on discovery of allegedly new evidence concerning unreliability of comparative bullet lead analysis; evidence of defendant's guilt was overwhelming, including witness's detailed account of murders. 28 U.S.C.A. § 2255.

**[8] Criminal Law 110 ⚷ 1536**

110 Criminal Law
    110XXX Post-Conviction Relief
      110XXX(B) Grounds for Relief
      110k1536 k. Newly discovered evidence. Most Cited Cases
Newly discovered evidence may open the door to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

post-conviction relief if it can form the basis of an actual innocence claim. 28 U.S.C.A. § 2255.

**[9] Criminal Law 110 🔑 1931**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1931 k. Experts; opinion testimony. Most Cited Cases
Trial counsel's failure to offer studies or experts to question reliability of comparative bullet lead analysis in prosecution for first-degree premeditated murder did not prejudice defendant, and thus could not amount to ineffective assistance; evidence adduced at trial overwhelmingly pointed to defendant's guilt. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 🔑 1590**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1590 k. Discovery and disclosure. Most Cited Cases
Defendant was not entitled to discovery of FBI reports concerning its decision to discontinue use of comparative bullet lead analysis in seeking to vacate, set aside, or correct his sentence for first-degree premeditated murder; additional discovery would not demonstrate defendant's entitlement to relief on claim that trial counsel rendered ineffective assistance in failing to offer experts to question reliability of analysis. U.S.C.A. Const.Amend. 6.

**[11] Criminal Law 110 🔑 1429(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1428 Presentation of Issue in Prior

Proceedings
            110k1429 In General
                110k1429(2) k. Post-conviction proceeding not a substitute for appeal. Most Cited Cases
Defendant's *Batson* claim, challenging government's use of peremptory strikes against prospective female jurors in prosecution for first-degree premeditated murder, was procedurally defaulted on his motion to vacate, set aside, or correct his sentence; defendant failed to raise claim before seeking post-conviction relief. U.S.C.A. Const.Amend. 5.

**[12] Jury 230 🔑 33(5.15)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges. Most Cited Cases
A *Batson* challenge requires a three-step inquiry: (1) the court first determines whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race or gender; (2) the prosecutor must then present a gender-neutral explanation for striking the juror in question; and (3) the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. U.S.C.A. Const.Amends. 5, 14.

**[13] Jury 230 🔑 33(5.15)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges. Most Cited Cases
A defendant may satisfy his initial burden of demonstrating a prima facie case of discrimination on a *Batson* claim by showing that: (1) the defendant was a member of a cognizable group; (2) the prosecution exercised peremptory challenges to remove from the venire members of defendant's race or gender; and (3)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

other relevant facts and circumstances give rise to an inference of discrimination. U.S.C.A. Const.Amends. 5, 14.

**[14] Jury 230** ⚷     **33(5.15)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k33 Constitution and Selection of Jury
                230k33(5) Challenges and Objections
                    230k33(5.15) k. Peremptory challenges. Most Cited Cases
Defendant failed to demonstrate that government engaged in purposeful discrimination in allegedly using its peremptory challenges against prospective female jurors in prosecution for first-degree premeditated murder, as required to prevail on his *Batson* claim; there was no evidence that government treated potential male and female jurors differently, and lack of women on jury was partly due to strikes made by defendant. U.S.C.A. Const.Amend. 5.

**[15] Criminal Law 110** ⚷     **1890**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1890 k. In general. Most Cited Cases
Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it. U.S.C.A. Const.Amend. 6.

**[16] Criminal Law 110** ⚷     **1992**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1992 k. Materiality and probable effect of information in general. Most Cited Cases
Promises made by the government in consideration for

testimony may be material under *Brady* if they create a reasonable probability of a different outcome at trial. U.S.C.A. Const.Amends. 5, 14.

**[17] Criminal Law 110** ⚷     **1999**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1993 Particular Types of Information Subject to Disclosure
                    110k1999 k. Impeaching evidence. Most Cited Cases
Defendant's conclusory allegation that government offered to dismiss unrelated drug charges against co-defendant in exchange for his testimony in prosecution for first-degree premeditated murder was insufficient to establish *Brady* violation based on government's alleged failure to disclose its offer prior to trial; there was no evidence that government ever offered to dismiss co-defendant's drug charges. U.S.C.A. Const.Amend. 5.

**[18] Criminal Law 110** ⚷     **1999**

110 Criminal Law
    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
                110k1993 Particular Types of Information Subject to Disclosure
                    110k1999 k. Impeaching evidence. Most Cited Cases
Government did not violate *Brady* in failing to disclose alleged alias used by witness that was tied to criminal charges pending against him at time he testified in prosecution for first-degree premeditated murder; witness's criminal conduct was fully apparent to jury during his testimony, and thus there was no reasonable probability of different outcome at trial. U.S.C.A. Const.Amend. 5.

**[19] Criminal Law 110** ⚷     **1935**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1935 k. Impeachment or contradiction of witnesses. Most Cited Cases
Trial counsel's failure to call witnesses to testify that co-defendant told them he was asleep at time of murder in effort to impeach his testimony that he saw defendant give murder weapon to another co-defendant did not prejudice defendant, and thus could not amount to ineffective assistance in prosecution for first-degree premeditated murder; counsel effectively cross-examined co-defendant with his prior inconsistent statements. U.S.C.A. Const.Amend. 6.

[20] Criminal Law 110 ⚷ 1871

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)1 In General
                110k1871 k. Presumptions and burden of proof in general. Most Cited Cases
In assessing an ineffectiveness of counsel claim, the court presumes counsel's conduct was within the range of reasonable professional assistance. U.S.C.A. Const.Amend. 6.

[21] Criminal Law 110 ⚷ 1923

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1923 k. Investigating, locating, and interviewing witnesses or others. Most Cited Cases
Claims of ineffective assistance of counsel based on failure to investigate potential witness testimony must show that the witness would have been willing to testify

and that the testimony would have created reasonable doubt as to the defendant's guilt. U.S.C.A. Const.Amend. 6.

[22] Criminal Law 110 ⚷ 1923

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1923 k. Investigating, locating, and interviewing witnesses or others. Most Cited Cases
Failure to investigate a crucial witness may suggest ineffectiveness of counsel, but failure to investigate every single person mentioned by the defendant is not tantamount to ineffective assistance. U.S.C.A. Const.Amend. 6.

[23] Criminal Law 110 ⚷ 1923

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1923 k. Investigating, locating, and interviewing witnesses or others. Most Cited Cases
Trial counsel's alleged failure to investigate co-defendant's prior unrelated gun charges in prosecution for first-degree premeditated murder did not prejudice defendant, and thus could not amount to ineffective assistance; co-defendant's unrelated gun charges were not exculpatory evidence in defendant's case. U.S.C.A. Const.Amend. 6.

[24] Criminal Law 110 ⚷ 1923

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Evidence at Trial
110k1923 k. Investigating, locating, and interviewing witnesses or others. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to interview government witness prior to trial in prosecution for first-degree premeditated murder concerning her claim that defendant violently assaulted her several years prior to trial; during cross-examination, witness conceded that her altercation with defendant was mutual, and there was no evidence that pre-trial interview would have caused witness to say anything different from what she said at trial. U.S.C.A. Const.Amend. 6.

**[25] Criminal Law 110** 🔑 **1457**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(B) Grounds for Relief
         110k1457 k. Criminal liability; innocence. Most Cited Cases
Even assuming actual innocence was valid basis for post-conviction relief, defendant failed to demonstrate that he was actually innocent of first-degree premeditated murder based on co-defendant's post-trial recantation of his testimony that he witnessed defendant give murder weapon to another co-defendant; evidence of defendant's guilt was overwhelming, including witness's detailed account of murders. 28 U.S.C.A. § 2255.

**[26] Criminal Law 110** 🔑 **1880**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General
           110k1879 Standard of Effective Assistance in General
             110k1880 k. In general. Most Cited Cases

On a claim of ineffective assistance of counsel, the question is not what the best lawyer would have done or even what most good lawyers would have done, but merely whether a reasonable lawyer could have made the same decision under the circumstances. U.S.C.A. Const.Amend. 6.

**[27] Criminal Law 110** 🔑 **1931**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
         110k1921 Introduction of and Objections to Evidence at Trial
           110k1931 k. Experts; opinion testimony. Most Cited Cases
Trial counsel's decision not to further cross-examine government's ballistics expert after he conceded that 1.5 million firearms could have produced the markings on bullets found at crime scene was reasonable trial strategy, and thus was not ineffective assistance in prosecution for first-degree premeditated murder; expert's concession was highly important to counsel's defense, and counsel reasonably decided not to spend more time questioning expert. U.S.C.A. Const.Amend. 6.

**[28] Criminal Law 110** 🔑 **1931**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
         110k1921 Introduction of and Objections to Evidence at Trial
           110k1931 k. Experts; opinion testimony. Most Cited Cases
Trial counsel did not render ineffective assistance in prosecution for first-degree premeditated murder by failing to call expert witness to estimate higher number of firearms that could have produced the markings on bullets found at crime scene after government's ballistics expert conceded that 1.5 million firearms could have made the markings; impact of such testimony would have been minimal. U.S.C.A. Const.Amend. 6.

**[29] Criminal Law 110** 🔑 **1939**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110k1939 k. Confrontation. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to object on confrontation grounds to introduction of tape-recorded telephone conversation during which defendant remained silent after news article was read to him stating that co-defendant admitted that murder took place at defendant's apartment; there was ample legal basis for counsel to believe that introduction of defendant's adoptive admission would not violate Confrontation Clause, and thus counsel's decision not to raise Sixth Amendment objection was reasonable. U.S.C.A. Const.Amend. 6.

**[30] Criminal Law 110 🔑 1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to present school records describing defendant's learning disabilities and emotional issues as mitigation evidence at sentencing in capital murder prosecution; counsel requested defendant's school records but only received transcript from school system indicating that his records had been purged, and counsel had no reason to know that school system actually retained special education records indefinitely. U.S.C.A. Const.Amend. 6.

**[31] Criminal Law 110 🔑 1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel was not deficient in failing to obtain testimony from defendant's father about his abusive conduct toward defendant during childhood as mitigation evidence at sentencing in capital murder prosecution, as

element of claim of ineffective assistance; counsel's mitigation specialist testified that he attempted to reach defendant's father prior to trial but received information that he did not want to participate in his son's defense. U.S.C.A. Const.Amend. 6.

**[32] Criminal Law 110 🔑 1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel's failure to obtain testimony from defendant's father about his abusive conduct toward defendant during childhood as mitigation evidence at sentencing in capital murder prosecution did not prejudice defendant, and thus could not amount to ineffective assistance; father's credibility would have been challengeable based on his relationship with defendant and his criminal history, and jury considered fact that father was absentee parent who had drug problem. U.S.C.A. Const.Amend. 6.

**[33] Criminal Law 110 🔑 1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel was not deficient in failing to obtain testimony from defendant's maternal aunt to corroborate other testimony concerning defendant's abusive childhood as mitigation evidence at sentencing in capital murder prosecution, as element of claim of ineffective assistance; counsel was never made aware that aunt possessed information concerning defendant's childhood. U.S.C.A. Const.Amend. 6.

**[34] Criminal Law 110 🔑 1961**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel's failure to obtain testimony from defendant's maternal aunt to corroborate other testimony concerning defendant's abusive childhood as mitigation evidence at sentencing in capital murder prosecution did not prejudice defendant, and thus could not amount to ineffective assistance; aunt would have offered no more than generalizations about defendant's abusive childhood, and her credibility was open to question. U.S.C.A. Const.Amend. 6.

**[35] Criminal Law 110 &#128273; 1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases
Trial counsel's decision to limit mitigation evidence to events that occurred before defendant's eighteenth birthday, at sentencing in capital murder prosecution, was reasonable trial strategy, and thus was not ineffective assistance; counsel fairly decided to minimize emphasis on defendant's multiple bad acts in adulthood. U.S.C.A. Const.Amend. 6.

**[36] Criminal Law 110 &#128273; 1962**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1962 k. Argument and comments. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to raise equal protection and Eighth Amendment challenges to government's decision to pursue death penalty in prosecution for first-degree premeditated murder; there was no evidence that government decided to pursue death penalty because defendant was African American. U.S.C.A. Const.Amends. 5, 6, 8.

**[37] Criminal Law 110 &#128273; 1963**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                    110k1963 k. Other particular issues in death penalty cases. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to object on confrontation grounds to introduction of police captain's testimony during sentencing in capital murder prosecution that co-defendant told him defendant drove murder weapon to park and threw it into river; state of law was unclear as to whether Confrontation Clause applied to capital sentencing proceedings at time of defendant's trial. U.S.C.A. Const.Amend. 6.

**[38] Criminal Law 110 &#128273; 1882**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)1 In General
                110k1879 Standard of Effective Assistance in General
                    110k1882 k. Deficient representation in general. Most Cited Cases
In evaluating a claim of ineffective assistance of counsel, the court judges the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. U.S.C.A. Const.Amend. 6.

**[39] Criminal Law 110 &#128273; 1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

110XXXI(C)2 Particular Cases and Issues
110k1958 Death Penalty
110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel's decision to limit mitigation evidence in response to government's decision to drop future dangerousness as aggravating circumstance at sentencing in capital murder prosecution was reasonable trial strategy, and thus was not ineffective assistance of counsel; counsel made decision so as not to open door to bad act rebuttal evidence. U.S.C.A. Const.Amend. 6.

**[40] Sentencing and Punishment 350H** ⚷ **1763**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1763 k. Victim impact. Most Cited Cases

The Eighth Amendment does not prohibit prosecutorial argument on the subject of victim impact evidence in capital proceedings. U.S.C.A. Const.Amend. 8.

**[41] Constitutional Law 92** ⚷ **4744(2)**

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4744 Matters Considered
92k4744(2) k. Evidence and witnesses. Most Cited Cases

Only where victim impact evidence would be so unduly prejudicial as to render the defendant's trial unfair does due process mandate its exclusion in capital proceedings. U.S.C.A. Const.Amends. 5, 14.

**[42] Constitutional Law 92** ⚷ **4744(2)**

92 Constitutional Law
92XXVII Due Process

92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4744 Matters Considered
92k4744(2) k. Evidence and witnesses. Most Cited Cases

**Sentencing and Punishment 350H** ⚷ **1763**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1763 k. Victim impact. Most Cited Cases

Victim impact evidence, including mother's testimony that her marriage nearly dissolved in wake of her daughter's murder and videotapes chronicling victims' lives, did not render capital defendant's trial fundamentally unfair in violation of due process. U.S.C.A. Const.Amend. 5.

**[43] Courts 106** ⚷ **100(1)**

106 Courts
106II Establishment, Organization, and Procedure
106II(H) Effect of Reversal or Overruling
106k100 In General
106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases

Rule announced in *United States v. Washington,* which held that judges must apply categorical approach in determining whether defendant's prior conviction satisfied requirements for sentence enhancement, was not watershed rule, and thus did not fall within exception to *Teague* rule barring retroactive application of new rules of criminal procedure.

**[44] Courts 106** ⚷ **100(1)**

106 Courts
106II Establishment, Organization, and Procedure
106II(H) Effect of Reversal or Overruling
106k100 In General

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases

Courts employ a three-step analysis to determine whether a new rule of criminal procedure should apply retroactively under *Teague*: first, the conviction for which the defendant filed a motion to vacate his sentence must have been final when the new law was enunciated; second, the new law must in fact be new; and third, the new rule must be of watershed magnitude.

**[45] Courts 106 ☞ 100(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(H) Effect of Reversal or Overruling
            106k100 In General
                106k100(1) k. In general; retroactive or prospective operation. Most Cited Cases

To qualify as a watershed rule for purposes of *Teague* retroactivity analysis, a new rule of criminal procedure must seriously diminish the likelihood of obtaining an accurate conviction and must alter one's understanding of the bedrock procedural elements essential to the fairness of a proceeding.

**[46] Criminal Law 110 ☞ 1961**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1958 Death Penalty
                110k1961 k. Presentation of evidence in sentencing phase. Most Cited Cases

Trial counsel did not render ineffective assistance in failing to object when government submitted defendant's previous firearm conviction as aggravating factor at sentencing in capital murder prosecution based on fact that defendant was not convicted of firearm offense until after he committed murders; state of law was unclear whether word "previous" in statute allowing jury to consider previous convictions as aggravating factor referred only to convictions occurring prior to subject offense or to all previous convictions. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3592(c)(2).

**[47] Sentencing and Punishment 350H ☞ 1788(10)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)4 Determination and Disposition
                350Hk1788 Review of Death Sentence
                350Hk1788(10) k. Harmless and reversible error. Most Cited Cases

Jury's consideration of invalid aggravating factor, specifically defendant's involvement in multiple killings, in sentencing him for capital murder did not invalidate his death sentence, where jury's consideration of victim impact aggravating factor allowed it to give weight to same facts and circumstances as invalid multiple killings factor. 18 U.S.C.A. § 3592(c)(16).

**[48] Criminal Law 110 ☞ 1433(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1433 Matters Already Adjudicated
              110k1433(2) k. Affirmance of conviction. Most Cited Cases

Defendant was procedurally barred from arguing that trial counsel rendered ineffective assistance in failing to interview inmates that were incarcerated with co-defendant concerning co-defendant's alleged admissions of guilt to murders in seeking to vacate, set aside, or correct his sentence for capital murder; defendant already litigated issue in context of *Brady* violation on direct appeal of his conviction. U.S.C.A. Const.Amends. 5, 6.

**[49] Criminal Law 110 ☞ 1433(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1433 Matters Already Adjudicated
              110k1433(2) k. Affirmance of conviction. Most Cited Cases

In seeking to vacate, set aside, or correct his sentence for capital murder, defendant was procedurally barred from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

arguing that his conviction should be retroactively invalidated under *Blakely* on ground that his indictment failed to allege any of aggravating factors considered during sentencing; defendant previously litigated issue on direct appeal of his conviction. 28 U.S.C.A. § 2255.

**[50] Criminal Law 110 🔑 1963**

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
         110k1958 Death Penalty
           110k1963 k. Other particular issues in death penalty cases. Most Cited Cases
Trial counsel did not render ineffective assistance in failing to seek instruction at penalty phase of capital murder prosecution that jury could only recommend death sentence if it found aggravating factors outweighed mitigating factors beyond reasonable doubt; court was not required to give reasonable doubt instruction at penalty phase of capital trial, and thus counsel was reasonable in not requesting instruction. U.S.C.A. Const.Amend. 6.

**[51] Criminal Law 110 🔑 1429(2)**

110 Criminal Law
   110XXX Post-Conviction Relief
      110XXX(A) In General
         110k1428 Presentation of Issue in Prior Proceedings
         110k1429 In General
           110k1429(2) k. Post-conviction proceeding not a substitute for appeal. Most Cited Cases
Defendant was procedurally barred from arguing that trial court violated his Eighth Amendment right to have jury consider all mitigation evidence by failing to instruct jury that he was ineligible for parole, in seeking to vacate, set aside, or correct his sentence for capital murder; defendant failed to raise issue on appeal from his conviction. U.S.C.A. Const.Amend. 8; 28 U.S.C.A. § 2255.

**[52] Sentencing and Punishment 350H 🔑 1780(3)**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(G) Proceedings
         350HVIII(G)3 Hearing
         350Hk1780 Conduct of Hearing
           350Hk1780(3) k. Instructions. Most Cited Cases
Trial court's failure to instruct jury that defendant was ineligible for parole did not violate his Eighth Amendment right to have jury consider all mitigation evidence in sentencing him for capital murder; parole ineligibility did not meet criteria for being mitigating factor, since it related neither to defendant's character or record. U.S.C.A. Const.Amend. 8.

**[53] Sentencing and Punishment 350H 🔑 1653**

350H Sentencing and Punishment
   350HVIII The Death Penalty
      350HVIII(C) Factors Affecting Imposition in General
      350Hk1653 k. Mitigating circumstances in general. Most Cited Cases
A capital sentencing jury must unquestionably give effect to all relevant mitigating evidence, as required by the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[54] Criminal Law 110 🔑 412.1(2)**

110 Criminal Law
   110XVII Evidence
      110XVII(M) Declarations
         110k411 Declarations by Accused
         110k412.1 Voluntary Character of Statement
           110k412.1(2) k. Statements while in custody; persons to whom made. Most Cited Cases
Defendant was not in custody for *Miranda* purposes when he told another inmate that he remained silent when police officers approached him to cooperate against co-defendant, and thus inmate's testimony at defendant's capital murder trial recounting what defendant told him did not violate defendant's right to remain silent; police officers were not using inmate to elicit incriminating responses from defendant. U.S.C.A. Const.Amend. 5.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**[55] Sentencing and Punishment 350H ⌐ 1780(3)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings
            350HVIII(G)3 Hearing
                350Hk1780 Conduct of Hearing
                    350Hk1780(3) k. Instructions. Most Cited Cases

Defendant was not entitled to instruction at penalty phase of capital murder prosecution that jurors were not permitted to draw adverse inference of guilt from defendant's decision not to testify; defendant never requested instruction and court gave same instruction at guilt phase of trial. U.S.C.A. Const.Amend. 5.

**[56] Criminal Law 110 ⌐ 1159.2(7)**

110 Criminal Law
    110XXIV Review
        110XXIV(P) Verdicts
            110k1159 Conclusiveness of Verdict
                110k1159.2 Weight of Evidence in General
                    110k1159.2(7) k. Reasonable doubt. Most Cited Cases

A court considering the sufficiency of evidence underlying a conviction will uphold a guilty verdict and deny post-conviction relief if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

**[57] Criminal Law 110 ⌐ 465**

110 Criminal Law
    110XVII Evidence
        110XVII(R) Opinion Evidence
            110k449 Witnesses in General
                110k465 k. Facts forming basis of opinion. Most Cited Cases

A lay witness may testify about information from records of which he has personal knowledge and over which he maintains personal control.

**[58] Criminal Law 110 ⌐ 1580(9)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1574 Petition or Motion
                  110k1580 Particular Issues
                    110k1580(9) k. Argument and conduct of prosecutor. Most Cited Cases

Postconviction petitioner's conclusory allegation that government withheld evidence in form of witness statements and police reports was insufficient to demonstrate *Brady* violation in prosecution for first-degree premeditated murder. U.S.C.A. Const.Amend. 5.

**[59] Criminal Law 110 ⌐ 1575**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)1 In General
                110k1574 Petition or Motion
                  110k1575 k. In general. Most Cited Cases

A defendant seeking to vacate, set aside, or correct his sentence must set forth specific facts in support of each ground of relief asserted. 28 U.S.C.A. § 2255.

**[60] Criminal Law 110 ⌐ 1652**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)3 Hearing and Determination
                110k1651 Necessity for Hearing
                  110k1652 k. In general. Most Cited Cases

A court may grant an evidentiary hearing to a defendant seeking post-conviction relief when the defendant has pled facts that, if established, entitle him to relief, and there is a material dispute regarding those facts. 28 U.S.C.A. § 2255.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**[61] Criminal Law 110 🔑 1618(8)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(C) Proceedings
            110XXX(C)2 Affidavits and Evidence
                110k1616 Sufficiency
                    110k1618 Particular Issues
                        110k1618(8) k. Conduct of trial. Most Cited Cases
Defendant could not obtain post-conviction relief from his capital murder conviction based on his conclusory allegation that jurors engaged in misconduct by considering matters extraneous to trial; defendant failed to substantiate his misconduct allegation. 28 U.S.C.A. § 2255.

**[62] Criminal Law 110 🔑 1557(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(B) Grounds for Relief
            110k1557 Matters Arising After Sentencing or Conviction
                110k1557(2) k. Execution of sentence. Most Cited Cases
Defendant's motion to vacate, set aside, or correct his sentence for capital murder was improper vehicle to challenge use of lethal injection under Eighth Amendment; defendant was not contesting validity of his conviction or sentence, but rather method of imposing his sentence. U.S.C.A. Const.Amend. 8; 28 U.S.C.A. § 2255.

**\*486** Michael Wiseman, Federal Defender of Philadelphia, Capital Habeas Corpus Unit, Federal Court Division, Philadelphia, PA, Stephen H. Sachs, Wilmer Cutler Pickering Hale and Dorr LLP, Baltimore, MD, for Petitioner.

Deborah A. Johnston, Office of the US Attorney, Greenbelt, MD, Sandra Wilkinson, Office of the US Attorney, Baltimore, MD, Jeffrey B. Kahan, Department of Justice, Capital Case Unit, Washington, DC, for Respondent.

***OPINION***

PETER J. MESSITTE, District Judge.

After finding Dustin Higgs guilty of the kidnapping and murder of Tamika Black, Mishann Chinn, and Tanji Jackson, a jury determined that he should receive the death penalty. The Court thereafter entered judgment on the verdict and Higgs appealed to the United States Court of **\*487** Appeals for the Fourth Circuit, which affirmed the conviction and sentence. *See United States v. Higgs,* 353 F.3d 281 (4th Cir.2003) (" *Higgs I* "). The Supreme Court denied Higgs' petition for writ of certiorari. *Higgs v. United States,* 543 U.S. 999, 125 S.Ct. 627, 160 L.Ed.2d 456 (2004).

During the pendency of his appeal, Higgs filed a Motion for a New Trial, which this Court denied, a decision which the Fourth Circuit also affirmed. *See United States v. Higgs,* 95 Fed.Appx. 37 (4th Cir.2004), *cert. denied, Higgs v. United States,* 543 U.S. 1004, 125 S.Ct. 608, 160 L.Ed.2d 465 (2004) (" *Higgs II* "). Higgs has now filed a Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241, asserting twenty-five claims of error. This filing is accompanied by a motion seeking additional discovery as to certain issues. The Court considers the pending motions.

**I.**

**Background**

The relevant facts, as set forth by the Fourth Circuit in *Higgs I,* are as follows:

**A. The Murders**

On Friday evening, January 26, 1996, Higgs, Willis Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up Tanji Jackson, Tamika Black, and Mishann Chinn. Higgs knew Jackson and they had arranged dates for Haynes

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.[FN1]

> FN1. After he was arrested in the fall of 1998 on federal charges of illegal distribution of crack cocaine, Victor Gloria agreed to cooperate with the government in the murder case against Higgs and Haynes. Most of the facts surrounding the murders of the three women were obtained from his eyewitness testimony. However, Gloria's testimony was partially corroborated by a friend of the Jackson family and Chinn's mother, both of whom observed the girls being picked up by a man or men in a blue Mazda MPV van. Gloria ultimately pled guilty to being an accessory after the fact to the murders and was sentenced to eighty-four months incarceration with three years supervised release.

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "she stopped at the door and said something like I am going to get you all f---ed up or robbed" or made "some kind of threat." J.A. 473. In response, Higgs commented to the other two men that Jackson "do know a lot of n-s." J.A. 474. As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh-." J.A. 474. Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f that, and grabbed his coat and said come on." J.A. 474. He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three **\*488** men got into Higgs's van,

with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3: 30 that morning.

According to Gloria, while en route to Washington, D. C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore-Washington Parkway exit, which would have taken them directly into Washington, D. C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from there," and Higgs responded, "something like that." J.A. 482. After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," J.A. 485, and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. J.A. 487. The men then left the apartment and dropped the trash by a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told by Higgs to "keep [his] mouth shut." J.A. 489.

At about 4: 30 a.m., a motorist found the bodies of the three women strewn about the roadway and contacted the Park Police. Jackson's day planner was found at the scene with Higgs's nickname-"Bones"-and telephone number recorded in it. On another page was written "13801 'MAZDA' 769GRY"-Higgs's address number on Briarwood Drive and the tag number for his Mazda van. A .38 caliber wadcutter bullet was also found there. According to the medical examiner, Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of the head.

**B. The Investigation**

Although Higgs was almost immediately a suspect, the investigation into the murders continued for nearly three years before an arrest was made. On March 21, 1996, Park Police officers first interviewed Higgs at his apartment. At that time, Higgs acknowledged that he knew **\*489** Jackson and that he may have talked to her the night before she died, but he denied that she had ever been in his apartment. Higgs told the officers that he first heard about the murders while watching the ten o'clock news on Saturday, January 27, while attending a party at the home of Phyllis Smith, who was his girlfriend at the time. Higgs also told the officers that he had immediately commented to a party guest that he thought he knew "that Tanji girl." J.A. 672. According to the chief investigator, however, the names and photographs of the three victims were not released to the media until January 28.

After the interview of Higgs was concluded, the officers executed an arrest and search warrant arising from Higgs's suspected involvement in unrelated bank fraud violations. In addition to a variety of documents and cash bundles, the officers seized crack cocaine, a .380 semiautomatic firearm, and boxes of ammunition for .380, .45 and .38 caliber weapons. Higgs was arrested on federal drug charges and, on May 12, 1997, pled guilty to possession with intent to distribute cocaine

base. He was ultimately sentenced to seventeen years imprisonment for the charge. Higgs has remained in the custody of either state or federal law enforcement officials since that arrest.

After Higgs was interviewed and arrested, the Park Police turned their attention to Phyllis Smith. Smith initially provided a false alibi for Higgs on the night of the murders. She claimed that Higgs had been with her and her family members the entire night of January 26, helping her clean her home in preparation for the party that was to be held the following night. She also instructed her family members to confirm the alibi. In April 1996, however, Smith testified before the grand jury that Higgs was only with her at 5 a.m. on January 27.

Ultimately, Smith recanted both accounts. She testified that Higgs called her when he was arrested in March 1996 and asked her to tell officials that he had been with her the entire night of January 26. She did as she was instructed, but believed at the time that she was being interviewed in connection with the drug charges that had been filed against Higgs. When Smith later learned that the questions pertained to the triple murder investigation, Higgs told her that he did not know the murdered women, but that Haynes had known them. When Smith was called before the grand jury in late 1998, she admitted her earlier lies about Higgs's whereabouts that night. Although she and several of her family members had been cleaning her home on the evening of January 26, Higgs was not with them. Nor was Higgs at her house in the early morning hours of January 27. At trial, Smith again testified that Higgs had not helped her prepare for the party that night and was not with her when she went to bed at 1: 30 a.m. on January 27. Nor was he in her home when she awoke, as she routinely did, at 5 a.m. to care for her disabled son. Smith returned to bed shortly thereafter and awoke at 10: 00 a.m., when she first found Higgs and Haynes present in her home. Thus, Higgs must have arrived at Smith's home sometime between 5 a.m. and 10 a.m. on the morning of January 27. Smith did confirm that Higgs and Haynes were at her house that night for the party and that the television was on during the party.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Officers also interviewed Enidsia Darby, a former girlfrend of Higgs and the mother of his son, Daquon. Darby testified that Higgs contacted her by telephone after his March 1996 arrest and **\*490** told her that he had been arrested for drugs. Darby, however, had seen news reports of Higgs's arrest that contained photographs of the three murdered women and she asked Higgs about them. In response, Higgs asked Darby if she remembered that he had been with her at the hospital on the night of the murders, which was not true. When Darby visited Higgs in jail, Higgs admitted that he had been present when Haynes shot the women. He told Darby that Jackson had been invited over to his house to smoke and drink because she had been "snitching on one of them." J.A. 759. He told her that he did not know the other two girls; "they were just for his friends." J.A. 761.

In addition to her testimony regarding Higgs's drug activities, Darby offered testimony regarding a bank fraud scheme and credit card scheme that she and Higgs had conducted in the fall of 1995. Higgs deposited checks into accounts that had been opened by Darby and Andrea Waters, one of Darby's friends. The women, in turn, would withdraw the cash and give it to Higgs. Waters was paid a portion of the money withdrawn from her account, but when the checks deposited in her account bounced and Higgs refused to return the money, she threatened to go to the police. Higgs responded with a threat to kill her. Darby also testified that, while employed in the electronics department of a retail department store, she charged merchandise for Higgs to a credit card number Higgs had given her. Months later, when Darby was contacted by the police about the matter, Higgs threatened to kill her if she identified him from the surveillance photographs.

The investigation into Higgs's possible involvement in the murders also uncovered his participation in two prior shooting incidents involving a .38 caliber weapon. The incidents were significant because the same caliber weapon had been used to murder the three women.

The first incident occurred on November 20, 1995, approximately two months before the murders. Higgs got into an argument outside the Chaconia Nightclub in Washington, D. C., and shot out the windows of a vehicle in a drive-by shooting. After Higgs's arrest on the federal drug charges and while the murder investigation was still underway, the vehicle was searched and the police recovered a .38 caliber bullet. Wondwossen Kabtamu, who was with Higgs at the time of the Chaconia shooting, testified that he drove Higgs's Mazda MPV van while Higgs did the shooting. Kabtamu threw the gun out the window after the shooting, but they returned to get it at Higgs's insistence.

Higgs was ultimately charged with the Chaconia shooting in the D.C. Superior Court. In late 1998, while housed at a D.C. jail, Higgs had a number of discussions about the Chaconia charges with Domenick Williams, a fellow inmate and "jailhouse lawyer." Higgs never admitted involvement in the Chaconia shooting to Williams, but he did tell Williams "that he didn't want to plead guilty because they would try to use the gun in another case." J.A. 975. After Williams learned through a press report that Higgs was being indicted for the murders of the three women, Higgs commented to Williams, "you see why I can't plead guilty to that charge?" J.A. 979. Higgs also advised Williams that he had rebuffed the authorities' attempts to strike a deal with him to cooperate against his codefendant Haynes. When Williams advised Higgs that the authorities would likely offer Haynes a deal to cooperate if Higgs refused, Higgs told Williams "that his **\*491** youngan would hold up," J.A. 984, and "that the government wouldn't offer a deal to the trigger man," J.A. 985.

Williams also testified that Higgs asked him what the chances would be "if the witness after the fact wasn't there," J.A. 982, referring to Gloria. Williams told him that "his chances would be good." J.A. 983. Higgs later "explained to [Williams] that he wasn't worrying about the [murder] case because Mel and T would be out there." J.A. 987. Melvin Grayson and "T" were former inmates at the jail where Williams and Higgs were incarcerated. Higgs told Williams "that Mel would be out there to handle anything that he needed and that he could rely on him." J.A. 992.

Williams later notified the authorities of his conversations with Higgs and produced letters that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Higgs had written to him in which Higgs reported that the Chaconia case had been dismissed, that Higgs had not heard from "T", but that "Mel has been in my corner." J.A. 1011. Through visitation records, authorities learned that Melvin Grayson had visited *Higgs* In the D.C. jail in February 1999 and again in March 1999. The Chaconia charges against Higgs were dismissed in D.C. Superior Court in May 1999.

The second shooting incident occurred on December 10, 1995, approximately a month after the Chaconia nightclub shooting. Haynes went to the home of Rodney Simms on Cherry Lane in Laurel, Maryland, and argued with Simms about a woman. During the argument, Haynes took out a 9mm handgun and began shooting. Higgs came out from a nearby shed and also began firing shots. Haynes and Higgs were charged in Maryland state court for the shooting. Police recovered 9mm and .38 caliber bullets and bullet casings from the Cherry Lane crime scene. Forensic evidence revealed that the .38 caliber bullets fired from the weapons at the Cherry Lane and Chaconia sites had five "lands and grooves," with a right twist.[FN2] Although forensics could not definitively conclude that the bullets had been fired from the same weapon, the .38 caliber bullets recovered from the Patuxent murder scene and the murder victims were also .38 caliber bullets shot from a gun with five lands and grooves with a right twist.

> FN2. According to the testimony, "lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." J.A. 1137. Because "different manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," J.A. 1123-24, the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

In April 1997, Higgs pled guilty to the Cherry Lane shooting and was sentenced to 18 months imprisonment. During the plea hearing, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to the facts underlying the Cherry Lane shooting, with the single exception of gratuitously asserting that he "didn't have a .38. It was the other way around." J.A. 1104.

## C. The Indictment

On December 21, 1998, Higgs and Haynes were indicted for three counts each of first-degree premeditated murder, see 18 U.S.C.A. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, see id, kidnapping resulting in death, see 18 U.S.C.A. § 1201(a), and using a firearm in the commission of a crime of violence, see **\*492**18 U.S.C. § 924(c). On October 22, 1999, the government filed the statutorily-required notice of its intent to seek a death sentence for the murder and kidnapping charges. See 18 U.S.C.A. § 3593(a). On December 20, 1999, the grand jury returned a second superseding indictment, and the government filed an amended death notice on February 8, 2000.[FN3]

> FN3. All references made to the indictment or death notice hereafter refer to the amended documents.

The cases were severed for trial. Haynes was tried first and convicted of first-degree murder, kidnapping, and use of a firearm during a crime of violence. During the penalty phase of Haynes's trial for the murder and kidnapping counts, however, the jury was unable to reach a unanimous verdict on the death sentence. Accordingly, on August 24, 2000, the district court sentenced Haynes to concurrent life terms for the first-degree murder and kidnapping counts and to a forty-five year consecutive sentence for the firearm offenses. His convictions and sentences were affirmed on appeal. *See United States v. Haynes,* 26 Fed.Appx. 123 (4th Cir.2001), *cert. denied,* 535 U.S. 979, 122 S.Ct. 1455, 152 L.Ed.2d 396 (2002).

## D. The Trial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Jury selection in Higgs's trial began on September 5, 2000, and the jury returned guilty verdicts on all charges on October 11, 2000. The case then proceeded to the penalty phase. On October 26, 2000, after hearing evidence on aggravating and mitigating factors, the jury returned a sentence of death for each of the murder and kidnapping counts.

In order to impose a sentence of death under the FDPA, a jury is required to find at least one "intent" factor enumerated by Congress, see 18 U.S.C.A. § 3591(a)(2), and at least one statutory "aggravating" factor, see 18 U.S.C.A. § 3592(c). Once the jury finds the requisite intent and statutory aggravating factors, the crime is death-eligible. The jury must then determine the existence of any nonstatutory aggravating factors submitted to it for consideration, provided the government has given the appropriate notice of its intent to submit such additional factors, see 18 U.S.C.A. § 3592(c), as well as any mitigating factors, see 18 U.S.C.A. § 3592(a), and "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death," 18 U.S.C.A. § 3593(e).

As to all victims and offenses, the jury in Higgs's case determined that the government had proven two intent factors beyond a reasonable doubt: (1) that Higgs had "intentionally participated in ... acts, contemplating that the [lives] of [the victims] would be taken or intending that lethal force would be used in connection with [the victims]"; and (2) that Higgs had "intentionally and specifically engaged in ... acts of violence, knowing that the acts created a grave risk of death to the [victims]." See 18 U.S.C.A. § 3591(a)(2)(C) & (D).

The jury also found that the government had proven beyond a reasonable doubt four statutory aggravating factors: (1) that the deaths occurred during the commission of another crime (kidnapping), for the first-degree murder counts only, see 18 U.S.C.A. § 3592(c)(1); (2) that Higgs had a previous conviction of a *493 violent felony involving a firearm, based on Higgs's guilty plea to assault and reckless endangerment for his participation in the Cherry Lane shooting, see 18

U.S.C.A. § 3592(c)(2); (3) that Higgs had a previous conviction for a serious federal drug offense, based on Higgs's March 1996 arrest and subsequent conviction for possession with intent to distribute cocaine base, see 18 U.S.C.A. § 3592(c)(12); and (4) that the crime for which he was on trial involved multiple killings in a single criminal episode, see 18 U.S.C.A. § 3592(c)(16). The jury found that the government had also proven two nonstatutory aggravating factors beyond a reasonable doubt: (1) that Higgs had caused harm and loss to each victim and their families, based on the effect of the offense on the victims, their personal characteristics as individual human beings, and the impact of the death upon the victims and their families ("victim impact"); and (2) that Higgs obstructed the investigation into the kidnappings and murders by tampering or attempting to tamper with evidence and witnesses ("obstruction of justice").

Members of the jury also found three mitigating factors by a preponderance of the evidence: (1) that Higgs was not the sole proximate cause of the victims' deaths (12 jurors); (2) that Higgs was impaired by alcohol and marijuana at the time of the murders (2 jurors); and (3) that a sentence of death would have an adverse impact on Higgs's son (4 jurors). See 18 U.S.C.A. § 3592(a). However, the jury unanimously rejected three additional mitigating factors: (1) that Haynes was an equally culpable defendant who had not been sentenced to death for the murders; (2) that Higgs's family history, including the abandonment by his father and the death of his mother at a young age, influenced the direction his life had taken; and (3) that other factors in Higgs's background, record, or character or other circumstances of the offense mitigated against imposition of the death sentence.

Ultimately, the jury recommended that Higgs be sentenced to death for each death-eligible conviction and, on January 3, 2001, the district court imposed nine death sentences. The district court also imposed sentences of five years, twenty years, and twenty years for the three § 924(c) convictions, respectively, directing that the sentences be served consecutively. Additionally, the court imposed a three-year term of supervised release and directed Higgs to pay restitution of $ 13,687.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

*United States v. Higgs,* 353 F.3d 281, 289-295 (4th Cir.2003).

**II.**

**Claim 1: Comparative Bullet Lead Analysis**

One item of evidence not discussed in the Fourth Circuit's recitation of the facts in *Higgs I* was the Comparative Bullet Lead Analysis (CBLA) which the Government offered at trial to suggest that bullets found at the crime scene and at Higgs's home could be linked to bullets Higgs fired during the Cherry Lane and Chaconia Nightclub shootings. Higgs claims that he is entitled to a new trial or sentencing because the CBLA was a discredited scientific analysis which, since the trial, the FBI has in fact abandoned.

CBLA is a process that measures the elemental composition of the lead found in one bullet and compares it to that of the lead found in another bullet. *See* Edward J. Imwinkelried & William A. Tobin, *Comparative Bullet Lead Analysis (CBLA) Evidence: Valid Inference or Ipse Dixit?,* 28 OKLA. CITY U.L.REV. 43, 44-45 (2003). **\*494** Pursuant to CBLA, two bullets with statistically significant similarities in their elemental composition may be declared "analytically indistinguishable," the implication being that they were manufactured during a single process by a single manufacturer and thereafter found their way into the same box of bullets purchased by a person who, inferentially, fired both.[FN4] *See* Imwinkelried & Tobin, *supra,* at 47; *see also Ragland v. Commonwealth,* 191 S.W.3d 569, 576 (Ky.2006).

> FN4. The typical inference is that two "analytically indistinguishable" bullets originated from the same source or melt of lead at a manufacturing plant.

At Higgs' trial, Kathleen Lundy of the FBI Laboratory's Elemental Analysis Group testified that a bullet recovered from Mishann Chinn's head and a bullet recovered from

the Cherry Lane shooting scene were "analytically indistinguishable." TT. Oct. 6, 2000 at 32. She also testified that a bullet recovered from the Chaconia nightclub shooting was indistinguishable from 18 bullets found at Higgs' Briarwood apartment. *Id.* at 33.

More than three years after the trial in this case, the National Research Council of the National Academy of Sciences released the results of a study criticizing the reliability of CBLA. Committee on Scientific Assessment of Bullet Lead, National Research Council, *Forensic Analysis: Weighing Bullet Lead Evidence* (2004). The study, which had been commissioned by the FBI in 2002, led to the FBI's September 1, 2005, announcement that it had discontinued the use of CBLA. *See* FBI, Press Release (Sept. 1, 2005), http:// www. fbi. gov/ pressrel/ pressrel 05/ bullet_ lead_ analysis. htm. In its September 1, 2005, announcement, the FBI admitted that "neither scientists nor bullet manufacturers are able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." *Id.*

Citing the FBI's decision to abandon CBLA as well as other scholarly papers challenging the reliability of the analysis, Higgs argues that CBLA was "inadmissible [as] junk science." This proposition is the launching point for three arguments that his constitutional rights were violated: (A) the Government's failure to disclose evidence of CBLA's unreliability violated the Due Process Clause of the Fifth Amendment; (B) defense counsel's failure to challenge the CBLA evidence amounted to Sixth Amendment ineffective assistance of counsel; and (C) recent revelations about CBLA's unreliability amount to new evidence entitling Higgs to relief under 28 U.S.C. § 2255 or 28 U.S.C. § 2241. The Court addresses these arguments in turn.

**A. *Brady v. Maryland***

[1] Higgs' first CBLA argument is that the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when it failed to apprise him of two studies available to the FBI but not to the public that could have been used to impeach Lundy's CBLA testimony-one study conducted by the FBI in 1991 ("FBI Study"),[FN5] and a second conducted by Iowa State

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

University researchers at the request of the FBI in 2000 ("Iowa State Study"). FN6 The Court will discuss**\*495** the findings of these studies presently, but the threshold question is whether an internal law enforcement study of the general reliability of a forensic tool (in contrast to the tool's reliability *vel non* in a particular defendant's case) can ever be deemed *Brady* material. The Court concludes that it can.

> FN5. E.R. Peele, D.G. Havekost, R.C. Halberstam, R.D. Koons, C.A. Peters, and J.P. Riley, *Comparison of Bullets Using the Elemental Composition of the Lead Component,* PROCEEDINGS OF THE INT'L SYMPOSIUM ON THE FORENSIC ASPECTS OF TRACE EVIDENCE (1991).

> FN6. Alicia Carriquiry, Michael Daniels, and Hal S. Stern, *Statistical Treatment of Class Evidence: Trace Element Concentrations in Bullet Lead* (May 4, 2000) (unpublished study, Iowa State University) (on file with Ames Laboratory, Iowa State University).

[2][3] Under *Brady,* the suppression by the prosecution of evidence favorable to the accused "violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. The duty of disclosure applies not only to evidence actually known to the trial prosecutor, but also evidence known to those acting on the Government's behalf. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that the "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *see also United States v. Munson,* No. 03-1153, 2004 WL 1672880, at \*2, 2004 U.S. Dist. LEXIS 15465, at \*7-\*8 (N.D.Ill. Aug. 5, 2004) ("As a general rule, the government's *Brady* obligation extends to all members of the prosecution's team, which may include the DEA, police, or other agencies, such as the FDA or Postal Service."), *accord United States v. Pelullo,* 399 F.3d 197, 218 (3d Cir.2005) *and United States v. Chalmers,* 410 F.Supp.2d 278, 290 (S.D.N.Y.2006).

[4][5][6] However, "the mere possibility that an item of undisclosed information might have helped the defense ... does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The prosecution's failure to disclose gives rise to a due process violation only where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. Moreover, where the defendant could have obtained the same information through the exercise of reasonable diligence, the prosecution's failure to disclose does not violate due process. *See Hoke v. Netherland,* 92 F.3d 1350, 1356 (4th Cir.1996) (citing *United States v. Meros,* 866 F.2d 1304, 1308 (11th Cir.1989) ("[t]o establish a *Brady* violation a defendant must prove ... that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence....")).

The Court accepts that certain internal studies and reports generally relevant to the reliability of evidence introduced against an accused may be material to guilt or innocence. For example, in *United States v. Wood,* the Ninth Circuit determined that Investigational New Drug applications ("INDs") FN7 released by the Federal Drug Administration ("FDA") "were *Brady* material, which the government had a duty to disclose...." 57 F.3d 733, 737 (9th Cir.1995). In that case, Wood had been convicted of distributing gamma hydroxybutrate and gamma hydroxybutyric acid sodium salt (collectively **\*496** "GHB") in violation of 18 U.S.C. § 371-defrauding the FDA by obstructing its function of ensuring that prescription drugs are safe and effective and dispensed pursuant to a prescription from a practitioner licensed by law to administer such drugs. *Id.* at 735.

> FN7. The FDA's website describes INDs as follows:

> Current Federal law requires that a drug be the subject of an approved marketing application before it is transported or distributed across state lines. Because a sponsor will probably want to ship the investigational drug to clinical investigators in many states, it must seek an exemption from that legal requirement. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

IND is the means through which the sponsor technically obtains this exemption from the FDA.

United States Food and Drug Administration, Center for Food Drug Evaluation and Research, htt p:// www. fda. gov/ Cder/ regulatory/ applications/ ind_ page_ 1. htm.

At trial, controversy arose over whether GHB could be considered a prescription drug, a point that turned on whether it could be deemed dangerous to humans. Subsequent to trial, Wood learned that INDs had been filed with the FDA that included "a fair amount of ... material ... [showing] ... that GHB, if properly taken by humans, was not dangerous to them." *Id.* The appellate court concluded that those INDs would have been useful in impeaching the Government's expert's testimony on GHB's dangerousness, and accordingly remanded the case to the district court to determine whether the INDs were "material" under *Brady. Id.* at 738-39. The district court's determination that the INDs were not material was later overturned in an unpublished Ninth Circuit opinion. *See United States v. Wood,* 1997 WL 207973, 1997 U.S. App. LEXIS 9077 (9th Cir. Apr. 25, 1997).

*Wood* thus stands for the proposition that studies or reports available to an agency involved in a prosecution and useful to a defendant may be *Brady* material. That said, such information is not always *Brady* material. For example, in *United States v. Bhutani,* 175 F.3d 572 (7th Cir.1999), the Seventh Circuit rejected the materiality of data numerous drug manufacturing companies had submitted to the FDA. There, husband and wife defendants, the Bhutanis, manufactured a generic form of Lactulose, a prescription drug used to combat advanced liver disease. The court described the relevant attributes of Lactulose as follows.

One way of testing the stability of Lactulose is to measure its pH level. The pH scale measures the acidity or baseness of a chemical on a scale of 0 to 14. A chemical with a pH below 7 is an acid, while one with a pH above 7 is a base. At the time of the trial, the accepted pH range in which Lactulose was considered

most effective, as set forth by the U.S. Pharmacopeia ("U.S.P."), also known as the "bible" of the pharmaceutical industry, was 3.0 to 7.0. The U.S.P. based this determination on stability data provided by various drug manufacturers to the FDA. As Lactulose ages and begins to degrade, it becomes more acidic, i.e. its pH drops. Thus, the older Lactulose gets, the lower its pH reading will become. If the pH level becomes too low, the drug will no longer be effective to fight the liver disease.

*Id.* at 575. The jury found that the Bhutanis were "spiking" their Lactulose "with the foreign substance sodium hydroxide in order to conceal [its] age. Sodium hydroxide is a base, and, when combined with a more acidic substance, will raise its pH level." *Id.*

Following their conviction, the Bhutanis filed a motion for a new trial based on the following alleged *Brady* violation:

They claimed that the government, at the time of the trial, had in its possession stability data from numerous drug manufacturing companies that showed that the effective range for Lactulose was not in fact 3.0 to 7.0, and that Lactulose was still perfectly effective with a pH level as low as 2.5. Furthermore, they asserted that the U.S.P. released a proposal [following the trial] to change the effective pH range for Lactulose from 3.0 to 7.0 to 2.5 to 6.5.

*Id.* at 575-76. This drug company data, the Bhutanis argued, could have been used at trial to show that they had no reason to spike the Lactulose because the drug was effective at its pH level prior to the alleged spike (4.6). *Id.* at 576.

**\*497** The court concluded that the data in the FDA's possession was not material under *Brady,* reasoning that the FDA did not know that the U.S. Pharmacopeia would alter the effective range for Lactulose.

The real evidence that the defendants rely on in their motion is the eventual publication of the U.S.P.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

proposal to lower the effective range of Lactulose. This was not published until well after the trial had ended. Simply because the FDA had stability data from other pharmaceutical companies does not mean that they had any knowledge that the U.S.P. was going to recommend the proposed change in Lactulose's effective pH range. The government cannot be held responsible for failing to disclose merely speculative evidence.

*Id.* at 577. In short, the Seventh Circuit found that the data in the Government's possession was too speculative to be deemed material.[FN8]

> **FN8.** Notably, the U.S.P.'s reevaluation of the effective range of Lactulose occurred after the trial and, therefore, could not have been *Brady* material. Had this policy change occurred prior to the Bhutanis' convictions and not been produced, the Seventh Circuit could conceivably have found a violation.

As *Bhutani* suggests, not every shred of general scientific information available to the prosecution constitutes *Brady* evidence. Indeed, the Court is mindful that a rule requiring the disclosure of all studies, reports, data, or communications in any way related, no matter how tangentially, to the reliability of forensic procedure would be overly burdensome, if not totally impractical. Instead, the Court must remain focused on scientific evidence that is truly material, and therefore capable of undermining confidence in the verdict. Determining materiality will often require evaluating the reliability and level of scientific refinement of the evidence as well as the strength of other evidence offered at trial,[FN9] among other considerations. A stray remark by a government scientist, for example,**\*498** will presumably carry less weight than the printed results of a study or a marked change in agency policy. Similarly, raw data such as that in *Bhutani* is less likely to potentially undermine the government's case than the studies available to the prosecution in *Wood.*

> **FN9.** On the issue of the strength of the evidence, *see United States v. Mitchell,* 365 F.3d 215, 254-57 (3d Cir.2004). There, the Third Circuit considered the application of *Brady* to the

Government's solicitation of studies on the reliability of the fingerprint identification analysis used to inculpate the defendant. At trial, Mitchell had challenged the admissibility of the Government's evidence linking him to fingerprints obtained from the gear shift of the getaway car that he had been accused of driving from the scene of an armored car robbery. Subsequent to his conviction, Mitchell learned of a research proposal solicitation released by the National Institute of Justice (an arm of the United States Department of Justice) entitled "Forensic Friction Ridge (Fingerprint) Examination Validation Studies" (the "solicitation"). *Id.* at 232. "The solicitation sought proposals for research studies on 'validation of the basis for friction ridge individualization [the process used to match the fingerprints on the gear shift to Mitchell's fingerprints on file with law enforcement] and standardization of comparison criteria.' Creation of the solicitation had been underway before Mitchell's trial, but the solicitation was not released until March 2000-after Mitchell's trial had concluded." *Id.* Certain evidence suggested, however, that the NIJ had delayed the solicitation's release until after Mitchell's conviction.

> Mitchell first raised the issue of the solicitation's discovery in a Motion for a New Trial, which the district court denied following a four day hearing. Mitchell again raised the issue on appeal in the context of a *Brady* claim, but the Third Circuit deferred to the District Court's finding on materiality.

> In ruling on Mitchell's Rule 33 motion, the District Court credited "the testimony of the Government's witnesses at the Solicitation Hearing that the Solicitation does not change their testimony regarding fingerprint technology." In other words, the District Court discounted the impeachment value of the solicitation even after having seen Mitchell's actual cross-examination of the government's experts both with the solicitation (at the new

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

trial hearing) and without it (at trial). The District Court had the best vantage point, at both proceedings, to assess the government's witnesses ... and we defer to its finding.

*Id.* at 257 (citations omitted). In deferring to the district court, the Third Circuit concluded that the impeachment value of the solicitation was simply not strong enough to undermine confidence in the verdict and, thus, could not signal a *Brady* violation.

Against this background, the Court turns to Higgs' case. Higgs' *Brady* claim derives from the prosecution's failure to divulge the FBI study and the Iowa State study, which he claims contained information that would have helped him impeach the Government's expert testimony with respect to CBLA. While the Court accepts that these studies raise questions as to the validity of CBLA, it concludes that they were not required to be disclosed. The Court reasons thus: (1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

**1. The availability of CBLA critiques offered by the FBI and Iowa State studies.**

A review of both Government studies reveals that their critiques of CBLA fall into two general categories: (1) challenges based upon bullet manufacturing and distribution processes, suggesting the possibility that bullets from the same lead source could make their way into separate boxes and ultimately into the possession of different individuals; and (2) challenges to the validity of the chemical and statistical analyses used to determine if two bullets-*e.g.,* a bullet found at a crime scene and a

bullet found in a suspect's possession-are "analytically indistinguishable."

The Court finds that the critiques based upon the bullet manufacturing and distribution processes, *i.e.* those in the first category, were accessible in at least one published study available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information. As the FBI Study and the Iowa State Study both note, bullets from a single source of lead can-while being sorted, packaged, and distributed downstream to parties in the supply chain-end up in separate boxes and, quite possibly, the possession of different buyers. *See* Peele et al. at 57; Carriquiry et al. at 30. As a result, per that study, even where a bullet from a crime scene is analytically indistinguishable from another bullet found in the possession of a suspect, one may not be able to conclude that the suspect ever possessed, let alone fired, the bullet involved in the crime.

Nevertheless, this finding does not constitute an automatic *Brady* violation. The Court, based on its own search, was able to **\*499** locate at least one publicly available study-published in September 1999, well before Higgs' trial-that offered essentially the same conclusion: "The extent of each particular source (i.e., the number of identical boxes by each manufacturer) and the bullets available in a particular geographic area at a particular time are all unknown factors. As a result, bullet lead analysis ... *does not generate individualizing information.*" R.O. Keto, *Analysis and Comparison of Bullet Leads by Inductively Coupled Plasma Mass Spectrometry,* 44 J. FORENSIC SCI. 1020, 1026 (1999) (emphasis added). Given the availability of a critique such as this,[FN10] the Court finds that the nonproduction of the FBI and Iowa State studies did not amount to a *Brady* violation. *See Hoke v. Netherland,* 92 F.3d 1350, 1356 (4th Cir.1996); *United States v. Orzechowski,* 547 F.2d 978, 985 (7th Cir.1976) (no *Brady* violation where information in unproduced DEA studies on what tests should be performed to determine if a substance is a cocaine isomer was available to defense in other forms and used during cross-examination of government expert).

FN10. Arguably the 1991 FBI Study itself was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

publicly available at the time of Higgs' trial. Although the Court need not reach a conclusion as to that, it does note that the publicly-available *Journal of Forensic Sciences* article cited the FBI Study, a fact which appears to weaken Higgs's claim that the FBI Study was not reasonably available at the time of his trial. *See* Keto at 1026 n. 16. Moreover, the Court notes that the FBI Study had been assigned an International Standard Book Number (ISBN) by 1999, *id.,* a fact which further erodes Higgs's contention that it was not externally available by the time of trial in 2000.

**2. Uncertainty of studies with respect to chemical and statistical analysis per CBLA.**

The Court further finds that the critiques which fall into the second category-challenges to the validity of the chemical and statistical processes that comprise the essence of comparative bullet lead analysis-involve no strong, material conclusions but at best suggest areas for possible additional study. The 1991 FBI Study, for example, actually did more to confirm the validity of CBLA processes than to discredit them, finding that "[a]ccurate, reproducible elemental concentration determinations in bullet leads can be obtained using both [Neutron Activation Analysis] and [Inductively Coupled Plasma-Atomic Emission Spectrometry] methods." Peele et al. at 65. At the same time, the Iowa State study never actually concluded that CBLA's chemical or statistical processes were invalid, finding instead that the two methods the researchers employed to assess the quality of bullet lead evidence produced indeterminate results, in large part because of limited data availability. *See* Carriquiry et al. at 30. These less than ringing conclusions do not suffice to undermine confidence in the outcome of Higgs' trial. They appear instead to be comparable to the speculative information available in *Bhutani, supra.* The Court concludes that the two Studies' findings did not constitute favorable evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555.

**3. Availability of expert witnesses.**

It is also noteworthy that Higgs, by his own admission, could have called witnesses capable of stating conclusions nearly identical to those he characterizes as present in the Government's studies. His petition, for instance, notes that, "[a]s early as 1970, metallurgists began writing about the techniques the FBI was using to compare **\*500** the elemental composition of bullets. Analysis of these techniques began to appear in published case law well before Petitioner's trial in 2000." Indeed, such critiques were also making their way into court proceedings as early as 1981. Higgs himself cites a 1981 dissent by Justice Hunter of the Indiana Supreme Court arguing that a CBLA technique similar to the technique relied upon in Higgs' case was unreliable and inadmissible. *See Jones v. State, 425 N.E.2d 128, 134-37 (Ind.1981)* (Hunter, J., dissenting). Ultimately, then, Higgs concedes that "any competent metallurgist in 2000 could have made many of the points made by [William A.] Tobin," the former employee of the FBI Laboratory whose affidavit Higgs has filed with the Court, who characterizes Government witness Lundy's conclusions as "unsupported by scientific foundation" and "not reliable." In light of these concessions, the Court finds unpersuasive Higgs' claim that the Government studies contained information not reasonably available elsewhere.

**4. Other bullet-related evidence.**

Finally, the Court notes that the FBI's CBLA analysis was not the only evidence that served to establish a link between Higgs and the .38 caliber bullets retrieved from the crime scene. In addition to the CBLA analysis, the Government presented: (1) eyewitness testimony linking Higgs to the firing of a .38 caliber weapon outside the Chaconia Nightclub in 1995; (2) ballistics evidence showing forensic similarities between a bullet recovered from the Chaconia Nightclub shooting and bullets recovered from the bodies of the murder victims in the present case; (3) statements by Higgs implying that he owned the .38 caliber weapon used in the Chaconia shooting; (4) the .38 caliber bullets found in Higgs's apartment upon execution of a search warrant; (5) evidence showing that a .38 caliber weapon was used in the Cherry Lane shooting, a crime to which Higgs pleaded guilty; and (6) the eyewitness testimony of Victor Gloria, who testified that Higgs owned a .38 caliber handgun which Higgs retrieved from a drawer on the night of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

murders and later handed to Haynes, who used it to kill the three victims. In light of this substantial evidence linking Higgs and a .38 caliber weapon, the Court concludes that the largely inconclusive information relative to CBLA offered in the Government studies, whether or not otherwise reasonably available at the time of the trial, did not comprise evidence that "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555.

### B. Newly Discovered Evidence

[7] Higgs's *Brady* argument is but the first of three arising from admission of the CBLA evidence at trial. The second is that the discovery of "new evidence" about the reliability of CBLA, including the National Research Counsel study that led to the FBI's abandonment of the practice, entitles him to a new trial. The Court disagrees.

[8] Newly discovered evidence may open the door to habeas corpus relief if it can form the basis of an actual innocence claim. *Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (" 'Actual innocence' is ... a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *see also Buckner v. Polk,* 453 F.3d 195, 199-200 (4th Cir.2006). While it is not entirely clear whether Higgs' actual innocence claim is brought as a means to reach a procedurally barred constitutional claim under *Schlup,* or **\*501** whether he intends it as a "free-standing" claim of innocence which purportedly entitles him to relief under *Herrera,* it appears that he is alleging his actual innocence, in and of itself, as the basis for collateral relief. That is to say, he would like the Court to overturn his conviction because he submits he is actually innocent, on the grounds that pivotal evidence adduced against him at trial was unreliable.

The Supreme Court has never squarely held that actual innocence is a viable independent collateral claim. *See Herrera,* 506 U.S. at 417, 113 S.Ct. 853 ("We may assume, for the sake of argument in deciding this case, that

in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."). But if such a claim exists, the Court has said, the threshold showing would "necessarily be extraordinarily high." *Id.* Higgs' showing in this case falls far short of such a high threshold. The evidence adduced against him at trial was extensive and strong. First and foremost, Victor Gloria provided a detailed account of the murders and Higgs' role in them, testimony which in large part was corroborated by the testimony of several other witnesses as well as physical evidence. In addition to Gloria's testimony, highly damaging evidence included:

1. Enidsia Darby's statement that Higgs told her that the victims were killed because Tanji Jackson was "snitching on one of them [Higgs or Haynes]." TT. Sept. 29, 2000 [Paper No. 355], at 33-35;

2. Higgs' attempt to manufacture alibis for himself by urging Phyllis Smith and Enidsia Darby to lie to investigators as to his whereabouts at the time of the murder, *Id.* at 31; TT. Sept. 29, 2000 [Paper No. 426], at 31-37;

3. Higgs' statement to Dominick Williams that he could not plead guilty to the Chaconia Nightclub shooting because he feared that the bullets found at that crime scene could be linked to those used to kill Black, Chinn, and Jackson-a statement tantamount to a confession, TT. Oct. 4, 2000, at 34;

4. Higgs' admission to Williams that the women were killed because they were "tripping," TT. Oct. 4, 2000, at 44-46;

5. Higgs's suggestion to Williams that his friends would stop Gloria from testifying, presumably by intimidating or killing him, *Id.* at 44, 49; and

6. Testimony from various witnesses that Higgs owned

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and had previously fired a .38 caliber gun, the same caliber used in the murders.

This evidence, the Court finds, effectively demolishes Higgs' claim of actual innocence. In light of this evidence, Higgs also fails to meet what appears to be the less restrictive standard for actual innocence suggested in *Schlup,* 513 U.S. at 327-28, 115 S.Ct. 851 (holding that in order to demonstrate actual innocence, a movant must establish that based on the evidence, "it is more likely than not that *no reasonable juror* would have convicted him") (emphasis added).

### C. Ineffective Assistance of Counsel

[9] Higgs' third CBLA argument is that defense counsel was ineffective for failing to offer available studies or experts critical of CBLA.

Claims of ineffective assistance of counsel are governed by the two-part test outlined in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires a showing (1) "that counsel's performance was deficient," and; **\*502** (2) "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. Representation is deficient if it "falls below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. A showing of prejudice requires "that counsel's errors were so serious as to deprive the defendant of a fair trial ... whose result is reliable," *id.* at 687, 104 S.Ct. 2052, and that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Put differently, "[t]he benchmark of an ineffective assistance claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. *See also, Roach v. Martin,* 757 F.2d 1463 (4th Cir.1985) (adopting the *Strickland* test for the Fourth Circuit).

Passing the question of deficiency *vel non* of counsel's performance, the Court concludes that there was no reasonable probability that, absent counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence previously catalogued establish that proposition beyond peradventure.

### D. Motion for Discovery

[10] For the same reason, the Court finds Higgs' discovery request for any FBI reports, studies, and scientific data related to the validity of CBLA or the FBI's decision to discontinue its use on September 1, 2005 without merit. Discovery in connection with a habeas petition may be given only upon a showing of "good cause." *See* RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS 6(a). "Good cause" exists when there is "reason to believe that [the defendant] may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." *Bracy v. Gramley,* 520 U.S. 899, 908-09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). As discussed, there is no reason to believe that such additional facts as Higgs might hope to mine during discovery would demonstrate his entitlement to relief at this juncture.

### III.

### Claim 2: Peremptory Challenges

In his second claim, Higgs argues his entitlement to a new trial because of the allegedly discriminatory manner in which the prosecution exercised its peremptory strikes against women. This, he says, violated the Equal Protection Clause of the Fifth Amendment. He cites *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which the Supreme Court held that litigants may not use peremptory challenges "solely on account of race," a holding extended to gender-based challenges in *J.E.B. v. Alabama,* 511 U.S. 127, 128-29, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). As evidence of gender discrimination, Higgs submits that, despite the fact that over one-third of the jury pool was comprised of women, the final jury contained only men.[FN11] He further submits that the actions of the prosecutors in this case were part of a pattern of discriminatory behavior, as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

evidenced by their elimination of a disproportionate number of women in another death penalty case heard by this Court following Higgs' trial.[FN12] Because of this jurisdiction's practice *503 of "blind striking" the jury, [FN13] Higgs says he has been unable to ascertain the exact number of strikes the Government exercised against potential female jurors.[FN14] He therefore argues that evidence relating to the Government's gender discrimination justifies discovery and an evidentiary hearing. He further complains that he was deprived of effective assistance when counsel failed to object to the prosecution's supposed gender bias in exercising its peremptory challenges.

> FN11. The jury of 12 was picked from a total of 44 prospective jurors. Of the 44 prospective jurors, 28 (63.5%) were men and 16 (36.5%) were women.

> FN12. *See United States v. Lighty,* PJM-03-00457 (D.Md.)

> FN13. Under this practice, after the Court conducts voir dire, each side is given a clean juror list with all strikes for cause noted. Counsel then make their peremptory strikes from their respective lists, without seeing which jurors are being struck by the opposing side. The Courtroom Deputy (CRD) then takes up the lists from counsel and prepares a master list incorporating both sides' strikes. Counsel are advised by the Court that, starting from the top of the list, the CRD will call into the jury box the first 12 unstruck names (or more, depending on the number of alternates to be chosen). After the prospective jurors are called into the jury box, counsel are given a final opportunity to object before the jury is sworn.

> FN14. While the prosecution and defense have not seen each others' strikes, they should be able to reconstruct those strikes by noting which of the first 28 names on the list (10 defense strikes and 6 prosecution strikes and 12 remaining jurors) have or have not been struck.

The Government argues that Higgs' claim is procedurally defaulted, but submits that even on the merits, he is unable to establish a *prima facie* case of discrimination or rebut the Government's legitimate, non-discriminatory reasons for its strikes. Because the underlying claim would have been futile, says the Government, the Sixth Amendment claim of ineffective assistance also fails.

**A.**

[11] The Court agrees that this claim is procedurally defaulted. Before now, Higgs has never argued that the prosecution exercised its peremptory strikes in violation of the Equal Protection Clause. Though a procedural default will be excused upon a demonstration of cause and prejudice, *see Massaro v. United States,* 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), and while it may be assumed *arguendo* that Higgs has shown "cause," *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (noting that ineffective assistance of counsel is "cause" for a procedural default), he has not shown "prejudice." The Court explains.

**B.**

[12] A *Batson*- *J.E.B.* challenge requires a three-step inquiry: (1) the court first determines whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of-in this case-gender, (2) the prosecutor must then present a gender-neutral explanation for striking the juror in question, and (3) the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

**1.**

[13] *Batson* provides that a defendant may satisfy his initial burden of demonstrating a *prima facie* case of discrimination by showing that: (1) the defendant was a member of a cognizable group, (2) the prosecution

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

exercised peremptory challenges to remove from the venire members of defendant's gender, and (3) other relevant facts and circumstances give rise to an inference of discrimination. **\*504**_Batson,_ 476 U.S. at 96, 106 S.Ct. 1712; _J.E.B.,_ 511 U.S. at 144-45, 114 S.Ct. 1419 (suggesting that analysis of gender-based discrimination claims should follow the approach outlined in _Batson_ ). While _Batson_- _J.E.B._ challenges were originally limited to discrimination claims regarding one's own race or gender, this has since been expanded to allow defendants who are of a different cognizable group than the stricken jurors to establish a _prima facie_ case. _See Powers v. Ohio,_ 499 U.S. 400, 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (holding that racial identity between the objecting defendant and the excluded jurors does not constitute a relevant precondition for a _Batson_ challenge). Because Higgs does not allege that members of his own gender, _i.e._ men, were improperly stricken from his jury, he must show that other relevant facts and circumstances give rise to an inference of discrimination involving women. _United States v. Joe,_ 928 F.2d 99, 102 (4th Cir.1991) (citing _Batson,_ 476 U.S. at 96, 106 S.Ct. 1712). He embarks upon a tortuous, ultimately unsuccessful course in his effort to do so.

Higgs begins by presenting statistics which he believes evidence discrimination by the prosecution during jury selection. He argues, from the limited information available to him, that it "appears" that the prosecution exercised eleven of its fifteen peremptory strikes, or 73.3%, to eliminate prospective female jurors, whereas women made up only 36.5% of the venire. [FN15]

> FN15. Of at least 15 strikes Higgs believes were used, he has determined that 11 of them were used against women.

The Government submits that these statistics are speculative and cannot suffice to establish a _prima facie_ case of discrimination. _See United States v. Tipton,_ 90 F.3d 861, 881 & n. 11 (4th Cir.1996) (rejecting a gender-discrimination claim where the defendants produced no evidence to support their argument other than "raw figures" of two men versus eight women stricken). It notes that four female jurors who were not excluded by the Government would have been seated if they had not been stricken by Higgs' own counsel.

The Court is not prepared to say that statistics alone can never suffice to establish a _prima facie Batson_ violation. _See, e.g., Howard v. Moore,_ 131 F.3d 399, 407 (4th Cir.1997) (_en banc_ ) (concluding that "prosecutor's striking of six out of the seven black prospective jurors"-without more-"constituted a _prima facie_ case of discrimination"); _see also Allen v. Lee,_ 366 F.3d 319, 359 (4th Cir.2004) ("When determining whether a _prima facie_ case of discrimination has been shown, the district court may consider the proportion of black jurors stricken compared with the composition of the venire."). On the other hand, neither is it necessarily suspect that the prosecution exercised 73.3% of its strikes against women, when women constituted 36.5% of the venire. But assuming without deciding that such numbers could form the basis for a _prima facie_ case of discrimination, Higgs nonetheless has failed to rebut the Government's proffered neutral, non-discriminatory reasons for its strikes.

**2.**

The Supreme Court has made clear that the prosecution's burden of establishing a legitimate reason for its strikes is not heavy. _See Rice,_ 546 U.S. at 338, 126 S.Ct. 969 ("[a]lthough the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices") (internal citations and quotations omitted). **\*505** To satisfy this burden, the prosecutors may provide a variety of reasons for their strikes, including among others the prospective juror's prior criminal jury service, the fact of the prospective juror having relatives who have served prison time, business concerns, and relationships between the prospective juror's relatives and trial counsel. Given this lenient standard, the prosecution easily satisfies its burden in this case. [FN16] _See Rice,_ 546 U.S. at 338, 126 S.Ct. 969.

> FN16. The Government has explained that female Jurors 19, 43, 64, 69, 100, 112, and 124 were stricken for neutral reasons justifying their exclusion-separate and apart from their death

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

penalty views. Jurors 19 and 112 were stricken as a result of their prior criminal jury service. Juror 43 was stricken due to her concerns about her business, which was going public, where she was the chief financial officer. Juror 64 had a nephew whom she believed had been wrongly convicted of manslaughter and who had received a 10-to-20 year prison sentence. Juror 124 had a cousin who was currently being prosecuted for drug offenses in Maryland and a father who had served time in federal prison. Juror 69's brother was a police officer who was successfully defended against criminal charges by Harry Trainor, Esquire, Higgs' trial counsel. At the time of trial, Trainor still had a professional relationship with the juror's brother. Juror 100 failed to establish eye contact during voir dire and also had a 22-year-old son, which the Government believed might make her unduly sympathetic to the similarly-aged defendant. Juror 100 also stated, without explanation, that she would not apply the death penalty in some cases.

[14] Once a non-discriminatory reason is offered, step three of a *Batson* inquiry requires the trial court to determine whether the defendant has rebutted the stated rationales in order to prove intentional discrimination. *Batson,* 476 U.S. at 98, 106 S.Ct. 1712.

A variety of circumstances may be considered in determining whether the prosecution discriminated in its jury selection. In *Miller-El II,* the Supreme Court was persuaded by six indicia of discrimination where prosecutors: (1) struck a high percentage of veniremen on the basis of their being part of a cognizable group; (2) proffered reasons for striking the members of the cognizable group that applied equally to veniremen who were not members of the cognizable group; (3) repeatedly "shuffled" potential jurors when confronted with eligible veniremen who were part of the cognizable group; (4) used different scripts depending on whether the veniremen were part of the cognizable group; (5) made written notes about the veniremen being part of the cognizable group; and (6) were part of an office with a systematic policy of discrimination. *Miller-El II,* 545 U.S. at 239-66, 125 S.Ct. 2317.

The present case stands in marked contrast to *Miller-El II.* The percentage of strikes against women here, arguably high enough to make a *prima facie* case, ultimately does not persuade the Court that the prosecution engaged in intentional discrimination, particularly given that the lack of women on the jury was due at least in part to strikes made by the defense.[FN17] Furthermore, unlike in *Miller-El II,* the "shuffling" of jurors and the asking of different questions of male and female jurors did not occur here. There is no indication that the prosecution in its voir dire treated potential male and female jurors differently.

FN17. The prosecution in *Miller-El II* struck 91% of the black veniremen, *id.* at 2325, while the prosecution in this case struck only 75% of the females on the venire.

Still, Higgs argues that under *Miller-El v. Cockrell,* a petitioner claiming discrimination in jury selection may prove that the prosecutor has engaged in systematic discrimination against a particular group of venire members as part of a "culture" of *506 discrimination. 537 U.S. 322, 347, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (*Miller-El I* ); *see also Miller-El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller-El II* ). A "culture" of discrimination can be established by a showing that the prosecutor discriminated "in case after case." *Swain v. Alabama,* 380 U.S. 202, 224, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Higgs alleges such a culture was in place here because his prosecutors, five years after his trial, tried another capital case together, *United States v. Lighty,* PJM-03-00457 (D.Md.2006), in which they purportedly exercised 10 of their 12 identifiable peremptory strikes against women.

Higgs also fails in his attempt to rely on *Swain.* As indicated, under *Swain* "an inference of purposeful discrimination would be raised on evidence that a prosecutor, 'in case after case' ... is responsible for the removal" of women who have been selected as potentially qualified jurors. *Batson,* 476 U.S. at 91-99, 106 S.Ct. 1712 (citing *Swain,* 380 U.S. at 224, 85 S.Ct. 824). Jury statistics from the *Lighty* case alone, which was tried five years after Higgs, whatever they might show, fall far short

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

of demonstrating a pattern of discrimination in "case after case." [FN18]

> FN18. For what it is worth, the Court notes that the two prosecutors charged with discriminating against females in their jury selection in this case and the *Lighty* case are themselves female.

**C.**

Higgs' proposal that discovery be allowed and an evidentiary hearing held to explore his claim of gender discrimination in jury selection is rejected.

The Court finds no "good cause" to engage in discovery or hold a hearing based on the highly speculative ruminations Higgs has engaged in. A defendant may not use discovery to go on a "fishing expedition" through the Government's files in search of evidence to support an imagined and fanciful claim. *See United States v. Wilson,* 901 F.2d 378, 381 (4th Cir.1990).

**D.**

Higgs' argument that trial counsel's failure to raise the *Batson* challenge in response to the prosecution's purported gender discrimination violated his Sixth Amendment right to effective assistance necessarily falls.

[15] Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000). Since counsel's decision to raise a constitutional challenge based on gender discrimination would have been futile, their failure to do so did not violate Higgs' Sixth Amendment right to effective assistance.

**IV.**

**Claim 3: Brady Issues as to Witness Testimony;**

**Ineffective Assistance as to Witnesses; and Investigation**

Higgs asserts that the Government failed to disclose certain evidence, denying him his Fifth Amendment Due Process rights and that trial counsel were ineffective in failing to call certain witnesses, denying him his Sixth Amendment right to counsel. He also believes, based on newly discovered evidence, that he should be exonerated of the charges against him.

The testimony of several trial witnesses is relevant to these claims.

Victor Gloria gave eyewitness testimony with respect to the murders. He stated that, on the night of the murders, he rode **\*507** in the backseat of Higgs' vehicle while Higgs drove and Haynes sat in the passenger seat. He testified that he saw Higgs hand a gun to Haynes while whispering something to Haynes. At the same time, Gloria conceded he had initially told investigators and several witnesses that he had been asleep immediately prior to the murders, later explaining he had lied about being asleep. During cross-examination at trial, Higgs' counsel attacked Gloria's credibility, eliciting statements about his criminal past (including his use and sale of drugs and his violation of probation), as well as his willingness to lie to authorities.

Two other witnesses, Wondwossen Kabtamu and Richard Diolamou, testified as to the November 1995 incident that occurred outside the Chaconia Nightclub where Higgs shot out the windows of a vehicle in a drive-by shooting while Kabtamu drove. This testimony was used to demonstrate Higgs' participation in one of two prior shooting incidents involving a .38 caliber weapon.

Domenick Williams testified as to a discussion he had with Higgs while they were housed in the same block in D.C. jail (Northwest 1.).[FN19] Specifically, Williams stated that, while Higgs did not expressly admit his involvement in the Chaconia shooting, he told Williams he did not want to plead guilty to it "because they would try to use the gun in another case." According to Williams, Higgs also asked him what his chances would be if "the witness after the fact [Gloria] wasn't there." The Government offered this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

testimony to demonstrate one of several acts evincing "consciousness of guilt" on Higgs' part.

>    FN19. Williams was later moved to the sentencing block (Southwest 2).

The Court concludes that the Government did not withhold material evidence that would have had a reasonable probability of affecting the outcome of the trial. Moreover, Higgs' trial counsel engaged in a thorough investigation and presentation of this evidence such that any claim of ineffective assistance of counsel is unwarranted. Finally, there is no new evidence that would justify overturning Higgs' conviction.

### A. Suppression of Evidence and Due Process

Higgs claims that the Government withheld evidence with respect to benefits it purportedly offered to Victor Gloria, Enidsia Darby, Richard Diolamou, Wondwossen Kabtamu and Domenick Williams in exchange for their testimony. This non-disclosure, he argues, violated his Fifth Amendment Due Process rights.

[16] As previously stated, in order for the prosecution's suppression of evidence to violate a defendant's due process rights, the evidence must be material. *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. To be "material," evidence must be such as would create a "reasonable probability" of a different outcome at trial. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Promises made by the Government in consideration for testimony can be material if they meet this "reasonable probability" standard. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Prosecutors therefore have a duty to disclose any consideration offered to a witness where the witness' credibility is crucial to the case. *Id.* at 154-55, 92 S.Ct. 763.

### 1. Gloria

[17] Higgs claims the Government failed to disclose

extensive information it had regarding its dealings with Gloria both in Maryland and other jurisdictions. He acknowledges that the jury knew Gloria faced 15 years in prison for his involvement**\*508** in the present case, plus 30 years on other federal drug charges and up to 10 years on State drug charges, and that it also knew that the Government had offered Gloria a lighter sentence for his role in this case in exchange for his cooperation. But Higgs argues that the jury never understood that Gloria might actually receive a lower sentence. As the Government correctly points out, however, the record squarely refutes this contention. Gloria himself testified that he could receive a sentence as low as 7 years, the sentence he in fact ultimately received based on the Government's motion at his sentencing that he receive a downward departure of two offense levels for substantial assistance under the sentencing guidelines. But Higgs says the jury did not know of additional consideration being offered to Gloria, i.e. that the charges he faced in connection with other federal drug violations would be dismissed and that, as to the state drug charges, he would only receive a sentence of one year concurrent with the time he was already serving in federal prison.

All this said, assuming Gloria actually received these benefits, there is no evidence that the Government offered any of the benefits to Gloria before he testified at the Higgs trial. That charges in a separate federal case against Gloria may have been dismissed 5 years after Higgs' trial in the present case in no sense establishes that the Government had determined not to pursue those charges at the time of Higgs' trial or that it had agreed with Gloria that it would do so. At the time of Higgs' trial, to the extent other federal claims may have been pending against Gloria, the Government may have had no intention whatsoever of dropping those charges, while 5 years later it may well have decided to drop the charges for wholly unrelated reasons. In short, Higgs has no basis, other than sheer speculation, for suggesting that the Government's dismissal of drug charges against Gloria, if indeed that is what happened, had any connection with Higgs' conviction and sentence. *See U.S. v. Roane,* 378 F.3d 382, 400-401 (2004) (finding that "airy generalities [and] conclusory assertions" are not sufficient to meet the defendant's burden in a § 2255 claim).

Higgs also claims that the Government offered Gloria

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

benefits in relation to state charges pending against him in Virginia as well as charges he potentially faced in Baltimore. Specifically, he submits that Virginia officials were never notified of Gloria's whereabouts during the Higgs prosecution, when presumably they should have been, and that state charges were never brought against Gloria for a homicide in Baltimore. Again, pure speculation about supposed benefits cannot substitute for hard facts. *See Roane,* 378 F.3d at 401. Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions.

Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could **\*509** not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict. *See Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *United States v. Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

### 2. Others

Higgs' contentions that the Government failed to disclose information relating to consideration offered to Diolamou, Kabtamu and Williams in exchange for testimony are similarly infirm.

Factual claims must be established by a preponderance of the evidence. *Miller v. United States,* 261 F.2d 546, 547 (4th Cir.1958); *Martin v. United States,* 395 F.Supp.2d 326, 328 (D.S.C.2005). Higgs surmises, but presents no

hard evidence, to support his claim that Diolamou and Kabtamu received favorable treatment in immigration proceedings in exchange for their testimony in this case. His claim of Government nondisclosure of benefits as to Diolamou rests on the fact that Diolamou was involved in deportation proceedings at the same time as Higgs' trial. But the mere fact that these legal proceedings were occurring simultaneously does not show that Diolamou received benefits in one in exchange for testimony given in the other. There is no evidence in the record that Diolamou was in fact facing deportation or that he understood that he would be receiving any sort of immigration benefits in exchange for his cooperation here, or indeed that he actually received any benefits. As to Kabtamu, Higgs offers nothing more than an unfounded assertion that Kabtamu received an immigration benefit.

[18] As to Williams, Higgs claims the Government violated his due process rights when it failed to disclose evidence of an alias used by Williams that was tied to charges pending against him at the time he testified, or that there was an open bench warrant for Williams as to those charges, or that Williams and Higgs in fact did not share the same cellblock at the time of the incident about which Williams testified.

But assuming the existence of these facts or that the Government knew of them-which Higgs has by no means demonstrated-there is no reason to conclude that these facts established a "reasonable probability" of a different outcome at trial. Williams' criminal ways were fully apparent to the jury at all times, as evidenced by the fact that Williams spoke of being in jail with Higgs. Even then, the suggestion that Williams and Higgs may have been housed in different sections of jail at the time the conversation about which Williams testified took place is of negligible consequence. The records show that defense counsel were well aware of the times Williams and Higgs were housed together on the Northwest cellblock and when Williams was moved to the Southwest block. Since counsel knew there were times when Higgs and Williams were housed together and when they were in different locations, it is not clear how the records of their precise locations within the jail would have helped Higgs' case at all, much less that their production would have been reasonably probable to affect the outcome of the proceeding. *See Fullwood v. Lee,* 290 F.3d 663, 685-87

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(4th Cir.2002) (finding that a defendant's claim of suppression cannot stand when the information is known to the defendant).

**B. Ineffectiveness of Counsel**

Higgs faults counsel for allegedly failing to investigate or present evidence regarding: (1) inconsistencies in Gloria's statements as to whether he was asleep at the time of the murders, including additional witnesses who could have testified to this issue; (2) Gloria's prior use and possession **\*510** of a. 38 caliber pistol; (3) Haynes' motive for the murders in this case other than the one the Government ascribed to him; (4) Higgs' supposed violent assault on Enidsia Darby; and (5) custodial records from the DC jail to impeach Williams' testimony and the supposed undisclosed benefits the Government offered to Williams. The Court agrees with the Government and rejects all these claims.

Per *Strickland,* counsel not only acted reasonably in regard to each of these claims, such that the claims for ineffective assistance of counsel fail; the Court finds no prejudice with respect to any of them.

**1.**

[19] Higgs alleges that two possible witnesses, Keon Dacosta and Katrina Havenner, the mother of Higgs' child, should have been called to impeach Gloria's testimony that Higgs put the murder weapon in Haynes' hands, because Gloria purportedly made statements to both Dacosta and Havenner that he was asleep during the murders. Dacosta has submitted a declaration stating that Gloria told him he was "asleep, or passed out" during the murders.

Higgs does not, however, suggest that his counsel knew about Dacosta. What he says is that Dacosta had witnessed an incident in which Higgs allegedly held a gun to the head of his former girlfriend Enidsia Darby. Higgs claims that counsel had a duty to interview Dacosta regarding that incident, and that if they had done so, counsel would have learned that Dacosta also had a connection with Gloria which, in turn, would have led to Dacosta's testimony that

Gloria told him he had been asleep at the time of the murders.

As for Havenner, she supposedly told a defense investigator that Gloria also told her he was unconscious at the time of the murders.

Higgs claims that had the statements of these witnesses been introduced, Gloria's credibility as a witness would have been further weakened. Although he acknowledges that his counsel were able to use Gloria's prior inconsistent statements to the police (i.e. that he was asleep during the murders) on cross-examination, he submits that counsel were ineffective for failing to establish a pattern of inconsistency in Gloria's statements. The Court finds none of these arguments persuasive.

[20][21][22] In assessing an ineffectiveness of counsel claim, the court presumes counsel's conduct was "within the range of reasonable professional assistance." *See Rose v. Lee,* 252 F.3d 676, 693 (4th Cir.2001) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Counsel's decision not to embark on certain investigations is "assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Claims of ineffective assistance of counsel based on failure to investigate potential witness testimony must show that the witness would have been willing to testify and that the testimony would have created "reasonable doubt" as to the defendant's guilt. *Spencer v. Murray,* 18 F.3d 229, 233-34 (4th Cir.1994). Failure to investigate a "crucial" witness may suggest ineffectiveness of counsel, but failure to investigate every single person mentioned by the defendant is not tantamount to ineffective assistance. *Huffington v. Nuth,* 140 F.3d 572, 580 (4th Cir.1998) (quoting *Gray v. Lucas,* 677 F.2d 1086, 1093 n. 5 (5th Cir.1982)).

Assuming *arguendo* that counsel ought to have interviewed Dacosta because he had been a witness to Higgs' assault on Darby, it is difficult to see how or why counsel would have had reason to know of Dacosta's relationship with Gloria. And if **\*511** counsel had no reason to know that one witness had a connection with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

another witness, they can hardly be faulted for failing to learn about the second witness because they failed to ask the first witness about the second. *See Ames v. Endell,* 856 F.2d 1441, 1444-45 (9th Cir.1988) (finding that counsel had no duty to investigate "what hypothetically might have happened"); *see also Alcala v. Woodford,* 334 F.3d 862, 893 (9th Cir.2003).

Ultimately, however, with respect to counsel's failure to call these various witnesses, Higgs must still show that their testimony would have been likely to alter the outcome of the trial. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 (1984). This he has not done. While the testimony of Dacosta and Havenner may have further impeached Gloria, as previously noted, defense counsel did a very effective job undermining Gloria's credibility; they even got Gloria to impeach himself when he admitted he had lied in his initial statements that he was sleeping at the time of the murders. Counsel also had Gloria lay out before the jury his "history of deception and criminality." The testimony of Dacosta and Havenner would have been of marginal significance. Counsel were not remiss in failing to interview them or call them to the stand.

**2.**

[23] Higgs next claims that counsel ought to have investigated Gloria's prior possession and use of .38 caliber pistols because this would have suggested that Gloria had a more prominent role in the murders in this case. Specifically, prior to the murders in this case, Gloria faced charges in two incidents involving handguns: In July 1994, he was charged with possession of a .38 caliber handgun in a vehicle and, in February 1995, during a search of his apartment for drugs and drug paraphernalia, the Howard County authorities discovered a handgun in the apartment (although Gloria was not charged with possession of the weapon.) Higgs also notes that Gloria had admitted to having fired .38 caliber pistols.

The Court finds that these facts would have contributed virtually nothing to Higgs' defense. Mere familiarity with the type of weapon used in the murders would not necessarily have increased the likelihood that it was Gloria who used the weapon in this case nor would it have affected his credibility. Although counsel have a duty to

conduct a reasonable investigation, Higgs must show that counsel's failure to perform an appropriate investigation led to a failure to present exculpatory evidence. *See Spencer,* 18 F.3d at 233. In the July 1994 situation, although Gloria was charged with possession of the weapon, it was the other individual in the vehicle who ultimately claimed ownership of the weapon. Nor, again, was Gloria charged with possession of the weapon in the 1995 incident. In sum, Gloria's potential association with a .38 caliber weapon, attenuated as it was, was hardly exculpatory evidence as far as Higgs was concerned.

**3.**

Higgs claims counsel were ineffective for failing to investigate evidence of motives that Haynes or other individuals may have had to murder the women in this case. He suggests that the victims owed money to two drug dealers, Cephus and Chico, which gave those two men a motive to kill them. Higgs then argues that Haynes had a strong motive to kill the women because Haynes was serving as the "muscle" for Cephus and Chico. In support of this theory, Higgs proffers a declaration from Patrice Birdine claiming that Haynes' brother told her that Haynes shot the women over money. These proffers, however, do nothing to assist Higgs. Anything Birdine says is rank hearsay, and the **\*512** same appears be true of the statement of Haynes' brother, since the brother does not say he heard Haynes make what at best might have been a declaration against penal interest. *See Fed.R.Evid. 803(8)(B).* Haynes' supposed motive to commit the murders in this case is speculation of the highest order. More to the point, there is no basis for concluding that the existence of this recently proffered motive on the part of Haynes should have occurred to Higgs' counsel at the time of trial.

**4.**

[24] Higgs also faults counsel for failing to investigate Enidsia Darby's claims that Higgs violently assaulted her in 1995. In testifying about the incident, Darby initially claimed Higgs put a gun in her face and threatened to kill her. During trial counsel's cross-examination, however, Darby conceded that the altercation had been mutual. Defense counsel also established that the police failed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

find a gun when they responded to the incident. But Higgs claims that the police report regarding the assault would have further impeached Darby's testimony, particularly because, at the time of the event, Darby made no mention of Higgs being violent. Higgs claims counsel ought to have interviewed Darby before trial because, having recanted her testimony since trial, she was presumably lying at trial.

The police report itself, of course, is inadmissible hearsay evidence. *See* Fed.R.Evid. 803(8)(B). In addition, there is no basis for concluding that a pre-trial interview of Darby would have caused her to say anything different from what she said at trial, notwithstanding what she apparently says today. Darby's current credibility is highly doubtful. Her most recent statement that she lied at trial because she believed the Government would give her benefits strongly suggests that even if she had been lying at trial, it is unlikely she would have sacrificed the hoped-for benefits she was lying for, simply because Higgs' counsel might have contacted her. Counsel's decision not to investigate Darby's claims did not amount to ineffective assistance.

**5.**

Higgs also contends that trial counsel failed to investigate Williams' precise location in the D.C. jail, the outstanding charges against him, or the outstanding warrant against him in Philadelphia. For the same reasons Higgs fails to prevail on his claim that the Government failed to disclose this evidence, there is no merit to his claim that counsel failed to investigate the matters. Counsel's performance was not deficient and nothing they did or did not do in this regard prejudiced the defense.

**C. New Evidence**

[25] Finally, Higgs asserts his innocence based on alleged new evidence, *viz.,* the post-trial recantation of Victor Gloria with respect to his trial testimony that Higgs handed Haynes the murder weapon, supposedly reviving Gloria's one-time claim that he slept through the moments before the murder, as he originally told police.[FN20] Higgs asserts that § 2255 relief is required because Gloria's recantation exonerates him and demonstrates that his

conviction amounts to a fundamental miscarriage of justice. The Court is unpersuaded.

> FN20. Gloria is said to have made this recantation in a discussion with Robert Durand, an investigator working for Higgs' habeas counsel.

A claim of actual innocence standing alone has never been deemed to present a constitutional issue justifying habeas relief, although the Supreme Court has acknowledged the theoretical possibility of such a **\*513** claim. *See Herrera, 506 U.S. at 417, 113 S.Ct. 853.* Clearly, however, a petitioner may assert a claim of actual innocence based on newly discovered evidence in an attempt to rescue an otherwise procedurally defaulted constitutional claim. *Id. at 404, 113 S.Ct. 853* (" 'Actual innocence' is not itself a constitutional claim ... but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *see also* Randy Hertz & James Liebman, *Federal Habeas Corpus Practice and Procedure* § 2.5 (5th ed., Vol. 1 1998).

If a petitioner seeks to use newly discovered evidence as a gateway to revive a defaulted claim, he still must prove "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup, 513 U.S. at 327, 115 S.Ct. 851.* But in the present case Higgs does not appear to cite Gloria's purported recantation in an effort to revive an otherwise procedurally defaulted constitutional claim. He appears to offer it to demonstrate his actual innocence, on the basis of which he seeks to have his guilty verdict overturned. But having not yet held that a free-standing innocence claim is sufficient in a habeas proceeding, as the Supreme Court itself nevertheless noted in *House v. Bell, 547 U.S. 518, 555, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006),* the "threshold for any hypothetical freestanding innocence claim" would be "extraordinarily high".

Here it makes little difference whether Higgs must meet the "extraordinarily high" standard alluded to in *House* or the "no reasonable juror would have convicted him" standard of *Schlup.* True, a declaration has been filed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

stating that the conversation between Gloria and a defense investigator took place.[FN21] But, generally speaking, recantations are highly suspect: they are not subject to cross-examination, they are generally offered years after the crime and the trial, and witnesses offering recantations are often facing radically different pressures than they were at the time of the initial trial. *See United States v. Johnson,* 487 F.2d 1278, 1279 (4th Cir.1973) (finding that recantations are viewed with great skepticism). The Government has outlined several incriminating actions Higgs took following the murders which were totally independent of what Gloria had to say (*e.g.* Higgs "sanitized his apartment, lied to police, attempted to create a false alibi, tried to silence Gloria"), all of which militate strongly against Higgs' claim of innocence based on a recantation made years after the crimes he was convicted of took place. His claim of actual innocence is totally unconvincing; the evidence of his guilt remains overwhelmingly strong. He has failed to meet either the *House* or *Schlup* standards.

> FN21. Initially, Higgs simply relied on the mere assertion in his briefing that such a recantation had taken place. After the Government filed its response noting the lack of a declaration, Higgs filed the Declaration of Robert Durand in which Durand deposes that "Mr. Gloria stated that he had been imprisoned 'for nothing,' because he had been asleep in the van when the murders were committed." (Durand Aff. ¶ 3; 2d Supplemental App. to Pet'r's Mot. for Relief)

**Claim 4: Ballistics Testimony**

Higgs next contends that trial counsel rendered ineffective assistance by failing to challenge the Government's ballistics testimony.

At trial, FBI ballistics examiner Carlo Rosati testified that the microscopic markings on the bullets fired by Willis Haynes at the murder scene, those found at the Chaconia shooting, and those found at the **\*514** Cherry Lane shooting shared common features, specifically five right-hand twisting lands and grooves. Rosati testified that the bullets were fired from the same class of weapon, but

conceded that he could not determine whether or not the bullets were fired from the same gun. When cross-examined by defense counsel, Rosati conceded that more than 1.5 million weapons could have left the same microscopic markings found on each of the bullets. Even so, this testimony was used by the Government to argue that the bullets were fired from the same weapon used in all three shootings, a conclusion which, *inter alia,* was cited by the Fourth Circuit in affirming the conviction.

Higgs argues that his counsel were ineffective for failing to cross-examine Rosati based on information in the FBI ballistics report generated by Rosati himself and by the Prince George's County crime laboratory. The report, Higgs says, indicated that at least two different calibers of weapons produced by eleven different revolver manufacturers would produce the same markings as those found on the bullets in question and that a single manufacturer, Smith & Wesson, produced 19 different models in two calibers that could have created the same impressions. Use of such information on cross-examination, Higgs continues, would have discredited Rosati's testimony.

Higgs also contends that counsel were ineffective for failing to hire a defense expert to evaluate and challenge the ballistics evidence and Rosati's testimony. In fact, he says, the purported ballistics expert retained by Higgs' current counsel, William Conrad, has provided a letter stating that Smith & Wesson alone, one of the eleven potential firearms manufacturers, produced over two million weapons that could have created the markings on the bullets in question. Higgs argues that an expert such as Conrad could have been called at trial to show that Rosati's testimony underestimated the number of possible firearms that could have left the markings on the bullets.

Higgs also argues that counsel were ineffective for failing to contest the admissibility of Rosati's testimony. The testimony, in Higgs' view, lacked probative value because it shed no light on the allegations in the case and was not determinative as to whether or not the various bullets examined were fired from the same weapon.

Finally, Higgs argues that counsel were ineffective for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

failing to object to the prosecution's misleading characterizations of Rosati's testimony during closing argument, specifically the statement that "[Higgs and Haynes] had done a shooting before.... [Higgs] knew Mr. Haynes would get out of that car and use that gun. Doesn't that make him more responsible for what happened that night?" TT 10/25/00, 23. These statements, according to Higgs, misled the jury and prevented them from fairly deciding the issue of his guilt or innocence.

**A.**

[26] Again, to prevail on an ineffective assistance claim, Higgs must establish that counsel's performance "fell below an objective standard of reasonableness," that prejudiced his defense. *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052 (1984). The Court presumes "that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Rose,* 252 F.3d at 693. The question is not "what the best lawyer would have done or even what most good lawyers would have done," but merely whether a reasonable lawyer could have made the same decision under the circumstances. *See Gilbert v. Moore,* 134 F.3d 642, 655 (4th Cir.1998) (citing *Waters v. Thomas,* 46 F.3d 1506, 1512 (11th Cir.1995) (en banc)). "There are countless **\*515** ways to provide assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Under the second prong of *Strickland,* the petitioner must demonstrate that counsel's alleged substandard performance actually prejudiced the outcome of the case.

**B.**

**1.**

[27] The claim of ineffective assistance with respect to counsel's failure to cross-examine Rosati is without merit.

Counsel had in hand the FBI ballistics report which clearly stated that at least two different calibers of weapons produced by eleven different revolver manufacturers would have produced the same markings found on the bullets, and that Smith & Wesson alone produced 19 different models in two calibers that could have created these impressions. In consequence, defense counsel, on cross-examination, got Rosati to concede that more than 1.5 million firearms could have produced the markings on the bullets. TT 10/5/00, 175. This was a highly important concession. The extensive numerical possibilities gave counsel wide latitude to argue to the jury that, based on the microscopic markings, it was not reasonable to infer that all the bullets came from the same weapon. It is difficult to envision how a more extensive cross-examination of Rosati could have benefitted the defense. Defense counsel constantly must decide what questions to ask and how much time to spend on a particular witness. These are precisely the types of tactical decisions a court is not supposed to second guess. *Byram v. Ozmint,* 339 F.3d 203, 209 (4th Cir.2003) (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052) (The Fourth Circuit has been "highly deferential" to strategy decisions of lawyers, and there is a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance."). Given the extraordinarily meaningful concessions counsel did elicit, they were not ineffective for their strategic decision not to further cross-examine Rosati with information from the FBI ballistics report.

**2.**

[28] The claim of counsel's alleged failure to engage an expert to estimate an even higher number of potential weapons that could have made the markings found on the bullets in question suffers a similar fate. As an initial matter, the letter Higgs offers authored by his recently retained "expert" is of questionable admissibility because Higgs has failed to establish the expert's qualifications. *See generally Miller v. United States,* 261 F.2d 546, 547 (4th Cir.1958) (reciting a collateral attacker's evidentiary burden). But even if a qualified expert on Higgs' behalf had been called to make a higher estimate of possible weapons than Rosati did, the impact of such testimony would have been minimal. Conrad's estimate that at least 2 million guns could have made the markings, as compared to Rosati's estimate of 1.5 million, could hardly have made a difference with respect to the jury's evaluation of the likelihood that the same gun was used in all three shootings.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Higgs' trial counsel, in fact, had designated a firearms expert for possible use at trial. The decision whether or not to rely on testimony adduced from Rosati as opposed to calling the defense's own firearms examiner was a reasonable tactical decision. Counsel apparently decided that it would be more compelling to elicit damaging evidence from the prosecution's witness himself rather than from an expert brought in by the defense to contradict **\*516** him, where the expert's motives and expertise could be challenged. There is no basis to find ineffective assistance with respect to counsel's failure to call a firearms expert.

**3.**

Higgs' claim that counsel rendered ineffective assistance for failing to object to the admission of Rosati's testimony also fails. As just discussed, Rosati's testimony permitted the defense to affirmatively demonstrate, without calling an expert of its own, that a substantial number of guns could have produced the markings on the bullets. *Byram,* 339 F.3d at 209. That alone was a sufficient tactical reason not to seek exclusion of the testimony.

**4.**

Finally, Higgs claims that trial counsel were ineffective for failing to object to the Government's closing argument that the same gun was used in all three incidents. But while Rosati's testimony may have permitted the Government to make this argument, it simultaneously gave the defense ample leeway to refute the argument. Beyond this, the Court specifically instructed the jury that its findings had to be based on an evaluation of the *evidence* presented and that "the arguments of the attorneys and the comments and rulings of the Court are not evidence." TT 10/24/2000, 142. Counsel's failure to object to this argument by the Government did not prevent the jury from fairly deciding the similarity *vel non* of the bullets and the weapon in this case and on other occasions. The absence of an objection by counsel was not unreasonable under the circumstances.

**C.**

Beyond this, Higgs has not shown that any of the claimed errors would have created a reasonable likelihood of acquittal. *See Spencer v. Murray,* 18 F.3d 229, 233 (4th Cir.1994). His own conduct, particularly his statement to jailhouse informant Domenick Williams that he refused to plead guilty to another case "because [the Government] would try to use the gun in another case," did far more to support the inference that the same weapon had fired all the pertinent bullets than did Rosati's testimony. This evidence fairly permitted the prosecution to argue and the jury to conclude that Higgs had committed several crimes, including the three murders in this case, using a single .38 caliber firearm. In addition, counsel's cross-examination of Rosati potentially neutralized any suggestion that only a handful of weapons could have fired the bullets. No reasonable probability exists that the defense counsel would have secured a more favorable verdict had they performed in the manner Higgs now promotes.

**Claim 5: Admissibility of Co-Defendant Haynes' Confessions During Guilt Phase**

Higgs contends that both trial and appellate counsel provided ineffective assistance by failing to raise a Sixth Amendment Confrontation Clause objection when the Government introduced evidence of Co-Defendant Haynes' confessions pertaining to the slayings.

During the guilt phase of Higgs' trial, the Government offered into evidence a tape-recorded telephone conversation in which Melvin Grayson, who was incarcerated with Higgs, read to Higgs the contents of a *Washington Post* article that recounted the statements made by Haynes. The article stated: "[A]ccording to testimony and Haynes' confessions to U.S. Park Police and FBI agents, the slayings were triggered by an argument between Higgs and Jackson during a party at Higgs' Laurel apartment just before the attack." In response to Grayson's reading,**\*517** Higgs remained silent. The Government argued that this silence constituted Higgs' recognition of the accuracy of Haynes' confessions. Higgs' trial counsel objected to admission of the reference to Haynes' confessions on Fifth Amendment grounds but did not raise an objection on Sixth Amendment Confrontation Clause grounds. The Court overruled the Fifth Amendment objection, admitting the recorded conversation as a potential adoptive admission. *See* Fed.R.Evid.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

801(d)(2)(B).

Nonetheless, in their opening brief on appeal Higgs' counsel raised not only the Fifth Amendment objection, but the Sixth Amendment Confrontation Clause objection as well, developing the Sixth Amendment argument in detail in their reply brief. The Fourth Circuit affirmed this Court's decision to admit the recorded telephone conversation. *See Higgs I,* 353 F.3d at 310 (holding that this Court did not err in admitting the telephone conversation between Grayson and Higgs).

Higgs now submits that trial counsel's failure to object to the recorded conversation on Confrontation Clause grounds constituted ineffective assistance. He argues that the admission of the recording violated his right to confrontation because Haynes' confessions were testimonial in nature and Higgs never had the opportunity to cross-examine him. *See Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that testimonial statements made out of court are barred unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness). Higgs says counsel had no reasonable or strategic basis for failing to object on Sixth Amendment grounds when clearly established law barred the admission of a co-defendant's out-of-court testimony. *See Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that the admission of a co-defendant's confession implicating the defendant violates the latter's Sixth Amendment right to cross-examination). Counsels' deficient performance, he says, "had substantial and injurious effect or influence in determining the jury's verdict" because the Government heavily relied on the recorded conversation throughout trial since the conversation implicated Higgs as the individual who "triggered" the killings, a central issue in the case. *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) (holding that the standard for determining habeas relief is whether the error had "substantial and injurious effect or influence in determining the jury's verdict"). Though the Court instructed the jury that the newspaper article was not offered for the truth of its substance, Higgs argues that this instruction did not cure the Sixth Amendment violation. *See Bruton,* 391 U.S. at 137, 88 S.Ct. 1620 (ruling that limiting jury instructions are not an adequate substitute for petitioner's constitutional right of cross-examination).

As for appellate counsel, Higgs argues that their fleeting reference to the Confrontation Clause issue in their opening brief, despite their more extensive development in the reply brief, was insufficient to invoke adequate appellate review. Higgs contends that, had appellate counsel adequately presented this issue on direct appeal, there would have been a reasonable probability that his guilt and/or death sentence would have been vacated.

The Government continues to maintain that Higgs' silence in the face of an incriminating statement constituted an adoptive admission. Fed.R.Evid. 801(d)(2)(B); *see United States v. Duval,* 496 F.3d 64, 76 (1st Cir.2007) (holding that adoptive admissions, **\*518** including admissions by silence or acquiescence, are admissible pursuant to Federal Rules of Evidence). Because, at the time of Higgs' trial, there was legal support for admitting a defendant's adoptive admissions irrespective of the Confrontation Clause, *see, e.g., United States v. Allen,* 10 F.3d 405, 413 (7th Cir.1993), the Government contends that Higgs' counsel reasonably have decided to abstain from objecting and therefore did not render ineffective assistance by failing to do so.

### A.

As before, the Court considers (1) whether counsels' "representation fell below an objective standard of reasonableness," considering all the circumstances, and (2) whether the deficiencies in counsels' performance were prejudicial. *See Strickland,* 466 U.S. at 688, 692, 104 S.Ct. 2052. The Court finds that Higgs has failed to satisfy the first prong with respect to the performance of both trial and appellate counsel, mooting the second prong analysis.

### B.

[29] The Sixth Amendment protects a defendant's right to confront the witnesses against him. U.S. Const. amend. VI. In 2004, four years after the trial in this case, *Crawford*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

held that defendants have the right to confront third parties who make out-of-court statements that are testimonial in nature. 541 U.S. at 68, 124 S.Ct. 1354. What effect, if any, does *Crawford* have in the present case?

To begin, the Supreme Court has held that *Crawford* does not apply retroactively to cases that were final when the decision issued. *Whorton v. Bockting,* 549 U.S. 406, 417-21, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). Since *Crawford* was decided in March 2004, and the Supreme Court did not deny Higgs' petition for certiorari until November 2004, *Crawford* remains in play for him. That said, it was and remains unclear whether and how *Crawford* might affect adoptive admissions because the Supreme Court explicitly left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " 541 U.S. at 68, 124 S.Ct. 1354.

But whatever *Crawford's* impact may ultimately have on the use of adoptive admissions against defendants, at the time of Higgs' trial there was ample legal basis for Higgs' attorneys to believe that introducing an adoptive admission would not violate the Confrontation Clause. Both the Sixth and the Seventh Circuits had expressly found that admitting a defendant's adoptive admission did not violate the Confrontation Clause. *See Neuman v. Rivers,* 125 F.3d 315, 320 (6th Cir.1997) (finding no Confrontation Clause violation when party adopted incriminating statement); *United States v. Allen,* 10 F.3d 405, 413 (7th Cir.1993) (holding defendant has no right to confrontation with respect to an adoptive admission because it is "a statement that the defendant has adopted as his own" and therefore the defendant is effectively the witness against himself). *But see United States v. Monks,* 774 F.2d 945, 952 (9th Cir.1985) (stating that "adoptive admissions do not automatically satisfy the Confrontation Clause, at least where the third party statements alleged to have been adopted have probative value independent of the fact that they may have been adopted by the defendant"). Because case law at the time of trial supported the proposition that adoptive admissions do not violate the Confrontation Clause, counsel's decision not to raise a Sixth Amendment objection to the admission Higgs' response to the reading of the *Washington Post* article was not unreasonable.

**\*519 C.**

Similarly, appellate counsel's performance did not fall "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. As noted on direct appeal, counsel in fact raised the Sixth Amendment Confrontation Clause objection in their opening brief, developing the claim more fully in their reply brief. Although Higgs contends that counsel's failure to extensively develop the issue in the opening brief precluded appellate review, the Fourth Circuit had no trouble finding that "the recording demonstrates that Higgs not only heard and understood the statements made by Grayson, but commented upon them to some extent." *Higgs I,* 353 F.3d at 310. Thus, the Fourth Circuit was able to conclude that "the district court did not abuse its discretion in admitting the [recorded telephone conversation between Higgs and Grayson] and charging the jury that Higgs' silence could be considered an admission." *Id.* In other words, appellate counsel's Sixth Amendment argument on direct appeal, which the Fourth Circuit was certainly aware of, gave it no pause and presented no obstacle.

Even if appellate counsel failed to adequately raise the Sixth Amendment objection, their performance would still have been reasonable. As of the time of Higgs' direct appeal in 2003, there was clear legal support for the admission of the recording as an adoptive admission because, not long before, the Fourth Circuit had ruled that "a party may manifest adoption of a statement in any number of ways, including [through] words, conduct, or silence." *United States v. Robinson,* 275 F.3d 371, 383 (4th Cir.2001) (citing *Marshall v. Young,* 833 F.2d 709, 716 n. 3 (7th Cir.1987)). Furthermore, as just observed in the context of trial counsel's failure to raise a Sixth Amendment objection, case law suggested that, when a statement forms the basis for an adoptive admission, the defendant has no claim under the Confrontation Clause. Accordingly, any further argument by appellate counsel would in all likelihood have been similarly futile. Appellate counsel could have reasonably decided to forego any further Sixth Amendment objection in this case. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000) (holding that failure to make a futile objection does not amount to ineffective assistance).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Because both trial and appellate counsel did not perform deficiently in respect of Confrontation Clause and due process issues, there was no prejudice to Higgs as to the probable outcome of his case.

**Claim 6: Denial of Effective Assistance of Counsel at Sentencing**

Higgs next argues his trial attorneys rendered ineffective assistance at sentencing by failing to: 1) obtain his school records, which would have illustrated that he was diagnosed as learning disabled from an early age and was emotionally disturbed and depressed due at least in part to his mother's death; 2) obtain a pre-sentence report from a criminal fraud proceeding against Higgs that was prepared in 1996; 3) secure the testimony and criminal records of Higgs' father, Alphonso Higgs, who would have admitted that he was an absentee father with serious drug addictions, who would have testified that he verbally and physically abused both Higgs' mother and Higgs himself; 4) locate and present testimony of Higgs' mother's younger sister, Nancy Lee Riley, and her older brother, Richard Bennett, who would have corroborated the testimony regarding Alphonso Higgs' abuse, and who would have testified to the impact Higgs' mother's death had on 10-year-old Higgs; and 5) provide the defense's retained mental health experts with mitigating**\*520** evidence in the form of Higgs' school records and testimony from Higgs' father, aunt, and uncle detailing Higgs' abusive upbringing. Higgs also argues that his trial attorneys rendered ineffective assistance during the penalty phase by deciding to limit mitigating evidence when the Government decided to drop a claim of future dangerousness from its presentation of aggravating circumstances. Specifically, he says trial counsel's decision to limit evidence of his personal history to events before he was 18, in order to avoid opening the door to bad acts evidence in rebuttal, was strategically unsound because evidence of his past bad acts had already been introduced during the guilt phase and already suggested through evidence of other aggravators, and because the decision was the result of a less than thorough investigation.

The Government argues that Higgs has failed to demonstrate that counsel erred or that he was in any way prejudiced by counsel's acts or omissions.

**A.**

Higgs must establish that counsel's performance "fell below an objective standard of reasonableness" and that in the absence of counsel's errors a reasonable probability exists that "the result of the proceeding would have been different." *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052. Again, when analyzing the unreasonableness prong, the Court must defer to counsel's decisions and tactical judgments made after full investigation, though to be sure the Court need not defer when such decisions and judgments are based upon less than a full investigation. *Wiggins v. Smith,* 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). As for prejudice, Higgs must show a reasonable probability that, but for counsel's allegedly deficient performance, the outcome of the case would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The Court weighs the totality of reasonably available mitigation evidence presented at trial against the totality of evidence presented in aggravation. *Williams v. Taylor,* 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**B.**

The Court considers the various ways in which counsel's investigation for and presentation at sentencing were allegedly deficient.

**1.**

[30] Higgs argues first that counsel failed to obtain certain school records, which would have demonstrated his troubled childhood and youth.

Higgs is correct that an attorney representing a capital defendant has a constitutionally-mandated duty to conduct a thorough investigation of any potential mitigation evidence in preparation for a capital sentence proceeding. *Id.* at 415, 120 S.Ct. 1495 (O'Connor, J., concurring). A "thorough investigation" requires diligent "efforts to discover *all reasonably available* mitigating evidence."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

*Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527 (emphasis in *Wiggins;* citation omitted). However, the duty only arises where an attorney has information suggesting that such investigation is necessary. *See Ames v. Endell,* 856 F.2d 1441, 1444-45 (9th Cir.1988) (failure to investigate a plausible scenario in defense of client when attorney and client agreed the scenario had not happened was not ineffective); *see also Hedrick v. True,* 443 F.3d 342, 350 (4th Cir.2006) (failure to investigate potentially mitigating evidence at sentencing regarding defendant's difficult childhood after a psychological expert did not suggest that further exploration was warranted was not ineffective); **\*521***Bacon v. Lee,* 225 F.3d 470, 481 (4th Cir.2000) (failure to fully investigate defendant's difficult childhood was not ineffective because counsel could have reasonably concluded that the evidence presented was sufficient).

Here, counsel in fact pursued Higgs' school records, but had no reason to believe further investigation was necessary. Higgs does not dispute that when counsel requested the records, the school system provided only a transcript indicating that it purged "full cumulative" student records six years after high-school graduation, the implication being that Higgs' records had been purged. Though in fact it appears the school system retained special education records indefinitely, counsel had no reason to know or suspect that. Indeed, even if counsel had researched the district's policies, there is no reason to suppose they would have found any basis for contradicting the school system's stated policy that the record-retention schedule required only a six-year retention of special education records. Nor would counsel's knowledge that Higgs was a special education student have necessarily prompted further investigation. The school system's response regarding "full cumulative" records and its stated policy led counsel to reasonably believe that Higgs' records had been destroyed. It was not, therefore, unreasonable for counsel to fail to search further.

In any event, Higgs cannot show prejudice. Though the school records might have provided additional information indicating Higgs' struggles passing his courses as well as instances of emotional disturbance and depression, they also demonstrated that he consistently rejected efforts to assist him to grow into responsible adulthood. No reasonable probability exists that the jury would have returned a more favorable verdict had the special education records been discovered. *Williams v. Taylor,* 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**2.**

In his Brief, Higgs also faults counsel for failing to obtain a pre-sentence investigation report prepared by the Maryland Department of Parole and Probation in connection with 1996 fraud charges. Here Higgs defeats his own argument that counsel's omission-assuming it occurred-was constitutionally deficient, since he concedes that the report "would have confirmed and corroborated [his] history of drug and alcohol abuse." Petitioner's Brief at 75. In other words, the evidence in the report would simply have tracked other evidence already in the case, hardly a compelling argument that counsel's performance should be judged to be constitutionally sub-standard.

**3.**

[31] Higgs' next claim relates to counsel's failure to secure testimony and criminal records of Higgs' father.

Here, too, Higgs fails to demonstrate that counsel's performance "fell below an objective standard of reasonableness." *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052. Though Alphonso Higgs now claims that he would have offered testimony on behalf of his son, the defense's mitigation/specialist, Joel Sickler, testified that he had attempted to reach Alphonso Higgs prior to the trial, but received information from two of Alphonso Higgs' children that he did not want to participate in his son's defense. Higgs fails to acknowledge his own investigator's unsuccessful attempts to contact Alphonso Higgs directly.

[32] Higgs also fails to demonstrate that he was prejudiced by the absence of his father's testimony. Alphonso Higgs' credibility would certainly have been challengeable, not only because of his relationship**\*522** to Defendant Higgs, but also because he was a convicted felon who admitted he was abusing drugs during the time period to which he would testify. In any event, the jury considered the fact

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

that Higgs' father was an absentee parent who had a drug problem. Investigator Sickler testified that Alphonso Higgs had problems with a narcotics addiction, had a substantial criminal history including time in jail for trafficking a controlled substance, and had provided little financial or emotional support to his son. There is no reason to believe that Alphonso Higgs' verbally recounted recollections of physical abuse he was responsible for would have significantly changed the jury's verdict in this case.

**4.**

[33] Higgs claims that counsel provided ineffective counsel by failing to present the testimony of Nancy Lee Riley (his mother's sister) and Richard Bennett (his mother's brother).

There is, however, no evidence that Higgs' lawyers were ever made aware of any particular information that these witnesses possessed that should have led the lawyers to further investigation. Beyond stating in general terms that Alphonso Higgs on occasion abused Marilyn Bennett in Defendant Higgs' presence, the witnesses' declarations would have offered no new concrete facts or specific incidents relevant to Defendant Higgs' background. Their purported testimony would have essentially tracked that of Investigator Sickler. The cases Higgs cites-which have found counsel ineffective where reasonable diligence would have *added* relevant undiscovered mitigating evidence-are distinguishable because here the additional evidence would either have been irrelevant or substantially similar to that already introduced. *See Williams,* 529 U.S. at 391-99, 120 S.Ct. 1495; *Wiggins,* 539 U.S. at 510, 123 S.Ct. 2527; *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

[34] Not only has Higgs failed to demonstrate that his counsel's performance was deficient, he again fails to demonstrate prejudice. No reasonable probability exists that inclusion of the Riley-Bennett testimony would have altered the jury's understanding of Higgs' upbringing or how it may have affected his actions on the night of the murders, such that a more favorable penalty-phase verdict would have resulted. *See Williams,* 529 U.S. at 397-98, 120 S.Ct. 1495. Riley and Bennett offer at best

generalizations, not specific instances of abuse. Moreover, the credibility of both is open to question, given that only now, years after trial, have they come forward with statements. Finally, the jury heard testimony regarding the heavy impact Higgs' mother's death had on Higgs. Constance McKinnon, who lived with Higgs after his mother's death, specifically testified regarding the emotional impact on Higgs.

No ineffective assistance was rendered when counsel did not pursue or present the testimony of Alphonso Higgs, Nancy Lee Riley, or Richard Bennett.

**5.**

Higgs' argument regarding mental health experts Lawrence Donner, Ph.D. and Susan Feister, M.D. is somewhat hard to follow.

In his opening Motion, Higgs argues that counsel were deficient because they failed to "[enlist] the aid" of these experts. Petitioner's Motion at 67. But counsel did in fact consult these experts, which Higgs concedes was "a step in the right direction." *Id.* What Higgs apparently contends was deficient on counsel's part is that the experts were not provided "access to relevant records or lay witnesses"-**\*523** presumably the school records, Alphonso Higgs, Nancy Lee Riley, and Richard Bennett. *Id.* The short answer to that argument, of course, is that since counsel were not deficient in not accessing the records or witnesses themselves, they would not be deficient for failing to transmit them to the mental health experts.

Higgs also appears to fault counsel for not calling either of these experts to testify-they were not in fact called-but this argument is not carried forward in his Brief in Support of his Motion or his Memorandum in Reply to the Government's Opposition. But, again, the failure to call argument, insofar as it has not been abandoned, is still premised on the fact that the experts were not provided with information that counsel cannot be faulted for not obtaining.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**6.**

[35] As for the suggestion that counsel made an unsound decision to limit Higgs' mitigating evidence to events before his eighteenth birthday, that clearly was a matter of tactical choice. Certainly evidence of Higgs' wayward life after age eighteen was already in the mix, but counsel could fairly have decided to minimize emphasis on the multiple bad acts of Higgs adulthood, especially in recognition of the fact that future dangerousness would not be pursued as aggravation. Counsel's decision in this regard did not constitute ineffective assistance.

**Claim 7: Racial Discrimination in the
Administration of the Death Penalty**

[36] Higgs's seventh claim is that trial counsel were ineffective for failing to raise equal protection and Eighth Amendment challenges to the Federal Government's decision to pursue the death penalty against him. In support of this claim, he cites statistics maintained by the Federal Death Penalty Resource Counsel which, he maintains, suggest that the Department of Justice has sought the death penalty in a racially discriminatory manner during the years since its reintroduction.

The Court finds the equal protection and Eighth Amendment claims to be procedurally defaulted. As he concedes, until now Higgs has never argued that the Federal Government's decision to pursue the death penalty against him violated these rights. Though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro,* 538 U.S. at 504, 123 S.Ct. 1690, no such relief is warranted here. Higgs has shown neither cause nor prejudice.

Statistics alone do not support a finding of discriminatory intent sufficient to strike down a death penalty scheme on equal protection grounds. *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *see also United States v. Bin Laden,* 126 F.Supp.2d 256, 261 (S.D.N.Y.2000) ("At its core, therefore, *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant.").

Since petitioner has offered no proof that the Government actually decided to pursue the death penalty *in this case* for biased reasons, he may not show that his attorneys were ineffective for choosing not to raise the issue.

Nor is there the slightest basis for concluding that discovery would reveal any racial bias on the part of prosecutors. Accordingly, Higgs' request for discovery on Claim 7 is denied.

**Claim 8: Admissibility of Portions of Co-Defendant
Haynes' Statements During Penalty Phase**

Higgs next says that trial counsel rendered ineffective assistance during the **\*524** penalty phase when they failed to raise Fifth Amendment Due Process and Sixth Amendment Confrontation Clause objections to testimony with respect to several statements made by his Co-Defendant Haynes.

Specifically, United States Park Police Captain Robert Rule testified that, according to Haynes, "[a]fter they returned to Mr. Higgs' apartment at the end of the evening ... they went into the apartment, began cleaning up the apartment and throwing out various items." TT 10/18/00, 150. As to the "murder weapon ... Mr. Higgs drove the van down to Anticostia [sic] Park and pulled over on a spot on Anticostia [sic] Drive not far from the Anticostia [sic] Rec Center pool, and [Mr. Haynes] ran and threw the gun into the river." *Id.* at 150-151. Captain Rule thus supplied critical evidence concerning the aggravating factor of obstruction of justice eventually found by the jury.

Higgs continues:

Haynes' statements were made to a law enforcement officer in the midst of a custodial interrogation and accordingly fall within the core class of statements deemed "testimonial" by the Supreme Court under *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. Because he had no opportunity to cross-examine Haynes, the admission of Haynes' statements violated Higgs' right to confrontation under the Sixth Amendment. Moreover, since Haynes had a strong

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

motive to place blame on Higgs rather than himself, his testimony implicating Higgs was presumptively unreliable.

While trial counsel objected to this evidence, unsuccessfully as it turned out, arguing that it was more prejudicial than probative, it is true that they did not specifically base their objections on Fifth or Sixth Amendment grounds. Appellate counsel, for the first time, attempted to argue that the evidence violated Higgs' Sixth Amendment Confrontation Clause right, but the Fourth Circuit deemed the argument waived because it was not raised at trial. The Fourth Circuit, in any event, rejected the claim under the plain-error doctrine, finding that the evidence was harmless. *See Higgs I,* 353 F.3d at 323-25.

Higgs now argues that trial counsel were ineffective for failing to raise the Fifth and Sixth Amendment objections at trial.

Of the two, he appears to rely principally on his Sixth Amendment Confrontation Clause argument. While he concedes that the Federal Rules of Evidence do not ordinarily apply at sentencing, he suggests that this does not mean that the Confrontation Clause is inapplicable at sentencing, especially the sentencing phase of a capital case when the proffered statements inculpate the defendant. Such evidence, says Higgs, is "presumptively unreliable," citing *Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and, as such, it also violated his due process rights. Because Haynes' statement clearly inculpated Higgs, and was an important piece of evidence establishing the obstruction of justice aggravator, Higgs submits that trial counsel's failure to object to the admission of the testimony on Fifth and Sixth Amendment grounds fell below an objective standard of reasonableness.

Higgs concedes, as he must, that the Fourth Circuit considered the Confrontation Clause argument on direct appeal, and found, given other overwhelming evidence of Higgs' guilt, that Officer Rule's testimony did not affect Higgs' substantial rights. But he argues here that that determination should be reconsidered in light of the Supreme Court's holding in *Crawford v. Washington,* issued post Higgs' trial, where the Court found that the

Constitution**\*525** demands that "testimonial" statements trigger a right to confrontation. According to Higgs, because Haynes' confession fell within the core class of statements deemed "testimonial" by the Supreme Court, it should have been subject to confrontation.

Finally, Higgs argues that even if counsel's failure to object on Fifth and Sixth Amendment grounds is found not to be prejudicial, he is still entitled to relief because of the cumulative prejudicial impact of counsel's errors. In support of this proposition he cites *Williams,* 529 U.S. at 398-99, 120 S.Ct. 1495 (finding ineffective assistance where the entire postconviction record, viewed as a whole including the mitigation evidence, demonstrated prejudice with respect to a sentencing proceeding).

In response, the Government argues that counsel's failure to make an evidentiary objection on constitutional grounds is procedurally barred. In any event, the Government argues that the Fourth Circuit's holding that Higgs' substantial rights were not affected by the admission of Officer Rule's testimony forecloses the question of prejudice as a matter of law. The Government also argues that the Fourth Circuit has expressly rejected the cumulative impact argument in ineffective assistance cases. *Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir.1998). In sum, the Government submits that the claim of ineffective assistance lacks merit because Higgs has failed to demonstrate that his attorneys provided constitutionally deficient, much less prejudicial, representation.

**A.**

Higgs is procedurally barred from relitigating the question of counsel's failure to object to the testimony regarding Haynes' statement. Because he effectively litigated the prejudicial effect of the Haynes confession on direct appeal, he may not revisit the issue by way of collateral attack. *Boeckenhaupt v. United States,* 537 F.2d 1182, 1183 (4th Cir.1976).

**B.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

That said, on the merits the claim fails in any event. Higgs must establish that counsel's performance "fell below an objective standard of reasonableness," and that in the absence of the alleged error a reasonable probability exists that "the result of the proceeding would have been different." *See Strickland,* 466 U.S. at 687-88, 104 S.Ct. 2052.

The Court agrees that the Fourth Circuit's rationale on direct appeal has answered the fundamental question of the reasonable probability *vel non* that Rule's testimony affected the trial's outcome: "Given the cumulative nature of the precise evidence challenged, and the overwhelming evidence otherwise proffered in support of the obstruction aggravator, we cannot say that Rule's limited testimony regarding Haynes' statements affected Higgs' substantial rights." *Higgs I,* 353 F.3d at 324-325. Substantial rights are affected only where there is "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez,* 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). In agreement with the Fourth Circuit, this Court is unable to find it reasonably probable that the testimony regarding Haynes' statement prejudiced the outcome of this case. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that **\*526** course should be followed."). [FN22]

> FN22. The lack of prejudice finding also definitively puts to rest any due process argument under the Fifth Amendment that Haynes' testimony was presumptively unreliable.

### C.

[37][38] Higgs has not, in any case, shown that his attorneys' conduct in omitting a Confrontation Clause objection to Haynes' confession fell below an objective standard of reasonableness. The Court "judge[s] the reasonableness of counsel's challenged conduct on the facts of a particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega,* 528 U.S. 470,

477, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). Courts are obliged to defer to counsel's tactical decisions at trial. *See Gardner v. Ozmint,* 511 F.3d 420 (4th Cir.2007).

Given the uncertainty of the state of the law at the time of trial as to whether the Confrontation Clause applies to capital sentencing proceedings, trial counsel were under no obligation to make such an objection. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Indeed, the Fourth Circuit stated on direct appeal in this case that "[I]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding." *Higgs I,* 353 F.3d at 325. While the Fourth Circuit has yet to conclusively rule on the issue, two years after Higgs' trial the Seventh Circuit did, holding that while the Confrontation Clause applies to the guilt phase of trial, it does *not* apply to the sentencing phase, even when a death penalty proceeding is involved. *Szabo v. Walls,* 313 F.3d 392, 398 (7th Cir.2002).

Nor is Higgs persuasive in his argument that his lawyers had a duty to anticipate *Crawford* and object to Haynes' statement. *Crawford,* decided four years after Higgs' trial, broke new ground by distinguishing "testimonial" statements as a species of evidence particularly offensive to the Confrontation Clause. *Crawford,* 541 U.S. at 71-72, 124 S.Ct. 1354 (Rehnquist, C.J., concurring) (noting that the Court had never drawn a distinction between testimonial and nontestimonial statements). As a result, the Supreme Court held that *Crawford* is not to be applied retroactively to cases on collateral review. *Whorton v. Bockting,* 549 U.S. 406, 417-21, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).[FN23] Trial counsel cannot therefore be found ineffective for failing to foresee this subsequent change in the law. *See United States v. Davies,* 394 F.3d 182, 189-91 (3d Cir.2005) (finding counsel had no duty to predict that arguments in an earlier case would become law and did not act unreasonably in failing to rely on its teachings); *See also United States v. Smith,* 241 F.3d 546, 548 (7th Cir.2001); *Parker v. Bowersox,* 188 F.3d 923, 929 (8th Cir.1999); *Pitts v. Cook,* 923 F.2d 1568, 1573 (11th Cir.1991).

> FN23. The cases relied upon by Higgs in support of the proposition that counsel should have foreseen the *Crawford* doctrine are unpersuasive.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Though noting a need for greater reliability in capital sentencing proceedings, the Supreme Court gave no indication prior to Higgs' trial that its opinion in *Crawford* was in the offing; hence counsel had no reason to anticipate its arrival. *See Monge v. California,* 524 U.S. 721, 727-28, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998); *California v. Ramos,* 463 U.S. 992, 1013-14, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

## D.

[39] Higgs' final claim in this regard is that trial counsel provided ineffective assistance during the penalty hearing by limiting their mitigating evidence in response to the Government's decision to drop future dangerousness as an aggravating circumstance.**527** He says, for example, that his counsel's closing argument barely addressed the influence of Higgs' childhood experiences on the direction of his life, as a result of which none of the jurors found that to be a mitigating factor.

The Fourth Circuit has been "highly deferential" to strategy decisions of lawyers, even indulging a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Byram,* 339 F.3d at 209 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Here, trial counsel's strategic decision to limit mitigation evidence so as not to open the door to bad act rebuttal evidence was not unreasonable. The decision was made after counsel conducted a reasonable investigation into Higgs' admittedly traumatic childhood, then weighed the other negatives of his serious adult misconduct. Counsel's choice was strategic; in no sense was it substandard.

Higgs has also failed to demonstrate prejudice. No reasonable probability exists that further emphasis on Higgs' troubled childhood would have persuaded the jury to find it as a mitigating factor or that it would have persuaded a juror to vote for other than the death penalty.

**Claim 9: Victim Impact Evidence**

As a ninth claim, Higgs asserts that defense counsel was ineffective for failing to object to the admission of victim impact evidence that he contends violated his Eighth Amendment rights. Specifically, he maintains that: (1) the victim impact testimony, statements, photographs, and videotapes presented to the jury during the sentencing phase were highly emotional, rendering the sentencing proceedings inflammatory and fundamentally unfair; (2) the prosecutor's use of imagery and metaphor during closing argument was inflammatory and rendered trivial and meaningless any mitigating evidence submitted by the defendants; (3) the prosecutor improperly and unconstitutionally alluded to the sentencing preferences of family members; and (4) the Court failed to provide the jury with guidance as to how they should weigh the victim impact evidence among other aggravating and mitigating factors, which resulted in an unreliable death verdict in violation of the Eighth Amendment.

## A.

The Court finds no deficiency in counsel's actions in the cited respects. In consequence, any objection by counsel to the victim impact evidence would have been futile.

## B.

[40][41] The law concerning victim impact evidence is well settled. In a capital case, victim impact statements that identify the extent and scope of the injury and loss suffered by the victim and the victim's family members are admissible. *See* 18 U.S.C. § 3593(a); *see also Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (holding that the Eighth Amendment erects no *per se* bar to the admission of victim impact testimony during the sentencing phase of a defendant's capital trial). Moreover, the Eighth Amendment does not prohibit prosecutorial argument on the subject of victim impact. *Payne,* 501 U.S. at 827, 111 S.Ct. 2597. Only where victim impact evidence would be so unduly prejudicial as to render the defendant's trial unfair does due process mandate its exclusion. *See id.* at 825, 111 S.Ct. 2597. However, the bar for demonstrating undue prejudice is quite high. *See, e.g., United States v. Barnette,* 211 F.3d 803, 818-19 (4th Cir.2000) (allowing family members to present stories of victims' childhoods, family

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

experiences, and trauma resulting from victims' deaths, as **\*528** well as poems reflecting deep sadness and regret); *United States v. McVeigh,* 153 F.3d 1166, 1218-22 (10th Cir.1998), *overruled on other grounds by* 184 F.3d 1206 (10th Cir.1999) (permitting a total of 38 witnesses to recount, among other things: last contacts with victims, efforts to discover victims' fates, discovery of body parts months after victims' deaths, uncontrollable screaming and crying upon hearing of victims' deaths, victims' life histories and personal accomplishments, and innocence and unconditional love manifested by child victims).

[42] Here, the testimony of the victims' family members, though unquestionably emotional, was highly relevant to the impact that the murders had on the families. Several of the victims' relatives testified that they had suffered severe emotional anguish as a result of the murders. The mother of one victim testified that her marriage nearly dissolved in the wake of her daughter's murder. Another testified that she "fell to the ground and ... screamed" when the police informed her of her daughter's death. Some witnesses presented photographs and videotapes that chronicled the lives of the victims. The evidence in this case was wholly consistent with that found proper in *Barnette* and *McVeigh,* where family members recounted stories of the victims' lives, past family experiences, and the anguish they suffered after the victims' deaths. *Barnette,* 211 F.3d at 818; *McVeigh,* 153 F.3d at 1218-22. The Court concludes that the victim impact testimony and exhibits in this case were well within bounds. Counsel cannot be faulted for failing to object to them.

The Court also rejects the argument that the prosecutor's use of imagery and metaphor during closing argument-specifically, comparing the family members' anguish to the weight of a heavy rock-rendered trivial and meaningless any mitigating evidence submitted by the defendants. The use of poetic license by a prosecutor in a closing argument is not *per se* impermissible. *See, e.g., United States v. Fields,* 483 F.3d 313, 340-41 (5th Cir.2007) (permitting the use of a "picture in picture" metaphor in a capital sentencing closing, whereby the prosecutor invited the jury to imagine the victim's murder displayed on one "screen," and the actions of the defendant before, during, and after the murder on the other); *Bussard v. Lockhart,* 32 F.3d 322, 324 (8th Cir.1994) (permitting the poetic, metaphoric use of a

Biblical quote in a closing argument); *United States v. Canales,* 744 F.2d 413, 429-30 (5th Cir.1984) (finding no grounds for reversal where the prosecution implored the jury to "cut out" the "cancer" of vote buying in Duval County, where the larger matter of widespread vote buying was not at issue in the case). Indeed, the use of a simple rock metaphor while displaying an actual rock is hardly an inflammatory image. It does not begin to approach the level of egregiousness required to create undue prejudice. Counsel had no reasonable cause to object to the prosecution's argument.

The Court also finds groundless Higgs's argument that the prosecutor unconstitutionally alluded to the sentencing preferences of family members during sentencing. To be sure, the Eighth Amendment precludes the admission of a victim's family members' characterizations and opinions regarding the crime, the defendant, or the appropriate sentence, because such evidence could "inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Booth v. Maryland,* 482 U.S. 496, 508, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), *overruled on other grounds by* 501 U.S. 808, 830, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Similarly, a prosecutor must **\*529** refrain from presenting family member opinions regarding the crime or the defendant. *See South Carolina v. Gathers,* 490 U.S. 805, 811, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), *overruled on other grounds by* 501 U.S. 808, 830, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (holding that assertions that would violate *Booth* are not a permissible subject of prosecutorial argument). Here, however, Higgs's effort to construe the prosecutor's statement-"you ask each one of those family members here what they wouldn't give for their daughters to be in Lewisburg Penitentiary rather than where they are"-as a statement of the victims' family members' sentencing preferences is simply inaccurate. The prosecutor did not state or imply that the family members had any opinions with respect to an appropriate punishment for Higgs. Rather, she made the statement to counter defense counsel's assertion that life imprisonment would harshly and adequately punish the defendant for his crimes. To construe the statement as Higgs does, as an allusion to the sentencing preferences of the family members, calls for an inference that logic does not justify. Defense counsel had no reason to interpose an objection on these grounds.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

Finally, Higgs's assertion that the Court's instructions failed to provide the jury with guidance as to how it should weigh the victim impact evidence among other aggravating and mitigating factors has no basis in fact. True, in a capital sentencing proceeding, the judge's instructions to the jury should make it clear that the jurors must consider both mitigating and aggravating factors and in no event should a judge give the impression that the two need not be considered in tandem. *See Mills v. Maryland, 486 U.S. 367, 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)*. However, the record shows that the Court gave the appropriate instructions with respect to the weighing of aggravating and mitigating factors:

> In carefully weighing the various factors at issue in this case, you are called upon to make a unique individualized judgment about the appropriateness of imposing either the death penalty or life imprisonment without the possibility of parole or release on the defendant for each count.... [Y]ou must consider the weight and the value of each factor in making your decision. Any one aggravating factor ... may outweigh several mitigating factors.... On the other hand, you must also recognize that a single mitigating factor ... may outweigh several aggravating factors.... At this final weighing stage in the process you are not called upon simply to find relevant factors. You are called upon to make a reasoned moral judgment based on all the evidence before you as to whether the death penalty is justified for the defendant and for the offense. After consideration of the aggravating and mitigating factors, you must unanimously determine [the penalty].

TT. Oct. 24, 2000 at 177-79. This instruction properly provided the jury with sufficient guidance as to the weighing of aggravating and mitigating factors.

Counsel were in no sense deficient in not objecting to the prosecution's use of victim impact evidence or the Court's jury instructions.

### Claim 10: Previous Conviction of a Violent Felony Involving a Firearm

#### A.

[43] Higgs contends that during the sentencing phase, when considering the aggravating factor of previous conviction for a violent felony involving a firearm, the jury improperly considered his involvement in the Cherry Lane shooting.

**\*530** In the Cherry Lane case, Higgs pleaded guilty to reckless endangerment and assault, neither crime necessarily involving the use of a firearm. Accordingly, he argues that the Cherry Lane event could not have formed the basis for the previous-firearm-conviction aggravating factor, according to the "categorical approach" adopted by the Fourth Circuit in *United States v. Washington* 404 F.3d 834 (4th Cir.2005), decided after its opinion on Higgs's direct appeal.[FN24]

> FN24. Higgs' direct appeal was denied by the Fourth Circuit on December 22, 2003. *See Higgs I,* 353 F.3d at 316. *Washington* was decided on April 15, 2005.

In *Washington,* the Fourth Circuit reversed a sentence that had been based on the defendant's prior conviction for breaking and entering, a crime which does not necessarily involve violence. *Id.* at 843. The court determined that, in order to comply with *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the judge must determine a sentence using a "categorical approach;" he can only consider whether the elements of a defendant's previous crime, and not the facts behind the actual incident, meet the statutory requirements for a sentence enhancement. *See Washington,* 404 F.3d at 843.

There is no need to delve into the merits of this claim for two reasons. First, Higgs' claim fails because, as he concedes, he previously litigated this issue on direct appeal. *See Boeckenhaupt,* 537 F.2d at 1183. Second, the rule enunciated in *Washington* came into existence *after* his conviction became final and, as an evidentiary or procedural rule, it cannot be applied retroactively.

While Higgs relies on *Davis v. United States,* 417 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), *Davis* considered retroactivity in the context of new *substantive* laws only. Thus, in *Davis* the court allowed retroactive application of an intervening law that decriminalized the conduct for which the defendant had been convicted and sentenced. *Davis v. United States,* 417 U.S. 333, 346, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). In so doing, the court reasoned that the "there can be no room for doubt that such a circumstance inherently results in a complete miscarriage of justice and presents exceptional circumstances that justify collateral relief under § 2255." *Id.* Generally, *Davis* ' holding that intervening law can be applied retroactively covers only substantive, not procedural laws. *See Schriro v. Summerlin,* 542 U.S. 348, 352, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (holding that substantive laws warrant retroactive application due to the "significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose").[FN25] However, in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), in which the Supreme Court invalidated the retroactive application of a procedural rule, the Supreme Court held that procedural rules can be applied retroactively on collateral review, but only in "exceptional circumstances." *See also Schriro,* 542 U.S. at 351, 124 S.Ct. 2519 ("when a decision ... results in a 'new rule', that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances").

> FN25. A procedural law "regulate[s] only the manner of determining the defendant's culpability," while a substantive law "alters the range of conduct or the class of persons that the law punishes." *Schriro,* 542 U.S. at 353, 124 S.Ct. 2519.

[44] *Teague* establishes a three-step analysis to determine whether a new rule **\*531** of criminal procedure should apply retroactively: first, the conviction for which the petitioner filed a § 2255 motion must have been final when the new law was enunciated; second, the new law must in fact be "new"; and third, the new rule must be of watershed magnitude. *United States v. Morris,* 429 F.3d 65, 69-70 (4th Cir.2005) (citing *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)).

[45] Proceeding directly to the third factor, the "categorical approach" rule of *Washington* fails to satisfy the *Teague* analysis because it was not a watershed decision. *See id.* at 71. To qualify as a watershed decision, the new rule must seriously diminish the likelihood of obtaining an accurate conviction and must alter one's understanding of the bedrock procedural elements essential to the fairness of a proceeding. *Id.* The possibility that *Washington* was a watershed decision is foreclosed by the Fourth Circuit's decision in *United States v. Morris. See Morris,* 429 F.3d at 71-72. There, the court held that the *Booker* decision, which required that a sentence be based on the facts found by the jury alone, was not watershed because it did not implicate the "fundamental fairness that require [s] retroactive application on collateral attack." *Id.* The *Washington* rule-a close relative of the one announced in *Booker* and an extension of *Apprendi,* which the Fourth Circuit has also decided was not of watershed magnitude, *United States v. Sanders,* 247 F.3d 139, 146 (4th Cir.2001)-leads to a similar conclusion. The new rule limiting the ability of a court to stray from the bare elements of a previous conviction during sentencing did not alter the bedrock principles of fairness in criminal procedure. *See id.*; *United States v. Sanders,* 247 F.3d 139, 148 (4th Cir.2001). Accordingly, the *Washington* rule does not apply retroactively and does not support Higgs's § 2255 motion.

**B.**

[46] Higgs also submits that he is entitled to relief because counsel provided ineffective representation in failing to object when the Government submitted to the jury the previous-firearm-conviction aggravating factor based on his guilty plea to the Cherry Lane shooting.

Section 3592(c)(2) of Title 18 allows a jury to consider, as an aggravating factor, whether "the defendant has *previously* been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in Section 921) against another person" when sentencing a defendant to death. 18 U.S.C. § 3592(c) (2004) (emphasis added). Higgs contends that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

counsel should have argued that the word "previously" refers only to convictions occurring before commission of the *crime* which is the subject of this prosecution, not convictions occurring before *sentencing* for that crime. Although the Cherry Lane shooting took place on December 10, 1995, approximately six weeks before the January 1996 murders in this case, Higgs was not convicted of assault and reckless endangerment for the Cherry Lane shooting until April 1997, over a year after the January, 1996 murders. Again, the jury returned its death sentence verdict in this case on October 26, 2000.

As a preliminary matter, Higgs is procedurally defaulted on this claim because he did not raise it before trial, at trial, or on direct appeal. *See Massaro,* 538 U.S. at 504, 123 S.Ct. 1690. Nor has he avoided the procedural bar, since his claim of ineffective assistance of counsel ultimately fails the *Strickland* test.

For counsel's failure to object to purportedly objectionable material to be constitutionally ineffective, the objection must **\*532** have been so obvious that it would have "struck those learned in the law like a bucket of ice water." *Humphries v. Ozmint,* 366 F.3d 266, 276 (4th Cir.2004). Here, arguing that the word "previously" referred only to convictions occurring prior to the pending capital offense (as opposed to prior to sentencing) was not an obvious choice for Higgs' counsel because, at the time, the law supporting that argument was not clear and obvious.[FN26]

> FN26. During the penalty phase of the trial, defense counsel did raise an objection to the use of Higgs's May 12, 1997, guilty plea to federal drug offenses to support a finding under 18 U.S.C. § 3592(c)(12) (2004), pertinent to the following aggravating factor: "The defendant had previously been convicted of violating title II or III of the Controlled Substances Act for which a sentence of 5 or more years may be imposed...." *Id.* Defense counsel argued that "had previously" meant previous to the murders and not the sentencing. However, counsel's decision to object to using the drug convictions has no bearing on the reasonableness of his failure to object to using the Cherry Lane shooting. The ineffective assistance reasonableness standard is

an objective, not a subjective, one. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 ("[T]he defendant must show that counsel's representation fell below an *objective* standard of reasonableness." (Emphasis added)); *United States v. Little,* 14 Fed.Appx. 200, 205 (4th Cir.2001) (holding that the subjective beliefs behind counsel's strategic decisions at trial are irrelevant to an ineffective assistance claim). It makes no difference if the objection should have occurred to Higgs's defense attorney. The proper question is whether it should have occurred to a reasonably able attorney.

Indeed, by the time of trial, the Fourth Circuit had issued two seemingly contradictory statements as to the meaning of the word "previously" for purposes of sentencing enhancement: in *United States v. Hobbs,* 136 F.3d 384, 387, n. 3 (4th Cir.1998), the court, in *dicta,* stated that the word "previous" in a § 922 sentencing provision referred only to convictions occurring prior to the subject offense. In contrast, in an unpublished opinion, *United States v. Hamilton,* No. 93-5393, 30 F.3d 131, 1994 WL 381735 (4th Cir. July 22, 1994), a separate Fourth Circuit panel had interpreted the same provision as including all previous convictions, regardless of when they were incurred.

But, says Higgs, using the post-dated Cherry Lane conviction to support the prior-firearm-conviction as an aggravating factor contradicted the established meaning of "previously," as set forth in decisions from other Circuits, albeit decisions establishing that the word "previously" in a different sentencing statute, 18 U.S.C. § 924(e), referred only to convictions occurring prior to the subject offense.[FN27] However, it is clear even if the other circuits had interpreted the specific statute at issue here, which was not the case, counsel was under no obligation to follow the law of other circuits, especially when the Fourth Circuit had yet to clarify its own position on the matter. *See United States v. Roane,* 378 F.3d 382, 397 (4th Cir.2004) (failing to follow another Circuit's law, when that law had not been adopted in the applicable Circuit was not unreasonable); *United States v. McNamara,* 74 F.3d 514, 517 (4th Cir.1996) (not ineffective assistance when counsel followed controlling circuit law at the time). Although the Fourth Circuit has since issued decisions that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

arguably bring into question the continuing validity of a firearm conviction post-crime but pre-sentence as an aggravating**533** factor, *see United States v. Pressley,* 359 F.3d 347, 350 (4th Cir.2004); *United States v. Ryan,* 187 Fed.Appx. 287 (4th Cir.2006)*,* counsel's failure to anticipate this new law did not constitute ineffective assistance. *See United States v. Stewart,* 36 Fed.Appx. 520, 521 (4th Cir.2002); *Honeycutt v. Mahoney,* 698 F.2d 213, 217 (4th Cir.1983)*.* Nor was appellate counsel's failure to object to this aggravating factor on direct appeal objectively unreasonable. To constitute ineffective assistance of counsel for failing to raise an issue on appeal, counsel must have "omitted significant and obvious issues, while pursuing issues that were clearly and significantly weaker." *United States v. Fox,* No. 94-6710, 1996 WL 359574 at *2 (4th Cir. June 28, 1996) (quoting *Mayo v. Henderson,* 13 F.3d 528 (2nd Cir.1994)).

> FN27. The Armed Career Criminal Act, provides for enhancement of the sentence of a defendant who "has three *previous* convictions ... for a violent felony or a serious drug offense, or both." 18 U.S.C. § 924(e) (emphasis added). Under 18 U.S.C. § 3592(c), the statute in question here, a defendant is eligible for the death penalty if he "*has previously* been convicted of a Federal or state offense ... involving the use ... of a firearm." Emphasis added.

Given the Fourth Circuit's conflicting interpretations of the statute and the factual dissimilarities between the death penalty statute at issue here and the sentencing statute addressed in the other circuits' decisions, the prior firearm conviction issue was not "significant and obvious." *See Fox,* 1996 WL 359574 at *3 (holding that counsel did not provide ineffective assistance when he chose not to raise an issue on appeal because the law on the topic was unclear in a relevant circuit and decisions in the other circuits were factually dissimilar). Nor can it be said that counsel, especially appellate counsel, failed to pursue this issue in deference to, and significantly weaker, issues. Even granting that the issue had substance, counsel's failure to pursue it was not tantamount to ineffective assistance. *See Fox,* 1996 WL 359574 at *2 ("failure to raise all non-frivolous issues on appeal is not ineffective assistance").

**Claim 11: Previous Conviction of a Federal Drug Offense**

Apart from raising it in the context of ineffective assistance, Higgs argues that the Fourth Circuit's decision in *Pressley* defining the word "previous" under the Armed Career Criminal statute constituted a relevant new rule which should apply retroactively to his case, vitiating one of the aggravating factors that led the jury to vote for the death penalty.

Since *Pressley* was decided while Higgs' conviction was on direct appeal, [FN28] Higgs is entitled to raise the issue at this time and no *Teague* analysis is required. *See Linkletter v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)*, overruled on other grounds by* 479 U.S. 314, 320, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) ("a change in law will be given effect while a case is on direct review"). But there are at least two reasons why the Court declines to embrace this argument.

> FN28. *Pressley* was decided on February 27, 2004, but Higgs' conviction did not become final until the Supreme Court denied his writ of certiorari on November 29, 2004. *See Clay v. United States,* 537 U.S. 522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003) (finding that a conviction becomes final when the Supreme Court affirms a conviction on the merits on direct review, denies a petition for a writ of certiorari, or the time for filing certiorari expires).

First, *Pressley* interprets a discrete provision of a *non-capital* sentencing statute, not the *death penalty* statute at issue here. *See Pressley,* 359 F.3d at 348. The fact that both statutes contain similar language is not dispositive, since the Fourth Circuit in *Pressley* was interpreting the issue there based on the specific Congressional intent embodied in the statute itself. *Id.* at 349. Arguably, then, the holding in *Pressley* is limited to the unique circumstances surrounding that statute, and cannot be extended to the death penalty context. Second, this Court has no authority **534** to overrule the Fourth Circuit's decision in *Higgs I,* 353 F.3d 281, 318 (4th Cir.2003)*,* that relied on a different interpretation of "previous" to uphold the previous-drug-conviction

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

aggravating factor. *See Doe v. Charleston Area Medical Center, Inc.,* 529 F.2d 638, 642. (4th Cir.1975) (holding that findings by the Court of Appeals are binding upon a district court until they are considered *en banc* ). That decision, and not *Pressley,* remains the controlling authority on this issue. *Id.*

**Claim 12: Multiple Killings**

Higgs argues that the Fourth Circuit erred in *Higgs I* when it chose not to overturn his death sentence despite the erroneous submission to the jury of the statutory aggravating factor alleging his involvement in multiple killings. *See* 18 U.S.C.A. § 3592(c)(16)

In *Higgs I,* the Fourth Circuit acknowledged that " 'multiple killings' was not added to the [Federal Death Penalty Act] as a statutory aggravating factor until April 1996, three months after the murders were committed." *Higgs I,* 353 F.3d at 300. Accordingly, it determined that "the 'multiple killings' aggravator was improperly submitted to the jury as a statutory aggravating factor." *Id.* at 319. Nevertheless, the court decided that the error was harmless and did not invalidate his death sentence because the jury had found additional aggravating factors beyond a reasonable doubt. *Id.*

Higgs challenges the Fourth Circuit's analysis as being inconsistent with *Stringer v. Black,* 503 U.S. 222, 237, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), which held that a sentencer's reliance on an invalid aggravating factor in a "weighing" jurisdiction, such as the federal system, "invalidates the sentence and at the very least requires constitutional harmless-error analysis or reweighing...." In *Higgs I,* he claims, the Fourth Circuit improperly assumed that the invalid "multiple killings" aggravator made no difference to the weighing process.

Higgs also argues that the decision in *Higgs I* runs afoul of the Supreme Court's decision in *Brown v. Sanders,* 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006), which eliminated the distinction between "weighing" and "non-weighing" jurisdictions and held that in any jurisdiction "(a)n invalidated sentencing factor ... will render the sentence unconstitutional by reason of its

adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders,* 546 U.S. 212, 220, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006). Higgs submits that none of the other five sentencing factors found by the jury in his case would have permitted aggravating weight to be given to the evidence of multiple killings, and urges the Court to invalidate his sentence under Sanders, if not under Stringer.

**A.**

The Court begins by noting once again that it does not have the authority to review the Fourth Circuit's decision in *Higgs I. See Charleston Area Medical Center, Inc.,* 529 F.2d at 642. Higgs cannot raise an issue already litigated on direct appeal under the guise of a collateral attack. *See Withrow v. Williams,* 507 U.S. 680, 720-21, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (Scalia, J., concurring). Since the Fourth Circuit has already rejected the claim that the jury improperly relied upon the multiple murder aggravator, Higgs is not permitted to revisit the issue.

**B.**

[47] Even so, analyzing Higgs' claim under *Sanders* (which has substantially **\*535** superceded *Stringer* ) the Court would nonetheless find Higgs's death sentence constitutional. So long as some other sentencing factor enabled the jury to give aggravating weight to the multiple killings, the death sentence will stand. *Sanders,* 546 U.S. at 220, 126 S.Ct. 884. The nonstatutory aggravating factor of "victim impact" did just that, allowing the jury to consider the number of deaths in this case.

The penalty phase jury instructions framed the victim impact factor as follows:

"The defendant caused injury, harm, and loss to the victim and the victim's family because of the effect of the offense on the victim, the victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family." In proving this factor,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
 (Cite as: 711 F.Supp.2d 479)

the prosecution introduced testimony during the penalty phase from family members of each of the three victims-Tamika Black, Mishann Chinn, and Tanji Jackson. From this evidence alone, the jury could infer the existence of multiple killings, to say nothing of the evidence of multiple murders presented during the guilt phase of the trial. *See generally United States v. Flaharty, 295 F.3d 182, 196 (2nd Cir.2002)* (in determining facts material to sentencing, district court may rely on evidence admitted at trial); *United States v. Dailey, 918 F.2d 747, 748 (8th Cir.1990)* (same). Since, the victim impact factor alone "enable[d] the sentencer to give aggravating weight to the same facts and circumstances" as the arguably invalid multiple killings factor, Higgs' *Sanders* claim must fail. *Brown v. Sanders, 546 U.S. 212, 220, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006)*.

### Claim 13: Failure to Interview & Call Witnesses Gerald Vaughn and Kevin Anderson

Higgs argues that counsel were ineffective for failing to interview and call Kevin Darnell Anderson and Gerald Vaughn as witnesses during both the guilt and penalty phases of the trial. Both individuals were incarcerated with Haynes at the Charles County Detention Center and both claimed to have had conversations with him regarding the murders.[FN29]

> FN29. At Haynes' trial, which took place before Higgs' trial, Vaughn gave live testimony and the defense submitted written statements from the Government's May 2000 interview of Anderson.

Higgs suggests that the potential testimony of these witnesses would have supported the defense theory that Haynes shot the victims for his own reasons, not at the command of Higgs. According to Higgs, Anderson would have testified that Haynes told him he killed one of the women because she "set him up." Anderson would purportedly have said that he witnessed a confrontation between Haynes and another inmate, in which the inmate commented "you think [you're] big stuff because you killed [three] women" and Haynes responded "I'll kill whoever the f--- I want to kill." As for Vaughn, Higgs contends his testimony would have demonstrated that Haynes never accused Higgs of forcing him to kill the

victims. *See United States v. Haynes, 26 Fed.Appx. 123, 128 (4th Cir.2001)* (summarizing testimony of Vaughn at Haynes' trial). In fact, Higgs says, Vaughn's testimony would have shown that Haynes bragged about the murders, that Haynes told Vaughn he killed the women because one of them owed Haynes $250,000, and that Haynes later told Vaughn that he killed the women because they cheated on him. *See id.*

Higgs argues that during the guilt phase the Vaughn-Anderson testimony would have shown that Haynes, the actual triggerman,**\*536** was responsible for the murders. During the penalty phase, Higgs says, the evidence would have provided "powerful support for the mitigating factor advanced by the defense that an equally culpable co-defendant had received a life sentence." According to Higgs, counsel's failure to interview or call these witnesses amounted to ineffective assistance.

### A.

To demonstrate ineffective assistance of counsel, a defendant must demonstrate both that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *See Strickland, 466 U.S. at 687, 104 S.Ct. 2052 (1984)*. A criminal defendant is prejudiced by counsel's performance when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id. at 694, 104 S.Ct. 2052.* Under this standard, Higgs' claim fails.

### B.

[48] Higgs is procedurally barred from relitigating the issue of whether the absence of Anderson's statements prejudiced his case. A litigant cannot, under the guise of a collateral attack, raise an issue already litigated. *See Withrow, 507 U.S. at 720-21, 113 S.Ct. 1745* (Scalia, J., concurring) ("prior opportunity to litigate an issue should be an important equitable consideration in *any* habeas case, and should ordinarily preclude the court from reaching the merits of a claim, unless it goes to the fairness of the trial process or to the accuracy of the ultimate result"); *see also Boeckenhaupt, 537 F.2d at 1183*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(affirming that the petitioner may not "recast, under the guise of collateral attack, questions fully considered by [the] Court").

On direct appeal, Higgs' counsel argued for a new trial and sentencing based on the Government's failure to identify Anderson as a potential witness and to provide Higgs with a copy of the Government's notes of its May 2000 interview with Anderson. The Fourth Circuit found that Anderson's absence from the witness stand had no prejudicial effect on the outcome because Haynes' comments regarding the murders were unreliable. *Higgs II,* 95 Fed.Appx. at 43. The Fourth Circuit also stated that there was "no reasonable probability that the jury would not have convicted Higgs of the kidnappings and murders had they been aware of the undisclosed statements made by Haynes to Anderson," *id.,* since "the evidence set forth at Higgs's trial provides 'strong support for the conclusion that [Higgs] would have been convicted of capital murder and sentenced to death, even if Haynes' statement to Anderson had been introduced into evidence." *Id.* at 44 (citation omitted).

Though the Fourth Circuit's ruling was in the context of an alleged *Brady* violation, the relevance of its analysis in the current context is obvious because the same prejudice standard applies in a *Strickland* analysis. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Anderson's statements cannot be relitigated here.

**C.**

Procedural bar aside, counsel's decision not to call Anderson and Vaughn as witnesses at trial did not amount to ineffective assistance.

**1.**

With respect to Anderson, even if counsel knew of his existence, they would not have been deficient for failing to interview or call him as a witness. Whatever Higgs might make of Anderson's statements to suggest Haynes may have had his own motive for the murders, the Court agrees with the Fourth Circuit that Haynes' **\*537** statements were thoroughly unreliable. *See Higgs II,* 95 Fed.Appx. at 43. At different times, Haynes gave multiple and inconsistent reasons for the killings,[FN30] such that anything he might have said to Anderson added nothing to his credibility. Counsel could reasonably have concluded that offering further evidence of Haynes' conflicting statements, subject as they would have been to strong impeachment, would have served no useful purpose. Moreover, as the Fourth Circuit recognized, Anderson's statements do not necessarily suggest that "Haynes acted alone or that Higgs was not involved" because they leave open the possibility that Haynes and Higgs shared a "joint motive" to kill the women. *See id.* at 43. Further, counsels' reference to Haynes' statement that he "will kill whoever the f--- [he] want[s] to kill" does not clearly relate to Haynes motive in the present case because the "tough guy" statements were made in the context of a blustery altercation with another inmate. *See id.* at 41.

> FN30. Haynes confessed to the police that he killed the women because he believed that had he not, Higgs would have done so. However, he apparently told Anderson that he killed one of the victims because she may have "set him up," then told Vaughn that he either killed the women because one owed him money or because they cheated on him.

Higgs also fails to demonstrate prejudice as a result of counsel's decision not to interview or call Anderson. As the Fourth Circuit noted, "the evidence of Higgs's involvement in the pursuit, kidnapping, and murders of the three women is overwhelming, as is the evidence of his predominant role in the events that took place that evening and early morning." *See Higgs II,* 95 Fed.Appx. at 44. There is no "reasonable probability" that the result of his trial would have been different had Anderson been called as a witness. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

**2.**

With respect to Vaughn, Higgs' claim fails for similar reasons. Counsel's decision not to interview or call him was reasonable. His potential testimony-that Haynes killed the women either because one of them owed him money

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(as Vaughn had testified in the Haynes trial) or because they cheated on Haynes (as Vaughn apparently told a defense investigator)-was of equally doubtful reliability. As with Anderson's statements, Vaughn's purported testimony would simply have multiplied the inconsistent explanations Haynes gave for why he supposedly committed the killings. *See Higgs II,* 95 Fed.Appx. at 43 (holding that the absence of Anderson's testimony did not prejudice the defense because it was unreliable). Vaughn's potential testimony would not necessarily have shown that Higgs did not coerce Haynes to commit the murders. It is entirely plausible, indeed highly probable, that it was Higgs who directed Haynes to murder the women, but, to impress his fellow inmates, Haynes subsequently took credit for them.

Regardless, Higgs cannot demonstrate prejudice as a result of counsel's decision not to interview or call Vaughn. The evidence against Higgs was overwhelming. Vaughn's testimony had no reasonable probability of changing the result of the trial. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

**Claim 14: Insufficiency of the Indictment**

[49] Higgs contends that *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) should be applied retroactively to invalidate his conviction on the grounds that his indictment failed to allege any of the intent or aggravating factors that were considered during the sentencing phase of his trial. He submits **\*538** that *Blakely* calls into question the Fourth Circuit's denial of this precise objection in *Higgs I* and therefore compels this Court to vacate his conviction and sentence.

On appeal, the Fourth Circuit found that the indictment in this case was constitutionally adequate, *Higgs I,* 353 F.3d at 295-304, and that the claimed defects with respect to it were harmless. *Id.* at 304-07. Because Higgs has previously litigated this claim, he is procedurally barred from relitigating it at this time. *Boeckenhaupt,* 537 F.2d at 1183.

On the merits, the claim also fails. Despite *Blakely*, *Higgs*

*I* remains the controlling authority on the matter, obliging the Court to accept the decision that Higgs' indictment is constitutionally sound. *Etheridge v. Norfolk & Western Ry. Co.,* 9 F.3d 1087, 1090 (1993) ("a decision of a panel of [the Fourth Circuit] becomes the law of the circuit ... unless it is overruled"). But *Blakely* may be distinguishable in any event, since it addresses Sixth Amendment sentencing requirements, whereas here Higgs raises the issue in the context of Fifth Amendment indictment requirements. It may be doubted that *Blakely* established new law relevant to the present issue that would overrule *Higgs I.* But insofar as *United States v. Green,* 372 F.Supp.2d 168 (D.Mass.2005) holds to the contrary, the Court rejects that holding.

**Claim 15: Reasonable Doubt Error in Jury Instructions**

Higgs next challenges the omission of any jury instruction in the penalty phase to the effect that it could recommend a death sentence only in the event that it found the aggravating factors to outweigh the mitigating factors *beyond a reasonable doubt.*[FN31] He claims that the lack of a reasonable doubt instruction ran afoul of the Sixth Amendment as interpreted by the Supreme Court's decisions in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

> FN31. In pertinent part, the jury was instructed to decide "whether all the aggravating factor or factors found to exist *sufficiently outweigh* all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are *sufficient* to justify a sentence of death." (Emphasis added)

Higgs challenges the omitted jury instruction by framing it as a § 2255 ineffective assistance of counsel claim, which triggers analysis under the *Strickland* test. However, Higgs submits that the alleged mistake amounts to a serious structural error that "necessarily render[ed] the trial fundamentally unfair," *Rose v. Clark,* 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Sullivan v. Louisiana,* 508 U.S. 275, 281, 113 S.Ct. 2078, 124

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

L.Ed.2d 182 (1993), in consequence of which the Court should presume that his claim satisfies *Strickland's* prejudice requirement, leaving only *Strickland's* reasonableness inquiry to be pursued. *See Bell v. Jarvis,* 236 F.3d 149, 180 (4th Cir.2000) (holding that a structural error cannot be dismissed as harmless and therefore presumptively satisfies *Strickland's* prejudice requirement and requires scrutiny only under *Strickland's* reasonableness prong).

**A.**

This claim is procedurally defaulted. As Higgs concedes, he has never before argued that his death sentence was obtained in violation of his constitutional rights by reason of the Court's failure to instruct the jury that it had to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt before **\*539** they could return a death penalty verdict. Though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro,* 538 U.S. at 504, 123 S.Ct. 1690, no such relief is warranted here. He has shown neither cause nor prejudice, nor is prejudice to be presumed.

**B.**

[50] Beyond procedural default, Higgs' claim fails on the merits. Although the Supreme Court has stated that a faulty reasonable doubt instruction during the guilt phase of an ordinary criminal trial amounts to a structural error, *see Sullivan v. Louisiana,* 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), it is by no means clear that that pronouncement applies to the sentencing phase of a death penalty proceeding. *See, e.g., Brice v. State,* 815 A.2d 314, 324-327 (Del.2003) (noting that the Supreme Court has employed structural error analysis only when reviewing constitutional errors occurring during the guilt/innocence phase of a trial and suggesting that such analysis does not apply to the sentencing phase). But assuming without deciding that a structural error occurred and that prejudice may be presumed, *see Bell,* 236 F.3d at 180, Higgs' motion would fail under the first prong of *Strickland;* counsel did not act unreasonably by failing to raise an *Apprendi* objection to the penalty phase jury instruction.

The alleged error at issue did not involve a straightforward and obvious application of *Apprendi's* principles that would have "struck those learned in the law like a bucket of ice water." *Humphries,* 366 F.3d at 276. Even since the trial in this case courts have refused to extend the Supreme Court's decisions in *Apprendi* and *Ring* to require a jury recommending capital punishment to find that aggravating factors outweigh mitigating factors *beyond a reasonable doubt. See e.g. Ritchie v. State,* 809 N.E.2d 258, 264-268 (Ind.2004) ("[Richie] contends that the trial court should have instructed the jury that it must apply a reasonable doubt standard in finding that the State proved that the aggravating circumstances outweigh the mitigating factors.... [W]e conclude that this process is not subject to a reasonable doubt standard."); *Brice,* 815 A.2d at 327 ("nothing in *Ring* suggests that the trial judge may not retain the responsibility of making the ultimate sentencing decision"); *Ex parte Waldrop,* 859 So.2d 1181, 1190 (Ala.2002); (" *Ring* and *Apprendi* do not require that a jury weigh the aggravating circumstances and the mitigating circumstances."); *but see Johnson v. State,* 118 Nev. 787, 59 P.3d 450, 460 (2002) (concluding that *Ring* requires a jury, and not a panel of judges, to find beyond a reasonable doubt that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found).[FN32]

FN32. For post- *Apprendi* cases that do not discuss *Apprendi* or *Ring* in reaching the conclusion that the reasonable doubt standard does not apply to penalty phase weighing, *see e.g., United States v. Sampson,* 335 F.Supp.2d 166, 238 (D.Mass.2004) ("Although important to the defendant and society, the sentencing decision in a capital case is, in its most important respects, fundamentally different than any other task that a jury is called upon to perform in our criminal justice system. The jury is not acting as a finder of fact. Rather, it is exercising discretion in sentencing that is ordinarily exercised by judges. Whether a jury's sentencing decision is right or wrong is not something that is capable of proof in the traditional sense."); *State v. Rizzo,* 266 Conn. 171, 833 A.2d 363, 378 (2003) ("specific standards for balancing aggravating against mitigating circumstances are not constitutionally required" (quoting *Zant v. Stephens,* 462 U.S. 862, 875-76 n. 13, 103 S.Ct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

2733, 77 L.Ed.2d 235 (1983) and *Jurek v. Texas,* 428 U.S. 262, 270, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976))).

For pre- *Apprendi* cases reaching the same conclusion, *see e.g. Ford v. Strickland,* 696 F.2d 804, 818 (11th Cir.1983) ("While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, the relative *weight* is not." (citations omitted)); *Fleenor v. State,* 514 N.E.2d 80, 92 (Ind.1987) ( "[T]he determination of weight to be accorded the aggravating and mitigating circumstances is not a 'fact' which must be proved beyond a reasonable doubt but is a balancing process." (citing *Daniels v. State,* 453 N.E.2d 160, 171 (Ind.1983))).

For a pre- *Apprendi* case finding that the reasonable doubt standard applies to penalty phase weighing, *see People v. Tenneson,* 788 P.2d 786, 793-94 (Colo.1990).

**\*540** In *Apprendi,* the Supreme Court held that "any *fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (emphasis added). It does not necessarily follow that this rule should extend to the weighing process that takes place during the penalty phase of a capital trial. Whether the aggravating factors presented by the prosecution outweigh the mitigating factors presented by the defense is a *normative* question rather than a *factual* one. When jurors weigh aggravating and mitigating factors, they draw upon their sense of community norms in light of the totality of circumstances surrounding the criminal and the crime to determine a just punishment. In marked contrast, in order to find a first-order fact to be true, the jurors must evaluate the evidence presented to determine whether they believe in the truth of the fact beyond any reasonable doubt. In reaching this determination, jurors rely on their deductive and inductive reasoning and not upon normative considerations. While the line between facts and norms is not always a clear one,

the process of determining a just punishment rests securely at the normative end of the fact/norm continuum. As the Eleventh Circuit put it in *Ford v. Strickland,* "[P]etitioner confuses proof of *facts* with the weighing process undertaken by the sentencing jury and judge.... [T]he latter process is not a fact susceptible of proof under any standard...." 696 F.2d 804, 818-19 (11th Cir.1983) (citations omitted).

This is not to say that a state could not require that a jury recommending the death penalty must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt. *See e.g. Tenneson,* 788 P.2d at 794 ("We are persuaded that the term 'beyond reasonable doubt' serves well to communicate to the jurors the degree of certainty that they must possess that any mitigating factors do not outweigh the proven statutory aggravating factors before arriving at the ultimate judgment that death is the appropriate penalty.").[FN33] But the point is that *Apprendi* and *Ring* do not require this. The Federal Death Penalty Act, which requires a jury recommending death to find that "the aggravating factor or factors found to exist *sufficiently* outweigh all the mitigating factor or factors," 18 U.S.C. 3593(e) (emphasis added), articulates a standard (sufficiency) that satisfies constitutional reliability requirement. At least one federal court has held under the Act that a reasonable doubt instruction is not required when a death penalty jury is weighing aggravating and mitigating factors. *See U.S. v. Lawrence,* 477 F.Supp.2d 864 (S.D.Ohio 2006). This Court sees no reason to take a different view.

> FN33. The Colorado death penalty statute considered in *Tenneson* did not specify any standard for weighing aggravating and mitigating factors. 788 P.2d at 789-90.

### C.

As for Higgs' claim that he was deprived of effective assistance when his counsel **\*541** failed to raise an *Apprendi* challenge to the lack of a reasonable doubt weighing instruction, the Court concludes that counsel were not ineffective. The attorney's performance must have fallen below an objective standard of reasonableness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

and a reasonable probability must exist that Defendant was prejudiced by the deficient performance. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052 (1984). Since the propriety *vel non* of a reasonable doubt instruction in regard to the weighing of aggravating and mitigating factors during the penalty phase of a death penalty case was (and remains) highly questionable, counsel's failure to pursue it did not amount to constitutionally deficient representation.

### Claim 16: Failure to Instruct Jury Regarding Parole Ineligibility as a Mitigating Factor

Higgs next argues that the Court's failure to instruct the jury that his ineligibility for parole could be found to be a mitigating factor, as requested by counsel during the penalty phase, violated his Eight Amendment rights. Following an objection by the Government, the Court declined to give the instruction on the grounds that parole ineligibility is not a "fact about [Higgs], not a fact about the crime. It's a fact about the punishment." The Court did, however, twice instruct the jurors that they had only two options: to sentence Higgs to death or to life without the possibility of parole. [FN34]

> FN34. Specifically, the Court told the jury, "You must ... answer the question as to whether or not the defendant, Dustin John Higgs, should be sentenced to death or life imprisonment without the possibility of parole or release. No other lesser sentence is authorized under the law for the offenses of which he has been convicted." On another occasion, the Court reiterated the jury's only two options, stating "you must now decide whether the appropriate sentence for the defendant is, one, death or two, life in prison without the possibility of parole or release."

Higgs contends that this general instruction was insufficient because a sentence of life imprisonment without parole would eliminate any risk of future danger from him. Consequently, the jury should have been allowed to expressly consider parole ineligibility as a mitigating factor.

Higgs also alleges ineffective assistance of counsel of

appellate counsel for failing to raise this issue on appeal.

### A.

[51] Higgs is procedurally barred from raising this claim because he failed to raise it on appeal. *See Massaro,* 538 U.S. at 504, 123 S.Ct. 1690. His argument that the Court should consider the merits of his claim because he can establish actual innocence as well as cause and prejudice is unpersuasive. *See Schlup,* 513 U.S. at 314-15, 327-30, 115 S.Ct. 851 (holding that a procedural default can be excused upon the requisite showing of actual innocence).

To demonstrate actual innocence, a movant must establish that based on the evidence, "it is more likely than not that no reasonable juror would have convicted him." *Id.* at 327-28, 115 S.Ct. 851. This remedy, however, is reserved for extremely "extraordinary" situations, where the defendant's conviction amounts to a constitutional violation. *See Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Given the overwhelming evidence of Higgs' guilt and the fact that the Court twice instructed the jury that it might consider Higgs' parole ineligibility, Higgs falls well short of this standard. [FN35]

> FN35. As discussed previously in connection with Claims 1 and 4, *supra,* to the extent that Higgs argues that he is entitled to relief solely because he is actually innocent, the Court again notes that he has not met the "extraordinarily high" standard for such a claim, if such claim even exists. *Herrera,* 506 U.S. at 417, 113 S.Ct. 853.

**\*542** Higgs fails to demonstrate cause or prejudice on the basis of appellate counsel's failure to raise the issue on his parole eligibility as a mitigating factor. Appellate counsel may well have judged that the matter of whether Higgs' ineligibility for parole mitigated against the death penalty was adequately covered by the Court's instructions and/or by the arguments counsel would be making (and did make) in closing during the penalty phase. As for prejudice, Higgs offers nothing more than the assertion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

that it is "reasonably likely that [his] death sentence would have been vacated on direct appeal."

## B.

[52][53] The procedural bar aside, Higgs' claim also fails on the merits. A capital sentencing jury must unquestionably give effect to all relevant mitigating evidence, as required by the Eighth Amendment. *See Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *see also Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). The Supreme Court has made clear that mitigating evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *See Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). It remains doubtful, however, that parole ineligibility meets the criteria for being a mitigating factor, since it relates to neither to the defendant's character or record or any of the circumstances of the offense in question. *See id.*

Higgs is correct to argue that a court must inform a capital jury of a defendant's parole ineligibility if his future dangerousness is raised as an issue. *See Simmons v. South Carolina,* 512 U.S. 154, 168-69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (holding that when the Government points to defendant's future dangerousness, due process requires that the defendant should have an opportunity to raise the fact that the alternative sentence is life without parole); *see also Townes v. Murray,* 68 F.3d 840, 850 (4th Cir.1995). But that requirement was satisfied here. When the Government raised the prospect of Higgs' future dangerousness in its closing statement, the Court satisfied the requirement articulated in *Simmons* when it twice told the jury that the only alternative sentence to death was life imprisonment without parole. *See Simmons,* 512 U.S. at 168-69, 114 S.Ct. 2187.

But Higgs claims that the Court should have specifically told the jury to list parole ineligibility as a mitigating factor on the verdict form and, in support of his argument, he cites two cases from state courts. *See Turner v. State,* 645 So.2d 444, 448 (Fla.1994) (reversing death sentence where the court overrode the jury's life sentence

recommendation because defendant's fifty-year minimum sentence was a mitigating issue upon which the jury "could have relied" when imposing a life sentence) *and State v. Henderson,* 109 N.M. 655, 789 P.2d 603, 606-07 (1990), *overruled on other grounds by* 118 N.M. 486, 882 P.2d 527 (1994) (finding error in the court's refusal to instruct the jury that the defendant would only be parole eligible after he served thirty years).

A close reading of *Turner* and *Henderson,* however, indicates that neither case addresses the specific issue of whether parole ineligibility must be listed on the verdict form as a mitigating factor. The Florida court in *Turner* found that there was ample mitigation evidence that the jury could have relied on when sentencing **\*543** the defendant to life imprisonment, including, among the factors, the defendant's parole ineligibility. 645 So.2d at 448. It did not, however, specifically instruct the jury to consider his parole ineligibility as a mitigating *factor. See id. Henderson* dealt only with the issue of whether an instruction regarding parole ineligibility is required. 789 P.2d at 607. The Court, moreover, is not persuaded that *Skipper,* cited by Higgs for the proposition that parole ineligibility must be specifically identified as a mitigating factor, actually stands for that proposition. There the Supreme Court held only that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *See Skipper,* 476 U.S. at 5, 106 S.Ct. 1669. None of the cases he cites teaches that parole ineligibility must be expressly *listed* as a mitigating factor. At most, they stand for the proposition that the jury must be made aware of this fact, which in this case they clearly and repeatedly were.

The Court finds that the jury received an appropriate instruction regarding Higgs' ineligibility for parole. He is not entitled to collateral relief based on this claim.

## C.

Given that there was no error in the Court's ruling as to the requested instruction, appellate counsel cannot be faulted for failing to raise the issue.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

### Claim 17: Materiality under *Brady*

Higgs argues that the Fourth Circuit erred in its analysis of whether, under *Brady v. Maryland,* the Government's failure to turn over the names of certain witnesses was material to the outcome of his trial.

Apparently appellate counsel, while preparing Higgs' direct appeal to the Fourth Circuit, became aware of the existence of two witnesses the Government knew of, but had not disclosed during trial-Gerald Vaughn and Kevin Anderson. As discussed in connection with Claim 13, *supra,* both witnesses purportedly heard Co-Defendant Haynes make statements suggesting that Haynes' involvement in the murders was more extensive than indicated by the testimony of key Government witness Victor Gloria, who portrayed Higgs in the more culpable light. Arguing a violation of *Brady v. Maryland,* counsel filed motion for a new trial and new sentencing hearing. The Court denied the motion and the Fourth Circuit affirmed.

Higgs submits that the Fourth Circuit incorrectly applied *Brady* as it relates to the sentencing phase of trial when it wrote,

> [T]o establish materiality, Higgs was required to demonstrate a reasonable probability that the evidence would have persuaded a juror to reach the conclusion that Haynes was "equally culpable" to Higgs in the murders, *and* that this mitigating factor, combined with the others, would have tipped the balance and led the juror to also conclude that the mitigating factors outweighed the aggravating factors so as to foreclose the sentence of death.

*Higgs II,* 95 Fed.Appx. 37, 43 (4th Cir.2004) (emphasis in original). Focusing on the word "outweighed," Higgs submits that the Fourth Circuit deviated from the statute, which requires the jury, in order to impose a death judgment, to determine whether all the aggravating "factors found to exist *sufficiently* outweigh all the mitigating ... factors found to exist." 18 U.S.C. § 3593(e) (emphasis added). Higgs argues that it is reasonably probable that the introduction of evidence casting Haynes

in a light equally culpable with Higgs would have resulted in at least one **\*544** juror finding that the aggravating factors did not *sufficiently* outweigh the mitigating factors, causing the juror to oppose the death penalty. Higgs thus reasons that the Fourth Circuit erred in affirming this Court's denial of his motion for a new sentencing hearing.

### A.

As stated previously, a habeas court does not ordinarily consider issues that have already been resolved and decided on direct review. *Boeckenhaupt,* 537 F.2d at 1183.

Higgs raised this *Brady* violation claim in the course of his direct appeal to the Fourth Circuit. *Higgs II,* 95 Fed.Appx. at 43. Therefore, this Court need not reach the merits of the claim.

### B.

Still, lest there be any doubt, the Court accepts that the Fourth Circuit applied the correct legal standard. As the Fourth Circuit opined, the Supreme Court has held that "[e]vidence is 'material' for purposes of the *Brady* inquiry 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Higgs II,* 95 Fed.Appx. at 41 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375).[FN36] In the present case, the Fourth Circuit did not simply find that the mitigating factors would not have outweighed the aggravating factors. It referred to the necessity of the mitigating factors "tipp[ing] the balance ... so as to foreclose the sentence of death." *Higgs II,* 95 Fed.Appx. at 43. This additional language is in accord with the statutory standard for imposition of a death sentence, i.e., that the aggravation must "sufficiently outweigh" the mitigation.

> FN36. At one point, the Government, citing Higgs' Brief, characterizes his claim to be that "the materiality test does not require a showing that it is reasonably probable that the result of the proceeding would have been different, had the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

evidence been disclosed to the defense." This characterization of Higgs' claim seems to be inconsistent with other parts of Higgs' Brief, which correctly state that the " *Brady* materiality analysis does require a showing that it is reasonably probable that the result of the proceeding would have been different, had the evidence been disclosed to the defense."

As for this Court's denial of Higgs' request for a new sentencing and the Fourth Circuit's affirmance of that decision, the appellate court found that this Court did not abuse its discretion because, as is true throughout, "the evidence set forth at Higgs' trial provides 'strong support for the conclusion that [Higgs] would have been convicted of capital murder and sentenced to death even if' " the witness statements had been introduced into evidence. *Higgs II,* 95 Fed.Appx. at 44 (citing *Strickler v. Greene,* 527 U.S. 263, 294, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).[FN37] There is no basis for disturbing this ruling.

> FN37. There is obviously no basis for an ineffective assistance of counsel claim in this regard since counsel raised and the Fourth Circuit decided the issue.

**Claim 18: Post-Arrest Silence**

Higgs next contends that the testimony of Government witness Domenick Williams regarding Higgs' post-arrest silence during a police interview violated Higgs' rights under the Fifth and Sixth Amendments.

Williams, facing charges of his own, was incarcerated with Higgs prior to Higgs' trial. At trial, Williams testified that Higgs told him of an instance in which police officers approached Higgs, who was at the time incarcerated, in an attempt to get Higgs to cooperate against Haynes. **\*545** Higgs told Williams that he refused to discuss the case with the officers.

Higgs argues that Williams' testimony about Higgs' silence when questioned by the police violated Higgs' Fifth

Amendment right to remain silent and his Sixth Amendment right to counsel. Higgs says that the use of his post-arrest silence against him, following the administration of *Miranda* warnings by the police, violated his right against self-incrimination and his right to due process. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Quinn,* 359 F.3d 666, 677 (4th Cir.2004) (" *Doyle* forbids the government to use a defendant's silence against him at trial where the government implicitly or explicitly advised the defendant upon arrest that he should keep silent."). Higgs also claims his trial and appellate counsel were ineffective for failing to raise this issue.

**A.**

Both the Fifth and Sixth Amendment claims are procedurally defaulted. Higgs concedes that he has not previously argued that Williams' testimony violated these rights. As recognized throughout, though a procedural default can be excused upon a demonstration of cause and prejudice, *see Massaro,* 538 U.S. at 504, 123 S.Ct. 1690, Higgs merely posits that his counsel's ineffective assistance constitutes "cause." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (noting that ineffective assistance is "cause" for a procedural default), and submits that he was prejudiced as a result. He has demonstrated neither.

**B.**

[54] Procedural default aside, Higgs' claims fail on the merits. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that the privilege against self-incrimination protects individuals from "informal compulsion exerted by law-enforcement officers during in-custody questioning." In *Doyle,* the Court extended the privilege to preclude admission of evidence that a defendant exercised his right to remain silent during an interrogation, as defined by *Miranda. Doyle,* 426 U.S. at 618, 96 S.Ct. 2240. "Interrogation" is defined as actual "questioning initiated by law enforcement officers," *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, or "its functional equivalent." *Arizona v. Mauro,* 481 U.S. 520, 526, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (citing *Rhode Island v. Innis,* 446 U.S. 291, 301,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Courts have interpreted the "functional equivalent" to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682; *see also Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *United States v. Wright,* 991 F.2d 1182, 1186 (4th Cir.1993) ( *Miranda* only applies while "the defendant is being interrogated"). On the other hand, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Innis,* 446 U.S. at 300, 100 S.Ct. 1682 (citing *Miranda,* 384 U.S. at 478, 86 S.Ct. 1602).

Insofar as his statements to Williams were concerned, Higgs was not in police custody at the time. *See Doyle,* 426 U.S. at 618, 96 S.Ct. 2240. Williams was neither a police officer nor a person that police were using to elicit an incriminating response from Higgs. In fact, Williams had not even asked Higgs a question; Higgs volunteered the information about his silence. Thus, even if Williams had been a police officer, this volunteered **\*546** statement would not have been barred by the Fifth Amendment. *See Innis,* 446 U.S. at 300, 100 S.Ct. 1682.

## C.

Higgs submits that trial and appellate counsel's failure to object to or otherwise litigate these issues violated his Sixth Amendment right to effective counsel because, he says, there could have been no strategy behind the failure to object. The Court disagrees. Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make the objection. *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000). Because, as demonstrated above, any Fifth and Sixth Amendment objections on this point would have failed, counsel's failure not to make them did not violate Higgs' Sixth Amendment right to effective representation. [FN38]

> FN38. It is not clear whether Higgs is also arguing that, when approached by the police officers, he was denied a Sixth Amendment right to counsel. To the extent that he is, the point is

academic because Higgs made no statement to the officers.

## Claim 19: Jury Instruction Challenge

Higgs argues that his Fifth Amendment rights were violated when the Court failed *sua sponte* to instruct the jurors at the close of the penalty phase that they were not permitted to draw adverse inferences of guilt based on Higgs' decision not to testify. While he concedes that the Court gave a no-adverse inference instruction during the guilt phase, he believes the risk of a juror drawing an improper inference from the Court's failure to provide this instruction in the penalty phase was heightened. He argues that trial counsel's failure to request this instruction during the penalty phase, as well as appellate counsel's failure to raise the issue on appeal, constituted ineffective assistance.

## A.

This claim is procedurally barred. Higgs concedes that counsel failed to timely raise it at either the trial level or on appeal which, unless excused, precludes its subsequent litigation. *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Again, a procedural default may be excused where the defendant establishes a cause for the omission and prejudice. *Massaro,* 538 U.S. at 504, 123 S.Ct. 1690. Higgs has shown neither.

He argues that counsel's ineffectiveness constitutes cause but, as discussed below, the Court finds counsel's performance to have been adequate. *See Murray,* 477 U.S. at 488, 106 S.Ct. 2639 ("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington, supra,* we discern no inequity in requiring him to bear the risk of attorney error that results in procedural default.") In any event, Higgs has not shown a "substantial likelihood" that the Court's failure to provide a non-adverse-inference instruction during the penalty phase, after having given the instruction in the guilt phase, prejudiced the outcome. *Frady,* 456 U.S. at 174, 102 S.Ct. 1584.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

**B.**

On the merits, this claim fails.

**1.**

[55] The Court had no obligation to *sua sponte* provide a cautionary jury instruction regarding Higgs' failure to testify during the penalty phase.

To be sure, under the Fifth Amendment, a defendant's silence at trial cannot be used as evidence of his guilt. U.S.C.A. **\*547** Const. Amend. V; *see also Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt"); *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (the Fifth Amendment protects a defendant's right to remain silent "unless he chooses to speak in the unfettered exercise of his own will") The right to remain silent extends to the sentencing phase. *Mitchell v. United States,* 526 U.S. 314, 327, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (a defendant may assert the privilege against self-incrimination in sentencing proceedings); *Estelle v. Smith,* 451 U.S. 454, 462-63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (there is no basis for distinguishing "between the guilt and penalty phases of respondent's trial so far as the protection of the Fifth Amendment privilege is concerned"). To protect this right, a defendant may request that the court instruct the jury not to draw any adverse inference from his silence. *United States v. Francis,* 82 F.3d 77, 78 (4th Cir.1996) (upon request the court gave the customary instruction regarding defendant's right not to testify and that no adverse inference could be drawn from the exercise of that right). However, in the absence of such a request, the court has no obligation to provide such an instruction. *See Carter v. Kentucky,* 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981) (state trial judge was required to give the jury an adverse inference instruction only "upon proper request")

Higgs admits that counsel failed to request a no-adverse-inference instruction during the penalty phase. Accordingly, the Court had no duty to provide one. *See*

*Carter,* 450 U.S. at 305, 101 S.Ct. 1112. Beyond that, however, a cautionary instruction during the penalty phase was wholly unnecessary because the Court made clear to the jury during the penalty phase that its instructions during the guilt phase carried over into the penalty phase and such an instruction had been given during the guilt phase. *See Wilson v. State,* 271 Ga. 811, 525 S.E.2d 339, 347 (1999), *overruled on other grounds by* 284 Ga. 758, 670 S.E.2d 388, 398 (2008) (holding that the jury understands continuing applicability of jury instructions throughout the duration of the trial); *See also People v. Wharton,* 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290, 339 (1991) (a reasonable jury would correctly assume "generic" instructions continued to apply); *State v. Wessinger,* 736 So.2d 162, 193-194 (La.1999) (finding no error in failure to repeat cautionary guilt phase instruction during sentencing phase); *People v. Sanders,* 11 Cal.4th 475, 46 Cal.Rptr.2d 751, 905 P.2d 420, 469 (1995) (court was not required to repeat at penalty phase instruction on credibility of witnesses and circumstantial evidence which were given at guilt phase).

Thus, during the guilt phase, the Court instructed the jury as follows:

> The defendant did not testify in this case. Under the United States Constitution he has no obligation to testify or to present any other evidence because it is the Government's burden to prove the defendant guilty beyond a reasonable doubt. [¶] The burden remains with the prosecution throughout the entire trial. It never shifts to the defendant. Any defendant is never required to prove that he is innocent, and you may not attach any significance to the fact that the defendant did not testify. No adverse inference against him may be drawn by you because he did not take the witness stand. You may not consider this against the defendant in any way in your deliberations in the jury room.

**\*548** During the penalty phase the Court informed the jury:

> The instructions that I gave you earlier in the case about witness credibility and so on and so forth still apply, so keep those in mind. But there are some specific

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

instructions that I now direct to you in this phase of the case.

Since the Court made clear that the penalty phase instructions were *in addition* to those provided at the guilt phase, it strains credulity to suggest that the jurors might infer that they were now free to draw inferences of guilt from Higgs' silence during the penalty phase. A redundant jury instruction would have served no purpose. *See United States v. Soria,* 959 F.2d 855, 857 (10th Cir.1992) (finding no general requirement for redundant instructions).

**2.**

As for the ineffective assistance of counsel claim relative to this issue, counsel's failure to request a cautionary instruction did not constitute ineffective assistance. For a conviction to be reversed on the grounds of ineffective assistance, a defendant must show that (1) the attorney's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced him. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. There is no basis to criticize trial counsel for not requesting a redundant instruction or appellate counsel for deciding not to raise the issue on appeal.

**Claim 20: Occurrence of the Offenses Within the Special Maritime and Territorial Jurisdiction of the United States**

Higgs claims that the Government failed to establish federal jurisdiction over the Patuxent Wildlife Refuge where the killings occurred; that the Court improperly instructed the jury regarding the matter of jurisdiction; and that counsel's failure to object to these alleged errors constituted ineffective assistance.

**A.**

Higgs begins by arguing that the Government failed to provide sufficient evidence that the Wildlife Refuge falls "within the special maritime and territorial jurisdiction of

the United States," as required by 18 U.S.C. § 1111(b).

The term "special maritime and territorial jurisdiction of the United States" includes land "under the exclusive or concurrent jurisdiction of the United States." 18 U.S.C. § 7(3). To prove jurisdiction in this case, the Government offered the testimony of Douglas Vandergraft, Chief Cartographer for the United States Fish and Wildlife Service. Vandergraft's testimony, says Higgs, was objectionable because he was never qualified as an expert, but was permitted to render a number of expert opinions with respect to jurisdiction. *See* Fed.R.Evid. 701 (barring lay opinions based on "scientific, technical or other specialized knowledge"). Higgs takes particular issue with Vandergraft's reliance on Fish and Wildlife maps of the Refuge. Those maps, according to Higgs, showed *ownership* of the Refuge, but not *jurisdiction.* Higgs contends that Vandergraft's reliance on the maps was improper because he never testified that the maps were accurate, stating only that the maps were "hopefully" up-to-date.

The Government rejects Higgs' arguments in every respect and the Court does as well. Higgs' challenge to Vandergraft's testimony qua expert is procedurally barred since it could have been raised on direct appeal. *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). While this procedurally barred claim may be considered if Higgs can show "cause" for the default and "prejudice" as a result, again he has shown neither.

**\*549** [56] A court considering the sufficiency of evidence underlying a conviction will uphold a guilty verdict and deny habeas relief if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Williams v. Ozmint,* 494 F.3d 478, 489 (4th Cir.2007) (applying *Jackson* standard to habeas petition to determine sufficiency of evidence sustaining state court conviction); *Arigbede v. United States,* 732 F.Supp. 615, 621-22 (D.Md.1990) (applying *Jackson* standard to habeas petition to determine sufficiency of evidence sustaining district court conviction). Courts defer to the jury's determination of credibility and view the record "in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

light most favorable to the prosecution." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

[57] Assuming Vandergraft's testimony was offered as lay testimony, it was properly admitted. A lay witness may testify about information from records of which he has personal knowledge and over which he maintains personal control. *MCI Telecomms. Corp. v. Wanzer,* 897 F.2d 703, 706 (4th Cir.1990) (holding that a lay witness may testify to conclusions about "records ... predicated on her personal knowledge and perception" and is not required to be identified as an "expert" witness). Vandergraft stated that he had worked in the Cartography Office of Fish and Wildlife for 15 years and that he personally maintained the Fish and Wildlife maps. Referring to those maps, he testified that the crime scene was within the Government's territorial ownership and jurisdiction. Indeed, Vandergraft specifically affirmed that the maps "accurately reflect the ownership, as well as the jurisdiction" of the Patuxent Wildlife Research Center as of January 1996, which directly refutes Higgs' argument that Vandergraft testified only to Government ownership, as opposed to jurisdiction.

Nor is it accurate to state that Vandergraft failed to authenticate the maps. While Vandergraft did state that Fish and Wildlife maps were "hopefully" up-to-date, he later testified that he had conducted a search to ensure that the particular maps he relied on with respect to the Refuge were accurate. FN39

> FN39. As properly authenticated public records, the maps themselves were admissible on the issue of Government ownership of the land, *see* Fed.R.Evid. 803(8).

Under the *Ozmint* and *Jackson* standards, Vandergraft's testimony, buttressed by the maps themselves, sufficed to establish that the Refuge was within the "special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b).

**B.**

Higgs nonetheless maintains that the Court's instructions

regarding jurisdiction confused the jury. This is what the Court told the jury:

> The second element with regard to the first degree murder charge that the Government must prove beyond a reasonable doubt is that the killings occurred within the maritime and territorial jurisdiction of the Untied States. The Government has offered evidence that the killings occurred on the grounds of the Patuxent National Wildlife Refuge and that the Patuxent National Wildlife Refuge is owned by the federal government and is within its special maritime and territorial jurisdiction.

> Thus, if you find that the killing occurred in the Patuxent National Wildlife Refuge, then you should consider the remaining elements. If, however, you find that the killing did not occur, killings, the killings [sic] did not occur in **\*550** the Patuxent National Wildlife Refuge, or if you have a reasonable doubt as to this element, then it is your duty to find the defendant not guilty.

According to Higgs, this language on the one hand instructed the jury to find that the offenses occurred within the special maritime and territorial jurisdiction of the United States, but on the other hand merely required that the jury find the offenses occurred within the Refuge.

This argument lacks merit. To begin, the claim is procedurally defaulted for the same reason that the claim with respect to Vandergraft's testimony is procedurally defaulted; it could have been raised on direct appeal. Apart from the default, the claim is still deficient. While the jury is obliged to make the factual determination of whether the crime at issue occurred on a particular piece of property, the court, as a matter of law, has the authority to determine whether federal jurisdiction extends to a particular piece of property. *United States v. Bridges,* No. 94-5130, 1994 WL 687301, at *1 (4th Cir. Dec. 9, 1994) (finding that it is "well established that a court may determine, as a matter of law, the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is for the trier of fact"); *United States v. Roberts,* 185 F.3d 1125, 1139 (10th Cir.1999)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(finding that it is the role of the trial court to decide jurisdiction of a specific area).

Accordingly, the Court in this case had the authority to determine, and did in fact determine, that the Refuge was "within the special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 1111(b), while leaving the jury to decide whether "the killing[s] occurred in the Patuxent National Wildlife Refuge." There was no jury confusion with respect to the Court's instructions.

**C.**

Finally, Higgs claims trial counsel were ineffective for failing to object to Vandergraft's testimony and the jury instruction, and for failing to move for judgment of acquittal pursuant to Fed.R.Crim.P. 29. He also claims that appellate counsel were ineffective for failing to challenge the jury instruction.

Higgs must show both that (1) his attorney's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that he was prejudiced by that performance. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Where an objection would have been futile, counsel is not constitutionally ineffective for failing to make such an objection. See Harris, 204 F.3d at 683. Since any objection to Vandergraft's testimony or the Court's instruction on jurisdiction would have been futile, it follows that Higgs' counsel-trial and appellate-were not constitutionally ineffective.

**Claim 21: Government's Failure to Provide All Park Police and FBI Witness Statements and Reports**

Higgs contends that, in violation of his Fifth Amendment due process rights, the Government withheld evidence in the form of witness statements and reports collected by the Park Police and FBI. While he concedes that he is not making any "specific allegation that the Government failed to disclose particular law enforcement reports or witness statements," he suggests that somewhere there may be some undisclosed documents that would have materially affected his guilt and mitigated his punishment. He warns

against prosecutors who "tack too close to the wind" by disclosing less material evidence than required. Kyles, 514 U.S. at 439, 115 S.Ct. 1555 (finding that prudent prosecutors who are uncertain regarding how much evidence**551** to disclose should disclose more information rather than less). He therefore requests that the Court order the Government to review its evidence for any relevant documents that might have been Brady or Giglio in nature, but which were not disclosed.[FN40]

> FN40. Higgs states that at a later time he will move for discovery of all witness statements and reports generated during the investigation of these murders.

**A.**

Higgs is procedurally barred from litigating this issue since it was not preserved at trial or raised on direct appeal. See Massaro, 538 U.S. at 504, 123 S.Ct. 1690. Again, while Higgs may bypass procedural default upon a showing of either actual innocence or cause and prejudice, he has failed to demonstrate either. See Bousley v. United States, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

**B.**

[58] Higgs' argument is devoid of merit. Under Brady, the Government is only required to disclose evidence that would be "material" to the defense. 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court has defined as material evidence that would create a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Here Higgs offers absolutely no facts, not even a slight suspicion, that the Government failed to turn over material evidence.

[59] As the Government correctly notes, a petitioner making § 2255 claims must set forth specific facts in support of each ground of relief asserted. See Blackledge v. Allison, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

(1977) (holding that a habeas petitioner must make specific allegations; "conclusory allegations unsupported by specifics," or "contentions that in the face of the record are wholly incredible" will not entitle one to discovery or a hearing); *see also Taylor v. United States,* 287 F.3d 658, 661 (7th Cir.2002) (finding that a mere impression of what happened, rather than specific allegations, does not satisfy the requirements for a collateral attack).

The "belief" of Higgs' habeas attorneys that trial counsel may not have been furnished with all exculpatory evidence that was available and their supposition that an error may have occurred finds no anchor in fact or law. Absent facts tending to show that relevant information was not turned over, the Court cannot possibly conclude that undisclosed "evidence" may have been material to his defense or that he was prejudiced as a result of the withholding.

### Claim 22: Cumulative Errors

Nearing the finish, Higgs argues that the cumulative effect of counsels' errors, as well as the alleged prosecutorial and Court errors, marred the fairness of his trial and sentencing proceedings. As a result, he says, his conviction and sentence should be overturned or, alternatively, that his sentence should be vacated. The Court rejects this claim.

In the first place, the Court has found no errors of counsel, the prosecution, or the Court in this case.

But the cumulative error argument itself is not recognized in this Circuit.

As for ineffective assistance of counsel claims, the Fourth Circuit has emphasized that it evaluates such claims on an individual rather than cumulative basis. *Compare* **\*552** *Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir.1998) (finding that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively"), *with Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir.1989) (finding the consideration of combined errors to be appropriate). The same goes for alleged cumulative errors of the trial court. *See Arnold v.*

*Evatt,* 113 F.3d 1352, 1364 (4th Cir.1997) (rejecting a claim of cumulative effect of trial court's errors based on rejection of each of the individual court error claims), *cert. denied,* 522 U.S. 1058, 118 S.Ct. 715, 139 L.Ed.2d 655 (1998); *Mohr v. United States,* No. 03-2893, 2007 WL 2903235, at *10 (D.Md. Sept. 30, 2007) (holding that once the court found no attorney error, there could be no cumulative error); *Robinson v. Conroy,* No. 01-1671, 2002 WL 32785545, at *4 (D.Md. Jan. 16, 2002) ("Because none of the issues raised by Robinson could be considered error, he cannot string them together in hopes of forming a constitutional violation.") Here, because Higgs has failed to prove individual constitutional errors by counsel, his claim of cumulative error would fail, even if the law of this Circuit recognized the cumulative error argument. *See Fisher,* 163 F.3d at 852 ("Having just determined that none of counsel's actions could be considered constitutional error ... it would be odd ... to conclude that those same actions, when considered collectively, deprived [the defendant] of a fair trial."). The same goes for alleged cumulative errors of the Court.

The Supreme Court cases Higgs cites do not require a contrary conclusion. In *Kyles v. Whitley,* 514 U.S. 419, 436-37, 441, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court held that, on habeas review, when evaluating whether the evidence is material in violation of *Brady v. Maryland,* suppressed evidence should be considered cumulatively. But the materiality of suppressed evidence is not the issue here. Moreover, in *Taylor v. Kentucky,* 436 U.S. 478, 487-88, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978), the Court found reversible error on a *direct appeal* based on the cumulative effect of trial court and prosecutorial errors that might otherwise be individually harmless. *See also United States v. Martinez,* 277 F.3d 517, 532-33 (4th Cir.2002) (recognizing that under "cumulative error doctrine," defendant could establish reversible error on direct appeal through the combined effect of otherwise harmless errors). *Taylor* and *Martinez* are therefore distinguishable. Higgs' has already exhausted his direct appeals and is now seeking collateral relief. But, as noted, in the context of collateral relief the Fourth Circuit has clearly stated that individual constitutional errors must exist before a court can consider cumulative relief. *Fisher,* 163 F.3d at 852; *see also Greene v. Hoke,* No. 08-294, 2009 WL 774491, at *6 (S.D.W.Va. Mar. 20, 2009) (adopting magistrate judge's holding that petitioner was not entitled to cumulative relief where petitioner failed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

establish individual errors committed by either trial court or counsel); *Aldridge v. Ballard,* No. 05-827, 2009 WL 772933, at *6 (S.D.W.Va. Mar. 18, 2009) (confirming magistrate judge's finding that cumulative error cannot be found where there are "no error[s] of federal law, constitutional or otherwise"). Higgs' claim of cumulative error in this habeas proceeding is without merit.

### Claim 23: Request for Evidentiary Hearing

[60] Higgs argues that because he has alleged a multitude of facts supportive of his request for relief, he is entitled to an opportunity to prove them in an evidentiary hearing. The Court thinks not. A court may grant a motion for an evidentiary hearing when the defendant has pled facts that, if established, entitle him to relief, and there is a material dispute regarding**553** those facts. *See Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled on other grounds by* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992) (holding that a federal court has the power to try facts anew if the petitioner "alleges facts, which if proved, would entitle him to relief"). Higgs acknowledges the wide discretion vested in courts during § 2255 proceedings in respect of matters involving disputed material facts. However, as the Government correctly argues, most of Higgs' claims "suffer from some procedural flaw that should prove fatal" and those that survive procedural challenge do not allege any facts which are "either potentially credible or, if taken as true, would merit relief." *See Engelen v. United States,* 68 F.3d 238, 240 (8th Cir.1995) (holding that a habeas "petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact"). The Court finds no reason to hold an evidentiary hearing and the request for such a hearing is denied.

### Claim 24: Juror Misconduct

Higgs contends that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated based on juror misconduct during trial.

He argues that this misconduct included, but was not limited to, improper consideration of matters extraneous to the trial, improper exposure to publicity and community sentiment, improper exposure to witnesses and others who claimed to have knowledge or opinions about Higgs and the case, false or misleading responses of jurors on the voir dire, improper biases which infected the jury's deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties and/or the trial judge, and improper prejudging of the guilt/innocence and penalty phases of Higgs' trial. Higgs also argues that his rights to a fair trial and due process were violated when the jury was not sequestered to avoid contact with the public. He claims that trial and appellate counsel were ineffective for failing to raise these issues. He asks for leave to interview jurors to prove the basis for these claims, arguing that his request is justified by the need for heightened standards for reliability in death penalty cases.

### A.

These juror misconduct claims are procedurally defaulted. As Higgs concedes, until now he has never argued that juror misconduct violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. He has shown neither cause nor prejudice to excuse the default.

### B.

[61] Nor is the claim valid on the merits. While due process requires that a jury consider only the evidence developed before it at trial, and not information received from outside sources, *see Davis v. Zahradnick,* 432 F.Supp. 444, 447 (W.D.Va.), *aff'd en banc on other grounds,* 601 F.2d 153 (4th Cir.1979), and 646 F.2d 123 (4th Cir.1981), Higgs alleges no specific incident to support his assertion that there was juror misconduct, sending up trial balloons of unsupported claims of misconduct. Given this lack of specificity, including a total failure to demonstrate how the lack of a sequestration order prejudiced him, there is no basis to grant him relief or discovery. *See Taylor v. United States,* 287 F.3d 658, 661 (7th Cir.2002) ( "[A § 2255] motion 'shall specify all the **554** grounds for relief which are available to the movant and of which he has or, by the exercise of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

reasonable diligence, should have knowledge and shall set forth in summary form the facts supporting each of the grounds thus specified.' ").

Higgs would apparently have the Court find that, because of the severity and irreversibility of the death penalty, the Eighth Amendment requires a heightened standard for determining that death is the appropriate punishment, and for that reason it should permit him to conduct juror interviews. This theory finds no support in the law. While courts have surely required a heightened standard for determining that death is the appropriate punishment for certain crimes, *see Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), no authority supports the proposition that juror interviews may be undertaken post-trial in death-penalty cases in a hunt for facts that might demonstrate juror misconduct.

Higgs argues that, under the American Bar Association Guidelines, "it is clear that, *where permitted,* post-conviction counsel have a duty to interview jurors." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 10.15.1, commentary, pg. 123 (rev. ed.2003) (emphasis added). For good reason, however, post-trial interviews of jurors are highly restricted in this District pursuant to Local Rule 107.16, which states, "[u]nless *permitted* by the presiding judge, no attorney or party shall directly or through an agent interview or question any juror, alternate juror, or prospective juror, with respect to that juror's service." L.R. 107.16 (emphasis added). This District takes the position that jurors should not have to account to interested parties, especially those who may be disposed to challenge the verdict and press the jurors to explain how and why they decided as they did. The Court, finding that the underlying claim is factually baseless, denied the request to interview jurors once before; it has no reason to modify its decision at this time.

### C.

While Higgs submits that trial and appellate counsel's failure to litigate these issues violated his Sixth Amendment right to effective counsel, he has not and cannot show that counsel's performance fell below an objective standard of reasonableness or that a reasonable

probability exists that he was prejudiced by their allegedly deficient performance. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Because the underlying claims would have failed, counsel's decision not to litigate the issues in the trial court or raise them on direct appeal did not amount to ineffective assistance.

### Claim 25: Lethal Injection as Cruel and Unusual Punishment

Higgs' final argument is that execution by lethal injection, which he faces in Maryland, violates the Eighth Amendment prohibition against cruel and unusual punishment, and that both the U.S. Government Execution Protocol and the Maryland Execution Protocol exceed their respective statutory authorities.

### A.

With respect to the Eighth Amendment argument, Higgs argues that the potentially insufficient administration of the anesthetizing agent during the execution process, combined with the administration of a muscle paralyzing agent, may lead him to suffer an agonizing death without the ability to communicate any consciousness or feeling. He further argues that the procedures used to administer the lethal injection, including the lack of expertise of the personnel performing the procedure, substantially**\*555** increase the risk of painful death.

### 1.

[62] This claim is not yet ripe for review because the instant Petition and appeals from it remain and Higgs has not yet been given an execution date. U.S. Const. art. III, § 2; *see Kennedy v. Block,* 784 F.2d 1220, 1222 (4th Cir.1986). Moreover, litigation may modify the Maryland Protocol prior to Higgs' actual execution. Accordingly, there is no "direct and immediate dilemma for the parties" that compels judicial resolution of the issue at this time. *See New Mexicans for Bill Richardson v. Gonzales,* 64 F.3d 1495, 1500 (10th Cir.1995).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

This claim also fails because it is improperly brought as a § 2255 claim. Under § 2255, federal courts have jurisdiction to consider errors leading to a criminal conviction and those committed at sentencing, but they do not have the jurisdiction to determine the legality of the rules for implementing that judgment. *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). Higgs is not contesting the validity of his conviction or sentence; he only attacks the method of imposing his sentence. Such a challenge, when timely, would properly be brought pursuant to 28 U.S.C. § 2241, *United States v. Little,* 392 F.3d 671, 679 (4th Cir.2004).

**2.**

Even if the present claim were properly before the Court, it is of highly doubtful prospect. The Supreme Court has decided that capital punishment is constitutional, *Gregg v. Georgia,* 428 U.S. 153, 177, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and, since Higgs' trial, that the three-drug protocol for execution used by the Federal Government and the State of Maryland does not constitute cruel and unusual punishment. *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 1532-34, 170 L.Ed.2d 420 (2008). As explained in *Baze,* to prevail on an Eighth Amendment claim, a defendant must show that there is a " 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.' " *Id.* at 1531 (citing *Farmer v. Brennan,* 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Although the risk of future harm can qualify as cruel and unusual punishment, the Constitution "does not demand the avoidance of all risk of pain in carrying out executions." *Baze,* 128 S.Ct. at 1529, 1530.

Referring specifically to the three-drug protocol, the Supreme Court observed that "it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated." *Baze,* 128 S.Ct. at 1532 (recognizing that thirty-six states that sanction capital punishment have adopted lethal injection as the means and that thirty of those states as well as the Federal Government use the same three-drug protocol).

The Supreme Court explicitly rejected Higgs' argument as

to speculative dangers, such as the possibility that the drug will not achieve its intended effect or that human error may occur during administration of the procedure. *Baze,* 128 S.Ct. at 1533-34. It held that the potential of the execution to cause pain due to an accident, without the suggestion of malevolence, "does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id.* at 1531; *see also Walker v. Johnson,* 448 F.Supp.2d 719, 723 (E.D.Va.2006) (citing *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 464, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (holding that the possibility of an accident in the process of execution cannot constitute substantial **\*556** risk of harm)). Thus, although definitive resolution of the issue must await imminent application of the challenged procedure, the Government and Maryland Execution Protocols do not appear to present an Eighth Amendment problem. *See Baze,* 128 S.Ct. at 1532-34.

**B.**

Higgs also argues that the U.S. Government Execution Protocol is not statutorily authorized. He reasons thus: Pursuant to 18 U.S.C. § 3596(a), a death sentence should be implemented "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a) (2006). The Department of Justice has violated this provision by delegating to the Director of the Bureau of Prisons responsibility for promulgating the Bureau's own Protocol for the execution of federal prisoners, *see* 28 C.F.R. § 26.3(a)(4), instead of following procedures prescribed by Maryland law. Indeed, says Higgs, Congress specifically rejected an amendment to 18 U.S.C. § 3596(a) that would have authorized the Attorney General to prescribe a uniform method of execution for federal prisoners. *See* H.R. Rep. 104-879 at 204 (1997). Higgs suggests that the Government Protocol is a "rule" that should have been, but was not subject to the notice and comment provisions of the Administrative Procedure Act. *See* 5 U.S.C. § 553 (2006).

As with the challenge to the method of execution, this claim is improperly raised in a § 2255 action and should, when timely, be brought under 28 U.S.C. § 2241. *See United States v. Little,* 392 F.3d 671, 679 (4th Cir.2004).[FN41]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 479
(Cite as: 711 F.Supp.2d 479)

FN41. Whether a *Bivens* action or a federal civil rights claim pursuant to 42 U.S.C. § 1983 are alternative avenues of challenge, is not before the Court. *See Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Hill v. McDonough,* 547 U.S. 573, 580, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006).

Here too, the challenge to the Government would ultimately seem to be weak on the merits. Article 18 U.S.C. § 3596 requires that execution be implemented in the "manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a) (2006). Significantly, the statute only speaks to the "manner" of implementing the sentence without reference to "procedure." The *manner* of execution authorized by Maryland law is lethal injection. Md.Code Ann., Correctional Services, § 3-905. Because lethal injection has been deemed permissible, *see Baze,* 128 S.Ct. at 1532-34, the Government appears to be in compliance with the authorizing statute.

**C.**

Higgs' final contention is that the Maryland Protocol, which he says should be implemented in place of the Government Protocol pursuant to 18 U.S.C. § 3596(a), goes beyond what the underlying Maryland statute, Md. Corr. Serv. section 3-905, authorizes. But again he travels beyond the bounds of a proper federal *habeas* petition, which does not extend to claims that state rules violate state statutes. *See* 28 U.S.C. § 2255(a) (2006) (a petitioner in a *habeas corpus* proceeding must allege that "his sentence was imposed in violation of the Constitution or laws of the United States"); *see also Carrizales v. Wainwright,* 699 F.2d 1053, 1055 (11th Cir.1983) (citing *Bronstein v. Wainwright,* 646 F.2d 1048, 1050 (5th Cir.1981) (holding a state's interpretation of its rules provides no basis for federal *habeas corpus* relief because no constitutional question is involved)). Accordingly, Higgs challenge to the Maryland Protocol is also rejected.

**\*557 CONCLUSION**

Having considered Higgs' various challenges to his conviction and sentence and finding merit in none of them, the Court **DENIES** his Motion for Relief, as well as his Motion for Discovery.

A separate Order will issue.

***FINAL ORDER OF JUDGMENT***

For the reasons set forth in the accompanying Opinion, it is, this 6th day of April, 2010,

**ORDERED**

1. The Government's Motion to Strike Procedurally Defective Claims [Paper No. 519] is **DENIED;**

2. Petitioner Higgs' Motion for Discovery [Paper No. 509] is **DENIED;**

3. Petitioner Higgs' Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 [Paper No. 492] is **DENIED;**

4. Final Judgment is **ENTERED** in favor of the Government and against Petitioner Higgs; and

5. The Clerk of the Court is directed to **CLOSE** the case.

D.Md.,2010.
Higgs v. U.S.
711 F.Supp.2d 479

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)



United States Court of Appeals,

Fourth Circuit.
UNITED STATES of America,
Plaintiff–Appellee,
v.
Dustin John HIGGS, Defendant–Appellant.
No. 10–7.

Argued: Sept. 21, 2011.
Decided: Nov. 23, 2011.

**Background:** Defendant was convicted in the United States District Court for the District of Maryland, Peter J. Messitte, Senior District Judge, of first-degree premeditated murder, first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, and kidnapping resulting in death, and was sentenced to death. Defendant appealed. The Court of Appeals, 353 F.3d 281, affirmed. Defendant moved for new trial. The District Court denied motion. Defendant appealed. The Court of Appeals, 95 Fed.Appx. 37, affirmed. Defendant filed motion to vacate. The District Court, Messitte, Senior District Judge, 711 F.Supp.2d 479, denied motion. Defendant appealed.

**Holdings:** The Court of Appeals, Traxler, Chief Judge, held that:

(1) government was not required, under *Brady*, to disclose two internal reports concerning validity of comparative bullet lead analysis (CBLA) evidence;

(2) defense counsel's handling of CBLA evidence did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel;

(3) government's failure to produce CBLA reports, assuming it was required to do so, did not violate defendant's due process rights;

(4) defense counsel's handling of CBLA issue, even if deficient, did not result in prejudice required to establish ineffective assistance of counsel;

(5) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not establish constitutionally deficient performance; and

(6) defense counsel's failure to file motion for new trial based on post-trial CBLA studies did not prejudice defendant.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 ⬅4594(1)**

92 Constitutional Law

  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
        92k4592 Disclosure and Discovery
          92k4594 Evidence
            92k4594(1) k. In general.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Most Cited Cases

Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ☞1991**

110 Criminal Law

    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
            110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

To prevail on *Brady* disclosure claim, defendant must demonstrate (1) that evidence is favorable, either because it is exculpatory or impeaching, (2) that the government suppressed the evidence, and (3) that the evidence was material to the defense. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ☞1991**

110 Criminal Law

    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information

            110k1991 k. Constitutional obligations regarding disclosure. Most Cited Cases

Government's *Brady* duty to disclose favorable evidence to defendant does not require government to make available all evidence in its possession or within its reach. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ☞2008**

110 Criminal Law

    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
        110k2008 k. Sanctions for failure to disclose. Most Cited Cases

Mere suppression of favorable evidence does not entitle defendant to relief based on violation of government's *Brady* disclosure obligation. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law 110 ☞1995**

110 Criminal Law

    110XXXI Counsel
        110XXXI(D) Duties and Obligations of Prosecuting Attorneys
            110XXXI(D)2 Disclosure of Information
            110k1993 Particular Types of Information Subject to Disclosure
            110k1995 k. Diligence on part of accused; availability of information. Most

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

[Cited Cases]

There is no *Brady* violation, due to government's failure to disclose evidence favorable to defendant, if the evidence is available to the defense from other sources or the defense already possesses the evidence. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 ⚷1992**

110 Criminal Law

    110XXXI Counsel
      110XXXI(D) Duties and Obligations of Prosecuting Attorneys
        110XXXI(D)2 Disclosure of Information
        110k1992 k. Materiality and probable effect of information in general. Most Cited Cases

No real violation of government's *Brady* disclosure obligation occurs unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 ⚷1992**

110 Criminal Law

    110XXXI Counsel
      110XXXI(D) Duties and Obligations of Prosecuting Attorneys
        110XXXI(D)2 Disclosure of Information
        110k1992 k. Materiality and probable effect of information in general. Most

Cited Cases

A "reasonable probability" of a different result is shown, as required for relief due to violation of government's *Brady* disclosure obligation, when government's evidentiary suppression undermines confidence in the outcome of the trial. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 ⚷1881**

110 Criminal Law

    110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General
        110k1879 Standard of Effective Assistance in General
        110k1881 k. Deficient representation and prejudice in general. Most Cited Cases

To succeed on a Sixth Amendment claim of ineffective assistance of counsel, defendant must demonstrate that defense counsel's performance fell below an objective standard of reasonableness measured by prevailing professional norms, and that counsel's deficient performance prejudiced his defense. U.S.C.A. Const.Amend. 6.

**[9] Criminal Law 110 ⚷1883**

110 Criminal Law

    110XXXI Counsel
      110XXXI(C) Adequacy of Representation
        110XXXI(C)1 In General

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

**110k1879** Standard of Effective Assistance in General

**110k1883** k. Prejudice in general. Most Cited Cases

To establish prejudice prong of claim of ineffective assistance of counsel, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, or that counsel's errors were so serious as to deprive defendant of a fair trial, meaning a trial the result of which is reliable. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 🔑2001**

110 Criminal Law

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1993 Particular Types of Information Subject to Disclosure

110k2001 k. Other particular issues. Most Cited Cases

Government had no *Brady* obligation to disclose two internal FBI reports concerning validity of comparative bullet lead analysis (CBLA) evidence in existence at time of capital murder trial; reports represented early attempts by FBI to quantify conclusions that could be drawn from lead analysis to counter criticisms then in existence and ultimately did little more than advise FBI that further study was warranted, and criticisms of CBLA were available to trial counsel prior to trial. U.S.C.A.

Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[11] Criminal Law 110 🔑1931**

110 Criminal Law

110XXXI Counsel

110XXXI(C) Adequacy of Representation

110XXXI(C)2 Particular Cases and Issues

110k1921 Introduction of and Objections to Evidence at Trial

110k1931 k. Experts; opinion testimony. Most Cited Cases

Defense counsel's handling of comparative bullet lead analysis (CBLA) evidence during capital murder trial did not rise to level of constitutionally deficient performance supporting claim of ineffective assistance of counsel, even though counsel did not ferret out two preliminary studies that were then available or present defense expert armed with same information; defense counsel conducted thorough and effective cross-examination of government's expert, demonstrating that they were well acquainted with criticisms of CBLA evidence, and went a long way toward impeaching uniqueness and homogeneity of lead melts, as well as overall probative value of CBLA evidence, without unduly calling attention to evidence or making it appear to be of more importance than was warranted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[12] Criminal Law 110 🔑1870**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1870 k. In general. Most Cited Cases

When considering a claim of deficient performance as part of claim alleging ineffective assistance of counsel, court must evaluate the conduct from counsel's perspective at the time. U.S.C.A. Const.Amend. 6.

**[13] Criminal Law 110 &sim;1871**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1871 k. Presumptions and burden of proof in general. Most Cited Cases

In deciding whether counsel who allegedly provided ineffective assistance of counsel rendered constitutionally deficient performance, court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy. U.S.C.A. Const.Amend. 6.

**[14] Criminal Law 110 &sim;1882**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)1 In General
110k1879 Standard of Effective Assistance in General
110k1882 k. Deficient representation in general. Most Cited Cases

In addressing deficient performance prong of claim of ineffective assistance of counsel, question is whether attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom. U.S.C.A. Const.Amend. 6.

**[15] Constitutional Law 92 &sim;4594(3)**

92 Constitutional Law

92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of
92k4594(3) k. In general. Most Cited Cases
**Criminal Law 110 &sim;1931**

110 Criminal Law

110XXXI Counsel
110XXXI(C) Adequacy of Representation
110XXXI(C)2 Particular Cases and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Issues

110k1921 Introduction of and Objections to Evidence at Trial

110k1931 k. Experts; opinion testimony. Most Cited Cases

**Criminal Law 110 🔑2001**

110 Criminal Law

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1993 Particular Types of Information Subject to Disclosure

110k2001 k. Other particular issues. Most Cited Cases

Evidence other than comparative bullet lead analysis (CBLA) evidence enabled government's introduction of evidence of capital murder defendant's involvement in other shootings, and therefore neither government's failure to produce two internal reports raising questions about CBLA evidence, assuming it had *Brady* obligation to do so, nor counsel's alleged deficient performance in failing to obtain exclusion of CBLA evidence or further challenge it caused defendant prejudice required to establish either *Brady* due process violation or ineffective assistance of counsel under theory that, had CBLA evidence been excluded or discredited, other acts evidence would not have been admitted. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

**[16] Constitutional Law 92 🔑4594(3)**

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)4 Proceedings and Trial

92k4592 Disclosure and Discovery

92k4594 Evidence

92k4594(2) Particular Items or Information, Disclosure of

92k4594(3) k. In general. Most Cited Cases

**Constitutional Law 92 🔑4745**

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)6 Judgment and Sentence

92k4741 Capital Punishment; Death Penalty

92k4745 k. Proceedings. Most Cited Cases

**Criminal Law 110 🔑2001**

110 Criminal Law

110XXXI Counsel

110XXXI(D) Duties and Obligations of Prosecuting Attorneys

110XXXI(D)2 Disclosure of Information

110k1993 Particular Types of Information Subject to Disclosure

110k2001 k. Other particular issues. Most Cited Cases

There was no reasonable probability that trial court would have excluded comparative

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

bullet lead analysis (CBLA) evidence had exclusion been sought, or that result in either guilt or penalty phase of capital murder trial would have been different had such evidence been excluded or further challenged, given the overwhelming evidence of guilt and defendant's predominant role in kidnappings and murders of three women, and therefore, assuming that government had *Brady* obligation to produce two internal reports raising issues about CBLA evidence, its failure to do so did not establish due process violation. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[17] Criminal Law 110 ☞1931**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
        110k1921 Introduction of and Objections to Evidence at Trial
        110k1931 k. Experts; opinion testimony. Most Cited Cases

**Criminal Law 110 ☞1961**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
        110k1958 Death Penalty
        110k1961 k. Presentation of

evidence in sentencing phase. Most Cited Cases

No reasonable probability existed that district court would have excluded comparative bullet lead analysis (CBLA) evidence had exclusion been sought in capital murder trial, or that outcome of either guilt or penalty phase of trial would have been different had such evidence been excluded or expert testimony concerning that evidence been subjected to additional cross-examination, given overwhelming evidence of defendant's guilt and his predominant role in kidnappings and murders of three women, and therefore defense counsel's performance with respect to CBLA evidence, even if deficient, did not prejudice defendant, as required to establish ineffective assistance of counsel. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2).

**[18] Criminal Law 110 ☞1965**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
        110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence was not constitutionally deficient, as required to establish ineffective assistance of counsel; post-trial studies were largely cumulative of criticisms of CBLA evidence known at time of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

trial and were at best impeachment evidence, and CBLA evidence played minor role during trial. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[19] Criminal Law 110 ⚷938(1)**

110 Criminal Law

    110XXI Motions for New Trial
        110k937 Newly Discovered Evidence
           110k938 In General
              110k938(1) k. In general. Most Cited Cases

To receive a new trial based on newly discovered evidence, defendant must show (1) that the evidence is newly discovered, (2) that he has been diligent in uncovering it, (3) that the evidence is not merely cumulative or impeaching, (4) that the evidence is material to the issues involved, and (5) that the evidence would probably produce an acquittal. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[20] Criminal Law 110 ⚷1965**

110 Criminal Law

    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
        110XXXI(C)2 Particular Cases and Issues
        110k1965 k. New trial motion. Most Cited Cases

Defense counsel's failure to file motion for new trial in capital murder case based on post-trial studies regarding comparative bullet lead analysis (CBLA) evidence did not prejudice defendant, as required to establish ineffective assistance of counsel, given overwhelming evidence of defendant's guilt, which precluded reasonable probability that post-trial studies or new trial would have produced different outcome in proceedings. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 1111(a), 1201(a)(2); Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**\*729 ARGUED:** Angela Elleman, Federal Community Defender Office, Philadelphia, Pennsylvania, for Appellant. Sandra Wilkinson, Office of the United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Leigh Skipper, Chief Federal Defender, Matthew Lawry, Michael Wiseman, Assistant Federal Defenders, Federal Community Defender Office, Philadelphia, Pennsylvania; Stephen H. Sachs, Wilmer Cutler Pickering Hale & Dorr, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Deborah Johnston, Assistant United States Attorney, Office of the United States Attorney, Baltimore, Maryland, for Appellee.

Before TRAXLER, Chief Judge, and SHEDD and KEENAN, Circuit Judges.

Affirmed by published opinion. Chief Judge TRAXLER wrote the opinion, in which Judge SHEDD and Judge KEENAN joined.

## OPINION

TRAXLER, Chief Judge:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Petitioner Dustin John Higgs was convicted of three counts each of first-degree premeditated murder, *see* 18 U.S.C. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.,* and kidnapping resulting in death, *see* 18 U.S.C. § 1201(a)(2), arising out of the January 27, 1996, murders of three young women in the Patuxent National Wildlife Refuge. He received nine death sentences. We affirmed his convictions and sentences. *See* **\*730***United States v. Higgs,* 353 F.3d 281 (4th Cir.2003) (" *Higgs I* "). Higgs also filed a motion for a new trial, which was denied by the district court and affirmed on appeal. *See United States v. Higgs,* 95 Fed.Appx. 37 (4th Cir.2004) (" *Higgs II* ").

Presently before us is Higgs's motion for relief under 28 U.S.C. § 2255, which was denied by the district court. *See Higgs v. United States,* 711 F.Supp.2d 479 (D.Md.2010). We granted a certificate of appealability to consider Higgs's claim that his constitutional rights to due process of law and effective assistance of counsel were violated by the introduction of Comparative Bullet Lead Analysis ("CBLA") evidence at trial. We now affirm.

I.

The facts in this case have been well-documented in the two prior opinions of this court, from which we borrow heavily.

At approximately 4:30 a.m., on January 27, 1996, Tanji Jackson, Tamika Black, and Mishann Chinn were found dead in a roadway in the Patuxent National Wildlife Refuge in Prince George's County, Maryland. Jackson and Black had each been shot once in the chest and once in the back. Chinn had been shot once in the back of her head. A .38 caliber wadcutter bullet was found at the scene. Jackson's day planner was also found, in which she had written Higgs's nickname and telephone number. On a separate page, Jackson had also recorded the notation "13801 'MAZDA' 769GRY," which matched Higgs's address number on Briarwood Drive in Laurel, Maryland, and the license tag number for Higgs's blue Mazda MPV van. *Higgs I,* 353 F.3d at 291 (internal quotation marks omitted). Chinn's mother and a friend of the Jackson family each confirmed that the girls had been picked up for dates the previous evening by a man or men in a blue Mazda MPV van. There were additional witnesses who saw the women at Higgs's apartment complex during the early morning hours of the murders.

On March 21, 1996, Park Police Officers interviewed Higgs at his apartment. Higgs admitted that he knew Jackson and that he may have spoken to her on the night before her murder but denied that she had ever been at his apartment and denied knowing where she lived. Higgs claimed that he first heard about the murders on January 27, 1996, while watching the ten o'clock news at the home of his girlfriend, Phyllis Smith, and that he commented to a guest at Smith's home that evening that he thought he knew " 'that Tanji girl.' " *Id.* The names and photographs of the victims, however, had not yet been released. During the search of Higgs's apartment, the police found cash, crack cocaine, a .380 semiautomatic firearm, and ammunition for .380, .45, and .38 caliber weapons. Higgs was arrested on federal drug charges, pled guilty, and was sentenced to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

seventeen years in prison.

In the fall of 1998, Victor Gloria was arrested on federal drug charges. Gloria admitted to authorities that he was with Higgs and Willis Mark Haynes on the night of the murders and agreed to cooperate with the authorities in the murder prosecutions. At trial, he provided a detailed, eyewitness account of the kidnappings and murders, which we summarized as follows:

On Friday evening, January 26, 1996, Higgs, Willie Mark Haynes and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington D.C. to pick up [Jackson, Black, and Chinn]. Higgs knew Jackson and they had arranged dates for Haynes and Gloria with Black and Chinn. They were traveling in Higgs's blue Mazda MPV van. After stopping at a liquor store, the three **\*731** couples returned to Higgs's apartment to drink alcohol and listen to music. While there, the men also smoked marijuana.

At some point during the early morning hours of January 27, Higgs and Jackson began to argue. Jackson retrieved a knife from the kitchen and Haynes, who had been in the bedroom with Black, heard the commotion and came out to break up the fight. Haynes talked to Jackson and got the knife away from her. However, Jackson was still angry and the three women left the apartment. According to Gloria, as Jackson was walking out, "[s]he stopped at the door and said something like I am going to get you all f——ed up or robbed"

or made "some kind of threat." In response, Higgs commented to the other two men that Jackson "do know a lot of n——s." As Higgs was watching the women leave, he saw Jackson stop and appear to write down the license plate number of his van. This angered Higgs, who commented to Haynes and Gloria that Jackson was "writing down [his] sh—." Gloria interpreted Higgs's comments as concern that Jackson intended to retaliate against Higgs.

At that point, "Higgs said f—— that, and grabbed his coat and said come on." He also retrieved a silver .38 caliber firearm from the end table drawer and put it in his pocket. The three men got into Higgs's van, with Higgs driving, Haynes in the front passenger seat, and Gloria sitting behind Higgs. Higgs drove the van to where the three women were walking on the side of the road and told Haynes to get them in the vehicle. After Haynes spoke to them, the three women got into the back seat of the vehicle and Higgs started driving towards Washington, D.C. Neighbors in the area heard and saw the three girls laughing and talking around 3:30 that morning.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and engaged in a quiet conversation that Gloria could not hear. The women were whispering in the back of the van and apparently believed they were being taken home. Higgs, however, drove past the Baltimore—Washington Parkway exit, which would have taken them directly into

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Washington, D.C., and instead drove the van into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. Eventually, Higgs pulled over at a secluded location. One of the girls asked if they were trying to "make [them] walk from [t]here," and Higgs responded, "something like that." After the women got out of the van, Higgs pulled out the pistol and handed it to Haynes, who put it behind his back and also exited the van. Within moments, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings from the rearview mirror. Gloria put his head down, heard more shots, and heard a woman screaming.

After firing a few more shots, Haynes got into the van and closed the door. According to Gloria, either Higgs or Haynes then commented that they had to "get rid of the gun," and Higgs drove to the Anacostia River where, according to Gloria, either Higgs or Haynes got out and threw the gun into the water. Higgs then drove back to his apartment where the three men began to clean up. Among other things, they wiped down the patio doors and "everything else, the bathroom, the doorknobs, the stereo," **\*732** and threw away any items the women might have touched, such as liquor bottles, CDs, and rented videotapes. The men then left the apartment and dropped the trash by a dumpster. Higgs and Haynes dropped Gloria off at a fast food restaurant, where he was told

by Higgs to "keep [his] mouth shut."

*Higgs I,* 353 F.3d at 289–90 (footnote and citations omitted).

At trial, Higgs's counsel did not challenge the government's evidence that Higgs knew Jackson prior to the murders, that the women were present at Higgs's apartment complex that evening, or that Haynes was the triggerman. Rather, Higgs's counsel argued that the government had failed to prove that Higgs was a principal in the kidnappings and murders. *See* 18 U.S.C. § 2 ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission," or who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."). In particular, Higgs challenged the government's evidence that he had been in prior possession of a .38 caliber weapon and that he handed the .38 caliber murder weapon to Haynes that night to carry out the murders.[FN1]

> FN1. Higgs and Haynes were jointly indicted for the kidnappings and murders in December 1998. Haynes was convicted of the murders several months before Higgs's trial, but the jury did not recommend the death penalty for Haynes. At Haynes's trial, defense counsel also admitted that Haynes was the triggerman but argued "that Haynes' actions were not truly voluntary because he was effectively controlled by his older, dominant co-defendant, Dustin

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

John Higgs." *Haynes v. United States,* 451 F.Supp.2d 713, 717 (D.Md.2006).

The government presented overwhelming evidence of Higgs's guilt, as well as of his predominant role in the murders. Although Gloria was an important witness for the government, substantial additional testimony and evidence corroborated Gloria's testimony. Of particular note was Jackson's day planner and its references to Higgs's identifying information, which corroborated Gloria's testimony that Higgs commented that Jackson was " 'writing down [his] sh—,' " just after his violent argument with Jackson and just prior to his retrieving his gun and pursuing the women. *Higgs I,* 353 F.3d at 290 (alteration in original).

In addition, Higgs made a number of incriminating statements after the murders. Phyllis Smith testified that Higgs had her tell the authorities that he was with her at the time of the murders; however, she recanted when she learned that the alibi was for the murders instead of drug charges. Similarly, Ednisia Darby, the mother of Higgs's child, testified that when she asked Higgs about the murders, he made an effort to remind her that they were together at the hospital that evening, which was not true. Darby testified that Higgs later admitted that he was with Haynes when the women were murdered. He also told Darby that Jackson had been invited over to his apartment that night because she had been " 'snitching on one of them,' " and that " 'the other two girls ... were just for his friends.' " *Id.* at 292.

Higgs also discussed matters with Domenick Williams, a fellow inmate and jailhouse lawyer who was housed with Higgs at the D.C. jail between August 1998 and January 1999. When Higgs told Williams that he had refused to cooperate against Haynes in the murder investigation, Williams told Higgs that the authorities would likely offer Haynes the same deal. In response, "Higgs told Williams 'that his youngan would hold up,' and 'that the government wouldn't offer a deal to the trigger man.' " *Id.* at 293 (citation omitted). **\*733** Williams also related conversations that he had with Higgs about Gloria. Higgs asked Williams what his chances of defeating the murder charges "would be 'if the witness after the fact wasn't there.' " *Id.* Williams told Higgs "that 'his chances would be good.' " *Id.* Higgs later told Williams " 'that he wasn't worrying about the [murder] case' " because two of the former inmates at the jail, Melvin Grayson and T, " 'would be out there,' " and " '[t]hat Mel would be out there to handle anything that he needed and that he could rely on him.' " *Id.* (alteration in original). Concerned that a conspiracy to harm Gloria might be in the works and that he might be implicated, Williams reported these conversations to the authorities. Williams also produced letters that Higgs had written to him, which stated "that Higgs had not heard from 'T', but that 'Mel has been in my corner.' " *Id.* Visitation records confirmed that Grayson visited Higgs in the D.C. jail in February and March of 1999.

The government also introduced evidence of a taped telephone conversation between Higgs and Grayson in May 2000. During the conversation, Higgs and Grayson discussed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Haynes's conviction for the murders and Higgs told Grayson that the attorney had " 'got[ten] the whole joint twisted.' " *Id.* at 309. When Grayson subsequently read Higgs a newspaper article reporting that Haynes had claimed that he shot the women only because he was afraid of Higgs, Higgs made no response at all. Later, Higgs told Grayson that the lawyers were trying to make it seem like the murders were over something petty. Thus, Higgs made no attempt to refute his involvement in the crimes during his conversation with Grayson and instead implied that the authorities were mistaken about the motive.

As noted above, Gloria testified that either Higgs or Haynes disposed of the murder weapon in a nearby river while en route back to Higgs's apartment. The authorities never found the .38 caliber murder weapon.[FN2] However, the government presented evidence that Higgs was involved in two other shootings during the two-month period leading up to the murders, both of which involved a .38 caliber handgun.

> FN2. During the sentencing phase, portions of Haynes's statements to the authorities were admitted, further corroborating Gloria's account of the events that occurred that evening. Haynes confirmed that Higgs was driving the van that night. In addition, Haynes advised the authorities that he threw the gun in the river.

The first shooting was on November 20, 1995, at the Chaconia Nightclub in Washington, D.C. Wondwossen Kabtamu testified that Higgs got into an argument outside the club, and that Higgs shot out the windows of a vehicle in a drive-by shooting while Kabtamu drove Higgs's Mazda MPV van. Kabtamu threw the gun out of the window shortly afterwards, but Higgs insisted that they return to get it. A .38 caliber bullet was recovered by the police from the vehicle targeted by Higgs. Williams testified that Higgs also discussed the Chaconia shooting with him, and that Higgs said that he could not plead guilty to the Chaconia charge because the authorities would try to use the gun in another case. When Williams learned that Higgs was being indicted for the triple murders, "Higgs commented to Williams, " 'you see why I can't plead guilty to that charge?' " " *Id.* at 293.

The second shooting was on December 10, 1995, on Cherry Lane in Laurel, Maryland. This shooting involved both Higgs and Haynes. Rodney Simms testified that Haynes came to his home and began arguing with him. During the argument, Haynes pulled a gun and began shooting **\*734** at Simms from the front of the house. Higgs came out from a nearby shed and also began shooting. Police recovered 9mm bullet casings from the front of the house, where the eyewitnesses placed Haynes, and a .38 caliber bullet from inside the house. In April 1997, Higgs pled guilty to his involvement in the Cherry Lane shooting. During the plea proceedings, the prosecutor stated that Haynes had fired the 9mm handgun and that Higgs had fired the .38 caliber handgun. Higgs offered no contest to his involvement in the shooting but claimed that he had fired the 9mm handgun and that Haynes had fired the .38 caliber handgun.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

Finally, the government presented two categories of forensic evidence to corroborate the eyewitness testimony and crime scene evidence from the murder scene and the two prior shootings. The government presented experts in the area of firearms examination, comparison, and identification, who testified that the .38 caliber bullets recovered from the Chaconia shooting, the Cherry Lane shooting, and the murders all shared the same rifling characteristics. As we previously explained in *Higgs I,*

> "lands and grooves" refer to the rifling marks that are "pressed onto a bullet when it travels down a barrel of a firearm." Because "[d]ifferent manufacturers will have different numbers of lands and grooves, different directions of twist, right or left, and different sizes," the marks allow forensic investigators to compare firearms with fired bullets and cartridge cases, and to compare fired bullets and cartridge cases from different crime scenes to one another.

*Id.* (citations omitted, alteration in original). The .38 caliber bullets recovered from the three crime scenes were all fired from a firearm with five lands and grooves with a right twist.

The government also presented CBLA evidence through the testimony of Kathleen Lundy, an examiner with the Elemental Analysis Group of the FBI laboratory. Lundy compared the elemental composition of the .38 caliber bullets recovered from the three crime scenes and from Higgs's apartment. According to Lundy, the lead composition of the .38 caliber bullet recovered

from the Chaconia shooting matched the lead composition of eighteen of the .38 caliber bullets found at Higgs's apartment. In addition, the lead composition of the .38 caliber bullet recovered from the Cherry Lane crime scene matched the lead composition of the .38 caliber bullet recovered from the murder scene.

## II.

Higgs contends that his due process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated by the government's failure to produce two reports that he asserts could have been used to either exclude or further impeach the CBLA evidence presented by Lundy. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because they failed to discover the reports on their own or present comparable and available expert testimony to challenge the CBLA evidence. He contends that his post-trial counsel were also ineffective because they failed to file a motion for a new trial on the basis of newly discovered studies on CBLA evidence.

### A.

[1][2] Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request, "where the evidence is material either**\*735** to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. To prevail on a *Brady* claim, the defendant must demonstrate (1) that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

evidence is favorable, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the evidence was material to the defense. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (including impeachment evidence within the scope of materials that the prosecution must disclose).

[3][4][5][6][7] The duty to disclose favorable evidence, however, does not require the government to make available all evidence in its possession or within its reach. Nor does the mere suppression of favorable evidence entitle the defendant to relief. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). There is no *Brady* violation if the evidence is available to the defense from other sources or the defense already possesses the evidence. *See United States v. Roane,* 378 F.3d 382, 402 (4th Cir.2004); *Fullwood v. Lee,* 290 F.3d 663, 686 (4th Cir.2002) ("The *Brady* rule does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." (internal quotation marks omitted)). And, while "the term ' *Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence ..., strictly speaking, there is never a real ' *Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936; *see also United States v. Bagley,* 473 U.S. 667, 677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Supreme Court precedent does not

"automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (internal quotation marks omitted)). A "reasonable probability" of a different result is shown "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375).

B.

[8][9] To succeed on a Sixth Amendment claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland.* The defendant must demonstrate that defense counsel's performance "fell below an objective standard of reasonableness" measured by "prevailing professional norms," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and that the "deficient performance prejudiced [his] defense," *id.* at 687, 104 S.Ct. 2052. The standard for *Strickland* prejudice is the same as for *Brady* materiality. *See id.; Kyles,* 514 U.S. at 434, 115 S.Ct. 1555; *Tice v. Johnson,* 647 F.3d 87, 110 (4th Cir.2011). The defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, or "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 687, 104 S.Ct. 2052.

III.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

In order to properly evaluate Higgs's challenges to the CBLA evidence in the context of his *Brady* and *Strickland* **\*736** claims, we begin with some background on CBLA evidence and the developments that took place before and after Higgs's trial.

A. *The Pre–Trial Reports*

From the late 1960s until at least 2004, CBLA was performed by the FBI to compare bullets found at or associated with a crime scene to bullets associated with a defendant, usually in cases where a fired bullet could not be matched to a particular firearm because the firearm was not recovered or the fired bullets were too mutilated for comparison of physical markings. CBLA evidence, when introduced at trial, generally consisted of two components: (1) the scientific test used to measure the elemental composition of the lead in bullets; and (2) the conclusions drawn by the examiner based upon the similarities or differences in the elemental compositions of the compared bullets.

The primary source of bullet lead is recycled car batteries. Secondary lead smelters melt and mix the lead with smaller lead sources and other chemicals in large vats, and these smelters then harden the lead into a solid form suitable for sale to bullet manufacturers. The manufacturers, in turn, process the lead into bullets. Due to impurities in the source material and the changes that are made to it, the elemental composition of lead melts varies. Bullets that share the same elemental composition were deemed by CBLA examiners to be analytically indistinguishable, creating the inference that the compared bullets originated from the same lead melt.

The first document at issue in this case derives from a presentation at an FBI conference in 1991 (the "FBI Report"), reporting that CBLA matches had been found in bullets taken from boxes manufactured seven months apart and fifteen months apart. Higgs claims that this report should have been disclosed to him because it raised a question as to whether lead melts are unique in their elemental compositions.

The second document at issue is a May 2000 study performed by the Iowa State University Department of Statistics and Ames Laboratory (the "Iowa State Study"). This study was performed at the request of the FBI, with the goal of "develop[ing] a means for assessing bullet evidence, especially to be able to quantify the significance of matching bullet lead." J.A. 522. The available data necessary to do so, however, was felt to be insufficient and additional study was deemed necessary. The study specifically suggested that further research be done on bullet manufacturing, distribution, and usage, noting that "[b]ullets manufactured from different batches of raw material may end up in the same box of bullets; similarly bullets manufactured from the same batch can end up in different boxes" and that it had "been difficult from the limited data available to estimate the relative frequency of these events." J.A. 522. Higgs contends that this study should also have been disclosed to him because it called into question the premise that lead melts are unique and homogeneous in their elemental compositions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

B. *The Post-trial Reports*

Higgs's trial was completed in October 2000. In the ensuing years, the FBI and the scientific community collaborated their efforts to quantify the significance of bullet lead matches from CBLA. *See Clemons v. Maryland,* 392 Md. 339, 896 A.2d 1059, 1076–78 (2006) (discussing the various studies released in 2002 that questioned the value of CBLA evidence and recommended further study of the issue). At the request of the FBI, the National Research Council ("NRC") of the National **\*737** Academy of Sciences undertook a study of the issue and, in 2004, released its recommendations in a report entitled "Forensic Analysis: Weighing Bullet Lead Evidence." J.A. 491 (internal quotation marks omitted). The NRC reported that "the FBI Laboratory's analytical instrumentation is appropriate and the best available technology with respect to precision and accuracy for the elements analyzed" and "that the elements selected by the FBI for this analysis are appropriate." J.A. 491. However, "[t]he NRC expressed concerns ... relating to the interpretation of the results of bullet lead examinations." J.A. 491. "Although the NRC stated that the FBI Laboratory did not need to suspend bullet lead examinations while undertaking [its] review [of the recommendations], the FBI elected to do so while the review was pending." J.A. 491. On September 1, 2005, the FBI announced that it would no longer perform CBLA because "neither scientists nor bullet manufacturers [had been] able to definitively attest to the significance of an association made between bullets in the course of a bullet lead examination." J.A. 491. Prior to doing so, however, "the FBI Laboratory ha[d] not determined that previously issued bullet lead reports were in error." J.A. 492.

Because Higgs's convictions and sentences were imposed prior to these additional studies and the FBI's response, Higgs claims that his defense counsel were also ineffective post-trial for failing to investigate and present the ongoing developments in a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

IV.

Higgs claims that the FBI Study and Iowa State Study, both of which were in existence at the time of his trial, were internal studies performed by or at the request of the FBI and, therefore, were not reasonably available to trial counsel. Accordingly, he asserts that the government violated its *Brady* obligations by failing to produce them. In the alternative, Higgs contends that his trial counsel were constitutionally ineffective for failing to independently discover the studies, or present comparable impeachment material that was reasonably available in the public domain through an expert. *See* Brief of Appellant at 41 (arguing that "[e]ven without the information withheld by the [g]overnment, reasonable counsel would still have had much at their disposal to exclude CBLA, impeach Lundy or persuade the jury that her testimony lacked probative value").

The district court rejected the *Brady* claim, holding that the government was not required to disclose the studies because:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

(1) the studies' strongest critiques of CBLA were available in at least one published study which was publicly available at the time of Higgs' trial, strongly suggesting that, through the exercise of reasonable diligence, Higgs could have obtained identical or nearly identical information; (2) the studies' remaining critiques do not consist of strong, definitive conclusions, but at most suggest areas for possible additional study; (3) by his own admission, Higgs could have called live witnesses capable of offering conclusions nearly identical to those offered in the Government's studies; and (4) other evidence presented at trial provided a firm link between Higgs and the bullets found at the murder scene.

*Higgs,* 711 F.Supp.2d at 498. With regard to Higgs's *Strickland* claim, the district court assumed that counsel's performance was deficient, but "conclude[d] that there was no reasonable probability that, absent **\*738** counsel's alleged errors, the result of the proceeding would have been different. The multiplicity and the strength of the evidence ... establish that proposition beyond peradventure." *Id.* at 502.

A.

As the government correctly observes, CBLA evidence was widely admitted into evidence in various courts in this country at the time of Higgs's trial and up until at least 2003, when the NRC began its review of the issue and ultimately recommended further study. *See, e.g.,*

*United States v. Davis,* 103 F.3d 660, 673–74 (8th Cir.1996); *Haynes v. United States,* 451 F.Supp.2d 713, 720 (D.Md.2006); *State v. Noel,* 157 N.J. 141, 723 A.2d 602, 605–06 (1999). [FN3] However, it seems equally clear, as Higgs has acknowledged, that the criticisms of CBLA were already present in the public domain at the time of Higgs's trial, even if the FBI Study and the Iowa State Study might not have been.

> FN3. In the wake of the scientific community's more recent reports about CBLA evidence, courts have, in appropriate cases, granted new trials or reversed convictions that hinged upon it. *Compare Ragland v. Commonwealth,* 191 S.W.3d 569, 582 (Ky.2006); (overturning murder conviction where CBLA was the only conclusive evidence linking defendant to the murder bullet), *Clemons v. State,* 392 Md. 339, 896 A.2d 1059, 1078 (2006) (reversing the trial court's denial of defendant's motion to exclude CBLA evidence because "a genuine controversy exists within the relevant scientific community about the reliability and validity of CBLA" and "[t]he only consensus that can be derived from [the scientific studies] is that more studies must be conducted"), and *New Jersey v. Behn,* 375 N.J.Super. 409, 868 A.2d 329, 345 (App.Div.2005) (granting new trial where the proof was "far from overwhelming" and the CBLA evidence was not cumulative or merely impeaching), *with United States v. Berry,* 624 F.3d 1031, 1041 (9th Cir.2010) (rejecting § 2255 claim based upon CBLA evidence because "while ...

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

the studies may caution against widespread usage of [CBLA] evidence," they did not "establish that [CBLA] evidence is so fundamentally unreliable that its introduction at [defendant's] trial violated his due process rights"), and *In re Berkley,* 375 Fed.Appx. 413, 415 (5th Cir.2010) (denying request to file successive application for habeas relief from capital conviction based upon CBLA criticism because, even assuming that the petitioner could not have discovered the flaws in the CBLA evidence through the exercise of reasonable diligence, he failed to "show [ ] that but for the flawed bullet analysis, no reasonable factfinder would have found him guilty of capital murder").

[10] Having reviewed the record presented by Higgs on this issue, we cannot conclude that the government violated its *Brady* obligations by failing to disclose the two internal reports in existence at the time of Higgs's trial. The reports represent early attempts by the FBI to quantify the conclusions that could be drawn from lead analysis to counter the criticisms that were in existence at the time and ultimately did little more than advise the FBI that further study was warranted. Additionally, the criticisms of CBLA appear to have been available to trial counsel prior to trial.

[11] Higgs also failed to demonstrate that his trial counsels' handling of the CBLA issue rose to the level of constitutionally deficient performance under *Strickland.* Defense counsel conducted a thorough and effective cross-examination of Lundy, demonstrating that Higgs's counsel were well acquainted with the criticisms of CBLA, and we see little that could have been gained by calling a defense expert to offer comparable criticisms. For example, Lundy admitted that CBLA evidence is far different from fingerprint analysis and DNA analysis, which provide narrow or unique identifiers. She testified that all bullets come from the same six secondary smelters, that they all share some similarities in elemental composition,**\*739** that an exact replication of elemental compositions can never be achieved, and that there is always uncertainty in measurements. She testified that Remington, the bullet manufacturer in this case, would have manufactured approximately five million bullets in 1995, and that there would be many, many other bullets with the same elemental composition as those matched in this case. She also testified that bullets within the same box of ammunition may be found to have different elemental compositions.

[12][13][14] When considering a claim of deficient performance, courts must evaluate the conduct from counsel's perspective at the time. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Roach v. Martin,* 757 F.2d 1463, 1476 (4th Cir.1985), and "that, under the circumstances, the challenged action, might be considered sound trial strategy," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter,* ––– U.S. ––––, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).

Here, Higgs has failed to demonstrate that defense counsel's handling of the CBLA evidence at trial was constitutionally ineffective simply because counsel did not ferret out the two preliminary studies or present a defense expert armed with the same information. On the contrary, counsel went a long way towards impeaching the uniqueness and homogeneity of lead melts, as well as the overall probative value of the CBLA evidence, demonstrating that counsel was well-versed in the subject and able to obtain important concessions. And counsel did so without unduly calling attention to the evidence, or making it appear to be of more importance than was warranted. Such decisions by experienced, capital defense counsel fall squarely within the class of those to which we give deference.

B.

Nevertheless, even if we were to assume that the government violated its *Brady* obligation by failing to produce the two reports to Higgs's counsel, or that the performance of Higgs's counsel was constitutionally deficient, Higgs is not entitled to relief because he has also failed to demonstrate that he was prejudiced by the government's failure to disclose the reports to him prior to trial or by the admission of the CBLA evidence at trial.

1.

In this appeal, Higgs's counsel attempts to establish prejudice in two ways: (1) by claiming that the CBLA evidence provided the crucial link between "Higgs ['s] bullets taken from the [murder] scene" and the bullets taken from "Higgs's apartment"; and (2) by claiming that it was the CBLA evidence that "enabled the [g]overnment to introduce prejudicial Rule 404(b) evidence" of Higgs's involvement in the Chaconia and the Cherry Lane shootings. Brief of Appellant at 45; *see* Fed.R.Evid. 404(b). Neither assertion, however, is accurate.

First, Higgs asserts that the CBLA evidence permitted the government "to put the .38 caliber handgun in Higgs's possession" prior to the murders by "showing that a bullet recovered from the Chaconia incident matched the chemical composition of the bullets recovered from Cherry Lane and the capital killings." Brief of Appellant at 45. In the absence of the CBLA evidence, Higgs claims, "there would have **\*740** been no unimpeached evidence linking Higgs's bullets taken from the crime scene to Higgs's apartment." *Id.; see also* Reply Brief at 1 (arguing that "Higgs's convictions and death sentences are tainted" by the CBLA evidence because it "purport[s] to 'match' bullets taken from Higgs's apartment with those found at the scene of the homicide, and two unrelated shooting incidents"); *id.* at 21 (contending that "*only* the CBLA evidence purported to draw a connection between the bullets Higgs owned and those fired at the homicide scene and the other shooting incidents") (emphasis added).

However, the CBLA evidence did not match the bullets from Higgs's apartment or the Chaconia shooting to the murder bullet; it only

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

linked the Cherry Lane bullet to the murder bullet. In fact, Lundy did not even bother to test the Chaconia bullet or the majority of the bullets found in Higgs's apartment for comparison to the murder bullets because they were of a different type, and the only .38 caliber wadcutter bullet that was found in Higgs's apartment did not match the wadcutter bullets found at the murder scene or at Cherry Lane.

[15] Higgs's claim that it was the CBLA evidence that enabled the government to introduce the 404(b) evidence of the Cherry Lane and Chaconia shootings is also inaccurate. On direct appeal, Higgs challenged the district court's admission of the Chaconia shooting under Rule 404(b), which, in contrast to the Cherry Lane shooting, involved a different type of bullet than the murder bullet and a crime to which Higgs had not pled guilty. We held as follows:

> The bullet recovered from the Chaconia shooting was forensically similar to those recovered from the Patuxent murder scene and the victims, in that they shared the same *rifling* characteristics—five lands and grooves with a right twist. Thus, the evidence of Higgs's participation in the Chaconia Nightclub shooting was properly introduced by the government as a means to link Higgs to the same caliber weapon that Gloria testified Higgs owned and retrieved from the drawer on the night of the murders, and one which shared the same rifling characteristics as did the murder weapon.

> *Higgs I,* 353 F.3d at 311–12 (emphasis

added). In doing so, we made no mention of the CBLA evidence, which is unsurprising given that the CBLA evidence did not match the Chaconia bullet to the murder bullet at all. Rather, the testimony and forensic evidence of rifling characteristics alone demonstrated the relevance and admissibility of the prior shootings under Rule 404(b). The district court's admission of the Chaconia shooting did not rest upon the CBLA evidence, and while the CBLA evidence could have provided an additional basis upon which to admit the Cherry Lane shooting had it been challenged, it was neither critical nor necessary.

2.

[16][17] Finally, we have carefully considered the materiality of the CBLA evidence that was introduced, and the question of whether there is a reasonable probability that the result of the proceedings would have been different had the government produced the studies at issue or had trial counsel handled the CBLA issue in different way. We are satisfied that there is not. [FN4]

> FN4. We may summarily dispose of Higgs's claim that the production of the preliminary studies or the presentation of comparable information would have resulted in the district court's exclusion of CBLA evidence at trial. Higgs's counsel has conflated the criticisms of CBLA that were present at the time of trial with the criticisms that followed. We evaluate the obligations of the government and the conduct of defense counsel at the time of trial and have no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

difficulty concluding that there is no reasonable probability that the trial court would have excluded the CBLA evidence in October of 2000.

**\*741** As we have twice concluded, the evidence of Higgs's guilt and of his predominant role in the brutal kidnappings and murders of the three women was overwhelming, as was the evidence, irrespective of the CBLA evidence, that linked Higgs to the .38 caliber weapon and to .38 caliber ammunition.

Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in them. Jackson's day planner, containing Higgs's name, telephone number, address and vehicle license tag number, corroborated Gloria's testimony regarding Higgs's words and actions in the wake of his violent argument with Jackson and the threat she made as she was leaving his apartment. And, as the government pointed out in closing arguments, Gloria's inability to recall every precise detail, such as who disposed of the gun, could well have bolstered his credibility.

For his part, Higgs admitted to the authorities that he knew Tanji Jackson and claimed that he commented to a guest at his girlfriend's house the following evening that he knew "that Tanji girl," even though the names of the victims had not yet been released to the press. _Id._ at 291 (internal quotation marks omitted). And after unsuccessfully attempting to establish an alibi through Smith and Darby, Higgs admitted to Darby that he was with

Haynes on the night of the murder, that the women were killed because Jackson was "snitching" on one of them, and that the other two women were just along "for his friends." _Id._ at 292 (internal quotation marks omitted).

As we previously summarized, there was overwhelming evidence confirming that:

it was Higgs who set up the "dates" with the girls, Higgs who got into the violent argument with Jackson, Higgs who observed Jackson writing down his license plate number, Higgs who retrieved the .38 caliber murder weapon (which he owned) and told the other two men to come along, Higgs who told Haynes to "trick" the women into getting into the van, Higgs who drove the van past the route back to their homes and into the Patuxent National Wildlife Refuge, Higgs who handed the murder weapon to Haynes moments before Haynes shot and killed the women, and Higgs who orchestrated the destruction of the physical evidence at his apartment after the murders.

_Higgs II,_ 95 Fed.Appx. at 44.

With regard to the Chaconia and Cherry Lane shootings, the eyewitness testimony and forensic evidence, irrespective of the CBLA, easily place a .38 caliber weapon in Higgs's possession in the two months prior to the murders. The rifling evidence alone, unlike the CBLA evidence, demonstrated a consistency in the bullets fired at all three crime scenes and corroborated the eyewitness testimony that Higgs possessed, used, or directed the use of a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

.38 caliber weapon in connection with all three crimes. Higgs's incriminating statements made in connection with the two prior shootings are particularly significant. Higgs conveyed to Williams that he could not plead guilty to the Chaconia shooting (in which Haynes was *not* involved) because the authorities might use the gun in connection with the murder case. And Higgs gratuitously advised the court during his plea to the Cherry Lane shooting **\*742** (in which Haynes *was* involved) that Haynes had fired the .38 caliber weapon and that Higgs had fired the 9mm weapon. Finally, Higgs's reference to Haynes as his "youngan," who would "hold up" if offered a deal to turn on him, revealed much about how Higgs viewed his relationship with his younger companion. *Higgs I,* 353 F.3d at 293 (internal quotation marks omitted).

Given this overwhelming evidence of Higgs's role in the murders, we are satisfied that the CBLA evidence did not affect the outcome of the verdicts. The CBLA evidence matching the Chaconia bullet to the bullets in Higgs's apartment merely corroborated the eyewitness testimony of Kabtamu, the crime scene evidence from the Chaconia shooting, including the rifling evidence, and Higgs's statements to Williams, all of which placed the .38 caliber weapon in Higgs's hands on the night of that shooting. Unlike the rifling evidence, however, there was no CBLA match between the ammunition used in the Chaconia shooting or the ammunition at Higgs's home and the ammunition used in the murders. Similarly, the CBLA evidence matching the Cherry Lane bullet to the murder bullet merely corroborated the eyewitness testimony of Simms and others at

Cherry Lane and the crime scene evidence from that shooting, including the rifling evidence that also matched the Cherry Lane bullet and the murder bullet. However, there was no match between the Cherry Lane bullet and the bullets associated with Higgs's apartment, and Higgs and Haynes were both involved in the Cherry Lane shooting and in the murders. Higgs did not contest that Haynes was the triggerman, or that Haynes used a .38 caliber weapon to murder the women. And, as defense counsel pointed out to the jury, there was substantial evidence that Haynes had equal if not more access to Higgs's apartment. Thus, while the CBLA evidence matched the bullet from Cherry Lane with the murder bullet, it was cumulative to other evidence but not inconsistent with Higgs's defense.

Having reviewed the challenged evidence in the context of the entire case, we conclude there is no reasonable probability that the district court would have excluded the CBLA testimony at Higgs's trial had it been challenged, or that the outcome of the guilt or sentencing phase would have been different had the CBLA evidence been excluded or subjected to additional cross-examination.

V.

[18] Higgs's final claim is that his defense counsel were ineffective because they failed to file a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure within three years of the verdict, based upon the CBLA studies that were published thereafter.

After his trial was concluded, Higgs

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 726

(Cite as: 663 F.3d 726)

requested and was granted a substitution of counsel for one of his two defense attorneys for the purpose of pursuing an appeal and other post-conviction relief. Higgs's counsel did not challenge the admission of the CBLA evidence on direct appeal, and although defense counsel did file a new trial motion based upon other evidence discovered in connection with a fresh review of the case, they did not file a similar motion on the basis of the more recent CBLA studies. Higgs contends that defense counsels' failure to also challenge the CBLA evidence in a motion for a new trial amounted to constitutionally deficient performance, and that he was prejudiced as a result.

[19] To receive a new trial based on newly discovered evidence, a defendant must show that the evidence is newly discovered; that he has been diligent in uncovering it; that the evidence is not merely cumulative or impeaching; that the evidence is material to the issues involved; and that the evidence would probably**\*743** produce an acquittal. *See United States v. Chavis,* 880 F.2d 788, 793 (4th Cir.1989). Unless the defendant demonstrates all five of these factors, the motion should be denied. *See id.* To obtain relief in this proceeding, Higgs must demonstrate that counsel's failure to file the motion constituted deficient performance and that he was prejudiced as a result. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052.

[20] Higgs has failed to demonstrate that defense counsel were constitutionally ineffective for failing to file a motion for a new trial based upon the post-trial studies. The post-trial studies published in 2002 and 2003 were largely cumulative of the criticisms known at the time of trial and were at best merely impeachment evidence. *Cf. Berry,* 624 F.3d at 1043 (concluding that even "the [NRC] report and the FBI's discontinued use of [CBLA] evidence were no more than impeaching evidence of the [CBLA] testimony introduced at [defendant's] trial"). And, as discussed above, there is no reasonable probability that the post-trial studies or a new trial would have resulted in a different verdict. We cannot say that the post-trial defense counsel team was constitutionally ineffective simply because they did not pursue a new trial motion on the basis of the CBLA developments, particularly in view of the cross-examination that was conducted and the minor role that the evidence played during the trial, or that Higgs was prejudiced as a result.

VI.

For the foregoing reasons, we affirm the district court's order denying Higgs's motion under 28 U.S.C. § 2255.
*AFFIRMED*

C.A.4 (Md.),2011.

U.S. v. Higgs
663 F.3d 726
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2016 WL 3541387**
Only the Westlaw citation is currently available.
United States District Court,
D. Maryland.

United States of America, Respondent,
v.
Dustin John Higgs, Petitioner.

Crim. No. PJM-98-0520
|
Civ. No. PJM-05-3180
|
Signed 06/29/2016

**MEMORANDUM OPINION**

PETER J. MESSITTE, UNITED STATES DISTRICT JUDGE

**\*1** Following Dustin John Higgs's conviction for the kidnapping and murder of Tanji Jackson, Tamika Black, and Mischann Chinn, a jury concluded that he should receive the death penalty. His conviction and sentence were affirmed on appeal. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) *cert. denied*, 543 U.S. 999, 125 S. Ct. 627, 160 L.Ed.2d 456 (2004). The Court denied Higgs's Motion to Vacate Pursuant to 28 U.S.C. § 2255, *see United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010). Two years later, Higgs filed his pending Motion for Relief pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) and Federal Rule of Civil Procedure 60(d). In his Motion, Higgs asks the Court to revisit his Motion to Vacate because he claims to have unearthed evidence from a police file that he says proves the U.S. Government committed fraud on the Court during the § 2255 proceedings. ECF No. 579. He also asks the Court to order discovery. ECF No. 580. Because the Court agrees with the Government that Higgs has failed to establish even colorable fraud on the Court, his Motions are **DENIED**.

**I.**

**Background**

The Court need not recite all the facts underlying Higgs's conviction, but to the extent it is helpful for understanding Higgs's pending motion, the following summary will be helpful.

On the evening of January 26, 1996 Higgs, Willis Haynes, and Victor Gloria drove from Higgs's apartment in Laurel, Maryland, to Washington, D.C. Once there, they arranged for Tanji Jackson, Tamika Black, and Mischann Chinn and to join them at Higgs's apartment to drink alcohol and listen to music. In the early hours of next morning, Higgs and Jackson began arguing, prompting Jackson to grab a knife from the kitchen. Haynes persuaded Jackson to drop the knife but Jackson remained angry and all three women, upset, left the apartment on foot. As Jackson left, she supposedly made some sort of threat against the men, which angered Higgs.

Shortly after the women left, Higgs grabbed his coat and a silver +.38 caliber handgun and urged Haynes and Gloria to come with him to catch up with the women. Higgs, Haynes and Gloria then got into Higgs's car and, with Higgs driving, Haynes in the front passenger seat, and Gloria behind Higgs in the back seat, pursued the three women. Not far from Higgs's apartment they caught up with them and ordered them into the car, drove into the Patuxent National Wildlife Refuge, a federal property

within the jurisdiction of the United States, and pulled over at a secluded spot. One of the young women asked if they were trying to "make [them] walk from there," to which Higgs responded, "Something like that." The women then got out of the car.

Higgs meanwhile handed his gun to Haynes, who put it behind his back and got out of the car. Moments later, Gloria, who remained in the back seat of the car, heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, and saw Higgs holding the steering wheel, watching the shootings in the rearview mirror. Gloria, still in the back seat, put his head down and heard more shots and the sound of women screaming. The three men then drove away, leaving the women, all of whom had apparently been shot, at the secluded spot.

**\*2** Afterwards, the three men drove to the Anacostia River and threw the guns in, then drove back to Higgs's apartment to clean the place of evidence. Higgs and Haynes left Gloria with a warning to "keep [his] mouth shut." Around 4:30 am, a driver found the dead women's bodies strewn along Maryland Route 197, which runs through the Patuxent National Wildlife Refuge. At the scene, Park Police found Jackson's day planner, which contained Higgs's nickname and telephone number, as well as a note of the street number of his apartment and the license plate number for his car.

On December 21, 1998 Higgs and Haynes were indicted on three counts each of first-degree premeditated murder, *see* 18 U.S.C.A. § 1111(a), first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, *see id.*, kidnapping resulting in death, *see* 18 U.S.C.A. § 1201(a)(2), and using a firearm while committing a crime of violence, *see* 18 U.S.C. § 924(c). Haynes was tried first. On August 24, 2000, after finding him guilty on all three counts in the guilt phase, the jury failed to reach a unanimous verdict on the death sentence in the penalty phase. The Court thereafter sentenced Haynes to concurrent life terms on the first-degree murder and kidnapping counts and forty-five years consecutive on the firearm offenses.

At Higgs's separate trial, which began five weeks later, a different jury returned guilty verdicts on all counts. Gloria's eyewitness testimony about the night of the murders was unquestionably significant to the jury's deliberations. At the guilt phase of the trial, Gloria told the jury, among other things, that following the argument with Jackson, Higgs wanted to have the victims killed; that he (Gloria) rode in the back seat of Higgs's car; and that he saw Higgs hand a gun to Haynes while whispering something to Haynes. During cross-examination, Higgs's counsel attacked Gloria's credibility, highlighting his criminal past, including his use and sale of drugs and his violation of probation, previous false statements he made to police investigating the murders, as well as his willingness to lie to authorities in general. The jury also heard that Gloria faced 15 years in prison for his involvement in the triple homicide, as well as over 30 years in jail for unrelated federal and state drug charges, and that in exchange for his cooperation in the Higgs case, the Government had agreed to seek a lighter sentence for Gloria for his role in the homicides.[1]

[1]       On November 22, 2000, the Court sentenced Gloria to 84 months in prison for his role in the *Higgs/Haynes* murders, followed by three years of supervised release.

On October 26, in the penalty phase of his case, the jury determined that Higgs should receive the death penalty on each of the murder and kidnapping charges. The Court entered judgment on the jury's verdict and Higgs appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed both the conviction and sentence. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ("*Higgs I*"). The Supreme Court denied Higgs's petition for writ of certiorari. *Higgs v. United States*, 543 U.S. 99, 125 S. Ct. 627, 160 L.Ed.2d 456 (2004). While his appeal was pending, Higgs filed a Motion for a New Trial, which this Court denied, and the Fourth Circuit affirmed. See *United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004), *cert. denied*, *Higgs v. United States*, 543 U.S. 1004, 125 S. Ct. 608, 160 L.Ed.2d 465 (2004) ("*Higgs II*").

**The § 2255 Proceedings**

On November 28, 2005, Higgs filed a 122-page Motion to Vacate under 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 asserting twenty-five claims of error.[2] The only claim relevant to the motion presently before the Court was Higgs's allegation that the Government had failed to turn over all the material relating to Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. Pet.'s Mot. Vacate § 2255, ECF No. 492. While preparing the § 2255 Motion, defense counsel claim to have learned Gloria had been a suspect in

the 1998 killing of one Martrelle Creighton, who was stabbed during a fight in the Baltimore Inner Harbor. In his Motion, Higgs alleged that Gloria was not charged with this murder at the behest of the Government in *Higgs* "in an effort to preserve his status as a testifying witness in [the] federal capital triple homicide case," and that the Government's failure to disclose this consideration violated Higgs's due process rights. Pet.'s Mot. Vacate § 2255 at 33, ECF No. 492. Had the Government disclosed this alleged understanding, Higgs argued, defense counsel would have used it to further impeach Gloria as a witness, which would have had a material effect on the outcome of his trial. *Id.*

[2]     Higgs also sought discovery on various issues raised in his petition, which the court denied. *See* ECF Nos. 509, 548.

**\*3** In response, the Government described Higgs's claims as "speculation about the Government's knowledge or actions," arguing that "vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial and federal officials." Govt.'s Resp. Mot. Vacate § 2255 at 88, ECF No. 520. The Government further argued that "[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony" but that prosecutors "had no duty or ability to predict, much less inform Higgs of the benefits, or acts of grace, that coincidentally flowed to the witness after this trial." *Id.* at 86. In response to Higgs's discovery request, the Government said "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial." Govt.'s Resp. Mot. Disc. at 5, ECF No. 513.

The Court agreed with the Government and denied Higgs's motion in all respects, including the alleged *Brady* violations regarding Gloria. *See Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010) ("*Higgs III*"). Specifically, addressing Higgs's claim that Gloria was spared a murder charge in Baltimore in exchange for his cooperation in the federal trial, the Court held:

> Again, pure speculation about supposed benefits cannot substitute for hard facts. See *Roane*, 378 F.3d at 401. Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions.

> Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict.

*Higgs III*, 711 F. Supp. 2d at 508.

The Court denied Higgs's motion for a certificate of appealability and his motion for reconsideration. ECF Nos. 560, 561. Higgs sought leave to appeal from the Fourth Circuit, which granted the certificate of appealability but only as to one issue unrelated to Higgs's present motion. On November 23, 2011, the Fourth Circuit denied Higgs's appeal. *United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011). On December 10, 2012, the U.S. Supreme Court denied Higgs's petition for a writ of certiorari. *Higgs v. United States*, 663 F.3d 726, 133 S. Ct. 787, 184 L.Ed.2d 583 (2012).

## The Creighton Murder Investigation

Meanwhile, Higgs's defense counsel continued to investigate Gloria's potential involvement in the Creighton murder and sought access to the investigation file of the Baltimore Police Department (BPD). Pet's Mot. Relief R. 60(d) "R.60(d) Mot." at 19, ECF No. 579. After some back and forth, Higgs obtained the complete file in the spring of 2012. *Id.*

Because Higgs and the Government differ sharply as to the interpretation of the facts contained in the police file, what follows is a summary of the facts upon which they appear to agree or which appear on the face of the exhibits.

On July 18, 1998, over two years after the *Higgs/Haynes* murders and two-and-a-half months before Gloria was arrested in connection with that case, a man named Martrelle Creighton was killed in the Inner Harbor area of Baltimore by a single stab wound to the neck. R.60(d) Mot., Ex. 2 at 1, ECF No. 579-1.

**\*4** Baltimore Police soon learned that Creighton had died during an argument between two groups of young men over a group of young women. *Id.* at 3. One of the groups of men consisted of Creighton and his friends Clarence White and David Bishop. *Id.* The other group comprised Kevin Miller, twin brothers Kevin and Keith Scott, and Victor Gloria. Witnesses described all four men in Miller's group as African-American, or multi-racial – in Gloria's case, half African-American half Puerto Rican. *See* R.60(d) Mot., Ex. 8 at 7, ECF No. 579-1.Various witnesses described Gloria as well as the Scott twins as "light skinned", and Miller as "brown skinned" or "dark skinned." R.60(d) Mot., Ex. 6 at 3, Ex. 8 at 7-8, 10, ECF No. 579-1. Miller was described as around six-feet tall; Gloria was described variously as between 5'7" and six feet. R.60(d) Mot., Ex. 2 at 4, Ex. 10 at 12, Ex. 11 at 8, ECF No. 579-1.

The trouble in the Inner Harbor began when Creighton's group attempted to strike up conversation with a group of three young women, which consisted of sisters Barbara and Charnetta Bailey, and their friend Erica Jones. R.60(d) Mot., Ex. 9 at 1, Ex. 10 at 2, ECF No. 579-1. The women, who knew nobody in Creighton's group, were not interested. *Id.* Shortly thereafter, the women began talking with Gloria's group, whom they also had not known previously. *Id.* Creighton apparently became angry that the young women were talking to members of Gloria's group given that they had no interest in talking to Creighton's group. *Id.* As a result, Creighton began yelling at the women and Gloria's group. *See* R.60(d) Mot., Ex. 6 at 2, ECF No. 579-1.

An altercation ensued. Someone in Gloria's group punched Creighton in the neck, apparently with a knife or sharp object of some kind, striking Creighton's carotid artery. More punches may or may not have been thrown; other people may have fought one another; members of Gloria's group ran away shortly thereafter and Creighton soon died of his wound.

The Baltimore Police Department ("BPD") began to investigate, interviewing White and Bishop (the victim's friends) on the night of the shooting. Handwritten notes in the police file indicate that White described how, once the altercation began, a man with "light skin" swung at Creighton, at which point Creighton "grabbed his neck and was bleeding bad." R.60(d) Mot., Ex. 5 at 2, ECF No. 579-1. In contrast, Bishop, in a taped interview hours after the killing, told how a 5'11" man with "dark skin" punched Creighton in the neck, and a man with "light skin" punched him in the head. R.60(d) Mot., Ex. 7 at 1-2, ECF No. 579-1.

About a week later, on July 29, BPD Detective Robert Patton interviewed Barbara Bailey. From her conversations with the two groups of men, Bailey knew their first names. R.60(d) Mot, Ex. 8 at 2, ECF No. 579-1. Bailey said that before the altercation took place, Gloria in fact ran away. *Id.* at 3. She said she was walking away from the group but turned around when the men began fighting and saw Miller, whom she described as dark skinned, punch the victim. *Id.* at 3-4. She did not realize that the victim had been stabbed, but said she did see blood all over his shirt. *Id.* at 4.

On August 12, Detective Patton interviewed Charnetta Bailey. She also said that before the victim was stabbed, Gloria had run off. R.60(d) Mot., Ex. 9 at 3, ECF No. 579-1. She indicated that she saw Miller and the victim circling each other as if they were going to fight but turned around before any punches were thrown. *Id.* She said she turned back and saw blood, and described how Miller then boasted of having beaten Creighton. *Id.* She, too, did not realize the victim had been stabbed. *Id.* at 5.

In mid-November, the BPD showed a photographic line-up to Bishop and the Bailey sisters, all of whom identified the Scott twins as part of Gloria's group. Govt.'s Resp. R. 60(d) Mot. ("Govt.'s Resp."), Ex. 5 at 1, Ex. 6 at 1, ECF Nos. 585-5, 585-6. The BPD arrested the Scott twins on February 2, 1999. R.60(d) Mot., Ex. 3 at 2, ECF No. 579-1.

**\*5** The Scott twins both stated that it was Gloria who stabbed Creighton, although they, too, did not initially realize that Creighton had been stabbed. R.60(d) Mot., Ex. 10 at 7-10, Ex. 11 at 4-7, 11, ECF No. 579-1. The Scott twins both said that Creighton approached Miller as though he was going to throw a punch, at which point Gloria punched Creighton in the neck and then ran away. R.60(d) Mot., Ex. 10 at 7-10, Ex. 11 at 4-7, 11, ECF No. 579-1. Both said neither they nor Miller exchanged blows with Creighton. *Id.* The Scott twins also indicated that they knew from the news that he knew Gloria at that time had been incarcerated in connection with the murder of three women in Prince George's County. R.60(d) Mot., Ex. 10 at 11, Ex. 11 at 11, ECF No. 579-1. Keith Scott further indicated that Gloria had been arrested with Willis Haynes, whom Keith knew. R.60(d) Mot., Ex. 10 at 11-12, ECF No. 579-1.

**APP-190**

At some point in their investigation, the BPD began discussing the case with federal authorities involved in the *Higgs/Haynes* Murder investigation and trial. The BPD file contains a handwritten note dated February, 2, 1999 – the same day the Scott twins identified Gloria as Creighton's killer. That note listed the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers. R.60(d) Mot., Ex. 14, ECF No. 579-1. It also lists the number for the Park Police Criminal Investigations Bureau. *Id.* Immediately under the names and telephone numbers was the following notation: "Jan '96 – 3/B/F victims shot to death on BW Pkwy." *Id.* Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Haynes, Higgs and Gloria, along with other identifying information. *Id.*

On that date, February 2, 1999, Detective Green retrieved a photographic line-up previously created by the Park Police, which included pictures of Gloria, and provided it to the Baltimore Police. R.60(d) Mot., Ex. 15, ECF No. 579-1. The police file also contained a complaint dated September 9, 1996 in which the complainant alleged that Gloria had thrown a rock at his face and pulled a knife on him outside an Applebee's restaurant in College Park, MD. R.60(d) Mot., Ex. 14, ECF No. 579-1.

The police file also contained a handwritten note dated February 10, 1999, which included the notation: "Case Agent for Victor Gloria S/A Brad Shaefe FBI Calverton Office." R.60(d) Mot., Ex. 16, ECF No. 579-1. Several additional, undated, handwritten notes contained the names of Detectives Green and Abt, along with telephone numbers and information relating to the *Higgs/Haynes* Murders. *Id.*; R.60(d) Mot., Ex. 17, Ex. 18, ECF No. 579-1. One such note contained directions to the U.S. Park Police Headquarters. R.60(d) Mot., Ex. 20, ECF No. 579-1.

On March 19, 1999, Detective Patton showed Barbara and Charnetta Bailey photographic line-ups of Gloria and Miller. Barbara Bailey could not identify either man. Govt.'s Resp., Ex. 12 at 1, ECF No. 585-12. Charnetta Bailey identified Miller but not Gloria. Govt.'s Resp., Ex. 13 at 1. As for Miller, Charnetta Bailey identified him as one of four suspects involved in the homicide.[3] *Id.*

[3]     In its brief, the Government quotes Charnetta Bailey as saying, presumably at the photographic line-up interview, in reference to Miller: "[H]e looks like the guy who may have had the knife." Govt.'s Resp. at 14-15, ECF No. 585. However, the exhibit to which the Government cites (Govt. Ex. 13) contains no such quote. Nor can the Court find it in any other exhibit parties have provided.

On April 7, 1999, the BPD arrested Miller. R. 60(d) Mot., Ex. 12 at 1, ECF No. 579-1. Although some details of his testimony differed from that of the Scott twins, Miller also said that Gloria punched Creighton and then ran away. *Id.* at 5-6. Miller said that he himself then threw a punch at one of Creighton's friends, but never hit Creighton. *Id.* Miller denied stabbing Creighton and said he did not realize when he began fighting that Creighton had been stabbed, and that it was only when the Scott twins called him after their arrest and "told him everything" that he learned about the stabbing. *Id* at 6. Miller told Detective Patton that he had talked with the Scotts at least three times since they were arrested because they wanted him to "be their witness" and give them some "lawyer money." *Id.* at 15. Miller also said he received a letter from the Scotts while they were in jail, and talked to their girlfriends. *Id.* at 16. He said he talked with the Scotts about the case over the phone, and described how "their girlfriends told me everything about their statements and stuff." *Id.*

**\*6** The BPD file also contained a handwritten note dated one week later, August 14, 1999, the author of which was Mark Cohen, then chief homicide prosecutor in the Baltimore City State's Attorney's Office[4]. The note read as follows:

Bobby,

Re Victor Gloria

1 I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99. She told me that Gloria pled guilty to AAF in triple murder case + that his plea agreement is sealed. The two Co-[Defendants] Willis Haynes + Dustin Higgs have trial date of 2-7-2000. Because plea agreement is sealed, she could not tell me if Gloria is going to testify agt. Co-[Defendant].

2 AUSA Johnston states that it is possible that Co-[Defendants] – Scott, Scott + Miller are blaming Gloria because they are friends of [Defendants] in her case especially Haynes. She suggested we talk to

(1) Joe Green Park Police B – [phone number]

(2) Brad Sheafe – FBI B – [phone number]
– They could give us background on case

3 After we talk to these officers, we will decide on next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case.

4 Please call me

Mark Cohen

R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1.

[4]     It is unclear exactly from the record to whom this note was addressed. But given that it was found in the BPD's investigative file and was addressed to "Bobby," quite probably it was meant for Robert Patton, the lead BPD detective on the Creighton case.

Further, the BPD file contained a progress report dated April 21, 1999 prepared by Detectives Patton and Kirk Hastings, addressed to the commanding officer of the Homicide Unit. Like the Cohen note, it indicated contact between state and federal authorities regarding the Creighton murder investigation. The report read as follows:

In reference to the captioned investigation four individuals have been identified as being involved in the captioned murder. Three of the suspects, Kevin Scott, Keith Scott and Kevin Anthony Miller have since been arrested and are currently being held without bail at C.B.l.F.

The Fourth suspect, Victor Gloria is currently in Federal custody and is being held in reference to a 1996 triple Homicide that occurred on the Baltimore Washington Parkway. Per the U.S. Attorney's office Victor Gloria had plead guilty and is slatted [sic] to testify against his co-defendants, Willis Haymes [sic] and Dustin Higgs who are reportedly are [sic] close friends with the Scott brothers and Kevin Miller.

Your Investigator will note that when the Scott brothers and Kevin Miller were interviewed at the Homicide office all three implicated Victor Gloria stating that Gloria was the only person who had engaged the victim in physical altercation. All three stated that Victor Glory [sic] punched the victim once in the face or neck. All three stated that Victor Gloria was not armed with any type of knife or weapon when they witnessed the altercation.

The Scott brothers along with Kevin Miller stated that after Victor Gloria punched the victim he immediately ran from the area. Your Investigator will note further and in reference the statements of the Kevin Miller and the Scott brothers. Your Investigator noticed that their statements are very similar in nature and appeared to have been rehearsed.
*7 This assumption was supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with Murder.

The U.S. Attorney's Office was advised by A.S.A Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria In the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes [sic] and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed [sic] to testify against Hymes [sic] and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria,

Your Investigators along A.S.A Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators

support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

In addition A.S.A Cohen indicated that if the Scott brothers cooperated and changed their statements and clear up the inconsistencies he wanted to administer a C.V.S.A. examination to verify their new statements. Your investigator ultimately spoke with Detective J.T. Brown and tentatively scheduled the examinations for the 21st of April 1999 and obtained the writs for the same date.

On the 21st of April 1999 your Investigator In concert with Detective John Thanner transported Keith Scott and Kevin Scott from the Baltimore City Detention Center to the Homicide office for re-interview. Once at the Homicide office the Scott brothers were placed in separate interview rooms and advised of their rights. Both refused to waive their rights and staled that their attorney's [sic] told them not to talk to the Police and to stand by their original statements.

Your Investigators explained in detail the circumstances surrounding the re-interview and the need for them to clear up the apparent inconsistent information that they initially provided in their original statements. Both brothers ultimately refused to cooperate and indicated that they were going to stand by their original statements and further refused to submit to a C.V.S.A. examination.

Your Investigators will note that the interview at this point had to be terminated and no new information was gleaned. Your Investigator at this point transported the Scott brothers back to B.C.D.C. and notified A.S.A. Cohen of the aforementioned results.

R.60(d) Mot., Ex. 22 at 1-2, ECF No. 579-1.

**\*8** On June 8, 1999, over a month after Detective Patton wrote his report, the BPD showed Bishop (Creighton's friend who was with him the night of the murder) photographic line-ups. Bishop identified Miller as the person who stabbed the victim. Govt.'s Resp., Ex. 17 at 1, ECF No. 585-17. He did not identify Gloria. Govt.'s Resp., Ex. 18, ECF No. 585-18.

Then, on June 11, 1999, the BPD showed White (who also was Creighton's friend and with him the night of the murder) photographic line-ups of Miller, Gloria and the Scott twins. Govt.'s Resp., Ex. 19 at 1, ECF No. 585-19. White also identified Miller, who he said "looks like the person who stabbed" the victim. R.60(d) Mot., Ex. 6 at 5, ECF No. 579-1. White did not identify Gloria. Govt.'s Resp., Ex. 21 at 1, ECF No. 585-21. White also identified Kevin and Keith Scott as having been present when the murder occurred. Govt.'s Resp., Ex. 20 at 1-2, ECF No. 585-20. When the BPD interviewed White on the night of the murder (about a year before this line-up), he had described the man who had swung at Creighton as having "light skin." But in an interview apparently simultaneous with the line-up, White – at that point 16 years old – described the assailant as having dark skin. R.60(d) Mot., Ex. 6 at 1-3, ECF No. 579-1.

Five days later, the BPD re-interviewed the Scott twins and administered a polygraph examination, which both twins "failed." The BPD file contains a report written by Detective Patton that same day addressed to the commanding officer. It read in part:

On the 16th of June 1999 at 0900 hours and in furtherance of the captioned investigation. Your Investigators obtained the appropriate legal documents and transported Keith and Kevin Scott from the Baltimore City Detention Center to the Homicide office. Your Investigators planed [sic] to initiate a marathon interrogation initiative and administer polygraph examination on both suspects.

Your Investigators will note that the Scott brothers in concert with Kevin Anthony Miller have conspired together and have given statement implicating Victor Gloria. Your Investigators will note that three independent eyewitnesses have since positively identified Kevin Anthony Miller as the individual who stabbed the above victim.

Those same witnesses are shown photographic arrays, which contained photographs of Victor Gloria and are unable to make an identification and in their statements they made no reference to Victor Gloria. Prior to the polygraph examination

**APP-193**

your investigators interviewed the Scott brothers in an effort to determine if there was any changes in their original statements.

Your Investigators ultimately found that both suspects continue to maintain that Victor Gloria was the stabber and was the only person who engaged the victim in altercation. At this point we initiated the polygraph examination starting with Keith Scott. Keith Scott was then moved to the polygraph examination room where Detective J.T. Brown initiated the polygraph examination.

Your Investigators will note that while Keith was taking the polygraph examination your Investigators continued the interrogation of Kevin Scott. After an extensive examination Det. Brown reported that Keith Scott was given the examination a total of three times and ultimately failed all three examinations. At this point, Kevin Scott was then taken to the polygraph examination room and Keith Scott was moved back to the Homicide office.

**\*9** In reference to Kevin Scott he was ultimately given the same number of examinations and also failed each examination. Your Investigators will note that while Kevin Scott was in the polygraph room your Investigators continued the interrogation of Keith Scott and were ultimately unable to rehabilitate him. Kevin Scott was ultimately moved back to the Homicide office where your investigators continued the interrogation that ultimately yielded the same results. Your investigators will note that the entire process encompassed several hours of comprehensive interrogation and interview, which ultimately had negative results. At conclusion the Scott brothers were transported back to B.C.D.C. with their conspiracy intact.

A month or so later, on July 18, 1999, the Scott twins and Miller were indicted on charges of first-degree murder. R.60(d) Mot., Ex. 23 at 1, Ex. 24 at 1, ECF No. 579-1. On August 30, 1999, the Scott twins pleaded guilty to second-degree assault, and were sentenced to time served (about seven months). R.60(d) Mot., Ex. 25 at 1, Ex. 26 at 1, ECF No. 579-1.

Miller pleaded guilty in state court to second-degree murder on October 18, 1999, and received a sentence of twenty years with all but five years suspended. R.60(d) Mot., Ex. 27 at 1, ECF No. 579-1. This five-year sentence was made concurrent to any other sentence, with credit for time served. R.60(d) Mot., Ex. 28 at 1, ECF No. 579-1. Miller was also given three years of probation upon release. *Id.* The judge who sentenced Miller, Judge William Quarles (then a judge for the Circuit Court for Baltimore City and later of the U.S. District Court for the District of Maryland) explained his departure from the state guideline range in the following terms: "[M]uddled factual statement leaves few things clear: someone died and the Def. was involved." *Id.* Miller did not serve his full five-year term; he was released from prison in July 2002, three years and three months after he was first arrested. R.60(d) Mot., Ex. 30 at 1, ECF No. 579.

Nothing in the BPD file indicates that Gloria was ever charged in connection with Creighton's murder, or that BPD investigators spoke with Gloria at any point during their investigation, or that the investigators made any sort of arrangement with the AUSA not to charge Gloria as part of an overall deal to get Gloria to testify against Higgs in the present case.

## II.

### The Pending 60(d) Motion

Based on this allegedly newly discovered evidence, Higgs has filed a Motion for Relief from Final Judgment Pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), and Federal Rule of Civil Procedure 60(d), asking the Court to set aside its decision denying his Motion to Vacate pursuant to § 2255 because of alleged "fraud on the court."[5] R.60(d) Mot., ECF No. 579. He also filed a Renewed Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery. Pet.'s Mot. Disc., ECF No. 580.

[5]     Higgs argues, and the Government does not dispute, that his motion is not barred by the prohibition on "second or successive" § 2255 petitions absent appellate court permission. *See* 28 U.S.C. § 2255(h). In support, he cites the Supreme Court's decision in *Gonzalez v. Crosby*, 545 U.S. 524 (2005), which held

that if a Rule 60(b) motion "attacks... the integrity of the federal habeas proceedings," rather than the outcome of those proceedings, it is not a habeas corpus application and does not require pre-filing authorization. *See id.* at 532. "[F]raud on the federal habeas court," the Supreme Court suggested, would be an example of a defect in the integrity of proceedings. *Gonzalez,* 545 U.S. at 532 n.5; *see also United States v. Williams,* 790 F.3d 1059, 1088 n.11 (10th Cir. 2015) (suggesting ADEPA does not limit court's power to correct fraud on initial habeas court because, in such a case, "the petitioner may not have had a fair opportunity to challenge the merits of his conviction in the first habeas proceeding"). *Gonzalez* specifically limited its discussion to § 2254 cases, and not § 2255 cases such as the one before the court. However, the Fourth Circuit has applied *Gonzalez* to Rule 60 petitions seeking to reopen § 2255 proceedings. *See United States v. McRae,* 793 F.3d 392, 397 (4th Cir. 2015). Given that *Gonzalez* applies to § 2255 in this Circuit, and that Higgs's Motion ostensibly attacks the integrity of the § 2255 proceedings (because he alleges misrepresentation by an officer of the court) the Court agrees with Higgs that his Motion is not barred by the "second or successive" rule.

**\*10** Higgs argues that the Government, through AUSA Johnston, made fraudulent assertions to the Court in its Response in Opposition to his Motion to Vacate regarding the extent of the connection between the federal murder investigation involving Gloria and the BPD's murder investigation. Specifically, Higgs alleges the Government committed fraud on the court by denying that federal officials knew about or had any influence with respect to benefits supposedly conferred on Gloria by the local authorities in Baltimore. R.60(d) Mot. at 2. In other words, Higgs claims, the Government knew his allegation that Gloria avoided murder charges in exchange for his testimony was supported by hard facts, but "made false representations to this Court during the § 2255 litigation in order to prevail." *Id.* at 2-3, 24. Higgs argues the Government's alleged misrepresentations "induced the Court to rule that Higgs's constitutional claim failed," and that it is "difficult to envision the Court making such rulings had it been presented with the arguments and evidence contained in this motion during the pendency of the § 2255." *Id.* at 24.

The Government responds that Higgs has failed to show fraud on the court, Govt.'s Resp. R.60(d) Mot. ("Govt.'s Resp.") at 20-24, ECF No. 585, arguing as follows: The evidence contained in the BPD's investigation file most likely shows the BPD did not charge Gloria because the BPD did not believe he was guilty; consequently Higgs has failed to prove Gloria was not charged for the Creighton murder in consideration of his testimony in the *Higgs/Haynes* murder trial. If Higgs cannot prove there was consideration to Gloria, Higgs also fails to prove that the Government's denial of that consideration during the § 2255 proceedings was in any way false or misleading. And if there is no misrepresentation to the Court by the Government, the Government argues, there was no fraud on the court as Higgs alleges. *See id.* The Government also attacks Higgs for allegedly failing to prove by clear and convincing evidence that the Government employed a "deliberately planned and carefully executed scheme" to defraud the Court. *Id.* at 24-25. Moreover, the Government argues, even if Higgs has proved a deliberate plot to mislead the Court – which the Government vigorously denies – he has not shown that the alleged deception was material to the Court's ruling on his § 2255 Motion. *Id.* at 26.

### III.
### Rule 60(d)

The bar Higgs has set himself in bringing a motion under Federal Rule of Civil Procedure 60(d) is a high one. *See Fox v. Elk Run Coal Co.,* 739 F.3d 131, 136-37 (4th Cir. 2014). Ordinarily when a party believes its opponent has obtained a court ruling by fraud or misrepresentation, it may move for relief under Federal Rule of Civil Procedure 60(b)(3) within one year of the judgment. *See* Fed R. Civ. P. 60(b)(3), (c). This one year limit "balances the competing interests of relieving an aggrieved party from the hardships of an unjustly procured decision against the deep 'respect for the finality of judgments...engrained in our legal system.' " *Fox,* 739 F.3d at 135 (alteration in original) (quoting *Great Coastal Express, Inc. v. Int'l Bhd. of*

*Teamsters*, 675 F.2d 1349, 1354-55 (4th Cir. 1982)). But "as often happens with a rule, there is an exception," *Fox*, 739 F.3d at 135. Accordingly, under Rule 60(d), a court is empowered to "set aside a judgment for fraud on the court" after more than one year has passed. Fed. R. Civ. P. 60(d)(3). However, because fraud on the court is a "nebulous concept" it "should be construed very narrowly" lest it swallow Rule 60(b)(3) entirely. *Fox*, 739 F.3d at 136 (citing *Great Coastal*, 675 F.2d at 1356).

Fraud on the court is therefore "not your garden-variety fraud." *Fox*, 739 F.3d at 135 (internal quotation marks and citations omitted). It is confined to "the most egregious cases," such as "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Great Coastal*, 675 F.2d at 1536; *see also Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) (indicating that fraud on the court involves "corruption of the judicial process itself" (quoting *In re Whitney-Forbes*, 770 F.2d 692, 698 (7th Cir. 1985))). Fraud on the court requires an "intentional plot to deceive the judiciary," and must "touch on the public interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136.

**\*11** The Fourth Circuit has held that a petitioner must also establish that the fraud was material to the disposition of the proceedings he or she wants reopen in order to be entitled to relief. *United States v. MacDonald*, No. 97-7297, 1998 WL 637184, at \*2 (4th Cir. Sept. 8, 1998) ("Our decision in *Great Coastal Express* requires that MacDonald at least establish that the fraud was material and deliberate."); *accord United States v. Estate of Stonehill*, 660 F.3d 415, 454 (9th Cir. 2011) (holding no fraud on the court because "[a]ny misrepresentations or false statements made by government witnesses or attorneys were on largely tangential issues and did not substantially undermine the judicial process by preventing the district court or this court from analyzing the case"); *Apotex Corp. v. Merck & Co.*, 507 F.3d 1357, 1360 (Fed. Cir. 2007) (holding fraud on the court requires "material subversion of the legal process").[6]

[6] That said, at least two Fourth Circuit panels prior to *MacDonald* held that a party seeking relief under Rule 60(b)(3) for fraud, misrepresentation, or misconduct need not show that newly obtained evidence would have altered the outcome of the final judgment. *Shultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994) (holding new evidence need not be "result altering" to entitle the petitioner to relief under Rule 60(b)(3) because the rule "focuses not on erroneous judgments as such, but on judgments which were unfairly procured." (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988))); *Square Const. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68, 72 (4th Cir. 1981) ("Setting aside a judgment under FRCP 60(b)(3) does not require that the material withheld be sufficient to alter the district court's judgment."). In contrast to both these cases, the defendant's motion in *MacDonald* was brought under a previous "savings clause" of Rule 60(b), which contained substantively identical language regarding fraud-on-the-court claims and was incorporated into Rule 60(d) in 2007. *See* Fed. R. Civ. P. 60(b) (1987) (amended 2007) (providing that "[t]his rule does not limit the power of the court...to set aside a judgment for fraud on the court"). Given that *MacDonald* came later in time and decided a motion, like this one, alleging fraud on the court, the Court follows *MacDonald* in holding that the petitioner must show materiality. This also seems more consistent with the strong policy in favor of finality of judgments, and the high bar defendants accordingly must meet to disturb a years-old final judgment under Rule 60(d). *See*, *e.g.*, *United States v. Beggerly*, 524 U.S. 38, 47 (1998) (cautioning that independent actions under Rule 60 should be available "only to prevent a grave miscarriage of justice"); *Great Coastal*, 675 F.2d at 1355 ("Respect for the finality of judgments is deeply engrained in our legal system."); *Fox*, 739 F.3d at 136-

37 (noting that proving fraud on the court presents a very high bar for any litigant).

Lastly, to prevail on a Rule 60(d) motion, the petitioner must prove fraud on the court by "clear and convincing evidence." *See United States v. MacDonald, No. 97-7297, 1998 WL 637184, at *2 (4th Cir. Sept. 8, 1998)* (citing *Square Const. Co. v. Wash. Metro. Area Transit Auth., 657 F.2d 68, 71 (4th Cir. 1981)* ("A party seeking relief under [Rule 60(b)(3)] must also prove the misconduct complained of by clear and convincing evidence.")); *Herring v. United States, 424 F.3d 384, 386-87 (3d Cir. 2005)* (requiring fraud on the court to be proven by "clear, unequivocal and convincing evidence" (internal quotation marks and citation omitted)); *see also Booker v. Dugger, 825 F.2d 281, 284 n.4 (11th Cir. 1987)* ("It is clear that the policy of finality of judgments requires the same, if not more stringent, standards [than the Rule 60(b)(3) clear and convincing evidence standard] be applied to independent actions alleging fraud on the court which are brought after the one year limit has run.")).

## IV.

**\*12** In the case at bar, the Court finds that Higgs has failed to prove by clear and convincing evidence, first, that the Government in any sense committed fraud on the court by denying that Gloria received consideration from Baltimore city prosecutors in the Creighton murder case; and second, that the Government engaged in an intentional plot to deceive the Court during § 2255 proceedings; and third, even assuming the factual accuracy of Higgs's allegations, he has failed to establish that evidence of benefits to Gloria beyond those already disclosed to the defense would have made a material difference to the outcome of § 2255 proceedings.

### A. The Government's Alleged Fraud

Higgs grounds his claim of fraud on the court in certain assertions the Government made during the § 2255 proceedings. Specifically, he argues, the Government denied the existence of any consideration flowing to Gloria in the Creighton murder investigation in exchange for Gloria's cooperation in the Higgs and Haynes trials, despite knowing that in fact such consideration existed.

To support his claim, Higgs relies primarily on two documents in the BPD's investigative file that supposedly demonstrate direct, two-way communication between Baltimore authorities and AUSA Johnston regarding the Creighton murder. Thus, he points to a phone-message note dated April 12, 1999 from Baltimore City ASA Cohen and likely to Detective Robert Patton, in which Cohen explains that he spoke to Johnston about Gloria, and that she suggested the Scott twins might be falsely implicating Gloria. According to the message note, Johnston then suggested that Baltimore authorities should talk to the Park Police and FBI because they "could give us background on the case." R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1. Cohen then wrote that "[a]fter we talk to these officers, we will decide on the next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case." *Id.* Higgs submits that it is hard to imagine what "background" the Government could have provided to state authorities that would have aided them in their deliberations, and that the "only logical conclusion" is that the "background" must have consisted of the Government informing state authorities that Gloria was a vital witness in the Higgs prosecution and that, on that basis, this information influenced state authorities. Pet.'s Repl. Br. at 2.

Higgs argues that Detective Patton's April 21, 1999 investigation report shows that the BPD embraced AUSA Johnson's version of events, further proving that federal intervention had a direct impact on Gloria not being charged. Patton wrote that:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott Brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during [the] course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes [sic] and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and plan[n]ed to testify against Hymes [sic] and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1, and added that "[y]our Investigators along with A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption." *Id.* Higgs also notes that, according to Patton's report, AUSA Johnston told Baltimore authorities that Gloria was due to testify against Higgs and Haynes, despite Johnston apparently telling Cohen nine days earlier that she could not reveal whether Gloria would testify, as his guilty plea was under seal.

**\*13** Higgs suggests that considering this evidence in light of other facts –namely the Scott twins' and Miller's testimony that Gloria fought with Creighton; the testimony of Clarence White, Creighton's friend, from the night of the murder that a "light skinned" man swung at Creighton, causing him to grab his neck and leaving him badly bleeding; Gloria's previous involvement in violent criminal activity; and the various notes indicating police contact with Park Police and FBI and interest in the *Higgs/Haynes* murders – the "only plausible explanation" for the BPD's apparent failure to charge or even interview Gloria in connection with the Creighton murder was that the BPD "did not want to disrupt their federal colleague's prosecution of a capital triple homicide." Pet.'s Repl. Br. at 4. Since the evidence shows Gloria received lenient treatment in the Creighton case because of his cooperation in the Higgs case, Higgs argues, the Government's denial of that lenient treatment during § 2255 proceedings constituted fraud on the court.

The Government responds that Higgs has failed to establish any false statements by AUSA Johnston during § 2255 proceedings. Govt.'s Resp. at 25. In the Government's view, the BPD files show that local authorities conducted a thorough, independent investigation of the Creighton homicide, and decided not to charge Gloria not in response to a federal request, but based on their own independent review of the evidence. *Id.* at 20. Since the files fail to show Gloria was spared murder charges because of his cooperation, the Government's denial of lenient treatment during § 2255 proceedings was not a false statement. *Id.* at 24.

As noted, to prevail on his 60(d) Motion, Higgs must prove by clear and convincing evidence that the Government's § 2255 response to this Court fraudulently denied the fact that Baltimore authorities decided not to charge Gloria at the behest of the federal prosecutors. He has not done so. On the contrary, it is far more likely, as the Government has it, that throughout its investigation the BPD suspected Miller, not Gloria, was Creighton's killer, and that the Baltimore City State's Attorney's Office ultimately chose not to prosecute Gloria because of the lack of evidence that he was involved, especially in the face of strong evidence pointing to Miller. *See United States v. Antone*, 742 F.3d 151, 159 (4th Cir. 2014) (holding that "clear and convincing" evidence must render factual determination "highly probable" and produce a "firm belief or conviction" as to the truth of the allegations being sought to be established).

Again, before Baltimore authorities discussed the case with AUSA Johnston, three eyewitnesses with no obvious motive to lie to police independently identified Miller as the likely murderer (two doing so by name), and all three suggested Gloria was not even involved in the altercation. On July 19, 1998, one day after the murder, Creighton's friend Bishop told police that three men[7] were involved in the fracas, a "dark skinned man" (a description consistent with Miller and inconsistent with Gloria) and two men who "looked like brothers." R.60(d) Mot., Ex. 7 at 3, ECF No. 579-1. Bishop also described how the dark-skinned man struck Creighton and "cut him with something in his neck." *Id.* at 2. Just over a month later, Barbara Bailey claimed Gloria had run off before the fight, and described how she then saw Miller punch Creighton leaving him with blood all over his shirt. Less than a month after that, Charnetta Bailey gave a similar account: Gloria ran off before the fight; Miller struck Creighton; and Creighton had blood on his neck.[8] Then, in March 1999, the police showed Charnetta Bailey photographs of Gloria and Miller, and she reportedly "without hesitation" identified Miller as being involved in the homicide, and failed to identify Gloria at all. Govt.'s Resp., Ex. 13 at 1, ECF No. 585-13. All these interviews took place before April 12, 1999 – the first recorded date of any contact between Baltimore authorities and AUSA Johnston. In marked contrast, the only eyewitness, besides the Scott twins and Miller, whose testimony pointed to Gloria being the murderer was Clarence White, a fifteen-year-old who later gave a conflicting account of the evening. The weight of evidence implicating Miller and exonerating Gloria to this point unquestionably supports the Government's position that the reason Gloria was not charged was because police concluded he was not involved.

[7]     It is also worth noting that the first officer report on the homicide, dated July 18, 1998, reported that the victim "had been engaged in a[n] argument and altercation with *three* unidentified black males." R.60(d) Mot., Ex. 2, ECF No. 579-1. Later testimony indicating Gloria fled before the fight is consistent with this initial report; quite possibly, then, this would have made the BPD more inclined to believe the fight involved Miller, the Scott twins, and Creighton (the Baileys', Bishop's and

White's version) and not Gloria, Miller, the Scott twins, and Creighton (the Scotts' and Miller's story).

[8]        Higgs casts doubt on the Baileys' version of events, noting that they both told police they were walking away when the fight started. According to Higgs, the most straightforward interpretation of the Bailey sisters' statements is that they had their backs turned when Gloria stabbed Creighton, and only turned around in time to see Gloria run away. Pet's Repl. Br. at 9. That may be so, but it is beside the point. The Court's inquiry is not to determine Gloria's actual guilt or innocence, but instead whether the evidence tends to show that the BPD came to their own independent conclusion not to charge Gloria at the time. Both sisters told police that Gloria ran off before the fight, and that Miller struck Creighton. Whether what they said is actually true does not change the fact that police had independent testimony that Gloria had absented himself and Miller struck Creighton and made him bleed. That supports the Government's argument that the BPD's decision not to charge Gloria was based on their own review of the evidence.

**\*14** Beyond this, it is clear that BPD had reason to doubt the reliability of the suspects' stories independent of the AUSA's input. Miller told Patton during his April 7, 1999 interview that the Scott twins had asked him for money and to be a witness for them, that he discussed the Creighton murder with both Scotts over the phone, that he knew what they had told police through the Scotts' girlfriends, and that he had received a letter from them while they were incarcerated about events the night of the Creighton murder.[9] Knowing this, the BPD had independent reason to doubt the accuracy and reliability of these statements[10] in comparison to the independent statements implicating Miller, again making it more likely that the decision not to charge Gloria was based not on federal intervention, but on the Baltimore authorities' own assessment of strength of the evidence in their case.

[9]        Admittedly, Miller equivocated on some of these facts, sometimes in the same breath. *See* R.60(d) Mot., Ex. 12 at 15-17, ECF No. 579-1.

[10]        Indeed, in his April 12, 1999 Report, Detective Patton notes that his "assumption" that the suspects' statements were rehearsed was "supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with murder." R.60(d) Mot., Ex. 22 at 1, ECF No. 579-1.

The reasonable inference from all the foregoing is that AUSA Johnston's suggestion of collusion among the Scott twins and Miller with regard to their statements merely helped solidify the BPD in their own theory of the case, rather than amounting to federal pressure that changed the course of the Creighton murder probe. Patton's own words in his April 1999 Report say it all: professing his belief that Johnston was "on track with [her] assumption" about the Creighton suspects, Patton told his superiors that his conclusion was supported by "information that Victor Gloria ran from the scene prior to the stabbing" and eyewitnesses who "identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation."[11] R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1. In short, the BPD appears to have had a strong intimation that Miller was the murderer, that Gloria was not involved, and that the Scott twins and Miller were lying.[12]

[11]     It is not entirely clear to the Court whom exactly Detective Patton is referring to when he speaks of "eyewitnesses" who identified Miller as the stabber from a photo line-up. As far as the record shows, at that point only one person (Charnetta Bailey) had identified Miller from a photo as involved in the homicide. This does not diminish the point, however, that at the time AUSA Johnston discussed the case with the Baltimore authorities, detectives already appeared to have a strong inclination that Miller, and not Gloria, was the murderer.

[12]     It seems highly doubtful that AUSA Johnston would have known through the course of the *Higgs/Haynes* investigation that Haynes and Higgs knew the Scott twins and Miller and therefore was able to deduce the Scotts and Miller were conspiring against Gloria on behalf of Haynes/Higgs. There is no indication the Scott twins or Miller were in any way connected to the *Higgs/Haynes* murders, and if Haynes or Higgs were behind that scheme they probably would not say so. As Higgs suggests, then, it seems plausible the AUSA's knowledge of the friendship and theory of the conspiracy came from her questioning Gloria himself about the Creighton murder. But just because the information may have come from Gloria, does not by itself suggest – let alone prove – that the AUSA's divulging it to state authorities was in some way an attempt to pressure them into dropping charges against Gloria, much less that it had such effect.

**\*15** But there is more. Higgs's claim that the Baltimore authorities failed to charge Gloria so as not to upset the federal murder trial is further undermined by evidence that emerged subsequent to the Baltimore authorities' conversations with AUSA Johnston that strongly links Miller with the murder and casts further doubt on Gloria's involvement. On June 8, 1999, the police conducted a photographic line-up with Bishop, Creighton's friend, who had previously told police the day after the murder that Creighton was cut on the neck by a dark-skinned man. Bishop picked out Miller's photo from the six-man array and identified him as the person who stabbed Creighton, but failed to pick out Gloria from a separate array. Three days later, on June 11, Clarence White told detective Patton that three men were involved in the altercation with Creighton, and that the "brown skinned guy" stabbed him. R.60(d) Mot., Ex. 6 at 2-3, ECF No. 579-1. White also identified Miller from a photo line-up as looking like the person who stabbed Creighton, identified the Scott twins as both being present when the stabbing occurred, and failed to pick out Gloria from a line-up. Moreover, the fact that the Scott twins were later interviewed and both "failed" polygraph tests while maintaining their story implicating Gloria supports the Government's assertions that BPD independently chose to discount their version of events.

Higgs's claims of a quid pro quo between the Baltimore and federal authorities is further undermined by evidence that the BPD continued to treat Gloria as a suspect in the Creighton murder even after discussing the case with AUSA Johnston and even after learning he was to testify in the *Higgs/Haynes* trial. As the Government points out, ASA Cohen was still contemplating charging Gloria at that point, noting in his phone message that "[a]fter we talk to these officers, we will decide on next course of action, *that is, either writ Gloria + charge him or talk to his lawyer about the case*." R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1 (emphasis added). Then, too, in his April 21, 1999 investigation report, Detective Patton tells his superiors what efforts he planned to take to "finally discern who of the *four* listed suspects actually stabbed the victim," R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1 (emphasis added). These statements suggest that the BPD still intended to treat Gloria as a suspect after speaking to the federal prosecutors, and that Baltimore authorities would make their own decision on the matter. What happened subsequently bears this out. In the months after Patton's April 1999 report, the BPD exposed both Bishop and White to photo line-ups containing Gloria's photo. It seems quite improbable that the BPD would go to that effort if it had by that point discarded Gloria as a suspect because of his acknowledged role in the federal case as Higgs claims.

**APP-200**

Higgs offers no explanation for this. In Detective Patton's follow-up report after re-interviewing the Scott twins, dated June 16, 1999, he continued to list Gloria as a suspect in the murder. Patton Rep. 2, Govt.'s Resp., Ex. 22 at 1, ECF No. 585-22.

Patton's June 16, 1999 Report reflects well the BPD's assessment of the case vis-à -vis Gloria weeks before the Scott twins and Miller were indicted for first-degree murder. Patton wrote that:

> Your Investigators will note that the Scott brothers in concert with Kevin Anthony Miller have conspired together and have given statement[s] implicating Victor Gloria. Your Investigators will note that three independent eyewitnesses have since positively identified Kevin Anthony Miller as the individual who stabbed the above victim.

> Those same witnesses are shown photographic arrays, which contained photographs of Victor Gloria and are unable to make an identification and in their statements that make no reference to Victor Gloria.

*Id.* at 2. Once more, the report shows Patton discounting Gloria as a suspect because of the lack of evidence linking him to the murder, in sharp contrast to the relatively strong eyewitness evidence implicating Miller. Patton appeared unwilling to believe the Scotts' and Miller's story implicating Gloria, finding it self-serving and inherently suspicious, and in conflict with eyewitness testimony, all of which pointed to Miller striking Creighton and none of which unambiguously put Gloria at the scene during the fight. Patton had a particular reason to disbelieve their testimony because they had just "failed" a lie-detector test.

**\*16** Higgs's argument suffers from other deficiencies as well. He does not sufficiently explain why state officials would have agreed to allow a murderer, which Higgs implies Gloria was, to escape prosecution and return to the streets just so the federal government could prosecute another set of defendants in an apparently unrelated case that did not take place in Baltimore. Higgs's response that the difficulty of the Creighton investigation somehow explains the BPD's willingness to help federal counterparts cuts no ice. Further, there is no evidence in the record showing federal authorities requested, urged, or even knew of the alleged lenient treatment of Gloria by Baltimore authorities. Higgs simply asks the Court to infer this from an alleged follow-up phone call in which state authorities purportedly sought "background" on the federal case at AUSA Johnston's suggestion.[13] This is clearly insufficient to sustain the high burden of proof required to grant a Rule 60(d) motion. *See, e.g.*, *Apotex*, 507 F.3d at 1360-61 ("[Fraud-on-the-court] requires rigorous proof, as do other challenges to final judgment, lest the finality established by Rule 60(b) be overwhelmed by continuing attacks on the judgment.").

[13]     Recall that ASA Cohen's note contained names and phone numbers for the FBI and U.S. Park Police, along with instructions that its recipient call them for "background on the case" before deciding whether to charge Gloria. There is no direct evidence in the record, however, that anyone made these calls.

The Court has no trouble concluding that Higgs has failed to meet his "very high bar" of showing by clear and convincing evidence that Gloria received leniency in the Creighton case in exchange for his testimony in the federal trial. *See Fox*, 739 F.3d at 136-37; *see also Herring*, 424 F.3d at 390 (employing a "demanding standard" for independent actions alleging fraud on the court). There was no fraud on the Court during § 2255 proceedings.[14]

[14]     Furthermore, to the extent Higgs claims the Government intentionally deceived the court, his claims necessarily fail because, as the Court finds, he has failed to establish that any statement by the Government in connection with § 2255 proceedings was deceitful or fraudulent. See *Great Coastal, 675 F.2d at 1356* (holding that petitioner must prove "deliberately planned and carefully executed scheme to defraud" the court (quoting *Hazel-Atlas Glass, 322 U.S. at 245-46*)); *see also Fox 739 F.3d at 136* (holding fraud on the court requires "an intentional plot to deceive the judiciary").

It is therefore unnecessary to discuss at length the issue of materiality of the Government's supposed fraud. If there was no

fraud, as the Court finds here, materiality is a moot point. Suffice it to here reiterate what the Court said when ruling on Higgs's § 2255 Motion:

> Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. ***In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict***.

*Higgs III*, 711 F. Supp. 2d at 508 (emphasis added).

## V.

### Higgs's Discovery Motion

In company with his Rule 60(d) Motion, Higgs asks the Court to order the Government to turn over all evidence in its possession relating to the Baltimore authorities' investigation of Creighton's murder, and grant a discovery request the Court previously denied. *See* Pet.'s Mot. Disc. at 2-4, ECF. No. 580. Although he does not clearly articulate whether he seeks discovery to supplement the record in relation to his Rule 60(d) Motion, or proceeds under the assumption that the Court will revisit his § 2255 claim, either way, the Court declines to grant the request.

**\*17** Rule 60(d) has no discovery provision, and Higgs offers no cases, and the Court has found none from this circuit, to support his request for such discovery. The First Circuit in *Pearson v. First NH Mortg. Corp.* has held that courts may consider such a request in the Rule 60(d) context and exercise its discretion to permit discovery "once the record evidence demonstrates a 'colorable' claim of fraud [on the court]." *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 35 (1st Cir. 1999). And a "colorable" claim has been defined as one "appearing to be true, valid, or right." *Bowie v. Maddox*, 677 F.Supp.2d 276, 285 (D.D.C. 2010) (applying *Pearson* to reject discovery request in context of fraud-on-the-court motion because plaintiff presented only "bare allegations and evidence that points to the mere possibility of fraud on the court" and nothing that "makes his claim appear to be true").

The Sixth Circuit in *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.* has held that a litigant seeking discovery to prove fraud-on-the-court claims must first "present some proof to establish" its charges. 536 F.2d 1115, 1122 (6th Cir. 1976); *see also Jones v. Ill. Central R.R. Co.* 617 F.3d 843, 853 (6th Cir. 2010) (holding, with minimal analysis, that under *H.K. Porter* a district court entertaining a discovery request under Rule 60(d) may "require the moving party to make some evidentiary showing of fraud before granting post-trial discovery or an evidentiary hearing"). The court stressed that "a request for discovery for the purpose of attacking a final judgment involves considerations not present in pursuing discovery in a pending action prior to a judgment," chief among them "the public interest of the judiciary in protecting the finality of judgments." *H.K. Porter Co.*, 536 F.2d at 1118. District courts applying *H.K. Porter* have required a prima facie showing of likely success on the merits of the fraud-on-the-court claim before permitting post-judgment discovery. *See Signtech USA, Ltd. v. Vutek, Inc.*, No. CIVASA-95-CA-0226NN, 1999 WL 33290625, at \*2-3 (W.D. Tex. Aug. 9, 1999); *accord Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 646 (N.D. Cal. 1978) ("The question then is whether [the] evidence demonstrates fraud on the court.") *aff'd*, 645 F.2d 699 (9th Cir. 1981)).[15]

[15] The only case the Court could find in which a district court has permitted discovery in connection with fraud-on-the-court allegations is *Whitmore v. Symons Intern. Grp., Inc.*, No. 1:09–cv–0391, 2011 WL 806624 (S.D. Ind. March 1, 2011). There, a creditor had obtained a $34 million judgment against its debtor, but prior to execution, a third party sued the same debtor for allegedly defaulting on $316 million worth of notes. *Id.* at \*1. The debtor consented to a judgment on the entire

$316 million before the original $34 million order became executable, and the second creditor thereby took priority over the first. *Id.* The original creditor intervened alleging fraud on the court in the form of collusion between the debtor and the third party. *Id.* Finding the debtor's failure to contest "highly unusual" in light of the high amount of the award and the debtor's historical litigiousness, and noting circumstantial evidence that the parties may not be adverse, the court (albeit with little discussion) found the evidence demonstrated a colorable claim of fraud sufficient to warrant post-judgment discovery. *Id.* at *2. Higgs's case differs from *Whitmore* not only because Higgs has, unlike the petitioner in that case, already obtained considerable evidence to support his motion, but also because the evidence he does present does not (for all the reasons explained above) rise to the same level of suspicion as the defendant's failure to contest did in *Whitmore*.

**\*18** But the Court need not adopt one standard or the other for the purposes of Higgs's motion. Under either *Pearson*'s "colorable claim" standard or *H.K. Porter*'s prima facie standard, Higgs has failed to proffer sufficient evidence to support his discovery request.

Alternatively, assuming as the Government does, that Higgs seeks discovery on the condition that his § 2255 Motion is reopened and the Court's judgment set aside, his request would be denied. Since the Court has found no basis to reopen § 2255 proceedings, there is no occasion for discovery.

## VI.

### Conclusion

For the reasons stated above, Higgs's Motion for Relief from Final Judgment Pursuant to *Hazel-Atlas Glass Co.* and Federal Rule of Civil Procedure 60(d) is **DENIED**. Higgs's Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery is also **DENIED**.

A separate Order will **ISSUE.**

**All Citations**

Slip Copy, 2016 WL 3541387

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

FILED: June 27, 2016

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 16-8**
**(8:98-cr-00520-PJM-2)**

———————————

In re: DUSTIN JOHN HIGGS

     Movant.

———————————

O R D E R

———————————

Dustin John Higgs has filed a motion pursuant to 28 U.S.C. §§ 2244(b), 2255(h) (2012) for authorization to file a second or successive 28 U.S.C. § 2255 (2012) motion.  Higgs argued that the new rule of constitutional law announced in Johnson v. United States, 135 S. Ct. 2551 (2015), and held to apply retroactively to cases on collateral review by Welch v. United States, 136 S. Ct. 1257 (2016), should apply to his case.  See In re Hubbard, ___ F.3d ___, No. 15-276, 2016 WL 3181417 (4th Cir. June 8, 2016).

Upon review of submissions relative to the motion for

**APP-204**

authorization for Higgs to file a second or successive § 2255 motion, the court denies the motion.

Judge Shedd and Judge Keenan voted to deny the motion. Chief Judge Traxler voted to grant the motion.


For the Court

/s/ Patricia S. Connor, Clerk

**APP-205**

FILED: July 25, 2016

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

No. 16-9516
(8:98-cr-00520-PJM-1)

───────────

In re: WILLIS MARK HAYNES,

　　　　　　Movant.

───────────

O R D E R

───────────

Willis Mark Haynes has filed a motion pursuant to 28 U.S.C. §§ 2244, 2255(h) (2012) for authorization to file a second or successive 28 U.S.C. § 2255 (2012) motion.  Haynes has made a prima facie showing that the new rule of constitutional law announced in Johnson v. United States, 135 S. Ct. 2551 (2015), and held to apply retroactively to cases on collateral review by Welch v. United States, 136 S. Ct. 1257 (2016), may apply to his case.  See In re Hubbard, __ F.3d __, No. 15-276, 2016 WL 3181417 (4th Cir. June 8, 2016).  We grant authorization for Haynes to file a second or successive § 2255 motion, thus permitting consideration of the motion by the district court in the first instance.  We express no view as to the timeliness of a § 2255 motion filed pursuant to this grant of authorization.

**APP-206**

Entered at the direction of the panel:   Judge Wilkinson, Judge King, and Judge Harris.

For the Court

/s/ Patricia S. Connor, Clerk

**APP-207**

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**
1100 East Main Street, Suite 501, Richmond, Virginia 23219

July 25, 2016

_____

NOTICE OF AUTHORIZATION
_____

No. 16-9516,   <u>In re: Willis Haynes</u>
8:98-cr-00520-PJM-1

TO: Parties and Counsel

The court has authorized a successive application for post-conviction relief in this case.

In accordance with Local Rule 22(d), the post-conviction application attached to the motion for authorization is being transferred to the district court with the order granting authorization. Any proposed amendment to the post-conviction application should be filed in the district court rather than in the court of appeals.

Karen Stump, Deputy Clerk

**APP-208**